# EXHIBIT 1

Private & Confidential

**THE ENTITIES LISTED IN SCHEDULE 1**
**as Borrowers**

**and**

**CITIBANK, N.A., LONDON BRANCH**
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Arrangers**

**with**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Agent**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Security Agent**

**guaranteed by**
**ELETSON GAS LLC**

---

**FACILITIES AGREEMENT**
**Loan Facilities of up to $254,179,500**

---

NORTON ROSE FULBRIGHT

## Contents

| Clause | Page |
|---|---|
| SECTION 1 - INTERPRETATION | 1 |
| 1    Definitions and interpretation | 1 |
| SECTION 2 - THE FACILITY | 26 |
| 2    The Facilities | 26 |
| 3    Purpose | 28 |
| 4    Conditions of Utilisation | 29 |
| SECTION 3 - UTILISATION | 31 |
| 5    Utilisation | 31 |
| SECTION 4 - REPAYMENT, PREPAYMENT AND CANCELLATION | 35 |
| 6    Repayment | 35 |
| 7    Illegality, prepayment and cancellation | 37 |
| SECTION 5 - COSTS OF UTILISATION | 42 |
| 8    Interest | 42 |
| 9    Interest Periods | 42 |
| 10    Changes to the calculation of interest | 43 |
| 11    Fees | 44 |
| SECTION 6 - ADDITIONAL PAYMENT OBLIGATIONS | 46 |
| 12    Tax gross-up and indemnities | 46 |
| 13    Increased Costs | 49 |
| 14    Other indemnities | 50 |
| 15    Mitigation by the Lenders | 53 |
| 16    Costs and expenses | 54 |
| SECTION 7 - GUARANTEE | 55 |
| 17    Guarantee and indemnity | 55 |
| SECTION 8 - REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT | 58 |
| 18    Representations | 58 |
| 19    Information undertakings | 64 |

20    Financial covenants ............................................................................................. 68

21    General undertakings ........................................................................................... 71

22    Dealings with Ships .............................................................................................. 76

23    Condition and operation of Ships ........................................................................ 80

24    Insurance ............................................................................................................. 84

25    Minimum security value ....................................................................................... 87

26    Chartering undertakings ...................................................................................... 90

27    Bank accounts ..................................................................................................... 90

28    Business restrictions ............................................................................................ 92

29    Events of Default ................................................................................................. 95

SECTION 9 - CHANGES TO PARTIES .......................................................................... 100

30    Changes to the Lenders ..................................................................................... 100

31    Changes to the Obligors/Restriction on Debt Purchase Transactions ............... 103

SECTION 10 - THE FINANCE PARTIES ........................................................................ 106

32    Roles of Agent, Security Agent and Arranger ................................................... 106

33    Conduct of business by the Finance Parties ..................................................... 125

34    Sharing among the Finance Parties ................................................................... 126

SECTION 11 - ADMINISTRATION .................................................................................. 128

35    Payment mechanics ........................................................................................... 128

36    Set-off ................................................................................................................ 131

37    Notices ............................................................................................................... 131

38    Calculations and certificates .............................................................................. 133

39    Partial invalidity .................................................................................................. 134

40    Remedies and waivers ....................................................................................... 134

41    Amendments and grant of waivers ..................................................................... 134

42    Counterparts ...................................................................................................... 137

43    Confidentiality .................................................................................................... 137

SECTION 12 - GOVERNING LAW AND ENFORCEMENT ............................................. 140

44    Governing law .................................................................................................... 140

45      Enforcement ................................................................................................................... 140

Schedule 1 The original parties ........................................................................................... 141

Schedule 2 Ship information................................................................................................ 146

Schedule 3 Conditions precedent........................................................................................ 153

Schedule 4 Utilisation Request............................................................................................ 160

Schedule 5 Selection Notice................................................................................................ 161

Schedule 6 Form of Transfer Certificate.............................................................................. 162

Schedule 7 Form of Compliance Certificate ....................................................................... 164

Schedule 8 Forms of Notifiable Debt Purchase Transaction Notice ................................... 165

**THIS AGREEMENT** is dated 24 June 2014, and made between:

(1) **THE ENTITIES** listed in Schedule 1 (*The original parties*) as borrowers (the **Borrowers**);

(2) **ELETSON GAS LLC** (the **Guarantor**);

(3) **CITIBANK, N.A., LONDON BRANCH** and **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as mandated lead arrangers and bookrunners (whether acting individually or together the **Arrangers**);

(4) **THE FINANCIAL INSTITUTIONS** listed in Schedule 1 (*The original parties*) as lenders (the **Original Lenders**);

(5) **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as agent for the other Finance Parties (the **Agent**); and

(6) **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as security agent for the other Finance Parties (the **Security Agent**).

**IT IS AGREED** as follows:

## SECTION 1 - INTERPRETATION

**1      Definitions and interpretation**

**1.1      Definitions**

In this Agreement and (unless otherwise defined in the relevant Finance Document) the other Finance Documents:

**Acceptable Bank** means:

(a) a bank or financial institution which has a rating for its long-term unsecured and non credit-enhanced debt obligations of "A-" or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or "Baa1" or higher by Moody's Investor Services Limited or a comparable rating from an internationally recognised credit rating agency; or

(b) any other bank or financial institution approved by the Majority Lenders,

and which is approved by the Borrowers.

**Account** means any bank account, deposit or certificate of deposit opened, made or established in accordance with clause 27 (*Bank accounts*).

**Account Bank** means, in relation to any Account, any one of Skandinaviska Enskilda Banken AB (publ), acting through its offices at Skandinaviska Enskilda Banken AB (publ), acting through its offices at 8, Kungsträgårdsgatan, 111 47 Stockholm, Sweden or Citibank International plc, acting through its branch at 47-49 Akti Miaouli, 185 36 Piraeus, Greece, or another bank or financial institution approved by the Lenders at the request of the Borrowers (but always subject to the provisions of clause 27.2 (*Other provisions*) regarding any new Accounts).

**Account Holder(s)** means, in relation to any Account, the Obligor(s) in whose name(s) that Account is held.

**Account Security** means, in relation to an Account, a deed or other instrument by the relevant Account Holder(s) in favour of the Security Agent and/or the other Finance Parties in an agreed form conferring a Security Interest over that Account.

**Accounting Reference Date** means 31 December or such other date as may be approved by the Majority Lenders.

**Advance** means each borrowing of a proportion of the Total Commitments by the Borrowers at any relevant time (and, in relation to a Ship, such borrowing as has been or is to be drawn in connection with that Ship under either Facility) or (as the context may require) the outstanding principal amount of such borrowing (and it includes the Pre-Delivery Advances and the Delivery Advances).

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

**Agent** includes any person who may be appointed as such under clause 32.12 (*Resignation of the Agent*).

**Approved Brokers** means each of H. Clarkson and Company Ltd (London), E.A., Gibson Shipbrokers Limited (London), Fearnleys AS (London), Braemar Seascope Limited (London), Joachim Grieg & Co. (London) and Inge Steensland S.A. (Oslo) or any other independent firm of shipbrokers agreed in writing from time to time between the Borrowers and the Agent (acting on the instructions of the Majority Lenders).

**Approved Exchange** means NASDAQ or NYSE in the U.S.A., any stock exchange in Singapore or Norway, any stock exchange in any of the United Kingdom or Greece or any other reputable stock exchange agreed by the Guarantor and the Majority Lenders.

**Auditors** means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche or another approved firm.

**Available Commitment** means, in relation to a Facility, a Lender's Commitment minus:

(a)    the amount of its participation in any outstanding Advances under that Facility; and

(b)    in relation to any proposed Utilisation, the amount of its participation in any Advances that are due to be made under that Facility on or before the proposed Utilisation Date.

**Available Facility** means, in relation to a Facility, the aggregate for the time being of each Lender's Available Commitment in respect of that Facility.

**Balloon Instalment** in respect of a Delivery Advance, shall have the meaning given to it in clause 6.2 (*Scheduled repayment of Facilities*).

**Basel II Accord** means the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 as updated prior to, and in the form existing on, the date of this Agreement, excluding any amendment thereto arising out of the Basel III Accord.

**Basel II Approach** means, in relation to any Finance Party, either the Standardised Approach or the relevant Internal Ratings Based Approach (each as defined in the Basel II Accord) adopted by that Finance Party (or any of its Affiliates) for the purposes of implementing or complying with the Basel II Accord.

**Basel II Regulation** means:

(c)    any law or regulation implementing the Basel II Accord; or

(d)    any Basel II Approach adopted by a Finance Party or any of its Affiliates,

but excludes any law or regulation implementing the Basel III Accord save and to the extent that it is a re-enactment of any law or regulation referred to in paragraph (a) of this definition.

**Basel III Accord** means, together:

(a)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(b)     the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement - Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(c)     any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

**Basel III Increased Cost** means an Increased Cost which is attributable to the implementation or application of or compliance with any Basel III Regulation (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates).

**Basel III Regulation** means any law or regulation implementing the Basel III Accord save and to the extent that it re-enacts a Basel II Regulation.

**Blackstone** means BTO Eletson Holding LP, an exempted limited partnership formed under the laws of the Cayman Islands, of c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

**Blackstone Family 1** means Blackstone Family Tactical Opportunities Investment Partnership (Cayman) ESC L.P., an exempted limited partnership formed under the laws of the Cayman Islands of Intertrust Corporate Services (Cayman) Limited, 290 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

**Blackstone Family 2** means Blackstone Family Tactical Opportunities Investment Partnership (Cayman) SMD L.P., an exempted limited partnership formed under the laws of the Cayman Islands of Intertrust Corporate Services (Cayman) Limited, 290 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

**Break Costs** means the amount (if any) by which:

(a)     the interest which a Lender should have received for the period from the date of receipt of all or any part of its participation in the Loan or Unpaid Sum to the last day of the current Interest Period in respect of the Loan or Unpaid Sum), had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

**Builder** means, in relation to a Ship, the person specified as such in Schedule 2 (*Ship information*).

**Building Contract** means, in relation to a Ship, the shipbuilding contract specified in Schedule 2 (*Ship information*) between the relevant Builder and the relevant Owner relating to the construction of such Ship.

**Building Contract Documents** means, in relation to a Ship, the Building Contract for that Ship, any Refund Guarantee for that Ship and any other guarantee or security given to any person for the relevant Builder's obligations under the relevant Building Contract.

**Building Contract Price** means, in relation to a Ship, the purchase price of the Ship payable under the Building Contract for such Ship, being on the date of this Agreement in the amount specified in Schedule 2 (*Ship information*) in respect of the relevant Ship.

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Stockholm, Athens, Paris, Amsterdam and New York.

**Change of Control** occurs if, at any time before and until an IPO is completed:

(a)    any Borrower or the Commercial Manager ceases to be a wholly-owned direct Subsidiary of the Guarantor; or

(b)    less than 50.1% of the issued membership interests of, or less than 50.1% of the issued voting membership interests of, the Guarantor are directly and legally and beneficially owned by the Initial Shareholders; or

(c)    any person or persons acting in concert (other than the Initial Shareholders):

(i)    own legally and beneficially, either directly or indirectly, more than 35% of the issued membership interests of, or more than 35% of the issued voting membership interests of, the Guarantor; or

(ii)    have the right or the ability to control, either directly or indirectly, the affairs or composition of the majority of the board of directors or the board of managers (or equivalent of it) of the Guarantor.

**Charged Property** means all of the assets of the Obligors which from time to time are, or are expressed or intended to be, the subject of the Security Documents.

**Charter** means, in relation to a Ship, any charter commitment in relation to that Ship, which is entered during the Facility Period between the relevant Owner as owner and any person as charterer or counterparty of such Owner thereunder, and which is capable of lasting at least 24 months (without taking into account any options to extend or renew contained therein) and **Charters** means all of them.

**Charter Assignment** means, in relation to a Ship and its Charter Documents, an assignment by the relevant Owner of its interest in such Charter Documents in favour of the Security Agent in the agreed form.

**Charter Documents** means, in relation to a Ship, the Charter (if any) of that Ship, any documents supplementing it and any guarantee or security given by any person for the Charterer's obligations under it.

**Charterer** means, in relation to a Ship and a Charter of that Ship, the charterer or counterparty of the Owner of such Ship under that Charter.

**Chinese Ship** means each of Hull No. S1024 and Hull No. S1025.

**Classification** means, in relation to a Ship, the highest classification available to vessels of this type (being on the date of this Agreement the classification specified in respect of such Ship in Schedule 2 (*Ship information*)) with the relevant Classification Society or another classification approved by the Majority Lenders as its classification, at the request of the relevant Owner.

**Classification Society** means, in relation to a Ship, the classification society specified in respect of such Ship in Schedule 2 (*Ship information*) or another classification society (being a member of

the International Association of Classification Societies (IACS) or, if such association no longer exists, any similar association nominated by the Agent) approved by the Majority Lenders as its Classification Society, at the request of the relevant Owner.

**Code** means the US Internal Revenue Code of 1986.

**Commercial Manager** means, in relation to a Ship, EMC or any other company which is a wholly-owned subsidiary of the Guarantor (subject to such company providing a Manager's Undertaking) appointed in accordance with clause 22.3 (*Manager*) or any other company (subject to such company providing a Manager's Undertaking) which is so appointed and the Agent may, with the authorisation of the Majority Lenders, approve from time to time, in each case as the manager of that Ship in respect of commercial and financial services and includes its successors in title.

**Commitment** means a Pre-Delivery Commitment or a Delivery Commitment.

**Compliance Certificate** means a certificate substantially in the form set out in Schedule 7 (*Form of Compliance Certificate*) or otherwise approved.

**Confidential Information** means all information relating to an Obligor, the Group, the Finance Documents or a Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or a Facility from either:

(a)     any member of the Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of clause 43 (*Confidentiality*); or

(ii)    is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(iii)   is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

**Constitutional Documents** means, in respect of an Obligor, such Obligor's memorandum and articles of association, by-laws or other constitutional documents including as referred to in any certificate relating to an Obligor delivered pursuant to Schedule 3 (*Conditions precedent*) (including any limited liability company agreement or any contribution agreement entered into between (inter alios) the Initial Shareholders in connection with the Guarantor).

**Debt Purchase Transaction** means, in relation to a person, a transaction where such person:

(a)     purchases by way of assignment or transfer;

(b)     enters into any sub-participation in respect of; or

(c)     enters into any other agreement or arrangement having an economic effect substantially similar to a sub-participation in respect of,

any Commitment or amount outstanding under this Agreement.

**Deed of Covenant** means, in relation to a Ship in respect of which the Mortgage is in account current form, a first deed of covenant in respect of such Ship by the relevant Owner in favour of the Security Agent in the agreed form.

**Default** means an Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of them) be an Event of Default.

**Defaulting Lender** means any Lender:

(a)    which has failed to make its participation in the Loan available or has notified the Agent that it will not make its participation in an Advance available by the Utilisation Date of that Advance in accordance with clause 5.4 (*Lenders' participation*);

(b)    which has otherwise rescinded or repudiated a Finance Document; or

(c)    with respect to which an Insolvency Event has occurred and is continuing,

unless, in the case of paragraph (a) above:

(i)    its failure to pay is caused by:

(A)    administrative or technical error; or

(B)    a Payment Disruption Event; and,

payment is made within 3 Business Days of its due date; or

(ii)    the Lender is disputing in good faith whether it is contractually obliged to make the payment in question.

**Delivery** means, in relation to a Ship, the delivery and acceptance of the Ship by the relevant Owner under the relevant Building Contract.

**Delivery Advance** means an Advance made or to be made under the Delivery Facility and, in relation to a Ship, an Advance made or to be made under the Ship Delivery Commitment for that Ship.

**Delivery Commitment** means:

(a)    in relation to an Original Lender, the amount set opposite its name under the heading "Delivery Commitment" in Schedule 1 (*The original parties*) and the amount of any other Delivery Commitment transferred to it under this Agreement; and

(b)    in relation to any other Lender, the amount of any Delivery Commitment transferred to it under this Agreement,

to the extent:

(i)    not cancelled, reduced or transferred by it under this Agreement; and

(ii)    not deemed to be zero pursuant to clauses 31.2.2 to 31.2.5 (*Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates*).

**Delivery Date** means, in relation to a Ship, the date on which its Delivery occurs.

**Delivery Facility** means the post-delivery term loan facility made available under this Agreement as described in clause 2.1(a) (*The Facilities*).

**Delivery Instalment** means, in relation to a Ship, the instalment of the Building Contract Price for such Ship falling due on its Delivery.

**Disposal Repayment Date** means in relation to:

(a)     a Total Loss of a Mortgaged Ship, the applicable Total Loss Repayment Date;

(b)     a sale of a Mortgaged Ship (including a reversal of sale by the relevant Owner returning the relevant Ship to the relevant Builder under any relevant provisions of the relevant Building Contract, if applicable) by the relevant Owner, the date upon which such sale is completed by the transfer of title to the purchaser in exchange for payment of all or part of the relevant purchase price; or

(c)     the assignment or novation of a Building Contract, the date upon which such assignment or novation is completed by taking effect in exchange for payment of the price for such assignment or novation.

**Disruption Event** means either or both of:

(a)     material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facilities (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

  (i)     from performing its payment obligations under the Finance Documents; or

  (ii)     from communicating with other Parties in accordance with the terms of the Finance Documents

(and which (in either such case)) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Earnings** means, in relation to a Ship and a person, all money at any time payable to that person for or in relation to the use or operation of such Ship including (without limitation) freight, hire and passage moneys, money payable to that person for the provision of services by or from such Ship or under any charter commitment or pool agreement, requisition for hire compensation, remuneration for salvage and towage services, demurrage and detention moneys and damages for breach and payments for termination or variation of any charter commitment.

**Earnings Account** means any Account designated as an **Earnings Account** under clause 27 (*Bank accounts*).

**EHI** means Eletson Holdings Inc., a company incorporated in the Republic of Liberia whose registered office is at 80 Broad Street, Monrovia, Liberia.

**EMC** means EMC Gas Corporation, a company incorporated in the Republic of Marshall Islands whose registered office is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (and which is, on the date of this Agreement, a wholly-owned subsidiary of the Guarantor) and includes its successors in title.

**Enforcement Costs** means any costs, expenses, liabilities or other amounts in respect of which any amount is payable under clauses 14.4 (*Indemnity concerning security*) or 16.3 (*Enforcement preservation and other costs*) or under any other Finance Document to which those provisions apply and any remuneration payable to a Receiver in connection with any Security Documents.

**Environmental Claims** means:

(a)     enforcement, clean-up, removal or other governmental or regulatory action or orders or claims instituted or made pursuant to any Environmental Laws or resulting from a Spill; or

(b)     any claim made by any other person relating to a Spill.

**Environmental Incident** means any Spill from any vessel in circumstances where:

(a)     any Fleet Vessel or its owner, operator or manager may be liable for Environmental Claims arising from the Spill (other than Environmental Claims arising and fully satisfied before the date of this Agreement); and/or

(b)     any Fleet Vessel may be arrested or attached in connection with any such Environmental Claim.

**Environmental Laws** means all laws, regulations and conventions concerning pollution or protection of human health or the environment.

**Event of Default** means any event or circumstance specified as such in clause 29 (*Events of Default*).

**Facility** means the Pre-Delivery Facility or the Delivery Facility and **Facilities** means either of them.

**Facility Office** means:

(a)     in respect of a Lender, the office or offices notified by a Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five Business Days' written notice) as the office through which it will perform its obligations under this Agreement; and

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for Tax purposes.

**Facility Period** means the period from and including the date of this Agreement to and including the date on which the Total Commitments have reduced to zero and all indebtedness of the Obligors under the Finance Documents has irrevocably and unconditionally been fully paid and discharged.

**FATCA** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations or other official guidance;

(b)     any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of paragraph (a) above; or

(c)     any agreement pursuant to the implementation of paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**FATCA Application Date** means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)     in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2017; or

(c)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2017,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement.

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA.

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction.

**FATCA FFI** means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if any Finance Party is not a FATCA Exempt Party, could be required to make a FATCA Deduction.

**FATCA Protected Lender** means any Lender irrevocably designated as a "FATCA Protected Lender" by the Borrowers by notice to that Lender and the Agent at least six months prior to the earliest FATCA Application Date for a payment by a Party to that Lender (or to the Agent for the account of that Lender).

**Fee Letter** means any letter dated on or about the date of this Agreement between (inter alios) the Arrangers and the Borrowers and/or the Guarantor (or the Agent and the Borrowers and/or the Guarantor) setting out any of the fees referred to in clause 11 (*Fees*).

**Final Repayment Date** means, subject to clause 35.7 (*Business Days*):

(a)     in relation to each Pre-Delivery Advance in respect of a Ship, the earlier of (i) the Delivery Date of that Ship and (ii) the Utilisation Date of the Delivery Advance for that Ship under clause 5.5 (*Preplacement of Delivery Advances*); and

(b)     in relation to the Delivery Advance for a Ship, the date falling 57 months after the First Repayment Date for that Delivery Advance.

**Finance Documents** means this Agreement, any Fee Letter, the Security Documents, any Transfer Certificate and any other document designated as such by the Agent and the Borrowers.

**Finance Party** means the Agent, the Security Agent, any Arranger or a Lender.

**Financial Indebtedness** means any indebtedness for or in respect of:

(c)     monies borrowed;

(d)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(e)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(f)    the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with GAAP, be treated as a finance or capital lease;

(g)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(h)    any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close out of that Treasury Transaction, that amount) shall be taken into account);

(i)    any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

(j)    the amount of any liability under an advance or deferred purchase agreement if (a) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (b) the agreement is in respect of the supply of assets or services and payment is due more than 180 days after the date of supply;

(k)    any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under GAAP; and

(l)    the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (i) above.

**First Repayment Date** means, in relation to a Delivery Advance and subject to clause 35.7 (*Business Days*), the date falling 3 months after the Utilisation Date of such Delivery Advance.

**Flag State** means, in relation to a Ship, the country specified in respect of such Ship in Schedule 2 (*Ship information*), or such other state or territory as may be approved by all the Lenders, at the request of the relevant Owner, as being the **Flag State** of such Ship for the purposes of the Finance Documents.

**Fleet Vessel** means each Mortgaged Ship and any other vessel owned by any Group Member.

**GAAP** means the most recent and up to date US GAAP at any relevant time.

**General Assignment** means, in relation to a Ship in respect of which the Mortgage is not in account current form, a first assignment of its interest in the Ship's Insurances, Earnings and Requisition Compensation by the relevant Owner in favour of the Security Agent and/or any of the other Finance Parties in the agreed form.

**Group** means the Guarantor and its Subsidiaries for the time being and, for the purposes of clause 19.1 (*Financial statements*) and clause 20 (*Financial covenants*), any other entity required to be treated as a subsidiary in the Guarantor's consolidated accounts in accordance with GAAP and/or any applicable law.

**Group Member** means any Obligor and any other entity which is part of the Group.

**Guarantee** means the obligations of the Guarantor under clause 17 (*Guarantee and indemnity*).

**Guarantor Affiliate** means the Guarantor, each of its Affiliates, any trust of which the Guarantor or any of its Affiliates is a trustee, any partnership of which the Guarantor or any of its Affiliates is a partner and any trust, fund or other entity which is managed by, or is under the control of, the Guarantor or any of its Affiliates.

**Holding Company** means, in relation to a company or corporation or other person, any other company or corporation or other person in respect of which it is a Subsidiary.

**Hull No. 8163** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Hull No. 8164** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Hull No. 8165** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Hull No. 8166** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Hull No. 8167** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Hull No. S1024** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Hull No. S1025** means the newbuilding vessel described as such in Schedule 2 (*Ship information*) as the same may be named from time to time following its Delivery.

**Impaired Agent** means the Agent at any time when:

(a)     it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under the Finance Documents by the due date for payment;

(b)     the Agent otherwise rescinds or repudiates a Finance Document;

(c)     (if the Agent is also a Lender) it is a Defaulting Lender under paragraph (a) or (b) of the definition of **Defaulting Lender**; or

(d)     an Insolvency Event has occurred and is continuing with respect to the Agent;

unless, in the case of paragraph (a) above:

      (i)     its failure to pay is caused by:

            (A)     administrative or technical error; or

            (B)     a Payment Disruption Event; and

            payment is made within 3 Business Days of its due date; or

      (ii)     the Agent is disputing in good faith whether it is contractually obliged to make the payment in question.

**Increased Costs** has the meaning given to it in clause 13.1.2 (*Increased Costs*).

**Indemnified Person** means:

(a)     each Finance Party and each Receiver and any attorney, agent or other person appointed by them under the Finance Documents;

(b)     each Affiliate of those persons; and

(c)     any officers, employees or agents of any of the above persons.

**Initial Shareholders** means, together, EHI, Blackstone, Blackstone Family 1 and Blackstone Family 2, and **Initial Shareholder** means any of them.

**Insolvency Event** in relation to a Finance Party means that the Finance Party:

(a)     is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)     becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)     makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)     institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)     has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

   (i)     results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

   (ii)    is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(f)     has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g)     has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h)     seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

(i)     has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(j)     causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (i) above; or

(k)     takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

**Insurance Notice** means, in relation to a Ship, a notice of assignment in the form scheduled to the Ship's General Assignment or Deed of Covenant or in another approved form.

**Insurances** means, in relation to a Ship:

(a)     all policies and contracts of insurance; and

(b)     all entries in a protection and indemnity or war risks or other mutual insurance association,

in the name of such Ship's Owner or the joint names of its Owner and any other person in respect of or in connection with such Ship and/or its Owner's Earnings from the Ship and includes all benefits thereof (including the right to receive claims and to return of premiums).

**Interbank Market** means the London interbank market.

**Interest Period** means, in relation to the Loan or any part thereof, each period determined in accordance with clause 9 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with clause 8.3 (*Default interest*).

**Interpolated Screen Rate** means in relation to LIBOR and the Loan or any part of it or any Unpaid Sum, the rate which results from interpolating on a linear basis between:

(a)     the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the relevant Interest Period for the Loan (or the relevant part of it) or the relevant Unpaid Sum; and

(b)     the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the relevant Interest Period for the Loan (or the relevant part of it) or the relevant Unpaid Sum,

each as of 11:00 am on the relevant Quotation Day.

**IPO** means an initial public offering of the total issued voting membership interests of the Guarantor on an Approved Exchange.

**IPO Change of Control** occurs if, at any time after an IPO has been completed:

(a)     any Borrower or the Commercial Manager ceases to be a wholly-owned Subsidiary of the Guarantor; or

(b)     less than 20% of the issued membership interests of, or less than 20% of the issued voting membership interests of, the Guarantor are legally and beneficially owned by EHI; or

(c)     a person or persons acting in concert (other than EHI):

(i)     own legally and/or beneficially, either directly or indirectly, more than the aggregate issued membership interests  of, or more than the aggregate issued voting membership interests of, the Guarantor legally or beneficially owned by EHI (whether directly or indirectly) at that time; and/or

(ii)     have the right or the ability to control, either directly or indirectly, the affairs or composition of the majority of the board of directors or the board of managers (or equivalent of it) of the Guarantor.

**Korean Ship** means each of Hull No. 8163, Hull No. 8164, Hull No. 8165, Hull No. 8166 and Hull No. 8167.

**Last Availability Date** means:

(a)     in respect of each Advance for Hull No. 8163, 31 January 2016;

(b)     in respect of each Advance for Hull No. 8164, 31 March 2016;

(c)     in respect of each Advance for Hull No. 8165, 31 May 2016;

(d)     in respect of each Advance for Hull No. 8166, 31 July 2016;

(e)     in respect of each Advance for Hull No. 8167, 30 September 2016;

(f)     in respect of each Advance for Hull No. S1024, 31 May 2017; or

(g)     in respect of each Advance for Hull No. S1025, 31 August 2017,

or such later date as may be approved by all the Lenders.

**Legal Reservations** means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of UK stamp duty may be void and defences of set-off or counterclaim; and

(c)     similar principles, rights and defences under the laws of any Relevant Jurisdiction.

**Lender** means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party in accordance with clause 30 (*Changes to the Lenders*),

which in each case has not ceased to be a Party in accordance with the terms of this Agreement.

**LIBOR** means, in relation to the Loan or any part of it or any Unpaid Sum:

(a)     the applicable Screen Rate; or

(b)     if no Screen Rate is available for the relevant Interest Period, the Interpolated Screen Rate for the Loan (or the relevant part of it) or that Unpaid Sum; or

(c)     if:

        (i)     no Screen Rate is available for the relevant currency;

        (ii)    no Screen Rate is available for the relevant Interest Period and it is not possible to calculate an Interpolated Screen Rate for the Loan (or the relevant part of it) or that Unpaid Sum,

the Reference Bank Rate,

as of 11:00 a.m. on the Quotation Day for the offering of deposits in dollars for a period comparable to the Interest Period for the Loan or relevant part of it or Unpaid Sum and if that rate is less than zero, LIBOR shall be deemed to be zero.

**Loan** means the loan made or to be made under the Facilities (comprising the Advances) or the principal amount outstanding for the time being of that loan.

**Loss Payable Clauses** means, in relation to a Ship, the provisions concerning payment of claims under the Ship's Insurances in the form scheduled to the Ship's General Assignment or Deed of Covenant or in another approved form.

**Losses** means any costs, expenses (including, but not limited to, legal fees), payments, charges, losses, demands, liabilities, taxes (including VAT), claims, actions, proceedings, penalties, fines, damages, judgments, orders or other sanctions.

**Major Casualty** means any casualty to a vessel for which the total insurance claim, inclusive of any deductible, exceeds or may exceed the Major Casualty Amount.

**Major Casualty Amount** means, in relation to a Ship, the amount specified as such against the name of that Ship in Schedule 2 (*Ship information*) or the equivalent in any other currency.

**Majority Lenders** means:

(a)     if no part of the Loan is then outstanding, a Lender or Lenders whose Commitments aggregate more than 66.67% of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 66.67% of the Total Commitments immediately prior to the reduction); or

(b)     at any other time, a Lender or Lenders whose participations in the Loan aggregate more than 66.67% of the Loan.

**Manager** means the Commercial Manager or the Technical Manager (as the case may be) and **Managers** means both of them.

**Manager's Undertaking** means, in relation to a Ship, an undertaking by any manager of the Ship to the Security Agent in the agreed form pursuant to clause 22.3 (*Manager*).

**Margin** means 3.25% per annum.

**Material Adverse Effect** means, in the reasonable opinion of the Majority Lenders, a material adverse effect on:

(a)     the business, operations, property performance, prospects or condition (financial or otherwise) of any Obligor or of the Group taken as a whole; or

(b)     the ability of an Obligor to perform its obligations under any of the Finance Documents; or

(c)     the legality, validity or enforceability of, or the effectiveness or ranking of any Security Interest granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

**Minimum Value** means the amount in dollars which is at any relevant time 130% of the Loan (disregarding the amounts drawn and outstanding under the Pre-Delivery Facility for Ships whose Delivery has not yet occurred).

**Mortgage** means, in relation to a Ship, a first priority or (as the case may be) first preferred mortgage of the Ship in the agreed form by the relevant Owner in favour of the Security Agent and/or any of the other Finance Parties.

**Mortgage Period** means, in relation to a Mortgaged Ship, the period from the date the Mortgage over that Ship is executed and registered until the date such Mortgage is released and discharged or, if earlier, its Total Loss Date.

**Mortgaged Ship** means, at any relevant time, any Ship which has been delivered to the relevant Owner under the relevant Building Contract and is subject to a Mortgage and/or whose Earnings,

Insurances and Requisition Compensation are subject to a Security Interest under the Finance Documents.

**Notifiable Debt Purchase Transaction** has the meaning given to that term in clause 31.2.3 (*Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates*).

**Obligors** means the parties to the Finance Documents (other than Finance Parties) and **Obligor** means any one of them.

**Original Financial Statements** means the audited consolidated financial statements of the Group for its financial year ended 31 December 2013.

**Original Obligor** means each party to this Agreement and the Original Security Documents (other than a Finance Party).

**Original Security Documents** means:

(a)     the Pre-Delivery Security Assignments;

(b)     the Mortgages over each of the Ships;

(c)     the Deeds of Covenant in relation to each of the Ships in respect of which the Mortgage is in account current form;

(d)     the General Assignments in relation to each of the Ships in respect of which the Mortgage is not in account current form;

(e)     the Charter Assignment in relation to each Ship's Charter Documents (if any);

(f)     the Share Security in relation to each Borrower;

(g)     the Account Security in relation to each Earnings Account; and

(h)     any Manager's Undertaking in relation to a Ship if required under clause 22.3 (*Manager*).

**Owner** means, in relation to a Ship, the Borrower specified against the name of that Ship in Schedule 2 (*Ship information*).

**Participating Member State** means any member state of the European Union that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

**Party** means a party to this Agreement.

**Payment Disruption Event** means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facilities (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)     from performing its payment obligations under the Finance Documents; or

(ii)    from communicating with other Parties in accordance with the terms of the Finance Documents,

(and which (in either such case)) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Permitted Maritime Liens** means, in relation to a Ship:

(a)    unless a Default is continuing, any ship repairer's or outfitter's possessory lien in respect of such Ship for an amount not exceeding the Major Casualty Amount for such Ship;

(b)    any lien on such Ship for master's, officer's or crew's wages outstanding in the ordinary course of its trading;

(c)    any lien on such Ship for salvage; and

(d)    any other maritime liens arising by operation of law and recognised as such by the Flag State of the relevant Ship in respect of claims which are overdue for not more than 60 days.

**Permitted Security Interests** means, in relation to any Mortgaged Ship, any Security Interest over it which is:

(a)    granted by the Finance Documents; or

(b)    a Permitted Maritime Lien; or

(c)    is approved by the Majority Lenders.

**Pollutant** means and includes crude oil and its products, any other polluting, toxic or hazardous substance and any other substance whose release into the environment is regulated or penalised by Environmental Laws.

**Pre-Delivery Advance** means an Advance made or to be made under the Pre-Delivery Facility and, in relation to a Ship, an Advance made or to be made under the Ship Pre-Delivery Commitment for that Ship.

**Pre-Delivery Commitment** means:

(c)    in relation to an Original Lender, the amount set opposite its name under the heading "Pre-Delivery Commitment" in Schedule 1 (*The original parties*) and the amount of any other Pre-Delivery Commitment transferred to it under this Agreement; and

(d)    in relation to any other Lender, the amount of any Pre-Delivery Commitment transferred to it under this Agreement,

to the extent:

(i)    not cancelled, reduced or transferred by it under this Agreement; and

(ii)    not deemed to be zero pursuant to clauses 31.2.2 to 31.2.5 (*Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates*).

**Pre-Delivery Facility** means the pre-delivery term loan facility made available under this Agreement as described in clause 2.1(b) (*The Facilities*).

**Pre-Delivery Instalment** means, in relation to a Ship, each of the instalments of the Building Contract Price for such Ship falling due before its Delivery (and for the avoidance of doubt it excludes the Delivery Instalment for such Ship).

17

**Pre-Delivery Security Assignment** means, in relation to a Ship, an assignment of the relevant Building Contract and the relevant Refund Guarantees by the relevant Owner in favour of the Security Agent in the agreed form.

**Quotation Day** means, in relation to any period for which an interest rate is to be determined, two Business Days before the first day of that period unless market practice differs in the Interbank Market for a currency, in which case the Quotation Day for that currency shall be determined by the Agent in accordance with market practice in the Interbank Market (and if quotations would normally be given by leading banks in the Interbank Market on more than one day, the Quotation Day will be the last of those days).

**Receiver** means a receiver or a receiver and manager or an administrative receiver appointed in relation to the whole or any part of any Charged Property under any relevant Security Document.

**Reference Bank Rate** means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request by each Reference Bank as the rate at which the relevant Reference Bank could borrow funds in the Interbank Market, in the relevant currency and for the relevant period, were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in that currency and for that period.

**Reference Banks** means, in respect of LIBOR, the principal offices of Skandinaviska Enskilda Banken AB (publ), in Stockholm, Citibank, N.A., in London and UniCredit Bank AG and/or such other banks as may be appointed by the Agent in consultation with the Borrowers.

**Refund Guarantee** means, in relation to any Ship, each guarantee details of which are specified in Schedule 2 (*Ship information*) issued by the relevant Refund Guarantor in respect of the obligations of the relevant Builder under the relevant Building Contract and any further guarantee to be issued by the relevant Refund Guarantor in respect of such obligations.

**Refund Guarantor** means, in relation to any Ship, the refund guarantor specified as such in Schedule 2 (*Ship information*).

**Registry** means, in relation to each Ship, such registrar, commissioner or representative of the relevant Flag State who is duly authorised and empowered to register the relevant Ship, the relevant Owner's title to such Ship and the relevant Mortgage under the laws of its Flag State.

**Relevant Jurisdiction** means, in relation to an Obligor:

(a)     its jurisdiction of incorporation;

(b)     any jurisdiction where any Charged Property owned by it is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     any jurisdiction whose laws govern the perfection of any of the Security Documents entered into by it.

**Repayment Date** means:

(a)     in relation to a Pre-Delivery Advance, the Final Repayment Date for that Pre-Delivery Advance; or

(b)     in relation to a Delivery Advance:

      (i)     the First Repayment Date for that Delivery Advance;

      (ii)     each of the dates falling at 3 monthly intervals thereafter up to but not including the Final Repayment Date for that Delivery Advance; and

      (iii)    the Final Repayment Date for that Delivery Advance.

**Repeating Representations** means each of the representations and warranties set out in clauses 18.1 (*Status*) to 18.10 (*Ranking and effectiveness of security*), 18.16 (*No breach of laws*), 18.18 (*Tax Compliance*), 18.19 (*Security and Financial Indebtedness*); 18.20.1 (*Legal and beneficial ownership*), 18.21 (*Shares*), 18.23 (*No adverse consequences*), 18.24 (*Copies of documents*), 18.26 (*No immunity*) and 18.30 (*Money Laundering*).

**Representative** means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

**Requisition Compensation** means, in relation to a Ship, any compensation paid or payable by a government entity for the requisition for title, confiscation or compulsory acquisition of such Ship.

**SAFE** means the State Administration for Foreign Exchange of The People's Republic of China or any successor organisation.

**Screen Rate** means the London Interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for dollars for the relevant period displayed on the appropriate page of the Bloomberg screen. If the agreed page is replaced or service ceases to be available, the Agent may specify another page or service displaying the appropriate rate after consultation with the Borrowers and the Lenders.

**Security Agent** includes any person as may be appointed security agent and trustee for the other Finance Parties under this Agreement.

**Security Documents** means:

(a)    the Original Security Documents; and

(b)    any other document as may be executed to guarantee and/or secure any amounts owing to the Finance Parties under this Agreement or any other Finance Document.

**Security Interest** means a mortgage, charge, pledge, lien, assignment, trust, hypothecation or other security interest of any kind securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Security Value** means, at any time, the amount in dollars which, at that time, is the aggregate of (a) the value of all of the Mortgaged Ships which have not then become a Total Loss and (b) the value of any additional security then held by the Security Agent or any other Finance Party provided under clause 25 (*Minimum security value*), in each case as most recently determined in accordance with this Agreement.

**Selection Notice** means a notice substantially in the form set out in Schedule 5 (*Selection Notice*) given in accordance with clause 9 (*Interest Periods*).

**Share Security** means, in relation to each Borrower, the document constituting a first Security Interest in respect of all the shares of such Borrower executed by the Guarantor in favour of the Security Agent in the agreed form.

**Ship Delivery Commitment** means, in relation to a Ship, the amount (being part of the Total Delivery Commitments) specified as such in respect of such Ship in Schedule 2 (*Ship information*), as cancelled or reduced pursuant to any provision of this Agreement, to be used (a) to refinance in full the Pre-Delivery Advances of that Ship and (b) as to its balance, to finance in part such Ship's Delivery Instalment.

**Ship Pre-Delivery Commitment** means, in relation to a Ship, the amount (being part of the Total Pre-Delivery Commitments) specified as such in respect of such Ship in Schedule 2 (*Ship*

*information*), as cancelled or reduced pursuant to any relevant provision of this Agreement, to be used to partly finance the Pre-Delivery Instalments of that Ship.

**Ship Representations** means each of the representations and warranties set out in clauses 18.27 (*Ship status*) and 18.28 (*Ship's employment*).

**Ships** means each of the ships (to be built by the relevant Builders and delivered to the relevant Owners under the Building Contracts) described in Schedule 2 (*Ship information*), being each of Hull No. 8163, Hull No. 8164, Hull No. 8165, Hull No. 8166, Hull No. 8167, Hull No. S1024 and Hull No. S1025 and **Ship** means any of them.

**Spill** means any actual or threatened spill, release or discharge of a Pollutant into the environment.

**Subsidiary** of a person means any other person:

(a)     directly or indirectly controlled by such person; or

(b)     of whose dividends or distributions on ordinary voting share capital such person is entitled to receive more than 50%.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same) and **Taxation** shall be construed accordingly.

**Technical Manager** means, in relation to a Ship, Eletson Corporation whose registered office is at 80 Broad Street, Monrovia, Liberia, or any other company appointed in accordance with clause 22.3 (*Manager*) (subject to such company providing a Manager's Undertaking) which the Agent may, with the authorisation of the Majority Lenders, approve from time to time, in each case as the manager of that Ship in respect of technical, administrative and operational matters and includes its successors in title.

**Total Commitments** means the aggregate of the Total Pre-Delivery Commitments and the Total Delivery Commitments, being $254,179,500 at the date of this Agreement.

**Total Delivery Commitments** means the aggregate of the Delivery Commitments, being $225,000,000 at the date of this Agreement (and comprising all the Ship Delivery Commitments for each Ship).

**Total Loss** means, in relation to a vessel, its:

(a)     actual, constructive, compromised or arranged total loss; or

(b)     requisition for title, confiscation or other compulsory acquisition by a government entity; or

(c)     hijacking, piracy, theft, condemnation, capture, seizure, arrest or detention for more than 60 days.

**Total Loss Date** means, in relation to the Total Loss of a vessel:

(a)     in the case of an actual total loss, the date it happened or, if such date is not known, the date on which the vessel was last reported;

(b)     in the case of a constructive, compromised, agreed or arranged total loss, the earliest of:

    (iv)    the date notice of abandonment of the vessel is given to its insurers; or

    (v)     if the insurers do not admit such a claim, the date later determined by a competent court of law to have been the date on which the total loss happened; or

(vi)    the date upon which a binding agreement as to such compromised or arranged total loss has been entered into by the vessel's insurers;

(c)    in the case of a requisition for title, confiscation or compulsory acquisition, the date it happened; and

(d)    in the case of hijacking, piracy, theft, condemnation, capture, seizure, arrest or detention, the date 60 days after the date upon which it happened.

**Total Loss Repayment Date** means, where a Mortgaged Ship has become a Total Loss after its Delivery, the earlier of:

(a)    the date 120 days after its Total Loss Date; and

(b)    the date upon which insurance proceeds or Requisition Compensation for such Total Loss are paid by insurers or the relevant government entity.

**Total Pre-Delivery Commitments** means the aggregate of the Pre-Delivery Commitments, being $29,179,500 at the date of this Agreement (and comprising all the Ship Pre-Delivery Commitments for each Ship).

**Transfer Certificate** means a certificate substantially in the form set out in Schedule 6 (*Form of Transfer Certificate*) or any other form agreed between the Agent and the Borrowers or, at any time after the occurrence of an Event of Default, required by the Agent.

**Transfer Date** means, in relation to a transfer pursuant to a Transfer Certificate, the later of:

(a)    the proposed Transfer Date specified in the Transfer Certificate; and

(b)    the date on which the Agent executes the Transfer Certificate.

**Treasury Transaction** means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price.

**Trust Property** means, collectively:

(a)    all moneys duly received by the Security Agent under or in respect of the Finance Documents;

(b)    any portion of the balance on any Account held by or charged to the Security Agent at any time;

(c)    the Security Interests, guarantees, security, powers and rights given to the Security Agent under and pursuant to the Finance Documents including, without limitation, the covenants given to the Security Agent in respect of all obligations of any Obligor;

(d)    all assets paid or transferred to or vested in the Security Agent or its agent or received or recovered by the Security Agent or its agent in connection with any of the Finance Documents whether from any Obligor or any other person; and

(e)    all or any part of any rights, benefits, interests and other assets at any time representing or deriving from any of the above, including all income and other sums at any time received or receivable by the Security Agent or its agent in respect of the same (or any part thereof).

**Unpaid Sum** means any sum due and payable but unpaid by an Obligor under the Finance Documents.

**US Tax Obligor** means:

(a)     a Borrower if it is resident for tax purposes in the United States of America; or

(b)     an Obligor some or all of whose payments under the Finance Documents are from sources within the United States for US federal income tax purposes.

**Utilisation** means the making of an Advance.

**Utilisation Date** means the date on which a Utilisation is made.

**Utilisation Request** means a notice substantially in the form set out in Schedule 4 (*Utilisation Request*).

**VAT** means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

## 1.2     Construction

1.2.1     Unless a contrary indication appears, any reference in any of the Finance Documents to:

(a)     Sections, clauses and Schedules are to be construed as references to the Sections and clauses of, and the Schedules to, the relevant Finance Document and references to a Finance Document include its Schedules;

(b)     a **Finance Document** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as it may from time to time be amended, restated, novated or replaced, however fundamentally;

(c)     words importing the plural shall include the singular and vice versa;

(d)     a time of day is to London time;

(e)     any person includes its successors in title, permitted assignees or transferees;

(f)     the knowledge, awareness and/or beliefs (and similar expressions) of any Obligor shall be construed so as to mean the knowledge, awareness and beliefs of the director and officers of such Obligor, having made due and careful enquiry;

(g)     two or more persons are **acting in concert** if pursuant to an agreement or understanding (whether formal or informal) they actively co-operate, through the acquisition (directly or indirectly) of shares or membership interests in an entity by any of them, either directly or indirectly to obtain or consolidate control of that entity;

(h)     **agreed form** means:

(i)     where a Finance Document has already been executed by all of the relevant parties, such Finance Document in its executed form;

(ii)     prior to the execution of a Finance Document, the form of such Finance Document separately agreed in writing between the Agent (acting on the instructions of all the Lenders) and the Borrowers, whether before or after the date of this Agreement, as

the form in which that Finance Document is to be executed or another form approved at the request of the Borrowers or, if not so agreed or approved, in the form required by the Agent;

(i) **approved by the Majority Lenders** or **approved by the Lenders** means approved in writing by the Agent acting on the instructions of the Majority Lenders or, as the case may be, all of the Lenders (on such conditions as they may respectively impose) and otherwise **approved** means approved in writing by the Agent acting on the instructions of the Majority Lenders (on such conditions as the Agent (acting on the instructions of the Majority Lenders) may impose) and **approval** and **approve** shall be construed accordingly;

(j) **assets** includes present and future properties, revenues and rights of every description;

(k) an **authorisation** means any authorisation, consent, concession, approval, resolution, licence, exemption, filing, notarisation or registration;

(l) **charter commitment** means, in relation to a vessel, any charter or contract for the use, employment or operation of that vessel or the carriage of people and/or cargo or the provision of services by or from it and includes any contract of affreightment and any agreement for pooling or sharing income derived from any such charter or contract;

(m) **control** of an entity means:

    (i) the power (whether by way of ownership of shares, membership interests, proxy, contract, agency or otherwise) to:

        (A) cast, or control the casting of, more than 50% of the maximum number of votes that might be cast at a general meeting of that entity; or

        (B) appoint or remove all, or the majority, of the directors or other equivalent officers of that entity; or

        (C) give directions with respect to the operating and financial policies of that entity with which the directors or other equivalent officers of that entity are obliged to comply; and/or

    (ii) the holding beneficially of more than 50% of the issued share capital or of the issued membership interests of that entity (excluding any part of that issued share capital or that issued membership interests that carries no right to participate beyond a specified amount in a distribution of either profits or capital) (and, for this purpose, any Security Interest over share capital or membership interests shall be disregarded in determining the beneficial ownership of such share capital or membership interests);

and **controlled** shall be construed accordingly;

(n) the term **disposal** or **dispose** means a sale, transfer or other disposal (including by way of lease or loan but not including by way of loan of money) by a person of all or part of its assets, whether by one transaction or a series of transactions and whether at the same time or over a period of time, but not the creation of a Security Interest;

(o) **dollar, $** and **USD** means the lawful currency of the United States of America;

(p) the **equivalent** of an amount specified in a particular currency (the **specified currency amount**) shall be construed as a reference to the amount of the other relevant currency which can be purchased with the specified currency amount in the London foreign exchange market at or about 11 a.m. on the date the calculation falls to be made for spot delivery, as conclusively determined by the Agent (with the relevant exchange rate of any such purchase being the **Agent's spot rate of exchange**);

(q)   a **government entity** means any government, state or agency of a state;

(r)   a **group of Lenders** includes all the Lenders;

(s)   a **guarantee** means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(t)   **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(u)   **month** means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

   (i)    if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that month (if there is one) or on the immediately preceding Business Day (if there is not); and

   (ii)   if there is no numerically corresponding day in that month, that period shall end on the last Business Day in that month

   and the above rules in paragraphs (i) to (ii) will only apply to the last month of any period;

(v)   an **obligation** means any duty, obligation or liability of any kind;

(w)   something being in the **ordinary course of business** of a person means something that is in the ordinary course of that person's current day-to-day operational business (and not merely anything which that person is entitled to do under its Constitutional Documents);

(x)   **pay**, **prepay** or **repay** in clause 28 (*Business restrictions*) includes by way of set-off, combination of accounts or otherwise;

(y)   a **person** includes any individual, firm, company, corporation, government entity or any association, trust, joint venture, consortium or partnership or other entity (whether or not having separate legal personality);

(z)   a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation and includes (without limitation) any Basel II Regulation or Basel III Regulation;

(aa)  **right** means any right, privilege, power or remedy, any proprietary interest in any asset and any other interest or remedy of any kind, whether actual or contingent, present or future, arising under contract or law, or in equity;

(bb)  **trustee**, **fiduciary** and **fiduciary duty** has in each case the meaning given to such term under applicable law;

(cc)  (i) the **liquidation**, **winding up**, **dissolution**, or **administration** of person or (ii) a **receiver** or **administrative receiver** or **administrator** in the context of insolvency proceedings or security enforcement actions in respect of a person shall be construed so as to include any equivalent or analogous proceedings or any equivalent and analogous person or appointee (respectively) under the law of the jurisdiction in which such person is established or incorporated or any jurisdiction in which such person carries on business including (in respect of proceedings) the seeking or occurrences of liquidation, winding-up,

reorganisation, dissolution, administration, arrangement, adjustment, protection or relief of debtors;

(dd) an entity is a **wholly-owned subsidiary** of another entity if it has no members except that other entity and that other entity's wholly-owned Subsidiaries or persons acting on behalf of that other entity or its wholly-owned Subsidiaries; and

(ee) a provision of law is a reference to that provision as amended or re-enacted.

1.2.2   Where in this Agreement a provision includes a monetary reference level in one currency, unless a contrary indication appears, such reference level is intended to apply equally to its equivalent in other currencies as of the relevant time for the purposes of applying such reference level to any other currencies.

1.2.3   Section, clause and Schedule headings are for ease of reference only.

1.2.4   Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

1.2.5   A Default (other than an Event of Default) is **continuing** if it has not been remedied or waived and an Event of Default is **continuing** if it has not been waived to the satisfaction of the Agent acting on the instructions of the Lenders.

1.2.6   Unless a contrary indication appears, in the event of any inconsistency between the terms of this Agreement and the terms of any other Finance Document when dealing with the same or similar subject matter, the terms of this Agreement shall prevail.

**1.3   Third party rights**

1.3.1   Unless expressly provided to the contrary in a Finance Document for the benefit of a Finance Party or another Indemnified Person, a person who is not a party to a Finance Document has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or to enjoy the benefit of any term of the relevant Finance Document.

1.3.2   Any Finance Document may be rescinded or varied by the parties to it without the consent of any person who is not a party to it (unless otherwise provided by this Agreement).

1.3.3   An Indemnified Person who is not a party to a Finance Document may only enforce its rights under that Finance Document through a Finance Party and if and to the extent and in such manner as the Finance Party may determine.

**1.4   Finance Documents**

Where any other Finance Document provides that this clause 1.4 shall apply to that Finance Document, any other provision of this Agreement which, by its terms, purports to apply to all or any of the Finance Documents and/or any Obligor shall apply to that Finance Document as if set out in it but with all necessary changes.

**1.5   Conflict of documents**

The terms of the Finance Documents (other than terms which relate to the creation and/or perfection of Security Interests) are subject to the terms of this Agreement and, in the event of any conflict between any provision of this Agreement and any provision of any Finance Document (other than provisions which relate to the creation and/or perfection of Security Interests) the provisions of this Agreement shall prevail.

## SECTION 2 - THE FACILITY

## 2     The Facilities

### 2.1     The Facilities

Subject to the terms of this Agreement, the Lenders make available to the Borrowers:

    (a)  a pre-delivery term loan facility in an aggregate amount equal to the Total Pre-Delivery Commitments; and

    (b)  a post-delivery term loan facility in an aggregate amount equal to the Total Delivery Commitments.

### 2.2     Finance Parties' rights and obligations

2.2.1  The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

2.2.2  The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

2.2.3  A Finance Party may, except as otherwise stated in the Finance Documents (including clauses 32.26 (*All enforcement action through the Security Agent*)) and 33.2 (*Finance Parties acting together*), separately enforce its rights under the Finance Documents.

### 2.3     Borrowers' rights and obligations

2.3.1  The obligations of each Borrower under this Agreement are joint and several. Failure by a Borrower to perform its obligations under this Agreement shall constitute a failure by all of the Borrowers.

2.3.2  Each Borrower irrevocably and unconditionally jointly and severally with each other Borrower:

    (a)  agrees that it is responsible for the performance of the obligations of each other Borrower under this Agreement;

    (b)  acknowledges and agrees that it is a principal and original debtor in respect of all amounts due from the Borrowers under this Agreement; and

    (c)  agrees with each Finance Party that, if any obligation of another Borrower under this Agreement is or becomes unenforceable, invalid or illegal for any reason it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any and all Losses it incurs as a result of another Borrower not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by that other Borrower under this Agreement. The amount payable under this indemnity shall be equal to the amount which that Finance Party would otherwise have been entitled to recover.

2.3.3  The obligations of each Borrower under the Finance Documents shall continue until all amounts which may be or become payable by the Borrowers under or in connection with the Finance Documents have been irrevocably and unconditionally paid or discharged in full, regardless of any intermediate payment or discharge in whole or in part.

2.3.4  If any discharge, release or arrangement (whether in respect of the obligations of a Borrower or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on

the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of the Borrowers under this Agreement will continue or be reinstated as if the discharge, release or arrangement had not occurred.

2.3.5    The obligations of each Borrower under the Finance Documents shall not be affected by an act, omission, matter or thing which, but for this clause (whether or not known to it or any Finance Party), would reduce, release or prejudice any of its obligations under the Finance Documents including:

(a)    any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any other Obligor;

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)    any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)    any insolvency or similar proceedings.

2.3.6    Each Borrower waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Borrower under any Finance Document. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

2.3.7    Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably and unconditionally paid or discharged in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Borrower will be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any money received from any Borrower or on account of any Borrower's liability under any Finance Document.

2.3.8    Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs (on such terms as it may require), no Borrower shall exercise any rights (including rights of set-off) which it may have by reason of performance by it of its obligations under the Finance Documents:

(a)    to be indemnified by another Obligor;

(b)    to claim any contribution from any other Obligor or any guarantor of any Obligor's obligations under the Finance Documents; and/or

(c) to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party; and/or

(d) to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which that Borrower is liable under this Agreement or any of the other Finance Documents; and/or

(e) to exercise any right of set-off against any other Obligor; and/or

(f) to claim or prove as a creditor of any other Obligor in competition with any Finance Party.

If a Borrower receives any benefit, payment or distribution in relation to such rights it will promptly pay an equal amount to the Agent for application in accordance with clause 35 (*Payment mechanics*). This only applies until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full.

**2.4    Adjustment for liquidated damages**

If an Owner becomes entitled to receive liquidated damages under a Building Contract or to have liquidated damages deducted from the Building Contract Price for the relevant Ship, the Ship Delivery Commitment for the relevant Ship, the Total Delivery Commitments outstanding and the Total Commitments shall each be reduced by an amount equal to 50% of such liquidated damages.

# 3    Purpose

**3.1    Purpose**

The Borrowers shall apply all amounts borrowed under each Facility in accordance with this clause 3.

**3.2    Use before Delivery**

The Ship Pre-Delivery Commitment for each Ship shall be made available for borrowing under the Pre-Delivery Facility in one or more Advances, each such Advance solely for the purpose of assisting the relevant Owner to finance in part payment of one Pre-Delivery Instalment by the relevant Owner under the Building Contract relevant to that Ship or (as the context may require) if and to the extent that the relevant Owner has already paid any such amount to the relevant Builder when the same was due, to reimburse such Owner for such payment.

**3.3    Use on Delivery**

The Ship Delivery Commitment for each Ship shall be made available solely for the purpose of assisting the relevant Owner:

(a) to refinance in full the outstanding Pre-Delivery Advances of that Ship as at the Delivery Date of that Ship; and

(b) as to any balance, to finance part of the Building Contract Price of that Ship payable on its Delivery by paying the same to the relevant Builder.

**3.4    Limitations**

The amount of the Facilities made available under this Agreement shall be subject to any reduction in accordance with the provisions of clause 5.3 (*Currency and amount*) and to the other provisions of this Agreement.

**3.5    Monitoring**

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

**4    Conditions of Utilisation**

**4.1    Initial conditions precedent**

The Borrowers may not deliver a Utilisation Request unless the Agent, or its duly authorised representative, has received all of the documents and other evidence listed in Part 1 of Schedule 3 (*Conditions precedent to any Utilisation*) of this Agreement in form and substance satisfactory to the Agent.

**4.2    Conditions precedent before Delivery**

An Advance under the Ship Pre-Delivery Commitment in respect of a Ship (referred to in Part 2 of Schedule 3 (*Conditions precedent before Delivery*) as the **Relevant Advance**) may only be drawn down under this Agreement if, on or before the Utilisation of the relevant Advance for that Ship, the Agent, or its duly authorised representative, has received all of the documents and evidence listed in Part 2 of Schedule 3 (*Conditions precedent before Delivery*) in relation to such Advance and such Ship in form and substance satisfactory to the Agent.

**4.3    Conditions precedent on Delivery**

The Ship Delivery Commitment in respect of a Ship may only be drawn down under this Agreement if, on or before the Utilisation of the relevant Advance for that Ship, the Agent, or its duly authorised representative, has received all of the documents and evidence listed in Part 3 of Schedule 3 (*Conditions precedent on Delivery*) in relation to such Ship in form and substance satisfactory to the Agent.

**4.4    Notice to Lenders**

The Agent shall notify the Borrowers and the Lenders promptly upon receiving and being satisfied with all of the documents and evidence delivered to it under this clause 4 in form and substance satisfactory to it.  Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives any such notification, the Lenders authorise (but do not require) the Agent to give that notification.  The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

**4.5    Further conditions precedent**

The Lenders will only be obliged to comply with clause 5.4 (*Lenders' participation*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a)  no Default is continuing or would result from the proposed Utilisation;

(b)  the Repeating Representations and, in relation to the first Utilisation, all of the other representations set out in clause 18 (*Representations*) (except the Ship Representations), are true;

(c)  no events, facts, conditions or circumstances shall exist or have arisen or occurred (and neither the Agent nor any Lender shall have become aware of other events, facts, conditions or circumstances not previously known to it), which the Agent (acting on the instructions of the Majority Lenders) shall determine, have had or could reasonably be expected to have, a Material Adverse Effect;

(d)  in relation to the Utilisation of the Ship Delivery Commitment for a Ship, the Ship Representations are true so far as they relate to the Ship relating to the Utilisation being made; and

(e)  no Total Loss Date has occurred in relation to a Total Loss.

## 4.6   Waiver of conditions precedent

The conditions in this clause 4 are inserted solely for the benefit of the Finance Parties and may be waived on their behalf in whole or in part and with or without conditions by the Agent acting on the instructions of the Majority Lenders.

## SECTION 3 - UTILISATION

### 5      Utilisation

#### 5.1    Delivery of a Utilisation Request

The Borrowers may utilise a Facility by delivery to the Agent of a duly completed Utilisation Request not later than 11:00 a.m. three Business Days before the proposed Utilisation Date.

#### 5.2    Completion of a Utilisation Request

5.2.1    A Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

    (a)   it identifies the Facility to be utilised;

    (b)   the proposed Utilisation Date in respect of an Advance is a Business Day falling not later than the Last Availability Date for that Advance;

    (c)   the currency and amount of the Utilisation comply with clause 5.3 (*Currency and amount*);

    (d)   the proposed Interest Period complies with clause 9 (*Interest Periods*); and

    (e)   it identifies the purpose for the Utilisation and that purpose complies with clause 3 (*Purpose*) and it identifies the relevant Ship Pre-Delivery Commitment or Ship Delivery Commitment to which it relates.

5.2.2    The Ship Pre-Delivery Commitment in respect of a Ship may be drawn down in up to as many Advances as there are Pre-Delivery Instalments for that Ship.

5.2.3    The Ship Delivery Commitment in respect of a Ship may only be drawn down in a single amount in one Advance.

#### 5.3    Currency and amount

5.3.1    The currency specified in a Utilisation Request must be dollars.

5.3.2    The amount of a proposed Pre-Delivery Advance specified in a Utilisation Request and advanced under the Ship Pre-Delivery Commitment in respect of a Ship shall not exceed the lower of:

    (a)   the amount in dollars equal to 35% of the Pre-Delivery Instalment for that Ship which that Advance is intended to finance;

    (b)   the Ship Pre-Delivery Commitment for that Ship; and

    (c)   the amount of the Available Facility for the Pre-Delivery Facility.

5.3.3    The amount of a proposed Delivery Advance specified in a Utilisation Request and advanced under the Ship Delivery Advance in respect of a Ship shall not exceed the lower of:

    (a)   the Ship Delivery Commitment for the Ship to which the proposed Advance relates; and

    (b)   the amount in dollars which is equal to 70% of the market value of that Ship as determined pursuant to the valuations of that Ship obtained under Part 3 of Schedule 3 (*Conditions precedent on Delivery*); and

    (c)   the amount of the Available Facility for the Delivery Facility.

**5.4      Lenders' participation**

5.4.1      If the conditions set out in this Agreement have been met, each Lender shall make its participation in each Advance available by the relevant Utilisation Date through its Facility Office.

5.4.2      The amount of each Lender's participation in each Advance under a Facility will be equal to the proportion borne by its Available Commitment in respect of that Facility to the Available Facility immediately prior to making the Advance.

5.4.3      The Agent shall promptly notify each Lender of the amount of the Advance and the amount of its participation in the Advance, in each case by 11:00 a.m. on the Quotation Day.

5.4.4      The Agent shall pay all amounts received by it in respect of each Advance (and its own participation in it, if any) to the Borrowers or the account of any of them or to the relevant Builder, in each case in accordance with the instructions contained in the relevant Utilisation Request.

**5.5      Pre-placement of Delivery Advances**

5.5.1      Notwithstanding that the Borrowers may have not yet satisfied all of the conditions precedent set out in Schedule 3, Part 3 (*Conditions precedent on Delivery*) in respect of a Delivery Advance, in order to facilitate compliance by any Owner with the Building Contract for the Ship relevant to such Delivery Advance, and provided that:

(a)    the Borrowers have submitted a Utilisation Request in respect of that Delivery Advance in accordance with this clause 5;

(b)    the Borrowers have satisfied the conditions precedent set out in Part 1 of Schedule 3 (*Conditions precedent to any Utilisation*), Part 2 of Schedule 3 (*Conditions precedent before Delivery*) and the condition precedent set out in paragraph 7 (*Value of Security*) of Part 3 of Schedule 3 (*Conditions precedent on Delivery*) and the Pre-Delivery Advances for the same Ship have been drawn down; and

(c)    in the discretionary opinion of the Agent (acting on the instructions of the Majority Lenders) the Borrowers are likely to satisfy all remaining and outstanding conditions precedent set out in Part 3 of Schedule 3 (*Conditions precedent on Delivery*) in relation to the Ship to which such Delivery Advance relates within five (5) Business Days from the Utilisation Date for such Delivery Advance and in any event on or before the Release (as defined below in clause 5.5.2) for such Delivery Advance,

the Agent (acting on the instructions of the Majority Lenders) may, subject to the other terms and conditions of this clause 5.5 and the other provisions of this Agreement, make such Delivery Advance, on the date specified in the relevant Utilisation Request, being the date on which the Delivery instalment of the relevant Building Contract Price is required to be deposited in accordance with the relevant Building Contract and with a bank as provided in the relevant Building Contract and at all times acceptable to all the Lenders (a **Builder's Bank**).

5.5.2      A Delivery Advance utilised pursuant to this clause 5.5 shall (subject to the other provisions of this Agreement) be used to refinance in full the outstanding Pre-Delivery Advances of that Ship at the Utilisation Date. Notwithstanding any other terms of this Agreement to the contrary, only the Delivery Commitments of those Lenders who have participations in the Pre-Delivery Advances for that Ship will be utilized for such purpose and, in relation to each such Lender, in an amount equal to such participation of that Lender. Such application may take place by mere book entries and on a cashless drawing basis in respect of each such Lender and each such equal amounts of participation and Commitment for an individual Lender. As a result of such application of the part of the relevant Delivery Advance for a Ship, the Pre-Delivery Advances for that Ship will be irrevocably pre-paid in full and the Delivery Commitments of such Lenders and the Ship Delivery Commitment for the relevant Ship will be immediately and irrevocably reduced by an amount equal to the amount so prepaid. Additionally, the balance of such Delivery Advance (a **Pre-placed Advance**) which has not been utilized for the above purpose will be remitted on the same day (and as part of the same

Utilisation) by the Agent to the relevant Builder's Bank as a cash deposit in the Agent's name with the relevant Builder's Bank with its correspondent bank in New York, and will be held by the relevant Builder's Bank to the order of the Agent for release by the Agent to the relevant Builder (a **Release**) and only subject to such irrevocable instructions addressed from the Agent to the relevant Builder's Bank as are acceptable to the Agent (**Irrevocable Instructions**).

5.5.3    Any such Irrevocable Instructions in relation to a Pre-placed Advance shall in any event provide (inter alia) that the relevant Pre-placed Advance shall be returned to the Agent within ten (10) days if it is not released to the Builder or its order (but, in connection with a Chinese Ship, subject to any different Irrevocable Instructions in connection with a Gas Trial Portion as defined in, and in accordance with, clause 5.5.4 below). Subject to clause 5.5.4 in connection with each Chinese Ship, the Finance Parties and the Obligors hereby agree that the relevant Pre-placed Advance shall not be released to the relevant Builder or to its order, and the Agent (and the authorised representatives of the Agent specified in the Irrevocable Instructions) shall not agree to counter-sign the "Protocol of Delivery and Acceptance" in respect of the relevant Ship nor release the relevant Pre-placed Advance to the Builder or its order, unless and until:

(a)    the Agent is satisfied that the "Protocol of Delivery and Acceptance" in respect of that Ship has been signed by the Builder and the relevant Owner; and

(b)    the Agent is satisfied that all the conditions precedent set out in Part 3 of Schedule 3 (*Conditions precedent on Delivery*) in relation to such Ship and such Pre-placed Advance have been satisfied in full.

5.5.4    Notwithstanding the provisions of clause 5.5.3 above, if a Pre-placed Advance relates to a Chinese Ship, then the only such part of the Pre-placed Advance may be released under the terms of such clause as is required and necessary to finance (and not exceeding in any event) the Delivery Instalment of such Chinese Ship (but not the instalment of the Building Contract Price of such Chinese Ship payable after Delivery and following completion of the gas trials of the relevant Ship under the relevant Building Contract (a **Gas Trial Portion**)). In such case, upon (but not before) the release of the relevant part of the Pre-placed Advance to the Builder under the terms of clause 5.5.3, the Gas Trial Portion may be released to the order of the relevant Owner for further release to the Builder, in accordance with the provisions of the relevant Building Contract or otherwise to the order of the Owner. The Irrevocable Instructions in connection with each Chinese Ship will reflect such arrangements. The Borrowers will notify the Agent immediately when a Gas Trial Portion in respect of a Chinese Ship has been released and will deliver to the Agent evidence that a Gas Trial Portion in relation to a Chinese Ship is not released unless and until the conditions of the Building Contract in respect of such release have been met (and the Borrowers undertake not to so release it unless and until such conditions are met).

5.5.5    Each Borrower hereby irrevocably and unconditionally undertakes that it shall not give any instructions to a Builder's Bank in respect of a Pre-placed Advance that are inconsistent with any Irrevocable Instructions in respect of that Pre-placed Advance.

5.5.6    The Borrowers shall immediately prepay a part of the relevant Delivery Advance equal to the amount of the Pre-placed Advance, together with interest thereon (calculated in accordance with clause 8.1 (*Calculation of interest*)), on the date on which the relevant Builder's Bank is required to return the moneys funded by that Pre-placed Advance to the Agent in accordance with the relevant Irrevocable Instructions (and regardless of whether the relevant Builder's Bank has then carried out such instructions), provided that any moneys actually returned to the Agent from the relevant Builder's Bank shall be applied by the Agent in satisfaction of such prepayment obligation of the Borrowers and in payment of any amounts payable by the Borrowers under clause 7.9 (*Restrictions*) as a result of such prepayment.

5.5.7    In case of application of this clause 5.5 in respect of any Delivery Advance, that Delivery Advance shall accrue interest in accordance with the terms of clause 8.1 (*Calculation of interest*) from the Utilisation Date for that Advance.

5.5.8    Any amount prepaid under clause 5.5.6 in respect of a Delivery Advance shall be, subject to the other terms of this Agreement, available to be redrawn by the Borrowers where Delivery of the relevant Ship has been delayed, in assisting the relevant Owner to finance part of the Building Contract Price of that Ship payable on its Delivery by paying the same to the relevant Builder.

## SECTION 4 - REPAYMENT, PREPAYMENT AND CANCELLATION

## 6    Repayment

### 6.1    Repayment

(a)    The Borrowers shall, on the Final Repayment Date for a Pre-Delivery Advance, repay such Pre-Delivery Advance in full.

(b)    The Borrowers shall, on each Repayment Date for a Delivery Advance, repay such part of such Delivery Advance as is required to be repaid by clause 6.2 (*Scheduled repayment of Delivery Facility*).

### 6.2    Scheduled repayment of Delivery Facility

To the extent not previously reduced, each Delivery Advance shall be repaid by instalments on each Repayment Date for that Delivery Advance by the amount specified below (as revised by clause 6.3 (*Adjustment of scheduled repayments*)):

| Repayment Date | Delivery Advance in relation to Hull No. 8163 | Delivery Advance in relation to Hull No. 8164 | Delivery Advance in relation to Hull No. 8165 | Delivery Advance in relation to Hull No. 8166 | Delivery Advance in relation to Hull No. 8167 | Delivery Advance in relation to Hull No. S1024 | Delivery Advance in relation to Hull No. S1025 |
|---|---|---|---|---|---|---|---|
| | Amount $ | Amount $ | Amount $ | Amount $ | Amount $ | Amount $ | Amount $ |
| First | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Second | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Third | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Fourth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Fifth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Sixth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Seventh | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Eighth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Ninth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Tenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Eleventh | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Twelfth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Thirteenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Fourteenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Fifteenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Sixteenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Seventeenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Eighteenth | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Nineteen | 493,600 | 493,600 | 493,600 | 493,600 | 493,600 | 640,000 | 640,000 |
| Twentieth | 20,238,369 | 20,238,369 | 20,238,369 | 20,238,369 | 20,238,368 | 26,298,078 | 26,298,078 |
| **TOTAL** | **29,616,769** | **29,616,769** | **29,616,769** | **29,616,769** | **29,616,768** | **38,458,078** | **38,458,078** |

The twentieth instalment of each Delivery Advance referred to above is comprised of two parts, namely:

(a) a repayment instalment in the amount of $493,600 (in respect of each Delivery Advance for a Korean Ship) or $640,000 (in respect of each Delivery Advance for a Chinese Ship); and

(b) a balloon instalment in the amount of $19,744,769 (in respect of each Delivery Advance for a Korean Ship other than Hull No. 8617), $19,744,768 (in respect of the Delivery Advance for Hull No. 8167) and $25,658,078 (in respect of each Delivery Advance for a Chinese Ship), with each such balloon instalment in respect of a Delivery Advance, referred to as the **Balloon Instalment** for such Delivery Advance.

On the Final Repayment Date for each Delivery Advance (without prejudice to any other provision of this Agreement), such Delivery Advance shall be repaid in full. On the last Final Repayment Date for a Delivery Advance to occur, all amounts outstanding under the Finance Documents shall be repaid in full.

**6.3     Adjustment of scheduled repayments**

If the Total Delivery Commitments in relation to a Delivery Advance have been partially reduced under this Agreement and/or any part of a Delivery Advance is prepaid (other than under clause 6.2 (*Scheduled repayment of Delivery Facility*)) before any Repayment Date for that Delivery Advance, the amount of the instalments (including the relevant Balloon Instalment) by which that Delivery Advance shall be repaid under clause 6.2 (*Scheduled repayment of Delivery Facility*) on any such Repayment Date for that Delivery Advance (as reduced by any earlier operation of this clause 6.3) shall be reduced pro rata to such reduction in the Total Delivery Commitments in relation to that Delivery Advance (except in the case of a reduction of the Total Delivery Commitments due to cancellation under clause 7.3 (*Voluntary cancellation*) or a prepayment under clause 7.4 (*Voluntary prepayment*), where the reduction shall be treated as reducing the instalments of that Delivery Advance (but excluding the relevant Balloon Instalment) by its aggregate amount pro rata).

**6.4     Maturity extension**

6.4.1     At any time between:

(a) 3 months after the later of the final Utilisation of a Delivery Advance to occur and the Last Availability Date; and

(b) 12 months before the earliest Final Repayment Date of a Delivery Advance under this Agreement,

the Borrowers shall be entitled to submit a written request to the Agent, requesting the Lenders to consent to an extension of the Final Repayment Date in respect of each Delivery Advance by 24 months. The effect of the requested extension for each Delivery Advance will be such that the Balloon Instalment of each Delivery Advance will be amortised in 8 quarterly instalments falling due at three monthly intervals after the then Final Repayment Date of such Delivery Advance, and a new balloon instalment for such Delivery Advance (the **Extension Balloon Instalment**) which will be payable on the last date of such 24 month period for such Delivery Advance. The amount of each of the eight (8) such quarterly instalments for each Delivery Advance shall be equal to the amount of the twentieth instalment of such Delivery Advance referred to in clause 6.2 (*Scheduled repayment of Delivery Facility*) less the Balloon Instalment for such Delivery Advance. The amount of the Extension Balloon Instalment for each Delivery Advance will be $15,795,969 (in respect of each Delivery Advance for a Korean Ship other than Hull No. 8617), $15,795,968 (in respect of the Delivery Advance for Hull No. 8167) and $20,538,078 (in respect of each Delivery Advance for a Chinese Ship).

6.4.2     The Lenders, acting unanimously, shall be entitled in their absolute and unfettered discretion, and without the need for assigning any reason to their decision, to either accept or decline such request.

The Lenders shall respond to the Borrowers' request as soon as practically possible after the request is sent to the Agent, and in any event within one (1) month thereafter.

6.4.3    If all the Lenders accept the Borrowers request in writing, the Parties agree to enter into such amendment documentation (including an amendment agreement to this Agreement, and amendments to the Mortgages) and the Obligors agree to deliver to the Agent such documents of the type referred to in Schedule 3 (*Conditions precedent*), in order to implement such changes to the repayment terms of the Loan referred to above, as the Majority Lenders may require in their absolute discretion and in each case at the cost and expense of the Borrowers.

6.4.4    If the Lenders' consent is granted, it shall not become effective unless and until the documentation referred to in clause 6.4.3 has been entered into and is effective and the documents referred to therein have been delivered to the Agent.

## 7    Illegality, prepayment and cancellation

### 7.1    Illegality

If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in the Loan:

(a)    that Lender shall promptly notify the Agent upon becoming aware of that event;

(b)    upon the Agent notifying the Borrowers, the Commitments of that Lender will be immediately cancelled and the remaining Ship Pre-Delivery Commitments and Ship Delivery Commitments in which it participated shall be reduced rateably and the Total Commitments shall be reduced accordingly; and

(c)    the Borrowers shall repay that Lender's participation in the Loan on the last day of the Interest Period occurring after the Agent has notified the Borrowers or, if earlier, the date specified by the Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law).

### 7.2    Change of control

If there is a Change of Control or an IPO Change of Control:

(a)    the Borrowers shall promptly notify the Agent of the same upon its occurrence;

(b)    a Lender shall not be obliged to fund a Utilisation; and

(c)    if a Lender so requires and notifies the Agent within 30 days of the date of occurrence of the Change of Control or the IPO Change of Control, the Agent shall, by not less than 30 days' notice to the Borrowers, cancel the Commitment of that Lender and declare the participation of that Lender in the Loan, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Commitment of that Lender will be cancelled and all such outstanding amounts will become immediately due and payable.

### 7.3    Voluntary cancellation

The Borrowers may, if they give the Agent not less than ten (10) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part of an Available Facility (but if in part, being an amount that reduces the amount of that Available Facility by a minimum amount of $1,000,000 and is a multiple of $1,000,000) which is undrawn at the proposed date of cancellation. Upon any such cancellation the Commitments of all the Lenders under that Facility shall be reduced rateably.

**7.4    Voluntary prepayment**

The Borrowers may, if they give the Agent not less than ten (10) Business Days' (or such shorter period as the Majority Lenders may agree) prior written notice, prepay the whole or any part of an Advance (but if in part, being an amount that reduces the amount of such Advance by a minimum amount of $1,000,000 and is a multiple of $1,000,000), on the last day of an Interest Period in respect of the amount to be prepaid or on any other date subject to payment of any Break Costs.

**7.5    Right of replacement or cancellation and prepayment in relation to a single Lender / right of cancellation in relation to a Defaulting Lender**

7.5.1    If:

(a)    any sum payable to any Lender by an Obligor is required to be increased under clause 12.2 (*Tax gross-up*); or

(b)    any Lender claims indemnification from the Borrowers under clause 12.3 (*Tax indemnity*) or clause 13.1 (*Increased Costs*); or

(c)    any FATCA Protected Lender notifies the Agent of a FATCA Event pursuant to clause 7.10 (*Mandatory repayment and cancellation of FATCA Protected Lenders*),

the Borrowers may, whilst the circumstance giving rise to the requirement for that increase or indemnification or FATCA Event continues for a maximum period of 30 days, give the Agent notice of cancellation of the Commitment of that Lender and their intention to procure the repayment of that Lender's participation in the Loan or give the Agent notice of their intention to replace that Lender in accordance with clause 7.5.4.

7.5.2    On receipt of a notice referred to in clause 7.5.1 above, the Commitments of that Lender shall immediately be reduced to zero and (unless the Commitments of the relevant Lender are replaced in accordance with clause 7.5.4) the remaining Ship Pre-Delivery Commitments and Ship Delivery Commitments in which it participated shall be reduced rateably and the Total Commitments shall be reduced accordingly.

7.5.3    On the last day of each Interest Period which ends after the Borrowers have given notice under clause 7.5.1 above in relation to a Lender (or, if earlier, the date specified by the Borrowers in that notice), the Borrowers shall repay that Lender's participation in the Loan.

7.5.4    The Borrowers  may, in the circumstances set out in clause 7.5.1, on 15 Business Days' prior notice to the Agent and that Lender, replace that Lender by requiring that Lender to transfer (and, to the extent permitted by law, that Lender shall transfer) pursuant to clause 30 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to a Lender or other bank, financial institution, trust, fund or other entity selected by the Borrowers which confirms its willingness to assume and does assume all the obligations of the transferring Lender in accordance with clause 30 (*Changes to the Lenders*) for a purchase price in cash or other cash payment payable at the time of the transfer equal to the aggregate of:

(a)    the outstanding principal amount of such Lender's participation in the Loan;

(b)    all accrued interest owing to such Lender to the extent that the Agent has not given a notification under clause 30.8 (*Pro-rata interest settlement*);

(c)    the Break Costs which would have been payable to such Lender pursuant to clause 10.4 (*Break Costs*) had the Borrowers prepaid in full that Lender's participation in the Loan on the date of the transfer; and

(d)    all other amounts payable to that Lender under the Finance Documents on the date of the transfer.

7.5.5    The replacement of a Lender pursuant to clause 7.5.4 shall be subject to the following conditions:

        (a)  the Borrowers shall have no right to replace the Agent;

        (b)  neither the Agent nor any Lender shall have any obligation to find a replacement Lender;

        (c)  in no event shall the Lender replaced under clause 7.5.4 be required to pay or surrender any of the fees received by such Lender pursuant to the Finance Documents; and

        (d)  the Lender shall only be obliged to transfer its rights pursuant to clause 7.5.4 above once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer.

7.5.6    If any Lender becomes a Defaulting Lender, the Borrowers may, at any time whilst the Lender continues to be a Defaulting Lender, give the Agent 5 Business Days' notice of cancellation of the Commitment of that Lender.

7.5.7    On the notice referred to in clause 7.5.6 above becoming effective, the Commitments of the Defaulting Lender shall immediately be reduced to zero and (unless the Commitments of the relevant Lender are replaced in accordance with clause 41.5 (*Replacement of a Defaulting Lender*)) the remaining Ship Pre-Delivery Commitments and Ship Delivery Commitments in which it participated shall be reduced rateably and the Total Commitments shall be reduced accordingly.

7.5.8    The Agent shall, as soon as practicable after receipt of a notice referred to in clause 7.5.6 above, notify all Lenders.

**7.6    Sale or Total Loss**

        On a Mortgaged Ship's Disposal Repayment Date the Borrowers shall prepay in full the Delivery Advance relevant to such Ship.

**7.7    Mandatory pre-delivery cancellation**

        If, prior to a Ship's Delivery:

        (a)  the Ship's Building Contract is for any reason and by any method cancelled, terminated or rescinded or transferred, assigned or novated or otherwise disposed of to any person (other than under the relevant Pre-Delivery Security Assignment) (but without prejudice to the rights of the Finance Parties under clause 22 (*Dealings with Ships*)); or

        (b)  a competent court or arbitration panel decides that the Ship's Building Contract has been validly cancelled, terminated or rescinded; or

        (c)  any of the Ship's Building Contract Documents is varied in a way prohibited by any Finance Document; or

        (d)  (i) any relevant Refund Guarantee for that Ship is repudiated, cancelled, rescinded or otherwise terminated or is not or ceases to be legal, valid, binding and enforceable obligations of the relevant Refund Guarantor or (ii) it is or becomes unlawful for the relevant Refund Guarantor to perform its obligations under it or (iii) the relevant Refund Guarantor becomes subject to any of the events or circumstances described in clause 29.8 (*Insolvency*) or in clause 29.9 (*Insolvency proceedings*); or

        (e)  the relevant Builder becomes subject to any of the events or circumstances described in clause 29.8 (*Insolvency*) or clause 29.9 (*Insolvency proceedings*); or

        (f)  Delivery of the Ship or Utilisation of the Ship Delivery Commitment for that Ship, has not occurred by the Last Availability Date for the Delivery Advance relevant to such Ship,

then the Agent may, and shall if so directed by the Majority Lenders, by notice to the Borrowers with effect from the date 5 Business Days after the giving of such notice (or such later date as may be approved in advance by the Majority Lenders) cancel the Ship Delivery Commitment for such Ship (whereupon the Total Delivery Commitments and the Available Facility shall be reduced by such Ship Delivery Commitment). The Borrowers shall on the date such cancellation takes effect prepay the Pre-Delivery Advances for that Ship in full.

**7.8    Automatic cancellation**

Any part of the Total Commitments relating to an Advance which has neither become available nor been utilised by the Last Availability Date for that Advance shall be automatically cancelled at close of business in London on the Last Availability Date for that Advance.

**7.9    Restrictions**

7.9.1    Any notice of cancellation or prepayment given by any Party under this clause 7 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment and, in the case of a prepayment under clause 7.4 (*Voluntary prepayment*), the relevant Advance to be prepaid.

7.9.2    Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

7.9.3    The Borrowers may not re-borrow any part of a Facility which is repaid or prepaid (subject as provided in clause 5.5.8).

7.9.4    The Borrowers shall not repay or prepay all or any part of the Loan or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

7.9.5    No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

7.9.6    If the Agent receives a notice under this clause 7 it shall promptly forward a copy of that notice to either the Borrowers or the affected Lender, as appropriate.

7.9.7    If the Total Commitments in respect of a Facility are partially reduced under this Agreement (other than under clause 7.1 (*Illegality*), clause 7.5 (*Right of replacement or cancellation and prepayment in relation to a single Lender / right of cancellation in relation to a Defaulting Lender*) and clause 7.10 (*Mandatory repayment and cancellation of FATCA Protected Lenders*)), the Commitments of the Lenders under that Facility shall be reduced rateably and in all cases where the Total Commitments are partially reduced under this Agreement (other than in relation to a cancellation of all of the Ship Pre-Delivery Commitment and/or the Ship Delivery Commitment for a Ship) the remaining Ship Pre-Delivery Commitments or (as the case may be) Ship Delivery Commitments for all the Ships shall be reduced rateably.

7.9.8    If the Advances under a Facility are partially prepaid under this Agreement (other than under clause 7.1 (*Illegality*), clause 7.5 (*Right of replacement or cancellation and prepayment in relation to a single Lender / right of cancellation in relation to a Defaulting Lender*) and clause 7.10 (*Mandatory repayment and cancellation of FATCA Protected Lenders*)), the amount prepaid shall reduce the participation of the Lenders in the Advances of that Facility rateably.

7.9.9    If the Advances under a Facility are partially prepaid under this Agreement (other than under clause 7.4 (*Voluntary prepayment*) or clause 7.6 (*Sale or Total Loss*) or clause 7.7 (*Mandatory pre-delivery cancellation*)), all remaining Advances under that Facility shall be reduced rateably.

**7.10    Mandatory repayment and cancellation of FATCA Protected Lenders**

7.10.1    If on the date falling three months before the earliest FATCA Application Date for any payment by a Party to a FATCA Protected Lender (or to the Agent for the account of that Lender), that Lender is not a FATCA Exempt Party and, in the opinion of that Lender (acting reasonably), that Party will, as a consequence, be required to make a FATCA Deduction from a payment to that Lender (or to the Agent for the account of that Lender) on or after that FATCA Application Date (a **FATCA Event**):

(a)    that Lender shall, reasonably promptly after that date, notify the Agent of that FATCA Event and the relevant FATCA Application Date;

(b)    if, on the date falling one month before such FATCA Application Date, that FATCA Event is continuing and that Lender has not been repaid or replaced pursuant to clause 7.5 (*Right of replacement or cancellation and prepayment in relation to a single Lender / right of cancellation in relation to a Defaulting Lender*) (other than by reason of that Lender's failure to comply with its obligations pursuant to clause 7.5.4):

(i)    that Lender may, at any time between one month and two weeks before such FATCA Application Date, notify the Agent;

(ii)    upon the Agent notifying the Borrowers, the Commitment of that Lender will be immediately cancelled; and

(iii)    the Borrowers shall repay that Lender's participation in the Loan made to the Borrowers on the last day of the Interest Period for the Loan occurring after the Agent has notified the Borrowers or, if earlier, the last Business Day before the relevant FATCA Application Date.

## SECTION 5 - COSTS OF UTILISATION

### 8   Interest

#### 8.1   Calculation of interest

The rate of interest on each Advance for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

    (a)  Margin; and

    (b)  LIBOR.

#### 8.2   Payment of interest

The Borrowers shall pay accrued interest on each Advance on the last day of each Interest Period for that Advance (and, if an Interest Period is longer than three months, on the dates falling at three monthly intervals after the first day of that Interest Period).

#### 8.3   Default interest

8.3.1   If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to clause 8.3.2 below, is 2 per cent. higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted the Loan for successive Interest Periods, each of a duration selected by the Agent (acting reasonably).   Any interest accruing in accordance with this clause 8.3 shall be immediately payable by the Obligors on demand by the Agent.

8.3.2   If any overdue amount consists of all or part of the Loan which became due on a day which was not the last day of an Interest Period relating to the Loan or the relevant part of it:

    (a)  the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to the Loan; and

    (b)  the rate of interest applying to the overdue amount during that first Interest Period shall be 2 per cent. higher than the rate which would have applied if the overdue amount had not become due.

8.3.3   Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

#### 8.4   Notification of rates of interest

The Agent shall notify the Lenders and the Borrowers of the determination of a rate of interest under this Agreement.

### 9   Interest Periods

#### 9.1   Selection of Interest Periods

9.1.1   The Borrowers may select an Interest Period for an Advance in the Utilisation Request for such Advance or (if such Advance has already been borrowed) in a Selection Notice.

9.1.2   Each Selection Notice is irrevocable and must be delivered to the Agent by the Borrowers not later than 11:00 a.m. five Business Days before the last day of the then current Interest Period.

9.1.3    If the Borrowers fail to deliver a Selection Notice to the Agent in accordance with clause 9.1.2, the relevant Interest Period will, subject to clause 9.2 (*Interest Periods overrunning Repayment Dates*), be 3 months.

9.1.4    Subject to this clause 9, the Borrowers may select an Interest Period of three or six months or any other period agreed between the Borrowers and the Agent on the instructions of all the Lenders.

9.1.5    No Interest Period in respect of an Advance shall extend beyond the Final Repayment Date for that Advance.

9.1.6    The first Interest Period for an Advance shall start on the Utilisation Date of that Advance and each subsequent Interest Period for that Advance shall start on the last day of its preceding Interest Period.

9.1.7    The first Interest Period for a Pre-Delivery Advance for a Ship (other than the first Pre-Delivery Advance for that Ship) shall end on the last day of the then current Interest Period for any other Pre-Delivery Advance previously drawn for that Ship, and all Pre-Delivery Advances for the same Ship shall always have Interest Periods ending on the same date.

**9.2    Interest Periods overrunning Repayment Dates**

If the Borrowers select an Interest Period in respect of a Delivery Advance which would overrun any later Repayment Date for that Delivery Advance, the relevant Delivery Advance shall be divided into parts corresponding to the amounts by which the Total Delivery Commitments for that Delivery Advance are scheduled to be reduced under clause 6.2 (*Scheduled repayment of Delivery Facility*) on each of the Repayment Dates for that Delivery Advance falling during such Interest Period (each of which shall have a separate Interest Period ending on the relevant Repayment Date for that Delivery Advance) and to the balance of that Delivery Advance (which shall have the Interest Period selected by the Borrowers).

**9.3    Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

**10    Changes to the calculation of interest**

**10.1    Absence of quotations**

Subject to clause 10.2 (*Market Disruption Event*), if LIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by 11:00 a.m. on the Quotation Day, the applicable LIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

**10.2    Market Disruption Event**

10.2.1    If a Market Disruption Event occurs in relation to the Loan for any Interest Period, then the rate of interest on each Lender's share of the Loan for the Interest Period shall be the rate per annum which is the sum of:

(a)    the Margin; and

(b)    the rate notified to the Agent by that Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in the Loan from whatever source it may reasonably select.

10.2.2    In this Agreement **Market Disruption Event** means that:

(a)  at or about noon on the Quotation Day for the relevant Interest Period LIBOR is to be determined by reference to the Reference Banks and none or only one of the Reference Banks supplies a rate to the Agent to determine LIBOR for the relevant Interest Period; or

(b)  before close of business in London on the Quotation Day for the relevant Interest Period, the Agent receives notifications from a Lender or Lenders (whose participations in the Loan equal or exceed 50% of the Loan or, if prior to the first Utilisation Date, whose Commitments equal or exceed 50% of the Total Commitments) that the cost to it of obtaining matching deposits in the Interbank Market would be in excess of LIBOR.

## 10.3    Alternative basis of interest or funding

10.3.1    If a Market Disruption Event occurs and the Agent or the Borrowers so require, the Agent and the Borrowers shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest.

10.3.2    Any alternative basis agreed pursuant to clause 10.3.1 above shall, with the prior consent of all the Lenders be binding on all Parties.

## 10.4    Break Costs

10.4.1    The Borrowers shall, within three Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of the Loan or Unpaid Sum being paid by the Borrowers on a day other than the last day of an Interest Period for the Loan or Unpaid Sum or relevant part of it.

10.4.2    Each Lender shall, as soon as reasonably practicable after a demand by the Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

## 11    Fees

## 11.1    Commitment commission

11.1.1    The Borrowers shall pay to the Agent (for the account of each Lender) a fee in dollars computed at the rate of 1.15% per annum on the undrawn and uncancelled portion of that Lender's Delivery Commitment calculated from the date of this Agreement (the **start date**).

11.1.2    The Borrowers shall pay the accrued commitment commission on each of 31 March, 30 June, 30 September and 31 December of each calendar year, on the Last Availability Date to occur and, if cancelled in full, on the cancelled amount of the relevant Lender's Delivery Commitment at the time the cancellation is effective.

11.1.3    No commitment commission is payable to the Agent (for the account of a Lender) on the undrawn portion of the Delivery Commitment of that Lender for any day on which that Lender is a Defaulting Lender.

11.1.4    No commitment commission is payable to the Agent (for the account of a Lender) on a part of that Lender's undrawn Delivery Commitment in respect of a Ship, which is equal to the aggregate of (a) such Lender's undrawn Pre-Delivery Commitment (if any) in respect of that Ship and (b) such Lender's participation in the Pre-Delivery Advances (if any) in respect of that Ship.

## 11.2    Arrangement fee

The Obligors shall pay to the Agent (for distribution to the Arrangers and the Lenders in a manner agreed between the Arrangers and the Lenders in the Arrangers' discretion) an arrangement fee in the amount and at the times agreed in a Fee Letter.

## 11.3   Agency fee

The Borrowers shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

## SECTION 6 - ADDITIONAL PAYMENT OBLIGATIONS

### 12      Tax gross-up and indemnities

#### 12.1     Definitions

12.1.1   In this Agreement:

**Protected Party** means a Finance Party or, in relation to clause 14.4 *(Indemnity concerning security)* and clause 14.7 *(Interest)* insofar as it relates to interest on any amount demanded by that Indemnified Person under clause 14.4 *(Indemnity concerning security)*, any Indemnified Person, which is or will be subject to any liability, or required to make any payment, for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document other than a FATCA Deduction.

**Tax Payment** means either the increase in a payment made by an Obligor to a Finance Party under clause 12.2 *(Tax gross-up)* or a payment under clause 12.3 *(Tax indemnity)*.

12.1.2   Unless a contrary indication appears, in this clause 12 a reference to **determines** or **determined** means a determination made in the absolute discretion of the person making the determination.

#### 12.2     Tax gross-up

12.2.1   Each Obligor shall make all payments to be made by it under any Finance Document without any Tax Deduction, unless a Tax Deduction is required by law.

12.2.2   The Borrowers shall, promptly upon any of them becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction), notify the Agent accordingly.   Similarly, a Lender shall notify the Agent on becoming so aware in respect of a payment payable to that Lender.  If the Agent receives such notification from a Lender it shall notify the Borrowers and that Obligor.

12.2.3   If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor under the relevant Finance Document shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

12.2.4   If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

12.2.5   Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Agent for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party (including by way of receipts) that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

#### 12.3     Tax indemnity

12.3.1   Each Obligor who is a Party shall (within three Business Days of demand by the Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

12.3.2    Clause 12.3.1 above shall not apply:

    (a)  with respect to any Tax assessed on a Finance Party:

        (i)  under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

        (ii)  under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

    if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party;

    (b)  to the extent a loss, liability or cost is compensated for by an increased payment under clause 12.2 *(Tax gross-up)*;

    (c)  to the extent a loss, liability or cost is compensated for by a payment under clause 12.4 *(Indemnities on after Tax basis)*; or

    (d)  to the extent a loss, liability or cost relates to a FATCA Deduction required to be made by a Party.

12.3.3    A Protected Party making, or intending to make a claim under clause 12.3.1 above shall promptly notify the Agent of the event which will give, or has given, rise to the claim, following which the Agent shall notify the Borrowers and the Guarantor.

12.3.4    A Protected Party shall, on receiving a payment from an Obligor under this clause 12.3, notify the Agent.

**12.4    Indemnities on after Tax basis**

12.4.1    If and to the extent that any sum payable to any Protected Party by the Borrowers under any Finance Document by way of indemnity or reimbursement proves to be insufficient, by reason of any Tax suffered thereon, for that Protected Party to discharge the corresponding liability to a third party, or to reimburse that Protected Party for the cost incurred by it in discharging the corresponding liability to a third party, the Borrowers shall pay that Protected Party such additional sum as (after taking into account any Tax suffered by that Protected Party on such additional sum) shall be required to make up the relevant deficit.

12.4.2    If and to the extent that any sum (the **Indemnity Sum**) constituting (directly or indirectly) an indemnity to any Protected Party but paid by the Borrowers to any person other than that Protected Party, shall be treated as taxable in the hands of the Protected Party, the Borrowers shall pay to that Protected Party such sum (the **Compensating Sum**) as (after taking into account any Tax suffered by that Protected Party on the Compensating Sum) shall reimburse that Protected Party for any Tax suffered by it in respect of the Indemnity Sum.

12.4.3    For the purposes of this clause 12.4 a sum shall be deemed to be taxable in the hands of a Protected Party if it falls to be taken into account in computing the profits or gains of that Protected Party for the purposes of Tax and, if so, that Protected Party shall be deemed to have suffered Tax on the relevant sum at the rate of Tax applicable to that Protected Party's profits or gains for the period in which the payment of the relevant sum falls to be taken into account for the purposes of such Tax.

**12.5    FATCA Information**

12.5.1    Subject to clause 12.5.3 below, each Party shall, within ten Business Days of a reasonable request by another Party:

(a)   confirm to that other Party whether it is:

(i)    a FATCA Exempt Party; or

(ii)   not a FATCA Exempt Party; and

(b)   supply to that other Party such forms, documentation and other information relating to its status under FATCA (including its applicable "passthru payment percentage" or other information required under the US Treasury Regulations or other official guidance including intergovernmental agreements) as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA.

12.5.2    If a Party confirms to another Party pursuant to clause 12.5.1(a) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

12.5.3    Clause 12.5.1 above shall not oblige any Finance Party to do anything which would or might in its reasonable opinion constitute a breach of:

(a)   any law or regulation;

(b)   any fiduciary duty; or

(c)   any duty of confidentiality.

12.5.4    If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with clause 12.5.1 above (including, for the avoidance of doubt, where clause 12.5.3 above applies), then:

(a)   if that Party failed to confirm whether it is (and/or remains) a FATCA Exempt Party then such Party shall be treated for the purposes of the Finance Documents as if it is not a FATCA Exempt Party; and

(b)   if that Party failed to confirm its applicable "passthru payment percentage" then such Party shall be treated for the purposes of the Finance Documents (and payments made thereunder) as if its applicable "passthru payment percentage" is 100%,

until (in each case) such time as the Party in question provides the requested confirmation, forms, documentation or other information.

**12.6    FATCA Deduction**

12.6.1    Each Party may make any FATCA Deduction it is required by FATCA to make, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

12.6.2    Each Party shall promptly upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction) notify the Party to whom it is making the payment and, in addition, shall notify the Borrowers, the Agent and the other Finance Parties.

**12.7    Stamp taxes**

The Borrowers shall pay and, within three Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

**12.8    Value added tax**

12.8.1    All amounts set out, or expressed in a Finance Document to be payable by any party to a Finance Party which (in whole or in part) constitute the consideration for a supply or supplies for VAT purposes shall be deemed to be exclusive of any VAT which is chargeable on such supply or supplies, and accordingly, subject to clause 12.8.3 below, if VAT is or becomes chargeable on any supply made by any Finance Party to any party under a Finance Document, that party shall pay to the Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of such VAT (and such Finance Party shall promptly provide an appropriate VAT invoice to such party).

12.8.2    If VAT is or becomes chargeable on any supply made by any Finance Party (the **Supplier**) to any other Finance Party (the **Recipient**) under a Finance Document, and any party to a Finance Document other than the Recipient (the **Subject Party**) is required by the terms of any Finance Document to pay an amount equal to the consideration for such supply to the Supplier (rather than being required to reimburse the Recipient in respect of that consideration):

(a)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Subject Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT. The Recipient must (where this paragraph (i) applies) promptly pay to the Subject Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(b)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Subject Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

12.8.3    Where a Finance Document requires any party to it to reimburse or indemnify a Finance Party for any cost or expense, that party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment of in respect of such VAT from the relevant tax authority.

12.8.4    Any reference in this clause 12.8 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term "representative member" to have the same meaning as in the Value Added Tax Act 1994).

12.8.5    In relation to any supply made by a Finance Party to any party under a Finance Document, if reasonably requested by such Finance Party, that party must promptly provide such Finance Party with details of that party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

## 13      Increased Costs

**13.1    Increased Costs**

13.1.1    Subject to clause 13.3 (*Exceptions*), the Borrowers shall, within three Business Days of a demand by the Agent, pay for the account of a Finance Party the amount of any Increased Cost incurred by that Finance Party or any of its Affiliates which:

(a) arises as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement; and/or

(b) is a Basel III Increased Cost.

13.1.2 In this Agreement **Increased Costs** means:

(a) a reduction in the rate of return from the Facilities or on a Finance Party's (or its Affiliate's) overall capital;

(b) an additional or increased cost; or

(c) a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document.

## 13.2 Increased Cost claims

13.2.1 A Finance Party intending to make a claim pursuant to clause 13.1 (*Increased Costs*) shall notify the Agent of the event giving rise to the claim, following which the Agent shall notify the Borrowers.

13.2.2 Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs.

## 13.3 Exceptions

13.3.1 Clause 13.1 (*Increased Costs*) does not apply to the extent any Increased Cost is:

(a) attributable to a Tax Deduction required by law to be made by an Obligor;

(b) compensated for by clause 12.3 (*Tax indemnity*) (or would have been compensated for under clause 12.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in clause 12.3.2 applied);

(c) attributable to a FATCA Deduction required to be made by a Party; or

(d) attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation.

13.3.2 In this clause 13.3, a reference to a **Tax Deduction** has the same meaning given to the term in clause 12.1 (*Definitions*).

## 14 Other indemnities

### 14.1 Currency indemnity

14.1.1 If any sum due from an Obligor under the Finance Documents (a **Sum**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **First Currency**) in which that Sum is payable into another currency (the **Second Currency**) for the purpose of:

(a) making or filing a claim or proof against that Obligor; and/or

(b) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall, as an independent obligation, within three Business Days of demand by a Finance Party, indemnify each Finance Party to whom that Sum is due against any Losses arising out of or as a result of the conversion including any discrepancy between (i) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (ii) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

14.1.2    Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

**14.2    Other indemnities**

14.2.1    The Borrowers shall (or shall procure that another Obligor will), within three Business Days of demand by a Finance Party, indemnify each Finance Party against any and all Losses incurred by that Finance Party as a result of:

      (a)    the occurrence of any Event of Default;

      (b)    a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any and all Losses arising as a result of clause 34 (*Sharing among the Finance Parties*);

      (c)    funding, or making arrangements to fund, its participation in the Loan requested by the Borrowers in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

      (d)    the Loan (or part of the Loan) not being prepaid in accordance with a notice of prepayment given by the Borrowers.

14.2.2    The Borrowers shall (or shall procure that another Obligor will), within three Business Days of demand by an Indemnified Person, indemnify each Indemnified Person against any and all Losses, joint or several that may be incurred by or asserted or awarded against any Indemnified Person, in each case arising out of or in connection with or relating to any claim investigation, litigation or proceeding (or the preparation of any defence with respect thereto) commenced or threatened in relation to this Agreement (or the transactions contemplated hereby) or any use made or proposed to be made with the proceeds of a Facility (including an Environmental Claim made or asserted against such Indemnified Person if such Environmental Claim would not have been, or been capable of being, made or asserted against such Indemnified Person if the Finance Parties had not entered into any of the Finance Documents and/or exercised any of their rights, powers and discretions thereby conferred and/or performed any of their obligations thereunder and/or been involved in any of the transactions contemplated by the Finance Documents). This indemnity shall apply whether or not such claims, investigation, litigation or proceedings is brought by any Obligor, any other Group Member, any of their shareholders, their Affiliates, or creditors, or an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto, except to the extent such Losses are found in a final non-appealable judgement by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or wilful misconduct. Each Indemnified Person may enforce and enjoy the benefit of this clause 14.2.2 under the Third Parties Act.

**14.3    Indemnity to the Agent and the Security Agent**

      The Borrowers shall promptly indemnify the Agent and the Security Agent against:

14.3.1    any and all Losses incurred by the Agent or the Security Agent (acting reasonably) as a result of:

      (a)    without prejudice to clause 32.7.2(a) as extended to the Security Agent by clause 32.22 (*Application of certain clauses to Security Agent*), investigating any event which it reasonably believes is a Default;

(b) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(c) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; or

(d) any action taken by the Agent or the Security Agent or any of their representatives, agents or contractors in connection with any powers conferred by any Security Document to enforce any Security Interest thereunder or to remedy any breach of any Obligor's obligations under the Finance Documents; and

14.3.2  any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent or the Security Agent (otherwise than by reason of the Agent's or the Security Agent's gross negligence or wilful default) (or, in the case of any cost, loss or liability pursuant to clause 35.11 (*Disruption to payment systems etc.*) notwithstanding the Agent's or the Security Agent's negligence, gross negligence or any other category of liability whatsoever (but not including any claim based on the fraud of the Agent) in acting as Agent or the Security Agent under the Finance Documents.

## 14.4     Indemnity concerning security

14.4.1  The Borrowers shall (or shall procure that another Obligor will) promptly indemnify each Indemnified Person against any and all Losses incurred by it in connection with:

(a) any failure by the Borrowers to comply with clause 16 (*Costs and expenses*);

(b) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(c) the taking, holding, protection or enforcement of the Security Documents;

(d) the exercise or purported exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and/or any other Finance Party and each Receiver by the Finance Documents or by law unless and to the extent that it was caused by its gross negligence or wilful default;

(e) any claim (whether relating to the environment or otherwise) made or asserted against the Indemnified Person which would not have arisen but for the execution or enforcement of one or more Finance Documents (unless and to the extent it is caused by the gross negligence or wilful default of that Indemnified Person); or

(f) any breach by any Obligor of any of its obligations expressed to be assumed by it in the Finance Documents.

14.4.2  The Security Agent may, in priority to any payment to the other Finance Parties, indemnify itself out of the Trust Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this clause 14.4 and shall have a lien on the Security Documents and the proceeds of the enforcement of those Security Documents for all monies payable to it.

## 14.5     Continuation of indemnities

The indemnities by the Borrowers in favour of the Indemnified Persons contained in this Agreement shall continue in full force and effect notwithstanding any breach by any Finance Party or the Borrowers of the terms of this Agreement, the repayment or prepayment of the Loan, the cancellation of the Total Commitments or the repudiation by the Agent or the Borrowers of this Agreement.

**14.6    Third Parties Act**

Each Indemnified Person may rely on the terms of clause 14.4 *(Indemnity concerning security)* and clauses 12 *(Tax gross-up and indemnities)* and 14.7 *(Interest)* insofar as it relates to interest on any amount demanded by that Indemnified Person under clause 14.4 *(Indemnity concerning security)*, subject to clause 1.3 (*Third party rights*) and the provisions of the Third Parties Act.

**14.7    Interest**

Moneys becoming due by the Borrowers to any Indemnified Person under the indemnities contained in this clause 14 or elsewhere in this Agreement shall be paid on demand made by such Indemnified Person and shall be paid together with interest on the sum demanded from the date of demand therefor to the date of reimbursement by the Borrowers to such Indemnified Person (both before and after judgment) at the rate referred to in clause 8.3 *(Default interest)*.

**14.8    Exclusion of liability**

No Indemnified Person will be in any way liable or responsible to any Obligor (whether as mortgagee in possession or otherwise) who is a Party or is a party to a Finance Document to which this clause applies for any loss or liability arising from any act, default, omission or misconduct of that Indemnified Person, except to the extent caused by its own gross negligence or wilful default. Any Indemnified Person may rely on this clause 14.8 subject to clause 1.3 (*Third party rights*) and the provisions of the Third Parties Act.

**14.9    Fax and email indemnity**

The Borrowers shall indemnify each Finance Party against any and all Losses together with any VAT thereon which any of the Finance Parties may sustain or incur as a consequence of any fax or email communication purporting to originate from the Borrowers to the Agent or the Security Agent being made or delivered fraudulently or without proper authorisation (unless such Losses are the direct result of the gross negligence or wilful default of the relevant Finance Party or the Agent or the Security Agent).

**14.10    Waiver**

In no event shall any of the Finance Parties be liable on any theory of liability for any special, indirect, consequential or punitive damages and the Obligors hereby waive, release and agree (for and on behalf of themselves and on behalf of the other Group Members and their respective Affiliates and shareholders) not to sue upon any such claim for any such damages, whether or not accrued and whether or not known or suspected to exist in their favour.

## 15    Mitigation by the Lenders

**15.1    Mitigation**

15.1.1    Each Finance Party shall, in consultation with the Borrowers, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of clause 7.1 (*Illegality*), clause 12 (*Tax gross-up and indemnities*) or clause 13 (*Increased Costs*), including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

15.1.2    Clause 15.1.1 does not in any way limit the obligations of any Obligor under the Finance Documents.

**15.2    Limitation of liability**

15.2.1    The Borrowers shall indemnify each Finance Party for all costs and expenses incurred by that Finance Party as a result of steps taken by it under clause 15.1 (*Mitigation*).

15.2.2    A Finance Party is not obliged to take any steps under clause 15.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 16    Costs and expenses

### 16.1    Transaction expenses

The Borrowers shall promptly within ten (10) Business Days of demand pay the Agent, the Arrangers and the Security Agent the amount of all costs and expenses (including fees, costs and expenses of legal advisers and insurance and other consultants and advisers) reasonably incurred by any of them (and by any Receiver) in connection with the negotiation, preparation, printing, execution, syndication, registration and perfection and any release, discharge or reassignment of:

   (a)   this Agreement and any other documents referred to in this Agreement and the Original Security Documents;

   (b)   any other Finance Documents executed or proposed to be executed after the date of this Agreement including any executed to provide additional security under clause 25 (*Minimum security value*);or

   (c)   any Security Interest expressed or intended to be granted by a Finance Document.

### 16.2    Amendment costs

If an Obligor requests an amendment, waiver or consent, the Borrowers shall, within five Business Days of demand by the Agent, reimburse the Agent for the amount of all costs and expenses (including fees, costs and expenses of legal advisers and insurance and other consultants and advisers) reasonably incurred by the Agent or by the Security Agent (and by any Receiver) in responding to, evaluating, negotiating or complying with that request or requirement.

### 16.3    Enforcement, preservation and other costs

The Borrowers shall on demand by a Finance Party, pay to each Finance Party the amount of all costs and expenses (including fees, costs and expenses of legal advisers and insurance and other consultants, brokers, surveyors and advisers) incurred by that Finance Party in connection with:

   (a)   the enforcement of, or the preservation of any rights under, any Finance Document and any proceedings initiated by or against any Indemnified Person and as a consequence of holding the Charged Property or enforcing those rights and any proceedings instituted by or against any Indemnified Person as a consequence of taking or holding the Security Documents or enforcing those rights;

   (b)   any valuation carried out under clause 25 (*Minimum security value*); or

   (c)   any inspection carried out under clause 23.8 (*Inspection and notice of drydocking*) or any survey carried out under clause 23.16 (*Survey report*).

## SECTION 7 - GUARANTEE

## 17    Guarantee and indemnity

### 17.1    Guarantee and indemnity

The Guarantor hereby irrevocably and unconditionally:

(a)    guarantees to the Security Agent (as trustee for the Finance Parties) and the other Finance Parties punctual performance by each other Obligor of all such Obligor's obligations under the Finance Documents;

(b)    undertakes with the Security Agent (as trustee for the Finance Parties) and the other Finance Parties that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, it shall immediately on demand pay that amount as if it was the principal obligor; and

(c)    agrees with the Security Agent (as trustee for the Finance Parties) and the other Finance Parties that it will, as an independent and primary obligation, indemnify each Finance Party immediately on demand against any cost, loss or liability it incurs (i) if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal where such cost, loss or liability arises as a result of the Borrowers not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by the Borrowers under any Finance Document on the date when it would have been due, or (ii) if as a result (directly or indirectly) of the introduction of or any change in (or the interpretation, administration or application of) any law or regulation, or compliance with any law, regulation or administrative procedure made after entry into this Agreement (a **Change in Law**), there is a change in the currency, the value of the currency or the timing, place or manner in which any obligation guaranteed by the Guarantor is payable.  The amount payable by the Guarantor under this indemnity:

(i)    in respect of paragraph (i) above, shall be the amount it would have had to pay under this clause 17 if the amount claimed had been recoverable on the basis of a guarantee but for any relevant unenforceability, invalidity or illegality; and

(ii)    in respect of paragraph (ii) above, shall include (1) the difference between (x) the amount (if any) received by the Agent and the other Finance Parties from the Borrowers and (y) the amount that the Borrowers were obliged to pay under the original express terms of the Finance Documents in the currency specified in the Finance Documents, disregarding any Change in Law (the **Original Currency**), and (2) all further costs, losses and liabilities suffered or incurred by the Agent and the other Finance Parties as a result of a Change in Law.

For the purposes of (1)(x) above, if payment was not received by the Agent or the other Finance Parties in the Original Currency, the amount received by the Agent and the other Finance Parties shall be deemed to be that payment's equivalent in the Original Currency converted, actually or notionally at the Agent's discretion, on the day of receipt at the then prevailing spot rate of exchange of the Agent or if, in the Agent's opinion, it could not reasonably or properly have made a conversion on the day of receipt of the equivalent of that payment in the Original Currency, that payment's equivalent as soon as the Agent could, in its opinion, reasonably and properly have made a conversion of the Original Currency with the currency of payment.

If the Original Currency no longer exists, the Guarantor shall make such payment in such currency as is, in the reasonable opinion of the Agent, required, after taking into account any payments by the Borrowers, to place the Agent and the other Finance Parties in a position reasonably comparable to that it would have been in had the Original Currency continued to exist.

**17.2    Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

**17.3    Reinstatement**

If any payment is made by an Obligor, or any discharge, release or arrangement is given by a Finance Party (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) in whole or in part on the basis of any payment, security or other disposition, and the same is avoided or reduced or must be restored in, or as a result of, insolvency, liquidation, administration or any other similar event or otherwise, then:

    (a)   the liability of each Obligor under this clause 17 shall continue as if the payment, discharge, release, arrangement, avoidance or reduction had not occurred; and

    (b)   each Finance Party shall be entitled to recover the value or amount of that security or payment from each Obligor, as if the payment, discharge, release, arrangement, avoidance or reduction had not occurred.

**17.4    Waiver of defences**

The obligations of the Guarantor under this clause 17 will not be affected by an act, omission, matter or thing (whether or not known to it or any Finance Party) which, but for this clause, would reduce, release or prejudice any of its obligations under this clause 17 including (without limitation):

    (a)   any time, waiver or consent granted to, or composition with, any Obligor or other person;

    (b)   the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any other Obligor;

    (c)   the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

    (d)   any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

    (e)   any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any Finance Document or other document or security;

    (f)   any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

    (g)   any insolvency or similar proceedings.

**17.5    Immediate recourse**

The Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Guarantor under this clause 17. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**17.6    Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Guarantor shall not be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from the Guarantor or on account of the Guarantor's liability under this clause 17.

**17.7    Deferral of Guarantor's rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, the Guarantor shall not exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this clause 17:

(a)    to be indemnified by another Obligor;

(b)    to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d)    to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which the Guarantor has given a guarantee, undertaking or indemnity under clause 17 (*Guarantee and Indemnity*);

(e)    to exercise any right of set-off against any other Obligor; and/or

(f)    to claim or prove as a creditor of any other Obligor in competition with any Finance Party.

If the Guarantor receives any benefit, payment or distribution in relation to such rights it will promptly pay an equal amount to the Agent for application in accordance with clause 35 (*Payment mechanics*). This only applies until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full.

**17.8    Additional security**

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

**17.9    Guarantor's rights and obligations**

The obligations of the Guarantor under the Finance Documents shall continue until all amounts which may be or become payable by the Guarantor under or in connection with the Finance Documents have been irrevocably and unconditionally paid or discharged in full, regardless of any intermediate payment or discharge in whole or in part.

## SECTION 8 - REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT

### 18      Representations

Each Obligor who is a Party makes and repeats the representations and warranties set out in this clause 18 to each Finance Party at the times specified in clause 18.32 (*Times when representations are made*).

#### 18.1      Status

18.1.1      Each Obligor is duly incorporated or formed (as the case may be) and validly existing under the laws of the jurisdiction of its incorporation or formation (as the case may be) as a limited liability company or corporation and (except in relation to Obligors incorporated in Liberia and/or the Marshall Islands) has no centre of main interests, permanent establishment or place of business outside the jurisdiction in which it is incorporated.

18.1.2      Each Obligor and each other Group Member has power and authority to carry on its business as it is now being conducted and to own its property and other assets.

18.1.3      No Obligor is a FATCA FFI or a US Tax Obligor.

#### 18.2      Binding obligations

Subject to the Legal Reservations, the obligations expressed to be assumed by each Obligor in each Finance Document any Charter Document and any Building Contract Document to which it is, or is to be, a party are or, when entered into by it, will be legal, valid, binding and enforceable obligations and each Security Document to which an Obligor is, or will be, a party, creates or will create the Security Interests which that Security Document purports to create and those Security Interests are or will be valid and effective.

#### 18.3      Power and authority

18.3.1      Each Obligor has power to enter into, perform and deliver and comply with its obligations under, and has taken all necessary action to authorise its entry into, each Finance Document, any Charter Document and any Building Contract Document to which it is or is to be a party.

18.3.2      No limitation on any Obligor's powers to borrow, create security or give guarantees will be exceeded as a result of any transaction under, or the entry into of, any Finance Document, any Charter Document or any Building Contract Document to which such Obligor is, or is to be, a party.

#### 18.4      Non-conflict

The entry into and performance by each Obligor of, and the transactions contemplated by the Finance Documents, the Charter Documents and the Building Contract Documents and the granting of the Security Interests purported to be created by the Security Documents do not and will not conflict with:

(a)   any law or regulation applicable to any Obligor;

(b)   the Constitutional Documents of any Obligor; or

(c)   any agreement or other instrument binding upon any Obligor or any other Group Member or its or any other Group Member's assets,

or constitute a default or termination event (however described) under any such agreement or instrument or result in the creation of any Security Interest (save for a Permitted Maritime Lien or under a Security Document) on any Group Member's assets, rights or revenues.

**18.5**     **Validity and admissibility in evidence**

18.5.1     All authorisations required or desirable:

(a)   to enable each Obligor lawfully to enter into, exercise its rights and comply with its obligations under each Finance Document and any Charter Document or any Building Contract Document to which it is a party;

(b)   to make each Finance Document and any Charter Document or any Building Contract Document to which it is a party admissible in evidence in its Relevant Jurisdiction; and

(c)   to ensure that each of the Security Interests created under the Security Documents has the priority and ranking contemplated by them,

have been obtained or effected and are in full force and effect except any authorisation or filing referred to in clause 18.12 (*No filing or stamp taxes*), which authorisation or filing will be promptly obtained or effected within any applicable period.

18.5.2     All authorisations necessary for the conduct of the business, trade and ordinary activities of each Obligor and each other Group Member have been obtained or effected and are in full force and effect if failure to obtain or effect those authorisations might have a Material Adverse Effect.

**18.6**     **Governing law and enforcement**

18.6.1     The choice of English law or any other applicable law as the governing law of any Finance Document, any Charter Document and any Building Contract Document will be recognised and enforced in each Obligor's Relevant Jurisdiction.

18.6.2     Any judgment obtained in England in relation to an Obligor will be recognised and enforced in each Obligor's Relevant Jurisdictions.

**18.7**     **Information**

18.7.1     Any Information is true and accurate in all material respects at the time it was given or made.

18.7.2     There are no facts or circumstances or any other information which could make the Information incomplete, untrue, inaccurate or misleading in any material respect.

18.7.3     The Information does not omit anything which could make the Information incomplete, untrue, inaccurate or misleading in any material respect.

18.7.4     All opinions, projections, forecasts or expressions of intention contained in the Information and the assumptions on which they are based have been arrived at after due and careful enquiry and consideration and were believed to be reasonable by the person who provided that Information as at the date it was given or made.

18.7.5     For the purposes of this clause 18.7, **Information** means: any information provided by any Obligor or any other Group Member to any of the Finance Parties in connection with the Finance Documents, the Charter Documents or the Building Contract Documents or the transactions referred to in them (including any information memorandum).

**18.8**     **Original Financial Statements**

18.8.1     The Original Financial Statements were prepared in accordance with GAAP consistently applied.

18.8.2     The Original Financial Statements give a true and fair view of the financial condition and results of operations of the relevant Obligors and the Group (consolidated in the case of the Group and the Guarantor) during the relevant financial year.

18.8.3  There has been no material adverse change in the assets, prospects, business or financial condition or operations of any Obligor (or the assets, prospects, business or operations or consolidated financial condition of the Group taken as a whole, in the case of the Guarantor) since the date of the Original Financial Statements.

**18.9  Pari passu ranking**

Each Obligor's payment obligations under the Finance Documents to which it is, or is to be, a party rank at least pari passu with all its other present and future unsecured and unsubordinated payment obligations, except for obligations mandatorily preferred by law applying to companies generally.

**18.10  Ranking and effectiveness of security**

Subject to the Legal Reservations and any filing, registration or notice requirements which is referred to in any legal opinion delivered to the Agent under clause 4.1 (*Initial conditions precedent*), the security created by the Security Documents has (or will have when the Security Documents have been executed) the priority which it is expressed to have in the Security Documents, the Charged Property is not subject to any Security Interest other than Permitted Security Interests and such security will constitute perfected security on the assets described in the Security Documents.

**18.11  No insolvency**

No corporate action, legal proceeding or other procedure or step described in clause 29.9 (*Insolvency proceedings*) or creditors' process described in clause 29.10 (*Creditors' process*) has been taken or, to the knowledge of any Obligor, threatened in relation to a Group Member and none of the circumstances described in clause 29.8 (*Insolvency*) applies to any Group Member.

**18.12  No filing or stamp taxes**

Under the laws of each Obligor's Relevant Jurisdictions it is not necessary that any Finance Document, any Charter Document or any Building Contract Document to which it is, or is to be, party be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to any such Finance Document, any Charter Document or any Building Contract Document or the transactions contemplated by the Finance Documents except any filing, recording or enrolling or any tax or fee payable in relation to any Finance Document which is referred to in any legal opinion delivered to the Agent under clause 4.1 (*Initial conditions precedent*) and which will be made or paid promptly after the date of the relevant Finance Document.

**18.13  Tax**

No Obligor is required to make any deduction for or on account of Tax from any payment it may make under any Finance Document to which it is, or is to be, a party and no other party is required to make any such deduction from any payment it may make under any, Charter Document or Building Contract Document.

**18.14  No Default**

18.14.1  No Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document or any Charter Document or Building Contract Document.

18.14.2  No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on any Obligor or any other Group Member or to which any Obligor's (or any other Group Member's) assets are subject which might have a Material Adverse Effect.

18.14.3    No other events, conditions, facts or circumstances exist or have arisen or occurred since 31 December 2012, which have had or could reasonably be expected to have a Material Adverse Effect.

**18.15    No proceedings pending or threatened**

No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency (including, without limitation, investigative proceedings) which, if adversely determined, might reasonably be expected to have a Material Adverse Effect, have (to the best of any Obligor's knowledge and belief) been started or threatened against any Obligor or any other Group Member.

**18.16    No breach of laws**

18.16.1    No Obligor or other Group Member has breached any law or regulation which might have a Material Adverse Effect.

18.16.2    No labour dispute is current or, to the best of any Obligor's knowledge and belief (having made due and careful enquiry), threatened against any Obligor or other Group Member which may have a Material Adverse Effect.

**18.17    Environmental matters**

18.17.1    No Environmental Law applicable to any Fleet Vessel and/or any Obligor or other Group Member has been violated in a manner or circumstances which might have, a Material Adverse Effect.

18.17.2    All consents, licences and approvals required under such Environmental Laws have been obtained and are currently in force.

18.17.3    No Environmental Claim has been made or threatened or is pending against any Group Member or any Fleet Vessel where that claim might have a Material Adverse Effect and there has been no Environmental Incident which has given, or might give, rise to such a claim.

**18.18    Tax Compliance**

18.18.1    No Obligor or other Group Member is materially overdue in the filing of any Tax returns or overdue in the payment of any amount in respect of Tax.

18.18.2    No claims or investigations are being, or are reasonably likely to be, made or conducted against any Obligor or other Group Member with respect to Taxes such that a liability of, or claim against, any Obligor or other Group Member is reasonably likely to arise for an amount for which adequate reserves have not been provided in the Original Financial Statements and which might have a Material Adverse Effect.

18.18.3    Each Obligor is resident for Tax purposes only in the jurisdiction of its incorporation.

**18.19    Security and Financial Indebtedness**

18.19.1    No Security Interest exists over all or any of the present or future assets of any Obligor or other Group Member in breach of this Agreement.

18.19.2    No Obligor or other Group Member has any Financial Indebtedness outstanding in breach of this Agreement.

**18.20    Legal and beneficial ownership**

18.20.1    Ownership of assets

Each Obligor is the sole legal and beneficial owner of the respective assets over which it purports to grant a Security Interest under the Security Documents.

18.20.2    Ownership of shares

(a)    Each Borrower and the Commercial Manager are wholly-owned Subsidiaries of the Guarantor.

(b)    All of the issued membership interests of, and all of the issued voting membership interests of, the Guarantor are legally and beneficially owned by the Initial Shareholders (and in such percentages as were disclosed by the Obligors to the Arrangers prior to the date of this Agreement).

**18.21    Shares**

The shares of each Owner are fully paid and not subject to any option to purchase or similar rights. The Constitutional Documents of each Owner do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Security Documents. There are no agreements in force which provide for the issue or allotment of, or grant any person the right to call for the issue or allotment of, any share or loan capital of each Owner (including any option or right of pre-emption or conversion).

**18.22    Accounting Reference Date**

The financial year-end of each Obligor or other Group Member is the Accounting Reference Date.

**18.23    No adverse consequences**

18.23.1    It is not necessary under the laws of the Relevant Jurisdictions of any Obligor:

(a)    in order to enable any Finance Party to enforce its rights under any Finance Document; or

(b)    by reason of the execution of any Finance Document or the performance by any Obligor of its obligations under any Finance Document to which it is, or is to be, a party,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in any of such Relevant Jurisdictions.

18.23.2    No Finance Party is or will be deemed to be resident, domiciled or carrying on business in any Relevant Jurisdiction by reason only of the execution, performance and/or enforcement of any Finance Document.

**18.24    Copies of documents**

The copies of the Charter Documents, the Building Contract Documents and the Constitutional Documents of the Obligors delivered to the Agent under clause 4 (*Conditions of Utilisation*) will be true, complete and accurate copies of such documents and include all amendments and supplements to them as at the time of such delivery and no other agreements or arrangements exist between any of the parties to any Charter Document or Building Contract Document which would materially affect the transactions or arrangements contemplated by any Charter Document or Building Contract Document or modify or release the obligations of any party under that Charter Document or Building Contract Document.

**18.25    No breach of any Building Contract Document or any Charter Document**

No Obligor nor (so far as the Obligors are aware) any other person is in breach of any Charter Document or Building Contract Document to which it is a party nor has anything occurred which entitles or may entitle any party to any Charter Document or Building Contract Document to rescind or terminate it or decline to perform their obligations under it.

**18.26    No immunity**

No Obligor or any of its assets is immune to any legal action or proceeding.

**18.27    Ship status**

Each Ship will on the first day of the relevant Mortgage Period be:

    (a)   registered in the name of the relevant Owner through the relevant Registry as a ship under the laws and flag of the relevant Flag State;

    (b)   operationally seaworthy and in every way fit for service;

    (c)   classed with the relevant Classification free of all requirements and recommendations of the relevant Classification Society; and

    (d)   insured in the manner required by the Finance Documents.

**18.28    Ship's employment**

Each Ship shall, on the first day of the relevant Mortgage Period, be free of any other charter commitment which, if entered into after that date, would require approval under the Finance Documents.

**18.29    Address commission**

There are no rebates, commissions or other payments in connection with any Building Contract Document or any Charter other than those referred to in it.

**18.30    Money Laundering**

In relation to the borrowing by each Borrower of the Loan, the performance and discharge of its obligations and liabilities under the Finance Documents, and the transactions and other arrangements effected or contemplated by the Finance Documents to which each Borrower is a party, each Borrower confirms (i) that it is acting for its own account; (ii) that it will use the proceeds of the Loan for its own benefit, under its full responsibility and exclusively for the purposes specified in this Agreement; and (iii) that the foregoing will not involve or lead to a contravention of any law, official requirement or other regulatory measure or procedure implemented to combat Money Laundering (as defined in clause 21.16 (*Bribery and corruption*)).

**18.31    Sanctions**

No Obligor nor any other Group Member nor any Affiliate of any Group Member, nor any of their respective directors, officers or employees nor, to the knowledge of any Obligor, any persons acting on any of their behalf:

    (a)   is a Prohibited Person;

    (b)   is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person;

    (c)   owns or controls a Prohibited Person;

(d)   is in breach of Sanctions; or

(e)   has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority.

Any capitalised terms referred to in paragraphs (a) - (e) above shall have the meanings given to them in clause 21.12 (*Sanctions*)

### 18.32   Times when representations are made

18.32.1   All of the representations and warranties set out in this clause 18 (other than Ship Representations) are deemed to be made and repeated on the dates of:

(a)   this Agreement;

(b)   the first Utilisation Request; and

(c)   the first Utilisation.

18.32.2   The Repeating Representations are also deemed to be made and repeated on the dates of each subsequent Utilisation Request and the first day of each Interest Period and, in the case of the representation in clause 18.7 (*Information*), on the date of primary syndication of the Facilities.

18.32.3   All of the Ship Representations are deemed to be made and repeated on the first day of the Mortgage Period for the relevant Ship.

18.32.4   Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances then existing at the date the representation or warranty is deemed to be made.

## 19   Information undertakings

Each Obligor who is a Party undertakes that this clause 19 will be complied with throughout the Facility Period.

In this clause 19:

**Annual Financial Statements** means the consolidated financial statements for a financial year of the Guarantor delivered pursuant to clause 19.1.1 (*Financial statements*).

**Quarterly Financial Statements** means the financial statements for each financial quarter of a financial year of the Guarantor delivered pursuant to clause 19.1.1 (*Financial statements*).

### 19.1   Financial statements

19.1.1   The Obligors shall supply to the Agent:

(a)   the audited consolidated financial statements of the Guarantor (including the Group) for each financial year as soon as the same become available, but in any event within 120 days after the end of each financial year;

(b)   the unaudited financial statements of the Guarantor (including the Group) for each financial quarter (other than the last quarter of each financial year) of the Guarantor as soon as the same become available, but in any event within 60 days after the end of each such financial quarter; and

(c)   not later than 31 March of each calendar year, a 12 month forecast (together with assumptions) of the Group in respect of the then current calendar year in the same format

as presented to the members of the Guarantor and prepared by the Guarantor's management and signed by the Chief Financial Officer of the Group.

**19.2    Provision and contents of Compliance Certificate and valuations**

19.2.1    The Obligors shall supply to the Agent:

    (a)    with each set of Annual Financial Statements and Quarterly Financial Statements, a Compliance Certificate; and

    (b)    with each set of Annual Financial Statements and the second Quarterly Financial Statements in respect of each financial year, valuations of each Fleet Vessel, each made in accordance with clause 25 (*Minimum security value*) at the cost and expense of the Borrowers and showing the value of each such Fleet Vessel (and for such purposes, the provisions of such clause 25 (*Minimum security value*) shall apply to each such Fleet Vessel and this paragraph (b) *mutatis mutandis* as if each such Fleet Vessel was a Ship).

19.2.2    Each Compliance Certificate shall, amongst other things, set out (in reasonable detail) computations as to compliance with clause 20.2 (*Financial condition*) and shall be signed by the Chief Financial Officer of the Guarantor.

**19.3    Requirements as to financial statements**

19.3.1    The Borrowers shall procure that each set of financial statements includes a profit and loss account, a balance sheet and a cashflow statement and that, in addition, each set of Annual Financial Statements shall be audited by the Auditors.

19.3.2    Each set of financial statements delivered pursuant to clause 19.1 (*Financial statements*) shall:

    (a)    be prepared in accordance with GAAP;

    (b)    give a true and fair view of (in the case of Annual Financial Statements for any financial year), or fairly represent (in other cases), the financial condition and operations of the Group, as at the date as at which those financial statements were drawn up; and

    (c)    in the case of annual audited financial statements, not be the subject of any qualification in the Auditors' opinion.

19.3.3    The Borrowers shall procure that each set of financial statements delivered pursuant to clause 19.1 (*Financial statements*) shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements, unless, in relation to any set of financial statements, the Borrowers notify the Agent that there has been a change in GAAP or the accounting practices and the Auditors deliver to the Agent:

    (a)    a description of any change necessary for those financial statements to reflect the GAAP or accounting practices and reference periods upon which corresponding Original Financial Statements were prepared; and

    (b)    sufficient information, in form and substance as may be reasonably required by the Agent, to enable the Lenders to determine whether clause 20 (*Financial covenants*) has been complied with and to make an accurate comparison between the financial position indicated in those financial statements and the Original Financial Statements.

Any reference in this Agreement to any financial statements shall be construed as a reference to those financial statements as adjusted to reflect the basis upon which the Original Financial Statements were prepared.

**19.4    Presentations**

Once in every financial year, or more frequently if requested to do so by the Agent if the Agent reasonably suspects a Default is continuing or may have occurred or may occur, the Borrowers shall procure that at least two directors of the Guarantor (one of whom shall be the chief financial officer) give a presentation to the Finance Parties about the on-going business and financial performance of the Group and any other matter which a Finance Party may reasonably request.

**19.5    Year-end**

The Borrowers shall procure that each financial year-end of each Obligor and each Group Member falls on the Accounting Reference Date.

**19.6    Information: miscellaneous**

The Borrowers shall supply to the Agent:

(a)   at the same time as they are dispatched, copies of all documents dispatched by the Guarantor to its shareholders generally (or any class of them) or dispatched by the Guarantor or any Obligors to its creditors generally (or any class of them);

(b)   promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any Group Member, and which, if adversely determined, might have a Material Adverse Effect or which would involve a liability, or a potential or alleged liability, exceeding, in the case of uninsured liabilities, $1,000,000 (or its equivalent in other currencies) or exceeding, in the case of insured liabilities, $2,000,000 (or its equivalent in other currencies);

(c)   promptly, such information as the Agent may reasonably require about the Charged Property and compliance of the Obligors with the terms of any Security Documents; and

(d)   promptly on request, such further information regarding the financial condition, assets and operations of the Group and/or any Group Member as any Finance Party through the Agent may reasonably request.

**19.7    Notification of Default**

The Borrowers shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon any Obligor becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

**19.8    Sufficient copies**

The Borrowers, if so requested by the Agent, shall deliver sufficient copies of each document to be supplied under the Finance Documents to the Agent to distribute to each of the Lenders.

**19.9    Use of websites**

19.9.1   The Borrowers may satisfy their obligation under this Agreement to deliver any information in relation to those Lenders (the **Website Lenders**) who accept this method of communication by posting this information onto an electronic website designated by the Borrowers and the Agent (the **Designated Website**) if:

(a)   the Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

(b)   both the Borrowers and the Agent are aware of the address of and any relevant password specifications for the Designated Website; and

(c)   the information is in a format previously agreed between the Borrowers and the Agent.

If any Lender (a **Paper Form Lender**) does not agree to the delivery of information electronically then the Agent shall notify the Borrowers accordingly and the Borrowers shall supply the information to the Agent (in sufficient copies for each Paper Form Lender) in paper form. In any event the Borrowers shall supply the Agent with at least one copy in paper form of any information required to be provided by it.

19.9.2 The Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Borrowers and the Agent.

19.9.3 The Borrowers shall promptly upon any of them becoming aware of its occurrence notify the Agent if:

    (a)  the Designated Website cannot be accessed due to technical failure;

    (b)  the password specifications for the Designated Website change;

    (c)  any new information which is required to be provided under this Agreement is posted onto the Designated Website;

    (d)  any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

    (e)  any Borrower becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If the Borrowers notify the Agent under paragraphs (a) or (e) above, all information to be provided by the Borrowers under this Agreement after the date of that notice shall be supplied in paper form unless and until the Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

19.9.4 Any Website Lender may request, through the Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. The Borrowers shall comply with any such request within ten Business Days.

**19.10**    **"Know your customer" checks**

19.10.1    If:

    (a)  the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

    (b)  any change in the status of an Obligor or the composition of the shareholders of an Obligor after the date of this Agreement; or

    (c)  a proposed assignment or transfer by a Lender of any of its rights and/or obligations under this Agreement to a party that is not already a Lender prior to such assignment or transfer,

obliges the Agent, the Security Agent or any Lender (or, in the case of paragraph (c) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the Agent or the Security Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender or the Security Agent (for itself or, in the case of the event described in paragraph (c) above, on behalf of any prospective new Lender, the Security Agent or the Agent) in order for the Agent, the Security Agent or such Lender or, in the case of the event described in paragraph (c) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

19.10.2    Each Finance Party shall promptly upon the request of the Agent or the Security Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent or the Security Agent (for itself) in order for it to carry out and be satisfied with the results of all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

**19.11    Money Laundering**

The Borrowers will:

19.11.1    provide the Agent with information, certificates and any documents required by the Agent or any other Finance Party to ensure compliance with any law official requirement or other regulatory measure or procedure implemented to combat Money Laundering (as defined in clause 21.16 (*Bribery and corruption*)) throughout the Facility Period; and

19.11.2    notify the Agent as soon as it becomes aware of any matters evidencing that a breach of any law official requirement or other regulatory measure or procedure implemented to combat Money Laundering (as defined in clause 21.16 (*Bribery and corruption*) may or is about to occur or that the person(s) who have or will receive the commercial benefit of this Agreement have changed from the date hereof.

## 20    Financial covenants

Each Obligor who is a Party undertakes that this clause 20 will be complied with throughout the Facility Period.

**20.1    Financial definitions**

In clauses 20.2 (*Financial condition*) and 20.3 (*Financial testing*):

**Cash and Cash Equivalents** means at any relevant time and in relation to a Measurement Period:

(a)   cash in hand or on deposit with any bank; and

(b)   any other short term financial investments (including marketable debt and equity securities) made by the Group which is investment grade or is otherwise approved by the Majority Lenders,

which is free from any Security Interests and to which any Group Member is beneficially entitled at that time and which are freely and readily available to Group Members and are capable of being applied against Financial Indebtedness, as demonstrated by the then most recent Financial Statements **Provided that** any undrawn amounts of any revolving or overdraft (committed or uncommitted) facility available to one or more Group Members shall be excluded in the calculation or determination of Cash and Cash Equivalents for the purposes of this Agreement and the other Finance Documents.

**Consolidated Debt** means, at any relevant time and in relation to a Measurement Period:

(a)   all Financial Indebtedness of the Group Members;

(b)   liability for any credit to the Group Members from a supplier of goods delivered or services rendered or under any instalment purchase or payment plan or other similar arrangement in relation to such goods or services;

(c)   deferred tax of the Group Members;

(d)   any other indebtedness of the Group Members whatsoever; and

(e)   liability under a guarantee, indemnity or similar obligation entered into by the Group Members in respect of a liability of another person which would fall within paragraphs (a) to (d) of this definition if the references to the Group Members referred to such other person,

but without double counting and excluding Financial Indebtedness between Group Members, in each case as demonstrated by the then most recent Financial Statements.

**EBITDA** means, at any relevant time and in relation to any period, the consolidated net pre-taxation profits of the Group as demonstrated by the then most recent Financial Statements relevant to such period, and all as adjusted by:

(a)   adding back Interest Expense arising from loan facilities and interest rate hedging instruments, and finance charges;

(b)   taking no account of any realised and unrealised gain or loss on derivative contracts;

(c)   taking no account of any exceptional or extraordinary item, interest income and any foreign exchange gain or losses;

(d)   adding back depreciation and amortisation of assets;

(e)   taking no account of any other non-cash items, including (without limitation) any non-cash gain or loss on sale or cancellation of vessels, asset impairments, any gain or loss from equity investments, stock-based compensation or any gain or loss arising from any non-controlling interest; and

(f)   taking into account amortization of deferred revenue (if any).

**Financial Statements** means any of the Annual Financial Statements or the Quarterly Financial Statements of the Group referred to and defined as such in clause 19.1 (*Financial statements*).

**Fleet Market Value** means, as of the date of calculation, the aggregate value of:

(a)   the Mortgaged Ships, as most recently determined pursuant to valuations made in accordance with the provisions of clause 25 (*Minimum security value*); and

(b)   all other Fleet Vessels (other than the Mortgaged Ships), as most recently determined pursuant to valuations of such vessels provided to the Agent under clause 19.2 (*Provision and contents of Compliance Certificate and valuations*) together with each Compliance Certificate and made in accordance with the provisions of clause 25 (*Minimum security value*).

**Fleet Vessels** means each of the Fleet Vessels as defined in clause 1.1 (*Definitions*) (including, but not limited to, the Ships but excluding vessels under construction) but only to the extent owned by the Group Members and **Fleet Vessel** means any of them.

**Interest Expense** means, at any relevant time and in relation to any period, all interest incurred or paid by the Group during such period, as demonstrated by the then most recent Financial Statements.

**Measurement Period** means each financial year of the Guarantor and each financial quarter of the Guarantor for which Financial Statements are to be delivered pursuant to clause 19.1 (*Financial Statements*).

**Six-month Debt Service** means, in respect of any Test Period, the aggregate of:

(a)   all repayment instalments (excluding the relevant balloon payments) plus interest thereon under this Agreement;

(b)  all repayment instalments (excluding any balloon payments) plus interest thereon under any other loan or facility agreement entered into by Group Members or guaranteed by Group Members;

(c)  any net payment under any interest rate hedging agreement or instrument (taking into account any premiums payable);

(d)  any bareboat obligations of the Group Members; and

(e)  any other payments and deductions of similar effect (including the capital and interest element of finance leases),

in each case, which are to fall due for payment by Group Members during such Test Period, each as shown in the then most recent Compliance Certificate and approved by the Majority Lenders.

**Test Period** means, on any relevant date, the six month period starting on such date.

**Total Assets** means, at any relevant time and in relation to any Measurement Period, the aggregate of (a) the value of the "Total Assets" of the Group (excluding Fleet Vessels) as demonstrated by the then most recent Financial Statements and (b) the Fleet Market Value.

**Total Debt Service** means, at any relevant time and in relation to any period, the aggregate of:

(a)  all scheduled repayment instalments (excluding the relevant balloon payments) plus interest thereon under this Agreement;

(b)  all scheduled repayment instalments (excluding any balloon payments) plus interest thereon under any other loan or facility agreement entered into by Group Members or guaranteed by Group Members;

(c)  any net payment under any interest rate hedging agreement or instrument (taking into account any premiums payable);

(d)  any bareboat obligations of the Group Members; and

(e)  any other payments and deductions of similar effect (including the capital and interest element of finance leases),

in each case, which have accrued or fallen due for payment by Group Members during such period, each as demonstrated by the then most recent Financial Statements relevant to such period.

## 20.2  Financial condition

Each Obligor who is a Party shall ensure that:

(a)  **Interest cover ratio:**  in respect of each Measurement Period, the ratio of (i) EBITDA for such Measurement Period to (ii) Interest Expense for such Measurement Period, shall be greater than 3.0:1.0.

(b)  **Debt service cover ratio:**  in respect of each Measurement Period, the ratio of (i) EBITDA for the twelve month period ending at the end of such Measurement Period to (ii) Total Debt Service for the twelve month period ending at the end of such Measurement Period, shall not be lower than 1.0:1.0.

(c)  **Consolidated leverage ratio:**  the ratio of Consolidated Debt to Total Assets shall, at all times during and in respect of each Measurement Period, be not greater than 0.75:1.00.

(d) **Minimum liquidity:** on each day during and in respect of each Measurement Period:

    (i) from the date of this Agreement to the earlier of (1) the date when all Ships are delivered to the Borrowers under the relevant Building Contracts and (2) the Last Availability Date (such earlier date, the "**Cut-off Date**"), the Cash and Cash Equivalents shall not be less than the aggregate of:

        (A) $1,250,000 per Mortgaged Ship; and

        (B) $1,000,000 per each other Fleet Vessel; and

    (ii) from the Cut-off Date and at all times thereafter, the Cash and Cash Equivalents shall not be less than the higher of:

        (A) $1,250,000 per Fleet Vessel; and

        (B) the Six-Month Debt Service for the Test Period commencing on such day.

## 20.3 Financial testing

The financial covenants set out in clause 20.2 (*Financial condition*) shall be calculated in accordance with GAAP on a consolidated basis and tested by reference to each of the Financial Statements of the Group delivered pursuant to, and defined as such in, clause 19.1 (*Financial statements*) and/or each Compliance Certificate delivered pursuant to clause 19.2 (*Provision and contents of Compliance Certificate and valuations*).

## 21 General undertakings

Each Obligor who is a Party undertakes that this clause 21 will be complied with throughout the Facility Period.

## 21.1 Use of proceeds

The proceeds of Utilisations will be used exclusively for the purposes specified in clause 3 (*Purpose*).

## 21.2 Authorisations

Each Obligor will promptly:

(a) obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b) supply certified copies to the Agent of,

any authorisation required under any law or regulation of a Relevant Jurisdiction to:

    (i) enable it to perform its obligations under the Finance Documents, the Charter Documents and the Building Contract Documents;

    (ii) ensure the legality, validity, enforceability or admissibility in evidence of any Finance Document, Charter Document or Building Contract Document; and

    (iii) carry on its business, where failure to do so has, or is reasonably likely to have, a Material Adverse Effect.

**21.3     Compliance with laws**

Each Obligor and each other Group Member will comply in all respects with all laws and regulations (including Environmental Laws) to which it may be subject.

**21.4     Tax Compliance**

21.4.1    Each Obligor and each Group Member shall pay and discharge all Taxes imposed upon it or its assets within such time period as may be allowed by law without incurring penalties unless and only to the extent that:

(a)    such payment is being contested in good faith;

(b)    adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Agent under clause 19.1 (*Financial statements*); and

(c)    such payment can be lawfully withheld.

21.4.2    Except as approved by the Majority Lenders, each Obligor shall maintain its residence for Tax purposes in the jurisdiction in which it is incorporated and ensure that it is not resident for Tax purposes in any other jurisdiction.

**21.5     Change of business**

Except as approved by the Majority Lenders, no substantial change will be made to the general nature of the business of the Guarantor, the Obligors or the Group taken as a whole from that carried on at the date of this Agreement.

**21.6     Merger**

Except as approved by the Majority Lenders, no Obligor or other Group Member, will enter into any amalgamation, demerger, merger, consolidation, redomiciliation, legal migration or corporate reconstruction (other than the solvent liquidation of any Group Member which is not an Obligor so long as any payments or assets distributed as a result of such liquidation or reorganisation are distributed to other Group Members) or change its legal name.

**21.7     Further assurance**

21.7.1    Each Obligor shall promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Agent may reasonably specify (and in such form as the Agent may reasonably require):

(a)    to perfect the Security Interests created or intended to be created by that Obligor under or evidenced by the Security Documents (which may include the execution of a mortgage, charge, assignment or other security over all or any of the assets which are, or are intended to be, the subject of the Security Documents) or for the exercise of any rights, powers and remedies of the Security Agent or any other Finance Party provided by or pursuant to the Finance Documents or by law;

(b)    to confer on the Security Agent and/or any other Finance Party Security Interests over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security Interest intended to be conferred by or pursuant to the Security Documents;

(c)    to facilitate the realisation of the assets which are, or are intended to be, the subject of the Security Documents; and/or

(d)    to facilitate the accession by a New Lender to any Security Document following an assignment in accordance with clause 30.1 (*Assignments and transfers by the Lenders*).

| | |
|---|---|
| 21.7.2 | Each Obligor shall take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security Interest conferred or intended to be conferred on the Security Agent and/or any other Finance Party by or pursuant to the Finance Documents. |

**21.8    Negative pledge in respect of Charged Property or Borrowers' shares**

| | |
|---|---|
| 21.8.1 | Except as approved by the Majority Lenders and for Permitted Maritime Liens, no Obligor will grant or allow to exist any Security Interest over any Charged Property. |
| 21.8.2 | Except under the Finance Documents, no Obligor will grant or allow to exist any Security Interest over any of the shares in any of the Borrowers or over any of the rights deriving from or related to such shares. |
| 21.8.3 | Each Obligor will procure that all of the shares and membership interests of or in all of the Obligors will be in registered form (and not in bearer form) at all times. |

**21.9    Environmental matters**

| | |
|---|---|
| 21.9.1 | The Obligors will notify the Agent as soon as reasonably practicable of any Environmental Claim being made against any Group Member or any Fleet Vessel which, if successful to any extent, might have a Material Adverse Effect and of any Environmental Incident which may give rise to such a claim and will keep the Agent regularly and promptly informed in reasonable detail of the nature of, and response to, any such Environmental Incident and the defence to any such claim. |
| 21.9.2 | The Obligors will procure that all Environmental Laws (and any consents, licences or approvals obtained under them) applicable to Fleet Vessels will not be violated in a way which might have a Material Adverse Effect. |

**21.10    Pari passu**

Each Obligor will ensure that its obligations under the Finance Documents shall, without prejudice to the security intended to be created by the Security Documents, at all times rank at least pari passu with all its other present and future unsecured and unsubordinated Indebtedness with the exception of any obligations which are mandatorily preferred by law and not by contract.

**21.11    Syndication**

The Guarantor will provide reasonable assistance to the Arrangers in the preparation of the primary syndication of the Facilities (including, without limitation, by making the senior management of the Guarantor available for the purpose of making presentations to, or meeting, potential lending institutions) and will comply with all reasonable requests for information from potential syndicate members prior to completion of syndication.

**21.12    Sanctions**

| | |
|---|---|
| 21.12.1 | No Obligor nor any other Group Member nor any Affiliate of any Group Member will, directly or indirectly, make any proceeds of the Loan available to, or for the benefit of, a Prohibited Person or permit or authorise any such proceeds to be applied in a manner or for a purpose prohibited by Sanctions. |
| 21.12.2 | The Borrowers will prevent any Mortgaged Ship from being used, directly or indirectly: |

    (a)  by, or for the benefit of, any Prohibited Person; and/or

    (b)  in any trade which could expose the relevant Ship, any Finance Party, any manager of the Ships, the ships' crew or the Ships' insurers to enforcement proceedings or any other consequences whatsoever arising from Sanctions.

21.12.3    The Borrowers will (so long as failing to do so would violate Sanctions) prevent each Mortgaged Ship from trading to Iranian and/or Syrian ports or carrying crude oil, petroleum products or petrochemical products or natural gas if they originate in Iran and/or Syria, or are being exported from Iran and/or Syria to any other country.

21.12.4    For the purposes of this clause 21.12, the following words shall have the following meanings:

**Prohibited Person** means a person that is:

(a)    listed on, or owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

(b)    located in, incorporated under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a person located in or organized under the laws of a country or territory that is the target of country-wide or territory-wide Sanctions (including, without limitation, Cuba, Iran, Burma, North Korea, Sudan and Syria); or

(c)    otherwise a target of Sanctions (namely a person with whom a US person or other national under the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities).

**Sanctions** means the economic or trade sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by any Sanctions Authority (whether or not any Obligor, any other Group Member or any Affiliate of any Group Member is legally bound to comply with such laws, regulations, embargoes or measures).

**Sanctions Authority** means any of:

(a)    the United States government;

(b)    the United Nations;

(c)    the United Kingdom; or

(d)    the European Union (or any Member State thereof),

and includes any government entity of any of the above, including, without limitation, the Office of Foreign Assets Control of the US Department of Treasury (**OFAC**), the United States Department of State, and Her Majesty's Treasury (**HMT**).

**Sanctions List** means:

(a)    the "Specially Designated Nationals and Blocked Persons" list maintained by OFAC;

(b)    the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by HMT; or

(c)    any similar list maintained by, or public announcement of Sanctions designation made by, any other Sanctions Authority.

## 21.13    IPO

21.13.1    The Obligors hereby agree to procure that no IPO will be attempted, commenced or completed unless the following conditions are met:

(a)    no Default has occurred at the times when such request is made, when such IPO commences and when such IPO completes or immediately thereafter; and

(b) the IPO relates to no less than 20% of the total issued voting membership interests of the Guarantor; and

(c) upon and immediately following the completion of such IPO, no IPO Change of Control occurs; and

(d) no public offering may be made of any shares of any Obligor or other Group Member except for an IPO in respect of the Guarantor; and

(e) the Finance Parties (through a decision obtained by the Majority Lenders) have provided their written consent to such IPO.

21.13.2 If an IPO compliant with this clause 21.13 and the other provisions of the Finance Documents has been completed, then the Obligors who are Party hereby agree to procure that by no later than 30 days after completion of the IPO, each Obligor will enter into amendment agreements to the Finance Documents (including a supplemental agreement to this Agreement) for the purpose of implementing any consequential changes to the Finance Documents as may be required as a result of the IPO and any provisions of the Finance Documents in relation to the IPO, in each case in such form and substance as may be required by the Agent and at the cost and expense of the Borrowers.

## 21.14 Borrowers' own account

Each Obligor will ensure that any borrowing by it and/or the performance of its obligations hereunder and under the other Finance Documents to which it is a party will be for its own account and will not involve any breach by it of any law, or regulatory measure relating to money laundering as defined in the provisions of the directive (2005/60/EC) of the European Parliament and of the Council or any equivalent law or regulatory measure in any other jurisdiction.

## 21.15 Inspection

Each Obligor who is a party undertakes with the Finance Parties that, from the date of this Agreement and so long as any moneys are owing under any of the Finance Documents, upon the request of the Agent it shall provide the Finance Parties or any of their representatives, professional advisors and contractors with access to, and permit inspection of, books and records of any Group Member, in each case at reasonable times and upon reasonable notice.

## 21.16 Bribery and corruption

21.16.1 No Obligor shall engage in:

(a) Corrupt Practices, Fraudulent Practices, Collusive Practices or Coercive Practices, including the procurement or the execution of any contract for goods or works relating to its functions;

(b) Money Laundering or acted in breach of any applicable law relating to Money Laundering; or

(c) the Financing of Terrorism.

21.16.2 Without prejudice to the generality of clause 21.16.1:

(a) no Obligor or other Group Member will directly or indirectly use the proceeds of the Facilities for any purpose which would breach the Bribery Act 2010 or the United States Foreign Corrupt Practices Act of 1977; and

(b)   the Obligors shall procure that each Group Member:

   (i)   conducts its business in compliance with the Bribery Act 2010 or the Unite States Foreign Corrupt Practices Act of 1977; and

   (ii)   maintains policies and procedures designed to promote and achieve compliance with such laws.

21.16.3   For the purposes of this clause 21.16 and clause 19.11 (*Money Laundering*), the following definitions shall apply:

**Coercive Practice** means impairing or harming or threatening to impair or harm, directly or indirectly, any party or its property or to improperly influence the actions of that party.

**Collusive Practice** means an arrangement between two or more parties without the knowledge, but designed to improperly influence the actions, of another party.

**Corrupt Practice** means the offering, giving, receiving, or soliciting, directly or indirectly, anything of value to improperly influence the actions of another party.

**Financing of Terrorism** means the act of providing or collecting funds with the intention that they be used, or in the knowledge that they are to be used, in order to carry out terrorist acts.

**Fraudulent Practice** means any action, including misrepresentation, to obtain a financial or other benefit or avoid an obligation, by deception.

**Money Laundering** means:

   (a)   the conversion or transfer of property, knowing it is derived from a criminal offence, for the purpose of concealing or disguising its illegal origin or of assisting any person who is involved in the commission of the crime to evade the legal consequences of its actions;

   (b)   the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of, property knowing that it is derived from a criminal offence; or

   (c)   the acquisition, possession or use of property knowing at the time of its receipt that it is derived from a criminal offence.

## 22   Dealings with Ships

Each Borrower undertakes that this clause 22 will be complied with:

   (a)   in respect of clauses 22.1 to 22.11 (inclusive), in relation to each Mortgaged Ship throughout the relevant Ship's Mortgage Period; and

   (b)   in respect of clauses 22.12– 22.24 (inclusive), in relation to each Ship and its Building Contract and each of its Refund Guarantees throughout the period from the date of this Agreement until the earlier of (i) the Delivery of that Ship and (ii) the cancellation of the Ship Pre-Delivery Commitment and the Ship Delivery Commitment of that Ship and payment of all amounts required to be paid to the Finance Parties under this Agreement upon such cancellation.

**22.1**    **Ship's name and registration**

    (a)  The Ship's name shall only be changed after prior notice to the Agent.

    (b)  The Ship shall be registered with the relevant Registry under the laws of its Flag State. Except with approval, the Ship shall not be registered under any other flag or at any other port or fly any other flag (other than that of its Flag State).  If that registration is for a limited period, it shall be renewed at least 45 days before the date it is due to expire and the Agent shall be notified of that renewal at least 30 days before that date.

    (c)  Nothing will be done and no action will be omitted if that might result in such registration being forfeited or imperilled or the Ship being required to be registered under the laws of another state of registry.

**22.2**    **Sale or other disposal of Ship**

    (a)  Except with approval of the Agent (acting on the instructions of all the Lenders), no Owner will sell, or agree to, transfer, abandon or otherwise dispose of its Ship or any share or interest in it.

    (b)  Paragraph (a) above does not apply to any disposal of a Ship which is in compliance with clause 7.6 (*Sale and Total Loss*) and where (i) at the time of such sale of that Ship no Default has occurred and is continuing and (ii) upon completion of such sale of that Ship, the Borrowers repay the Advance relevant to that Ship in full and pay all other amounts owing and payable under this Agreement and the other Finance Documents at the time of such prepayment.

**22.3**    **Manager**

A manager of the Ship (other than EMC and Eletson Corporation of Liberia) shall not be appointed unless that manager and the terms of its appointment are approved by the Agent (acting on the instructions of the Majority Lenders) and it has delivered a duly executed Manager's Undertaking to the Security Agent. The relevant Owner shall not agree to any change to the terms of appointment of a manager which have been approved unless such change is approved by the Majority Lenders.

**22.4**    **Copy of Mortgage on board**

A properly certified copy of the relevant Mortgage shall be kept on board the Ship with its papers and shown to anyone having business with the Ship which might create or imply any commitment or Security Interest over or in respect of the Ship (other than a lien for crew's wages and salvage) and to any representative of the Agent or the Security Agent.

**22.5**    **Notice of Mortgage**

A framed printed notice of the Ship's Mortgage shall be prominently displayed in the navigation room and in the Master's cabin of the Ship.  The notice must be in plain type and read as follows:

**"NOTICE OF MORTGAGE**

This Ship is subject to a first mortgage in favour of [**here insert name of mortgagee**] of [**here insert address of mortgagee**]. Under the said mortgage and related documents, neither the Owner nor any charterer nor the Master of this Ship has any right, power or authority to create, incur or permit to be imposed upon this Ship any commitments or encumbrances whatsoever other than for crew's wages and salvage".

No-one will have any right, power or authority to create, incur or permit to be imposed upon the Ship any lien whatsoever other than for crew's wages and salvage.

**22.6    Conveyance on default**

Where the Ship is (or is to be) sold in exercise of any power conferred by the Security Documents, the relevant Owner shall, upon the Agent's request, immediately execute such form of transfer of title to the Ship as the Agent may require.

**22.7    Chartering**

22.7.1    Except with approval by the Majority Lenders, the relevant Owner shall not enter into any charter commitment for the Ship, which is:

(a)   a bareboat or demise charter or passes possession and operational control of the Ship to another person;

(b)   capable of lasting more than 24 calendar months;

(c)   on terms as to payment or amount of hire which are materially less beneficial to it than the terms which at that time could reasonably be expected to be obtained on the open market for vessels of the same age and type as the Ship under charter commitments of a similar type and period; or

(d)   to another Group Member.

22.7.2    Without prejudice to the rights of the Finance Parties under clause 22.7.1 above and any other provisions of the Finance Documents, the Borrowers shall advise the Agent promptly of any proposed Charter of a Ship and:

(a)   forthwith after its execution deliver a certified copy of each such Charter to the Agent;

(b)   forthwith following demand by the Agent procure that the relevant Owner executes in favour of the Security Agent a Charter Assignment of any such Charter and any notice of assignment required in connection therewith and promptly procure the service of any such notice of assignment on the relevant Charterer and use its best endeavours to procure the acknowledgement of such notice by the relevant Charterer; and

(c)   pay on demand by the Agent all legal and other costs properly incurred by the Agent or the Security Agent in connection with each such Charter Assignment.

22.7.3    Without prejudice to the rights of the Finance Parties under clause 22.7.1 above and any other provisions of the Finance Documents, the Guarantor shall procure that at all times at least 40% of the Fleet Vessels (including the Mortgaged Ships) which have been delivered to Group Members, and any vessels which may have been chartered in by, and delivered to, Group Members, will be chartered out by Group Members on fixed term employment under charter commitments each capable of lasting at least 12 months (as at their inception), with charterers or counterparties and on such other terms in all respects acceptable to the Majority Lenders, provided however that no such Fleet Vessel (excluding the Ships which are subject to 22.7.1(a) in this regard) shall be made subject to a bareboat or demise charter capable of lasting more than 24 months by a Group Member without the prior written consent of the Majority Lenders.

**22.8    Merchant use**

The relevant Owner shall use the Ship only as a civil merchant trading ship.

**22.9    Sharing of Earnings**

Except with approval by the Majority Lenders, the relevant Owner shall not enter into any arrangement under which its Earnings from the Ship may be shared with anyone else.

**22.10    Payment of Earnings**

The relevant Owner's Earnings from the Ship shall be paid in the way required by the Ship's General Assignment or Deed of Covenant (as the case may be).  If any Earnings are held by brokers or other agents, they shall be paid to the Security Agent or the Agent (as the case may be), if it requires this after the Earnings have become payable to it under the Ship's General Assignment or Deed of Covenant.

**22.11    Lay up**

Except with approval (such approval not to be unreasonably withheld), no Ship shall be laid up or deactivated.

**22.12    Document of title**

The relevant Owner shall give irrevocable instructions to the relevant Builder to hold the Ship and any document of title to the Ship to the order and at the disposal of the Security Agent and ensure that the relevant Builder complies with such instructions.

**22.13    Performance of Building Contract**

The relevant Owner shall duly and punctually observe and perform all the conditions and obligations imposed on it by the Building Contract.

**22.14    Performance by Builder and Refund Guarantor**

The relevant Owner shall use its best endeavours to ensure that the relevant Builder performs its obligations under the Building Contract and builds the Ship diligently and that the relevant Refund Guarantor performs its obligations under the relevant Refund Guarantees.

**22.15    Progress and information**

Upon the Agent's request, the relevant Owner shall advise the Agent of the progress of construction of the Ship and supply the Agent with such other information as the Agent may require about the construction of the Ship or the Building Contract or the relevant Refund Guarantees.

**22.16    Arbitration under Building Contract**

The relevant Owner shall promptly notify the Agent:

(a)   if either party begins an arbitration under the Building Contract;

(b)   of the identity of the arbitrators; and

(c)   of the conclusion of the arbitration and the terms of any arbitration award.

**22.17    Conveyance on default**

Where the Ship is (or is to be) sold in exercise of any power contained in the Pre-Delivery Security Assignment or otherwise conferred on the Security Agent, the relevant Owner shall execute, immediately upon the Agent's request, such form of conveyance of the Ship as the Agent may require.

**22.18    Enforcement of rights**

The relevant Owner shall do everything which the Agent requires for the purpose of enforcing the rights of the relevant Owner under the Building Contract and/or the relevant Refund Guarantees and allow its name to be used by the Security Agent for that purpose.

**22.19    Notification of certain events**

The relevant Owner shall notify the Agent immediately if either party cancels, rescinds, repudiates or otherwise terminates the Building Contract (or purports to do so) or rejects the Ship (or purports to do so) or if the Ship becomes a Total Loss or partial loss or is materially damaged or if a dispute arises under the Building Contract.

**22.20    Ship's registration and mortgage**

The relevant Owner will, immediately upon its Delivery, duly execute (and deliver to the Agent) the Mortgage of that Ship and register the Ship and the Mortgage with the relevant Registry under the laws and flag of its Flag State.

**22.21    Sale or other disposal**

Except with approval of the Lenders, the relevant Owner will not dispose of the Ship or any share or interest in it or its rights under the Building Contract or any relevant Refund Guarantees or agree to do so.

**22.22    Variations**

Except with approval:

(a)    each relevant Refund Guarantee will not be varied;

(b)    the Building Contract shall not be varied in any material respect;

(c)    the Building Contract shall not be varied and the specification of the Ship will not be changed in a way which might reasonably be expected to delay the delivery of the Ship beyond the Last Availability Date for the Delivery Advance for the Ship; and

(d)    the specification of the Ship will not be changed in a substantial way.

For this purpose, ordering any extras, additions or alterations will be a substantial change and a material variation if their cost (or if the aggregate cost of the proposed work together with the cost of any additional work already ordered or change of specification already agreed) will alter the Building Contract Price by a cumulative amount greater than five per cent (5%) of the original Building Contract Price. The relevant Owner shall agree in writing with the Builder the terms and specification of any such work before the work is put in hand irrespective of whether approval of that work is required under the Finance Documents.

**22.23    Releases and waivers**

Except with approval, there shall be no release of a Builder or Refund Guarantor from any of its obligations under a Building Contract or a Refund Guarantee, no waiver of any breach of such obligations and no consent to anything which would otherwise be such a breach.

**22.24    Rejection and cancellation**

Except with approval, the relevant Owner shall not exercise any right which it may have to reject the relevant Ship or cancel or rescind or otherwise terminate the Building Contract.

## 23    Condition and operation of Ships

Each Borrower undertakes that this clause 23 will be complied with in relation to each Mortgaged Ship throughout the relevant Ship's Mortgage Period.

**23.1    Defined terms**

In this clause 23 and in Schedule 3 *(Conditions precedent)*:

**applicable code** means any code or prescribed procedures required to be observed by the Ship or the persons responsible for its operation under any applicable law (including but not limited to those currently known as the ISM Code and the ISPS Code).

**applicable law** means all laws and regulations applicable to vessels registered in the Ship's Flag State or which for any other reason apply to the Ship or to its condition or operation at any relevant time.

**applicable operating certificate** means any certificates or other document relating to the Ship or its condition or operation required to be in force under any applicable law or any applicable code.

**23.2    Repair**

The Ship shall be kept in a good, safe and efficient state of repair.  The quality of workmanship and materials used to repair the Ship or replace any damaged, worn or lost parts or equipment shall be sufficient to ensure that the Ship's value is not reduced.

**23.3    Modification**

Except with approval by the Majority Lenders, the structure, type or performance characteristics of the Ship shall not be modified in a way which could or might materially alter the Ship or materially reduce its value.

**23.4    Removal of parts**

Except with approval by the Majority Lenders, no material part of the Ship or any equipment shall be removed from the Ship if to do so would materially reduce its value (unless at the same time it is replaced with equivalent parts or equipment owned by the relevant Owner free of any Security Interest except under the Security Documents).

**23.5    Third party owned equipment**

Except with approval by the Majority Lenders, equipment owned by a third party shall not be installed on the Ship if it cannot be removed without risk of causing damage to the structure or fabric of the Ship or incurring significant expense.

**23.6    Maintenance of class; compliance with laws and codes**

The Ship's class shall be the relevant Classification with the relevant Classification Society and neither the Classification nor the Classification Society of the Ship shall be changed without approval. The Ship and every person who owns, operates or manages the Ship shall comply with all applicable laws and the requirements of all applicable codes. There shall be kept in force and on board the Ship or in such person's custody any applicable operating certificates which are required by applicable laws or applicable codes to be carried on board the Ship or to be in such person's custody.

**23.7    Surveys**

The Ship shall be submitted to continuous surveys and any other surveys which are required for it to maintain the Classification as its class.  Copies of reports of those surveys shall be provided promptly to the Agent if it so requests.

**23.8    Inspection and notice of drydockings**

The Agent and/or surveyors or other persons appointed by it for such purpose shall be allowed to board the Ship at all reasonable times to inspect it and given all proper facilities needed for that

purpose. Upon the Agent's request the Owner will procure that the Agent shall be given reasonable advance notice of any intended drydocking of the Ship (whatever the purpose of that drydocking).

## 23.9    Prevention of arrest

All legitimate debts, damages, liabilities and outgoings which have given, or may give, rise to maritime, statutory or possessory liens on, or claims enforceable against, the Ship, its Earnings or Insurances shall be promptly paid and discharged.

## 23.10    Release from arrest

The Ship, its Earnings and Insurances shall promptly be released from any arrest, detention, attachment or levy, and any legal process against the Ship shall be promptly discharged, by whatever action is required to achieve that release or discharge.

## 23.11    Information about Ship

The Agent shall promptly be given any information which it may reasonably require about the Ship or its employment, position, use or operation, including details of towages and salvages, and copies of all its charter commitments entered into by or on behalf of any Obligor and copies of any applicable operating certificates.

## 23.12    Notification of certain events

The Agent shall promptly be notified of:

(a) any damage to the Ship where the cost of the resulting repairs may exceed the Major Casualty Amount for such Ship;

(b) any occurrence which may result in the Ship becoming a Total Loss;

(c) any requisition of the Ship for hire;

(d) any Environmental Incident involving the Ship and Environmental Claim being made in relation to such an incident;

(e) any withdrawal or threat to withdraw of any applicable operating certificate;

(f) the issue of any operating certificate required under any applicable code;

(g) the receipt of notification that any application for such a certificate has been refused;

(h) any requirement or recommendation made in relation to the Ship by any insurer or the Ship's Classification Society or by any competent authority which is not, or cannot be, complied with in the manner or time required or recommended; and

(i) any arrest, hijacking or detention of the Ship or any exercise or purported exercise of a lien or other claim on the Ship or its Earnings or Insurances.

## 23.13    Payment of outgoings

All tolls, dues and other outgoings whatsoever in respect of the Ship and its Earnings and Insurances shall be paid promptly.  Proper accounting records shall be kept of the Ship and its Earnings.

### 23.14   Evidence of payments

The Agent shall be allowed proper and reasonable access to those accounting records when it requests it and, when it requires it, shall be given satisfactory evidence that:

(a)   the wages and allotments and the insurance and pension contributions of the Ship's crew are being promptly and regularly paid;

(b)   all deductions from its crew's wages in respect of any applicable Tax liability are being properly accounted for; and

(c)   the Ship's master has no claim for disbursements other than those incurred by him in the ordinary course of trading on the voyage then in progress.

### 23.15   Repairers' liens

Except with approval by the Majority Lenders, the Ship shall not be put into any other person's possession for work to be done on the Ship if the cost of that work will exceed or is likely to exceed the Major Casualty Amount for such Ship unless that person gives the Security Agent a written undertaking in approved terms not to exercise any lien on the Ship or its Earnings for any of the cost of such work.

### 23.16   Survey report

As soon as reasonably practicable after the Agent requests it, the Agent shall be given a report on the seaworthiness and/or safe operation of the Ship, from surveyors or inspectors approved by the Agent (acting on the instructions of the Majority Lenders).  If any recommendations are made in such a report they shall be complied with in the way and by the time recommended in the report.

### 23.17   Lawful use

The Ship shall not be employed:

(a)   in any way or in any activity which is unlawful under international law or the domestic laws of any relevant country;

(b)   in carrying illicit or prohibited goods;

(c)   in a way which may make it liable to be condemned by a prize court or destroyed, seized or confiscated; or

(d)   if there are hostilities in any part of the world (whether war has been declared or not), in carrying contraband goods,

and the persons responsible for the operation of the Ship shall take all necessary and proper precautions to ensure that this does not happen, including participation in industry or other voluntary schemes available to the Ship and in which leading operators of ships operating under the same flag or engaged in similar trades generally participate at the relevant time.

### 23.18   War zones

No Ship shall enter or remain in any zone which has been declared a war zone by any government entity or that Ship's war risk insurers except if any requirements of the Agent and/or that Ship's insurers necessary to ensure that such Ship remains properly insured in accordance with the Finance Documents (including any requirement for the payment of extra insurance premiums) are complied with.

## 24 Insurance

Each Borrower undertakes that this clause 24 shall be complied with in relation to each Mortgaged Ship and its Insurances throughout the relevant Ship's Mortgage Period.

### 24.1 Insurance terms

In this clause 24:

**excess risks** means the proportion (if any) of claims for general average, salvage and salvage charges not recoverable under the hull and machinery insurances of a vessel in consequence of the value at which the vessel is assessed for the purpose of such claims exceeding its insured value.

**excess war risk P&I cover** means cover for claims only in excess of amounts recoverable under the usual war risk cover including (but not limited to) hull and machinery, crew and protection and indemnity risks.

**hull cover** means insurance cover against the risks identified in clause 24.2(a).

**minimum hull cover** means, in relation to a Mortgaged Ship, an amount equal at the relevant time to 120% of such proportion of the Loan (less the amount then drawn under the Pre-Delivery Facility for any Ships whose Delivery has not yet occurred) as is equal to the proportion which the market value of such Mortgaged Ship bears to the aggregate of the market values of all of the Mortgaged Ships at the relevant time.

**P&I risks** means the usual risks (including liability for oil pollution, excess war risk P&I cover) covered by a protection and indemnity association which is a member of the International Group of protection and indemnity associations (or, if the International Group ceases to exist, any other leading protection and indemnity association or other leading provider of protection and indemnity insurance) (including, without limitation, the proportion (if any) of any collision liability not covered under the terms of the hull cover).

### 24.2 Coverage required

The Ship (including its hull and machinery, hull interest, freight interest, disbursements and/or increased value) shall at all times be insured at the Ship's Owner's cost:

(a) against fire and usual marine risks (including excess risks) and war risks (including war protection and indemnity risks (including crew) and terrorism, piracy and confiscation risks) on an agreed value basis, for the higher of its minimum hull cover and its market value (and with the insured value under the hull and machinery cover to be at least 80% of its market value);

(b) against P&I risks for the highest amount then available in the insurance market for vessels of similar age, size and type as the Ship (but, in relation to liability for oil pollution, for an amount of not less than $1,000,000,000) and a freight, demurrage and defence cover;

(c) against such other risks and matters which the Agent notifies it that it considers reasonable for a prudent shipowner or operator to insure against at the time of that notice; and

(d) on terms which comply with the other provisions of this clause 24.

### 24.3 Placing of cover

The insurance coverage required by clause 24.2 (*Coverage required*) shall be:

(a) in the name of the Ship's Owner and (in the case of the Ship's hull cover) no other person (other than the Security Agent and any other Finance Party if required by the Agent)

(unless such other person is approved (and the Technical Manager from time to time is hereby approved) and, if so required by the Agent, has duly executed and delivered a first priority assignment of its interest in the Ship's Insurances to the Security Agent or the other Finance Parties in an approved form and provided such supporting documents and opinions in relation to that assignment as the Agent requires);

(b) if the Agent so requests, in the joint names of the Ship's Owner and the Security Agent and any other Finance Party (and, to the extent reasonably practicable in the insurance market, without liability on the part of the Security Agent or such other Finance Party for premiums or calls);

(c) in dollars or another approved currency;

(d) arranged through approved brokers or direct with approved insurers or protection and indemnity or war risks associations; and

(e) on approved terms and with approved insurers or associations.

## 24.4    Deductibles

The aggregate amount of any excess or deductible under the Ship's hull cover shall not exceed an approved amount.

## 24.5    Mortgagee's insurance

The Borrowers shall promptly reimburse to the Agent the cost (as conclusively certified by the Agent) of taking out and keeping in force in respect of the Ship and the other Mortgaged Ships on terms approved by the Agent (acting on the instructions of the Majority Lenders), or in considering or making claims under:

(a) a mortgagee's interest insurance and a mortgagee's additional perils (all P&I risks) cover for the benefit of the Finance Parties for an aggregate amount up to 110% of the Loan at such time (less the amount then drawn under the Pre-Delivery Facility for any Ships whose Delivery has not yet occurred); and

(b) any other insurance cover which the Agent reasonably requires in respect of any Finance Party's interests and potential liabilities (whether as mortgagee of the Ship or beneficiary of the Security Documents).

## 24.6    Fleet liens, set off and cancellations

If the Ship's hull cover also insures other vessels, the Security Agent shall either be given an undertaking in approved terms by the brokers or (if such cover is not placed through brokers or the brokers do not, under any applicable laws or insurance terms, have such rights of set off and cancellation) the relevant insurers that the brokers or (if relevant) the insurers will not:

(a) set off against any claims in respect of the Ship any premiums due in respect of any of such other vessels insured (other than other Mortgaged Ships); or

(b) cancel that cover because of non-payment of premiums in respect of such other vessels,

or the Borrowers shall ensure that hull cover for the Ship and any other Mortgaged Ships is provided under a separate policy from any other vessels.

## 24.7    Payment of premiums

All premiums, calls, contributions or other sums payable in respect of the Insurances shall be paid punctually and the Agent shall be provided with all relevant receipts or other evidence of payment upon request.

**24.8**     **Details of proposed renewal of Insurances**

At least 14 days before any of the Ship's Insurances are due to expire, the Agent shall be notified of the names of the brokers, insurers and associations proposed to be used for the renewal of such Insurances and the amounts, risks and terms in, against and on which the Insurances are proposed to be renewed.

**24.9**     **Instructions for renewal**

At least seven days before any of the Ship's Insurances are due to expire, instructions shall be given to brokers, insurers and associations for them to be renewed or replaced on or before their expiry.

**24.10**    **Confirmation of renewal**

The Ship's Insurances shall be renewed upon their expiry in a manner and on terms which comply with this clause 24 and confirmation of such renewal given by approved brokers or insurers to the Agent at least seven days (or such shorter period as may be approved) before such expiry.

**24.11**    **P&I guarantees**

Any guarantee or undertaking required by any protection and indemnity or war risks association in relation to the Ship shall be provided when required by the association.

**24.12**    **Insurance documents**

The Agent shall be provided with pro forma copies of all insurance policies and other documentation issued by brokers, insurers and associations in connection with the Ship's Insurances as soon as they are available after they have been placed or renewed and all insurance policies and other documents relating to the Ship's Insurances shall be deposited with any approved brokers or (if not deposited with approved brokers) the Agent or some other approved person.

**24.13**    **Letters of undertaking**

Unless otherwise approved where the Agent (upon the instructions of the Majority Lenders) is satisfied that equivalent protection is afforded by the terms of the relevant Insurances and/or any applicable law and/or a letter of undertaking provided by another person, on each placing or renewal of the Insurances, the Agent shall be provided promptly with letters of undertaking in an approved form (having regard to general insurance market practice and law at the time of issue of such letter of undertaking) from the relevant brokers, insurers and associations.

**24.14**    **Insurance Notices and Loss Payable Clauses**

The interest of the Security Agent or any other Finance Parties as assignees of the Insurances shall be endorsed on all insurance policies and other documents by the incorporation of a Loss Payable Clause and an Insurance Notice in respect of the Ship and its Insurances signed by its Owner and, unless otherwise approved, each other person assured under the relevant cover (other than the Security Agent or any other Finance Party, if it is itself an assured).

**24.15**    **Insurance correspondence**

If so required by the Agent following an Event of Default, the Agent shall promptly be provided with copies of all written communications between the assureds and brokers, insurers and associations relating to any of the Ship's Insurances as soon as they are available.

**24.16**   **Qualifications and exclusions**

All requirements applicable to the Ship's Insurances shall be complied with and the Ship's Insurances shall only be subject to approved exclusions or qualifications.

**24.17**   **Independent report**

If at any time after the Delivery Date the Agent requires and obtains a detailed report from an approved independent firm of marine insurance brokers giving their opinion on the adequacy of the Ship's Insurances then the Borrowers shall reimburse the Agent for the cost of obtaining that report (but not the cost for more than one such report per Ship per calendar year).

**24.18**   **Collection of claims**

All documents and other information and all assistance required by the Agent to assist it and/or the Security Agent in trying to collect or recover any claims under the Ship's Insurances shall be provided promptly following the Agent's request after an Event of Default, or any Total Loss or any Major Casualty in respect of the Ship.

**24.19**   **Employment of Ship**

The Ship shall only be employed or operated in conformity with the terms of the Ship's Insurances (including any express or implied warranties) and not in any other way (unless the insurers have consented and any additional requirements of the insurers have been satisfied).

**24.20**   **Declarations and returns**

If any of the Ship's Insurances are on terms that require a declaration, certificate or other document to be made or filed before the Ship sails to, or operates within, an area, those terms shall be complied with within the time and in the manner required by those Insurances.

**24.21**   **Application of recoveries**

All sums paid under the Ship's Insurances to anyone other than the Security Agent shall be applied in repairing the damage and/or in discharging the liability in respect of which they have been paid except to the extent that the repairs have already been paid for and/or the liability already discharged.

**24.22**   **Settlement of claims**

Any claim under the Ship's Insurances for a Total Loss or Major Casualty shall only be settled, compromised or abandoned with prior approval.

**24.23**   **Change in insurance requirements**

If the Agent gives notice to the Borrowers to change the terms and requirements of this clause 24 (which the Agent may only do, in such manner as it considers appropriate, as a result in changes of circumstances or practice after the date of this Agreement), Obligors undertake to agree to modify this clause 24 in the manner so notified by the Agent not later than 14 days after such notice from the Agent is received.

**25**   **Minimum security value**

Each Borrower undertakes that this clause 25 will be complied with throughout the Facility Period.

**25.1**   **Valuation of assets**

For the purpose of the Finance Documents, the value at any time of any Mortgaged Ship or a Ship before its Delivery (as indicated by a valuation dated not more than 4 weeks before the relevant

87

Utilisation Date), or any other asset over which additional security is provided under this clause 25 will be its value as most recently determined in accordance with this clause 25.

## 25.2 Valuation frequency

Valuation of each Mortgaged Ship or each Ship before its Delivery and each such other asset in accordance with this clause 25 may be required by the Agent at any time (but in any event not less frequently than twice per calendar year).

## 25.3 Expenses of valuation

The Borrowers shall bear, and reimburse to the Agent where incurred by the Agent, all costs and expenses of providing any valuation of each Mortgaged Ship under this clause 25 twice annually, save that where an Event of Default has occurred the Borrowers shall bear, and reimburse to the Agent where incurred by the Agent, the costs and expenses of any valuations of each Mortgaged Ship obtained under this clause 25.

## 25.4 Valuations procedure

The value of any Mortgaged Ship and each Ship before its Delivery shall be determined in accordance with, and by valuers approved and appointed in accordance with, this clause 25. Additional security provided under this clause 25 shall be valued in such a way, on such a basis and by such persons (including the Agent itself) as may be approved by the Majority Lenders or as may be agreed in writing by the Borrowers and the Agent (on the instructions of the Majority Lenders).

## 25.5 Currency of valuation

Valuations shall be provided by valuers in dollars or, if a valuer is of the view that the relevant type of vessel is generally bought and sold in another currency, in that other currency. If a valuation is provided in another currency, for the purposes of this Agreement it shall be converted into dollars at the Agent's spot rate of exchange for the purchase of dollars with that other currency as at the date to which the valuation relates.

## 25.6 Basis of valuation

Each valuation will be addressed to the Agent in its capacity as such, it will be not more than 4 weeks old from its delivery to the Agent and made:

(a) without physical inspection (unless required by the Agent, acting on the instructions of the Majority Lenders);

(b) on the basis of a sale for prompt delivery for a price payable in full in cash on delivery at arm's length on normal commercial terms between a willing buyer and a willing seller; and

(c) without taking into account the benefit or detriment of any charter commitment.

## 25.7 Information required for valuation

The Borrowers shall promptly provide to the Agent and any such valuer any information which they reasonably require for the purposes of providing such a valuation.

## 25.8 Approved Brokers

All valuers must be Approved Brokers. The Agent may from time to time notify the Borrowers and the Lenders of any additional independent ship brokers which have been approved by the Borrowers and the Agent (acting on the instructions of the Majority Lenders) as Approved Brokers for the purposes of this clause 25.

**25.9** **Appointment of Approved Brokers**

When a valuation is required for the purposes of this clause 25, the Borrowers shall promptly appoint the relevant Approved Brokers to provide such a valuation. If the Borrowers fail to do so promptly, the Agent may appoint the relevant Approved Brokers to provide that valuation.

**25.10** **Number of valuers**

25.10.1 Each valuation must be carried out by two (2) Approved Brokers one of which shall be nominated by the Borrowers and the other by the Agent. If the Borrowers fail promptly to nominate an Approved Broker then the Agent may nominate that valuer.

25.10.2 If the two (2) valuations of a Ship made by two (2) Approved Brokers vary by more than 10%, then a third Approved Broker must be nominated by the Borrowers to provide a valuation of such Ship. If the Borrowers fail to promptly nominate such third Approved Broker, then the Agent may nominate that third Approved Broker.

**25.11** **Differences in valuations**

If valuations provided by individual Approved Brokers differ, the value of the relevant Ship for the purposes of the Finance Documents will be the mean average of those valuations.

**25.12** **Security shortfall**

If at any time the Security Value is less than the Minimum Value, the Agent may, and shall, if so directed by the Majority Lenders, by notice to the Borrowers require that such deficiency be remedied. The Borrowers shall then within 30 days of receipt of such notice ensure that the Security Value equals or exceeds the Minimum Value. For this purpose, the Borrowers may:

(a) provide additional security over other assets approved by the Majority Lenders in accordance with this clause 25; and/or

(b) prepay part of the Loan under clause 7.4 (*Voluntary prepayment*) but on three (3) Business Days' notice instead of the period required by such clause.

**25.13** **Creation of additional security**

The value of any additional security which the Borrowers offer to provide to remedy all or part of a shortfall in the amount of the Security Value will only be taken into account for the purposes of determining the Security Value if and when:

(a) that additional security, its value and the method of its valuation have been approved by the Majority Lenders;

(b) a Security Interest over that security has been constituted in favour of the Security Agent or (if appropriate) the Finance Parties in an approved form and manner;

(c) this Agreement has been unconditionally amended in such manner as the Agent requires in consequence of that additional security being provided; and

(d) the Agent, or its duly authorised representative, has received such documents and evidence it may require in relation to that amendment and additional security including documents and evidence of the type referred to in Schedule 3 (*Conditions precedent*) in relation to that amendment and additional security and its execution and (if applicable) registration.

## 26     Chartering undertakings

Each Borrower undertakes that this clause 26 will be complied with in relation to each Mortgaged Ship and its Charter Documents throughout the Facility Period.

### 26.1     Variations

Except with approval by the Majority Lenders, the Charter Documents shall not be varied in any material respects (and, for the avoidance of doubt, any assignment, transfer or novation of a Charter Document, whether from the relevant Owner or the relevant Charterer, without approval shall constitute a material variation), and the relevant Owner shall not grant any consent to the relevant Charterer in respect of any such material variation.

### 26.2     Releases and waivers

Except with approval by the Majority Lenders, there shall be no release by the relevant Owner of any material obligation of any other person under the Charter Documents (including by way of novation, assignment or transfer), no waiver of any breach of any such material obligation and no consent to anything which would otherwise be such a breach.

### 26.3     Termination by Owner

Except with approval by the Majority Lenders, the relevant Owner shall not terminate or rescind any Charter Document or withdraw the Ship from service under the Charter or take any similar action.

### 26.4     Charter performance

The relevant Owner shall perform its obligations under the Charter Documents and use its best endeavours to ensure that each other party to them performs their obligations under the Charter Documents.

### 26.5     Notice of assignment

The relevant Owner shall give notice of assignment of the Charter Documents to the other parties to such documents promptly upon execution of the relevant Charter Assignment, in the form specified by the Charter Assignment for the relevant Charter and Ship and shall ensure that the Agent receives a copy of that notice acknowledged by each addressee in the form specified therein as soon as practically possible after the relevant Charter Assignment has been executed and in any event in accordance with clause 22.7.2 (*Chartering*).

### 26.6     Payment of Charter Earnings

All Earnings which the relevant Owner is entitled to receive under the Charter Documents shall be paid in the manner required by the Security Documents (and, if the Charterer is a Group Member, without any set-off or counterclaim and free and clear of any deductions or withholdings).

## 27     Bank accounts

Each Borrower undertakes that this clause 27 will be complied with throughout the Facility Period.

### 27.1     Earnings Account

27.1.1     EMC shall be the holder of one or more Accounts with an Account Bank, designated as an "**Earnings Account**" for the purposes of the Finance Documents.

27.1.2     The Earnings of the Mortgaged Ships and all moneys payable to each Owner under each Ship's Insurances shall be paid by the persons from whom they are due to an Earnings Account unless

required to be paid to the Security Agent or any other Finance Parties under the relevant Finance Documents.

27.1.3    The Obligors shall procure that EMC shall not withdraw amounts standing to the credit of an Earnings Account except as permitted by clause 27.1.4.

27.1.4    The Obligors undertake to procure that if there is no Default which is continuing, amounts standing to the credit of the Earnings Accounts shall be at the free disposal of EMC and EMC may withdraw moneys from an Earnings Account for any purpose whatsoever which is permitted (or not prohibited) by the terms of this Agreement and the Finance Documents, including (without limitation) for:

(a)    payments then due to Finance Parties under the Finance Documents;

(b)    payments to another Earnings Account;

(c)    payments of the proper costs and expenses of insuring, repairing, operating and maintaining any Mortgaged Ship; and

(d)    payments to purchase other currencies in amounts and at times required to make payments referred to above in the currency in which they are due.

## 27.2    Other provisions

27.2.1    An Account may only be designated for the purposes described in this clause 27 if:

(a)    such designation is made in writing by the Agent and acknowledged by the Borrowers and specifies the names and addresses of the relevant Account Bank and the Account Holder(s) and the number and any designation or other reference attributed to the Account;

(b)    an Account Security has been duly executed and delivered by the relevant Account Holder(s) in favour of the Security Agent or the other Finance Parties;

(c)    any notice required by the Account Security to be given to an Account Bank has been given to, and acknowledged by, the Account Bank in the form required by the relevant Account Security; and

(d)    the Agent, or its duly authorised representative, has received such documents and evidence it may require in relation to the Account and the Account Security including documents and evidence of the type referred to in Schedule 3 (Conditions precedent) in relation to the Account and the relevant Account Security.

27.2.2    The rates of payment of interest and other terms regulating any Account will be a matter of separate agreement between the relevant Account Holder(s) and Account Bank. If an Account is a fixed term deposit account, the relevant Account Holder(s) may select the terms of deposits until the relevant Account Security has become enforceable and the Security Agent directs otherwise.

27.2.3    The Obligors shall procure that the relevant Account Holder(s) shall not close any Account or alter the terms of any Account from those in force at the time it is designated for the purposes of this clause 27 or waive any of its rights in relation to an Account except with approval.

27.2.4    The Obligors shall procure that the relevant Account Holder(s) shall deposit with the Security Agent all certificates of deposit, receipts or other instruments or securities relating to any Account, notify the Security Agent of any claim or notice relating to an Account from any other party and provide the Agent with any other information it may request concerning any Account.

27.2.5    Each of the Agent and the Security Agent agrees that if it is an Account Bank in respect of an Account then there will be no restrictions on creating a Security Interest over that Account as contemplated by this Agreement and it shall not (except with the approval of the Majority Lenders)

exercise any right of combination, consolidation or set-off which it may have in respect of that Account in a manner adverse to the rights of the other Finance Parties.

## 28 Business restrictions

Except as otherwise approved by the Majority Lenders each Obligor undertakes that throughout the Facility Period this clause 28 will be complied with by and in respect of each Group Member to which each of the provisions below is expressed to apply.

### 28.1 General negative pledge

28.1.1 In this clause 28.1, **Quasi-Security** means an arrangement or transaction described in clause 28.1.3.

28.1.2 No Borrower shall permit any Security Interest to exist, arise or be created or extended over all or any part of its assets.

28.1.3 (Without prejudice to clauses 28.2 (*Financial Indebtedness*) and 28.6 (*Disposals*)), no Borrower shall:

    (a) sell, transfer or otherwise dispose of any of its assets on terms whereby that asset is or may be leased to, or re-acquired by, any other Group Member other than pursuant to disposals permitted under clause 28.6 (*Disposals*);

    (b) sell, transfer, factor or otherwise dispose of any of its receivables on recourse terms (except for the discounting of bills or notes in the ordinary course of business);

    (c) enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

    (d) enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

28.1.4 Clauses 28.1.2 and 28.1.3 above do not apply to any Security Interest or (as the case may be) Quasi-Security, listed below:

    (a) those granted or expressed to be granted by any of the Security Documents; and

    (b) in relation to a Mortgaged Ship, Permitted Maritime Liens.

### 28.2 Financial Indebtedness

No Borrower shall incur or permit to exist, any Financial Indebtedness owed by it to anyone else except:

    (a) Financial Indebtedness incurred under the Finance Documents;

    (b) Financial Indebtedness owed to another Borrower or the Guarantor (provided that any such Financial Indebtedness owed by an Owner is unsecured and subordinated to the Finance Documents on approved terms);

    (c) Financial Indebtedness owed to trade creditors of a Borrower given in the ordinary course of its business;

    (d) Financial Indebtedness permitted under clause 28.3 (*Guarantees*); and

    (e) Financial Indebtedness permitted under clause 28.4 (*Loans and credit*).

92

**28.3    Guarantees**

No Borrower shall give or permit to exist, any guarantee by it in respect of indebtedness of any person or allow any of its indebtedness to be guaranteed by anyone else except:

(a)    guarantees in favour of its own trade creditors given in the ordinary course of its business; and

(b)    guarantees which are Financial Indebtedness permitted under clause 28.2 (*Financial Indebtedness*).

**28.4    Loans and credit**

No Borrower shall make, grant or permit to exist any loans or any credit by it to anyone else other than:

(a)    loans or credit to another Borrower or the Guarantor permitted under clause 28.2 (*Financial Indebtedness*); and

(b)    trade credit granted by it to its customers on normal commercial terms in the ordinary course of its trading activities.

**28.5    Bank accounts, operating leases and other financial transactions**

No Borrower shall:

(a)    maintain any current or deposit account with a bank or financial institution except for the Accounts and the deposit of money, operation of current accounts and the conduct of electronic banking operations through the Accounts;

(b)    hold cash in any account other than the Accounts;

(c)    enter into any obligations under operating leases relating to assets; or

(d)    be party to any banking or financial transaction, whether on or off balance sheet, that is not expressly permitted under this clause 28.

**28.6    Disposals**

28.6.1    No Borrower shall enter into a single transaction or a series of transactions, whether related or not and whether voluntarily or involuntarily, to dispose of any asset except for any of the following disposals so long as they are not prohibited by any other provision of the Finance Documents:

(a)    disposals of assets made in (and on terms reflecting) the ordinary course of trading of the disposing entity;

(b)    disposals of obsolete assets, or assets which are no longer required for the purpose of the business of the relevant Borrower, in each case for cash on normal commercial terms and on an arm's length basis;

(c)    disposals permitted by clauses 28.1 *(General negative pledge)* or 28.2 (*Financial Indebtedness*) or 22.2 (*Sale or other disposal of Ship*);

(d)    dealings with its own trade creditors with respect to book debts in the ordinary course of trading; and

(e)    the application of cash or cash equivalents in the acquisition of assets or services in the ordinary course of its business.

28.6.2    The Guarantor shall not enter into a single transaction or a series of transactions, whether related or not and whether voluntarily or involuntarily, to dispose of any of the shares in a Borrower, except that it may do so if on or immediately prior to the completion of such disposal with regard to the shares of a Borrower, the Borrowers prepay in full the Advance of the Ship relevant to such Borrower, together with interest thereon, and any other amounts payable by the Obligors to the Finance Parties under this Agreement and any other Finance Documents together with such prepayment.

**28.7    Contracts and arrangements with Affiliates**

No Borrower shall be party to any arrangement or contract with any of its Affiliates unless such arrangement or contract is on an arm's length basis.

**28.8    Subsidiaries**

No Borrower shall establish or acquire a company or other entity.

**28.9    Acquisitions and investments**

No Borrower shall acquire any person, business, assets or liabilities or make any investment in any person or business or enter into any joint-venture arrangement except:

(a)    acquisitions of assets in the ordinary course of business (not being new businesses or vessels);

(b)    the incurrence of liabilities in the ordinary course of its business;

(c)    any loan or credit not otherwise prohibited under this Agreement; or

(d)    pursuant to any Finance Documents, Building Contract Documents or Charter Documents to which it is party.

**28.10    Reduction of capital**

No Borrower shall redeem or purchase or otherwise reduce any of its equity or any other share capital or any warrants or any uncalled or unpaid liability in respect of any of them or reduce the amount (if any) for the time being standing to the credit of its share premium account or capital redemption or other undistributable reserve in any manner.

**28.11    Increase in capital**

No Borrower shall issue shares or other equity interests to anyone who is not a wholly-owned Subsidiary of the Guarantor.

**28.12    Distributions and other payments**

None of the Obligors who are Parties shall:

(a)    declare or pay (including by way of set-off, combination of accounts or otherwise) any dividend or redeem or make any other distribution or payment (whether in cash or in specie), including any interest and/or unpaid dividends, in respect of its equity, membership interests or any other share capital or any warrants for the time being in issue; or

(b)    make any payment (including by way of set-off, combination of accounts or otherwise) by way of interest, or repayment, redemption, purchase or other payment, in respect of any shareholder loan, loan stock or similar instrument,

except if no Default is continuing at the time of the declaration or payment of any such dividend, distribution or other payment, nor would result from the declaration or payment of the same and the

Obligors would be in compliance with their obligations under clause 20 (*Financial covenants*) immediately after declaration and payment of the same if the financial covenants were tested then.

## 29 Events of Default

Each of the events or circumstances set out in clauses 29.1 (*Non-payment*) to 29.21 (*Breach of Ministerial Decision*) is an Event of Default.

### 29.1 Non-payment

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable, unless:

(a) its failure to pay is caused by administrative or technical error or by a Payment Disruption Event; and

(b) payment is made within 3 Business Days of its due date.

### 29.2 Financial covenants

The Obligors do not comply with clause 20 (*Financial covenants*).

### 29.3 Value of security

The Borrowers do not comply with clause 25 (*Minimum security value*).

### 29.4 Insurance

29.4.1 The Insurances of a Mortgaged Ship are not placed and kept in force in the manner required by clause 24 (*Insurance*).

29.4.2 Any insurer either:

(a) cancels any such Insurances; or

(b) disclaims liability under them by reason of any mis-statement or failure or default by any person.

### 29.5 Other obligations

29.5.1 An Obligor does not comply with any provision of the Finance Documents (other than those referred to in clauses 29.1 (*Non-payment*), 29.2 (*Financial covenants*), 29.3 (*Value of security*) and 29.4 (*Insurance*)).

29.5.2 No Event of Default under clause 29.5.1 above will occur if the Agent (acting on the instructions of the Majority Lenders) considers that the failure to comply is capable of remedy and the failure is remedied within fifteen (15) days, or, in the case of a failure to comply with clause 22.7.2, thirty (30) days, of the Agent giving notice to the Borrowers.

### 29.6 Misrepresentation

Any representation or statement made or deemed to be made by an Obligor in the Finance Documents or any other document delivered by or on behalf of any Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

**29.7    Cross default**

29.7.1    Any Financial Indebtedness of any Group Member is not paid when due nor within any originally applicable grace period.

29.7.2    Any Financial Indebtedness of any Group Member is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

29.7.3    Any commitment for any Financial Indebtedness of any Group Member is cancelled or suspended by a creditor of that Group Member as a result of an event of default (however described).

29.7.4    The counterparty to a Treasury Transaction entered into by any Group Member becomes entitled to terminate that Treasury Transaction early by reason of an event of default (however described).

29.7.5    Any creditor of any Group Member becomes entitled to declare any Financial Indebtedness of that Group Member due and payable prior to its specified maturity as a result of an event of default (however described).

29.7.6    No Event of Default will occur under this clause 29.7 if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness in relation to all Group Members falling within clauses 29.7.1 to 29.7.5 above is less than $5,000,000 (or its equivalent in any other currency or currencies).

**29.8    Insolvency**

29.8.1    A Group Member is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or any one or more Group Members, by reason of actual or anticipated financial difficulties, commence negotiations with one or more of their creditors with a view to rescheduling any of their indebtedness having an aggregate value in excess of $5,000,000 (or its equivalent in any other currency or currencies).

29.8.2    The value of the assets of any Group Member is less than its liabilities (taking into account contingent and prospective liabilities).

29.8.3    A moratorium is declared in respect of any indebtedness of any Group Member.  If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

**29.9    Insolvency proceedings**

29.9.1    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(a)  the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Group Member other than a solvent liquidation or reorganisation of any Group Member which is not an Obligor;

(b)  a composition, compromise, assignment or arrangement with any creditor of any Group Member;

(c)  the appointment of a liquidator (other than in respect of a solvent liquidation of a Group Member which is not an Obligor), receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any Group Member or any of its assets (including the directors of any Group Member requesting a person to appoint any such officer in relation to it or any of its assets); or

(d)  enforcement of any Security Interest over any assets of any Group Member,

or any analogous procedure or step is taken in any jurisdiction.

29.9.2     Clause 29.9.1 shall not apply to any winding-up petition (or analogous procedure or step) which is frivolous or vexatious and is discharged, stayed or dismissed within seven days of commencement or, if earlier, the date on which it is advertised.

**29.10    Creditors' process**

29.10.1    Any expropriation, attachment, sequestration, distress, execution or analogous process affects any asset or assets of any Group Member having an aggregate value in excess of $1,000,000 and is not discharged within seven days.

29.10.2    Any judgment or order for an amount in excess of $1,000,000 is made against any Group Member and is not stayed or complied with within seven (7) days.

**29.11    Unlawfulness and invalidity**

29.11.1    It is or becomes unlawful for an Obligor to perform any of its obligations under the Finance Documents or any Security Interest created or expressed to be created or evidenced by the Security Documents ceases to be effective.

29.11.2    Any obligation or obligations of any Obligor under any Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Lenders under the Finance Documents.

29.11.3    Any Finance Document or any Security Interest created or expressed to be created or evidenced by the Security Documents ceases to be in full force and effect or is alleged by a party to it (other than a Finance Party) to be ineffective for any reason.

29.11.4    Any Security Document does not create legal, valid, binding and enforceable security over the assets charged under that Security Document or the ranking or priority of such security is adversely affected.

**29.12    Cessation of business**

Any Group Member suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

**29.13    Expropriation**

The authority or ability of any Group Member to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any Group Member or any of its assets.

**29.14    Repudiation and rescission of Finance Documents**

An Obligor (or any other relevant party) repudiates or purports to repudiate a Finance Document or evidences an intention to rescind or purports to rescind a Finance Document.

**29.15    Litigation**

Any litigation, alternative dispute resolution, arbitration or administrative proceeding is taking place, or threatened against any Group Member (including, without limitation, investigative proceedings) or any of its assets, rights or revenues which, if adversely determined, is reasonably likely to have a Material Adverse Effect.

**29.16    Material Adverse Effect**

Any event or circumstance or series of events (including any Environmental Incident or any change of law) occurs which the Majority Lenders reasonably believe has, or is reasonably likely to have, a Material Adverse Effect.

**29.17    Security enforceable**

Any Security Interest (other than a Permitted Maritime Lien) in respect of Charged Property becomes enforceable.

**29.18    Arrest of Ship**

Any Mortgaged Ship is arrested, confiscated, seized, taken in execution, impounded, forfeited, detained in exercise or purported exercise of any possessory lien or other claim and the relevant Owner fails to procure the release of such Ship within a period of 15 days thereafter (or such longer period as may be approved).

**29.19    Ship registration**

Except with approval, the registration of any Mortgaged Ship under the laws and flag of its Flag State is cancelled or terminated or, where applicable, not renewed or, if such Ship is only provisionally registered on the date of its Mortgage, such Ship is not permanently registered under such laws within 90 days of such date.

**29.20    Political risk**

The Flag State of any Mortgaged Ship or any Relevant Jurisdiction of an Obligor becomes involved in hostilities or civil war or there is a seizure of power in the Flag State or any such Relevant Jurisdiction by unconstitutional means if, in any such case, such event or circumstance, in the reasonable opinion of the Agent, has or is reasonably likely to have, a Material Adverse Effect and, within 30 days of notice from the Agent to do so, such action as the Agent may require to ensure that such event or circumstance will not have such an effect has not been taken by the Borrowers.

**29.21    Breach of Ministerial Decision**

If the Flag State of any Mortgaged Ship is the Hellenic Republic, the relevant Owner commits any breach of or varies the Ministerial Decision (as defined in the relevant Mortgage) with respect to a Mortgaged Ship or cancels or varies such Ministerial Decision except with approval.

**29.22    Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders, by notice to the Borrowers:

(a)    cancel the Total Commitments at which time they shall immediately be cancelled; and/or

(b)    declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable; and/or

(c)    declare that all or part of the Loan be payable on demand, at which time it shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders; and/or

(d)    declare that no withdrawals be made from any Account; and/or

(e) exercise or direct the Security Agent and/or any other beneficiary of the Security Documents to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

## SECTION 9 - CHANGES TO PARTIES

## 30      Changes to the Lenders

### 30.1      Assignments and transfers by the Lenders

Subject to this clause 30, a Lender (the **Existing Lender**) may assign any of its rights to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **New Lender**).

### 30.2      Conditions of assignment

30.2.1      The consent of the Borrowers is required for an assignment by a Lender, unless the assignment is to a first class commercial bank or a shipping bank or to another Lender or an Affiliate of a Lender or an Event of Default is continuing. The Agent will immediately advise the Borrowers of the assignment.

30.2.2      The Borrowers' consent may not be unreasonably withheld or delayed and will be deemed to have been given three (3) Business Days after the Lender has requested consent unless consent is expressly refused within that time.

30.2.3      An assignment will only be effective:

(a)     on receipt by the Agent of written confirmation from the New Lender (in form and substance satisfactory to the Agent) that the New Lender will assume the same obligations to the Borrowers and the other Finance Parties as it would have been under if it was an Original Lender;

(b)     on the New Lender entering into any documentation required for it to accede as a party to any Security Document to which the Original Lender is a party in its capacity as a Lender and, in relation to such Security Documents, completing any filing, registration or notice requirements;

(c)     if an assignment takes effect after there has been a Utilisation under a Facility, the assignment of an Existing Lender's participation in the Utilisations (if any) under that Facility shall take effect in respect of the same fraction of each such Utilisation;

(d)     on the performance by the Agent of all "know your customer" or other checks under all applicable laws and regulations relating to any person that it is required to carry out in relation to such assignment to a New Lender, the completion of which the Agent shall promptly notify to the Existing Lender and the New Lender; and

(e)     if that Existing Lender assigns equal fractions of its Commitment and participation in the Loan and each Utilisation (if any) under each Facility.

30.2.4      Each New Lender, by executing the relevant Transfer Certificate, confirms, for the avoidance of doubt, that the Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with the Finance Documents on or prior to the date on which the assignment and/or transfer becomes effective in accordance with the Finance Documents and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

### 30.3      Fee

The New Lender shall, on the date upon which an assignment takes effect (but excluding any assignment taking place in the context of the general primary syndication, anticipated to take place within a few months after the date of this Agreements), pay to the Agent (for its own account) a fee of $5,000.

**30.4** **Limitation of responsibility of Existing Lenders**

30.4.1 Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(a) the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents or any other documents;

(b) the financial condition of any Obligor;

(c) the performance and observance by any Obligor or any other person of its obligations under the Finance Documents or any other documents;

(d) the application of any Basel II Regulation or any Basel III Regulation to the transactions contemplated by the Finance Documents; or

(e) the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

30.4.2 Each New Lender confirms to the Existing Lender and the other Finance Parties that it:

(a) has made (and shall continue to make) its own independent investigation and assessment of:

(i) the financial condition and affairs of the Obligors and their related entities in connection with its participation in this Agreement; and

(ii) the application of any Basel II Regulation or any Basel III Regulation to the transactions contemplated by the Finance Documents;

and has not relied exclusively on any information provided to it by the Existing Lender or any other Finance Party in connection with any Finance Document;

(b) will continue to make its own independent appraisal of the application of any Basel II Regulation or Basel III Regulation to the transactions contemplated by the Finance Documents; and

(c) will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

30.4.3 Nothing in any Finance Document obliges an Existing Lender to:

(a) accept a re-assignment from a New Lender of any of the rights assigned under this clause 30; or

(b) support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Finance Documents or by reason of the application of any Basel II Regulation or Basel III Regulation to the transactions contemplated by the Finance Documents or otherwise.

**30.5** **Procedure for transfer**

30.5.1 Subject to the conditions set out in clause 30.2 (*Conditions of assignment*) an assignment may be effected in accordance with clause 30.5.4 below when (a) the Agent executes an otherwise duly completed Transfer Certificate and (b) the Agent executes any document required under clause 30.2.3 which it may be necessary for it to execute in each case delivered to it by the

101

Existing Lender and the New Lender duly executed by them and, in the case of any such other document, any other relevant person. The Agent shall, as soon as reasonably practicable after receipt by it of a Transfer Certificate and any such other document each duly completed, appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate and such other document. The Obligors and the other Finance Parties irrevocably authorise the Agent to execute any Transfer Certificate on their behalf without any consultations with them.

30.5.2    The Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

30.5.3    The Obligors and the other Finance Parties irrevocably authorise the Agent to execute any Transfer Certificate on their behalf without any consultations with them.

30.5.4    Subject to clause 30.8 (*Pro rata interest settlement*), on the Transfer Date:

(a)    the Existing Lender will assign absolutely to the New Lender the rights under the Finance Documents expressed to be the subject of the assignment in the Transfer Certificate;

(b)    the Existing Lender will be released by each Obligor and the other Finance Parties from the obligations owed by it (the **Relevant Obligations**) and expressed to be the subject of the release in the Transfer Certificate (but the obligations owed by the Obligors under the Finance Documents shall not be released); and

(c)    the New Lender shall become a Party to the Finance Documents as a "Lender" for the purposes of all the Finance Documents and will be bound by obligations equivalent to the Relevant Obligations.

30.5.5    Lenders may utilise procedures other than those set out in this clause 30.5 (*Procedure for transfer*) to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with clause 30.5 (*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that Obligor by the Lenders or the assumption of equivalent obligations by a New Lender provided that they comply with the conditions set out in clause 30.2 (*Conditions of assignment*).

**30.6    Copy of Transfer Certificate to Borrowers**

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate and any other document required under clause 30.2.3, send a copy of that Transfer Certificate and such documents to the Borrowers.

**30.7    Security over Lenders' rights**

In addition to the other rights provided to Lenders under this clause 30.7, each Lender may without consulting with or obtaining consent from an Obligor, at any time charge, assign or otherwise create a Security Interest in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a)    any charge, assignment or other Security Interest to secure obligations to a federal reserve or central bank; and

(b)    in the case of any Lender which is a fund, any charge, assignment or other Security Interest granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities, except that no such charge, assignment or Security Interest shall:

(i)    release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security Interest for the Lender as a party to any of the Finance Documents; or

(ii)    require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, these required to be made or granted to the relevant Lender under the Finance Documents.

**30.8    Pro rata interest settlement**

If the Agent has notified the Lenders that it is able to distribute interest payments on a "pro rata basis" to Existing Lenders and New Lenders then (in respect of any assignment pursuant to clause 30.5 (*Procedure for transfer*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

30.8.1    any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date (**Accrued Amounts**) and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six months, on the next of the dates which falls at six monthly intervals after the first day of that Interest Period); and

30.8.2    the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts, so that, for the avoidance of doubt:

(a)    when the Accrued Amounts become payable, those Accrued Amounts will be payable to the Existing Lender; and

(b)    the amount payable to the New Lender on that date will be the amount which would, but for the application of this clause 30.8, have been payable to it on that date, but after deduction of the Accrued Amounts.

## 31    Changes to the Obligors/Restriction on Debt Purchase Transactions

**31.1    Changes to the Obligors**

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**31.2    Prohibition on Debt Purchase Transactions by the Group**

31.2.1    The Obligors shall not, and the Guarantor shall procure that each Group Member shall not, enter into any Debt Purchase Transaction or be a Lender or beneficially own all or any part of the share capital of a company that is a Lender or a party to a Debt Purchase Transaction of the type referred to in paragraphs (b) or (c) of the definition of Debt Purchase Transaction.

**Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates**

31.2.2    For so long as a Guarantor Affiliate (i) beneficially owns a Commitment or (ii) has entered into a sub-participation agreement relating to a Commitment or other agreement or arrangement having a substantially similar economic effect and such agreement or arrangement has not been terminated:

(a)    in ascertaining the Majority Lenders or whether any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments has been obtained to approve any request for a consent, waiver, amendment or other vote under the Finance Documents, such Commitment shall be deemed to be zero; and

(b)  for the purposes of clause 41.2 (*Exceptions*), such Guarantor Affiliate or the person with whom it has entered into such sub-participation, other agreement or arrangement shall be deemed not to be a Lender (unless, in the case of a person not being a Guarantor Affiliate, it is a Lender by virtue otherwise than by beneficially owning the relevant Commitment).

31.2.3   Each Lender shall, unless such Debt Purchase Transaction is an assignment or transfer, promptly notify the Agent in writing if it knowingly enters into a Debt Purchase Transaction with a Guarantor Affiliate (a **Notifiable Debt Purchase Transaction**), such notification to be substantially in the form set out in Part 1 of Schedule 8 (*Forms of Notifiable Debt Purchase Transaction Notice*).

31.2.4   A Lender shall promptly notify the Agent if a Notifiable Debt Purchase Transaction to which it is a party:

(a)  is terminated; or

(b)  ceases to be with a Guarantor Affiliate,

such notification to be substantially in the form set out in Part 2 of Schedule 8 (*Forms of Notifiable Debt Purchase Transaction Notice*).

31.2.5   Each Guarantor Affiliate that is a Lender agrees that:

(a)  in relation to any meeting or conference call to which all the Lenders are invited to attend or participate, it shall not attend or participate in the same if so requested by the Agent or, unless the Agent otherwise agrees, be entitled to receive the agenda or any minutes of the same; and

(b)  in its capacity as Lender, unless the Agent otherwise agrees, it shall not be entitled to receive any report or other document prepared at the behest of, or on the instructions of, the Agent or one or more of the Lenders.

**31.3**   **Special Maritime Enterprises**

Notwithstanding anything to the contrary contained in this Agreement, the Agent and the Lenders hereby agree that, if the Owners request the Lenders' consent, whether for restructuring purposes or otherwise, to transfer their Ships to special maritime enterprises ("*Ειδικές Ναυτικές Επιχειρήσεις*") incorporated in Greece (for the purposes of this clause 30.4, together the "**Purchasers**" and each a "**Purchaser**"), the Agent and the Lenders shall consent to any such request for a Ship if no Event of Default has occurred or is continuing at the time **Provided that**:

(a)  the Owners' said request in respect of any such transfer has been sent to the Agent in writing at least fifteen (15) days prior to the proposed date of the relevant transfer; and

(b)  any Purchaser is a wholly-owned subsidiary of the Guarantor; and

(c)  any Ship to be transferred from an Owner to a Purchaser must be so transferred pursuant to transfer documentation (including in the form of a novation of the Building Contract in favour of a Purchaser immediately prior to Delivery of that Ship) which shall be in all respects acceptable to the Agent in its sole discretion; and

(d)  no such transfer of a Ship shall take place before the Delivery of the Ship by the Builder under the Building Contract (but in the event of a novation of the relevant Building Contract in favour of the relevant Purchaser as described in paragraph (c) above, it may take place immediately prior to the Delivery of the Ship, provided however that the Delivery of the Ship under the Building Contract shall take place immediately thereafter); and

(e)   any Ship which is to be delivered to the relevant Purchaser is, immediately upon such delivery, duly registered in the name of the relevant Purchaser under the Greek flag at the port of Piraeus; and

(f)   prior to the date when any such transfer of a Ship takes place, the relevant Purchaser becomes joint and several borrower with the other Borrowers under this Agreement; and

(g)   on the date of delivery of a Ship to the relevant Purchaser, such Purchaser executes in favour of the Lenders a first preferred Greek mortgage over such Ship and a general assignment of the Earnings, the Insurances and the Requisition Compensation of such Ship, on the same terms and conditions as the Mortgage and the General Assignment relevant to such Ship, and such mortgage is duly registered against such Ship at the relevant registry of Greek ships; and

(h)   the relevant Purchaser of a Ship and the Obligors execute on or prior to the date when the relevant transfer of such Ship takes place, such amendments or supplements to this Agreement and/or the other Finance Documents and of such form and substance, as the Agent, acting on the instructions of the Majority Lenders, may require or approve; and

(i)   on or prior to the date when a Ship is delivered to the relevant Purchaser, the Purchaser and the Obligors provide to the Agent documents and evidence of the type referred to in Schedule 3 (*Conditions precedent*) in relation to the documentation referred to in paragraphs (a) to (h) above, in form and substance satisfactory in all respects to the Agent, acting on the instructions of the Majority Lenders.

## SECTION 10 - THE FINANCE PARTIES

## 32    Roles of Agent, Security Agent and Arranger

### 32.1    Appointment of the Agent

32.1.1    Each other Finance Party (other than the Security Agent) appoints the Agent to act as its agent under and in connection with the Finance Documents.

32.1.2    Each such other Finance Party (other than the Security Agent) authorises the Agent:

(a)    to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions; and

(b)    to execute each of the Security Documents and all other documents that may be approved by the Majority Lenders for execution by it.

### 32.2    Instructions to Agent

32.2.1    The Agent shall:

(a)    unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by:

(i)    all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; and

(ii)    in all other cases, the Majority Lenders; and

(b)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (a) above.

32.2.2    The Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Agent may refrain from acting unless and until it receives those instructions or that clarification.

32.2.3    Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties.

32.2.4    The Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

32.2.5    In the absence of instructions, the Agent may act (or refrain from acting) as it considers to be in the best interest of the Lenders.

32.2.6    The Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document.  This clause

32.2.6 shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Security Documents or enforcement of the Security Documents.

**32.3    Duties of the Agent**

32.3.1   The Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

32.3.2   The Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent for that Party by any other Party.

32.3.3   Without prejudice to clause 30.6 (*Copy of Transfer Certificate to Borrowers*), clause 32.3.2 shall not apply to any Transfer Certificate.

32.3.4   Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

32.3.5   If the Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

32.3.6   If the Agent is aware of the non-payment of any principal, interest, commitment commission or other fee payable to a Finance Party (other than the Agent or an Arranger or the Security Agent for their own account) under this Agreement it shall promptly notify the other Finance Parties.

32.3.7   The Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

**32.4    Role of the Arrangers**

Except as specifically provided in the Finance Documents, the Arrangers have no obligations of any kind to any other Party under or in connection with any Finance Document or the transactions contemplated by the Finance Documents.

**32.5    No fiduciary duties**

32.5.1   Nothing in this Agreement constitutes the Agent or an Arranger as a trustee or fiduciary of any other person.

32.5.2   None of the Agent, the Security Agent or any Arranger shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account or have any obligations to the other Finance Parties beyond those expressly stated in the Finance Documents.

**32.6    Business with the Group**

The Agent, the Security Agent and any Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor or other Group Member or their Affiliates and shall not be obliged to account to the other Finance Parties for any profits.

**32.7    Rights and discretions of the Agent**

32.7.1   The Agent may:

(a)  rely on any representation, communication, notice or document (including, without limitation, any notice given by a Lender pursuant to clauses 31.2.3 and 31.2.4

(*Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates*)) believed by it to be genuine, correct and appropriately authorised;

(b) assume that:

    (i) any instructions received by it from the Majority Lenders, any Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents; and

    (ii) unless it has received notice of revocation, that those instructions have not been revoked; and

(c) rely on a certificate from any person:

    (i) as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

    (ii) to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (i) above, may assume the truth and accuracy of that certificate.

32.7.2   The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the other Finance Parties) that:

(a) no Default has occurred (unless it has actual knowledge of a Default arising under clause 29.1 (*Non-payment*));

(b) any right, power, authority or discretion vested in any Party or the Majority Lenders has not been exercised;

(c) any notice or request made by a Borrower (other than a Utilisation Request or Selection Notice) is made on behalf of and with the consent and knowledge of all the Obligors; and

(d) no Notifiable Debt Purchase Transaction:

    (i) has been entered into;

    (ii) has been terminated; or

    (iii) has ceased to be with a Guarantor Affiliate.

32.7.3   The Agent may engage, and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts in the conduct of its obligations and responsibilities under the Finance Documents.

32.7.4   Without prejudice to the generality of clause 32.7.3 or clause 32.7.5, the Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Agent (and so separate from any lawyers instructed by the Lenders) if the Agent in its reasonable opinion deems this to be desirable.

32.7.5   The Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

32.7.6    The Agent may act in relation to the Finance Documents through its officers, employees and agents and the Agent shall not:

   (a)   be liable for any error of judgment made by any such person; or

   (b)   be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by the Agent's gross negligence or wilful default.

32.7.7    Unless a Finance Document expressly provides otherwise, the Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

32.7.8    Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent, nor the Arranger is obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality. The Agent and the Arranger may do anything which in its opinion, is necessary or desirable to comply with any law or regulation of any jurisdiction.

32.7.9    Without prejudice to the generality of clause 32.7.7, the Agent may disclose the identity of a Defaulting Lender to the other Finance Parties and the Borrowers and shall disclose the same upon the written request of the Majority Lenders.

32.7.10   Notwithstanding any provision of any Finance Document to the contrary, the Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

32.7.11   Neither the Agent nor any Arranger shall be obliged to request any certificate, opinion or other information under clause 19 (*Information undertakings*) unless so required in writing by a Lender, in which case the Agent shall promptly make the appropriate request of the Borrowers if such request would be in accordance with the terms of this Agreement.

## 32.8    Responsibility for documentation and other matters

Neither the Agent nor any Arranger is responsible or liable for:

   (a)   the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Agent, the Arranger, an Obligor or any other person given in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or of any representations in any Finance Document or of any copy of any document delivered under any Finance Document;

   (b)   the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any Building Contract Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document, any Charter Document or any Building Contract Document;

   (c)   the application of any Basel II Regulation or Basel III Regulation to the transactions contemplated by the Finance Documents;

   (d)   any loss to the Trust Property arising in consequence of the failure, depreciation or loss of any Charged Property or any investments made or retained in good faith or by reason of any other matter or thing;

(e)   accounting to any person for any sum or the profit element of any sum received by it for its own account;

(f)   the failure of any Obligor or any other party to perform its obligations under any Finance Document, any Charter Document or any Building Contract Document or the financial condition of any such person;

(g)   ascertaining whether all deeds and documents which should have been deposited with it (or the Security Agent and/or any other beneficiary of a Security Document) under or pursuant to any of the Security Documents have been so deposited;

(h)   investigating or making any enquiry into the title of any Obligor to any of the Charged Property or any of its other property or assets;

(i)   failing to register any of the Security Documents with the Registrar of Companies or any other public office;

(j)   failing to register any of the Security Documents in accordance with the provisions of the documents of title of any Obligor to any of the Charged Property;

(k)   failing to take or require any Obligor to take any steps to render any of the Security Documents effective as regards property or assets outside England or Wales or to secure the creation of any ancillary charge under the laws of the jurisdiction concerned;

(l)   (unless it is the same entity as the Security Agent) the Security Agent and/or any other beneficiary of a Security Document failing to perform or discharge any of its duties or obligations under the Security Documents;

(m)  any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by any applicable law or regulation relating to insider dealing or otherwise;

(n)   making any investigation in respect of or in any way be liable whatsoever for the existence, accuracy or sufficiency of any legal or other opinions, reports, certificates or investigations delivered or obtained or required to be delivered or obtained at any time in connection herewith;

(o)   any unsuitability, inadequacy or unfitness of any Charged Property as security for the Loan and shall not be obliged to make any investigation into, and shall be entitled to assume, the suitability, adequacy and fitness of the Charged Property as security for the Loan; or

(p)   any damage to or any unauthorised dealing with the Charged Property nor shall it have any responsibility or liability arising from the fact that the Charged Property, or documents relating thereto, may be registered in its name or held by it or any other bank or agent selected by the Agent or the Security Agent.

## 32.9    No duty to monitor

The Agent shall not be bound to enquire:

(a)   whether or not any Default has occurred;

(b)   as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

(c)   whether any other event specified in any Finance Document has occurred.

**32.10        Exclusion of liability**

32.10.1      Without limiting clause 32.10.2 (and without prejudice to any other provision of the Finance Documents excluding or limiting the liability of the Agent) the Agent will not be liable (including, without limitation, for negligence or any other category of liability whatsoever) for:

(a)   any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Charged Property, unless directly caused by its gross negligence or wilful default.  For the avoidance of doubt and notwithstanding anything contained in the Finance Documents, the Agent shall not in any event be liable for any indirect or consequential loss (including, without limitation, loss of profit, business or goodwill) regardless of whether it was informed of the likelihood of such loss and irrespective of whether any such claim is made for breach of contract, in tort or otherwise;

(b)   exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Charged Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Charged Property, unless directly caused by the gross negligence or wilful default of the Agent and in the course of the exercise or non exercise by it of any right, power, authority or discretion given to it expressly under a Finance Document; or

(c)   without prejudice to the generality of paragraphs (a) and (b) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(i)    any act, event or circumstance not reasonably within its control; or

(ii)   the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

32.10.2      No Party (other than the Agent) may take any proceedings against any officer, employee or agent of the Agent in respect of any claim it might have against the Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Agent may rely on this clause 32.10 subject to clause 1.3 *(Third party rights)* and the provisions of the Third Parties Act.

32.10.3      The Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Agent if the Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Agent for that purpose.

32.10.4      Nothing in this Agreement shall oblige the Agent or any Arranger to carry out:

(a)   any "know your customer" or other checks in relation to any person; or

(b)   any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Lender,

on behalf of any Lender and each Lender confirms to the Agent and the Arrangers that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent or any Arranger.

32.10.5   Without prejudice to any provision of any Finance Document excluding or limiting the Agent's liability, any liability of the Agent arising under or in connection with any Finance Document or the Charged Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Agent at any time which increase the amount of that loss.  In no event shall the Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Agent has been advised of the possibility of such loss or damages.

**32.11    Lenders' indemnity to the Agent**

32.11.1   Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Agent, within three Business Days of demand, against:

(a)   any Losses for negligence or any other category of liability whatsoever incurred by the Agent in the circumstances contemplated pursuant to clause 35.11 (*Disruption to payment systems etc.*) notwithstanding the Agent's negligence, gross negligence, or any other category of liability whatsoever but not including any claim based on the fraud of the Agent); and

(b)   any other Losses (otherwise than by reason of the Agent's gross negligence or wilful default) including the costs of any person engaged in accordance with clause 32.7 (*Rights and discretions of the Agent*) and any Receiver in acting as its agent under the Finance Documents,

in each case incurred by the Agent in acting as such under the Finance Documents (unless the Agent has been reimbursed by an Obligor pursuant to a Finance Document or out of the Trust Property) and this clause 32.11 as applied in favour of the Security Agent pursuant to clause 32.22 (*Application of certain clauses to Security Agent*) shall be without prejudice to any right to indemnity by law given to trustees generally and any other indemnity in the Security Agent's favour in any other Finance Document.

The indemnities contained in this clause 32.11 shall survive the termination or discharge of this Agreement.

32.11.2   Subject to clause 32.11.3, the Borrowers shall immediately on demand reimburse any Lender for any payment that Lender makes to the Agent pursuant to clause 32.11.1.

32.11.3   Clause 32.11.2 shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Agent to an Obligor.

**32.12    Resignation of the Agent**

32.12.1   The Agent may resign without giving any reason therefor and appoint one of its Affiliates as successor by giving notice to the Lenders, the Security Agent and the Borrowers.

32.12.2   Alternatively the Agent may resign without giving any reason therefor by giving 30 days' notice to the other Finance Parties and the Borrowers, in which case the Majority Lenders (after consultation with the Borrowers) may appoint a successor Agent acting through an office in the United Kingdom.

32.12.3   If the Majority Lenders have not appointed a successor Agent in accordance with clause 32.12.2 above within 20 days after notice of resignation was given, the retiring Agent (after consultation with the Borrowers) may appoint a successor Agent.

32.12.4   If the Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Agent is entitled to appoint a successor Agent under clause 32.12.3, the Agent may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Agent to become a party to this Agreement as Agent) agree with the proposed successor Agent amendments to this clause 32 and any other term of this Agreement dealing with the rights or obligations of the Agent consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Agent's normal fee rates and those amendments will (subject to approval by the Majority Lenders, which approval shall not be unreasonably withheld or delayed) bind the Parties.

32.12.5   The retiring Agent shall, either at the Lenders' expense if it has been required to resign pursuant to clause 32.13 (*Replacement of the Agent*) or otherwise at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.  The Borrowers shall, within three Business Days of demand, reimburse the retiring Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

32.12.6   The Agent's resignation notice shall only take effect upon the appointment of a successor.

32.12.7   The appointment of the successor Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Agent.  As from this date, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under clause 32.12.5) but shall remain entitled to the benefit of clause 14.3 (*Indemnity to the Agent and the Security Agent*) and this clause 32 (and any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

## 32.13   Replacement of the Agent

32.13.1   After consultation with the Borrowers, the Majority Lenders may, by giving 30 days' notice to the Agent (or, at any time the Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Agent by appointing a successor Agent.

32.13.2   The retiring Agent shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.

32.13.3   The appointment of the successor Agent shall take effect on the date specified in the notice from the Majority Lenders to the retiring Agent.  As from this date, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under clause 32.13.2) but shall remain entitled to the benefit of clause 14.3 (*Indemnity to the Agent and the Security Agent*) and this clause 32 (and any agency fees for the account of the retiring Agent shall cease to accrue from (and shall be payable on) that date).

32.13.4   Any successor Agent and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

**32.14    Confidentiality**

32.14.1    In acting as agent for the Finance Parties, the Agent shall be regarded as acting through its department, division or team directly responsible for the management of the Finance Documents which shall be treated as a separate entity from any other of its divisions, departments or teams.

32.14.2    If information is received by another division or department of the Agent, it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

32.14.3    Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent, nor any Arranger is obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty.

**32.15    Relationship with the Lenders**

32.15.1    Subject to clause 30.8 (*Pro rata interest settlement)* the Agent may treat the person shown in its records as Lender at the opening of business (in the place of its principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office:

(a)    entitled to or liable for any payment due under any Finance Document on that day; and

(b)    entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five Business Days prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

32.15.2    Any Lender may by notice to the Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents.  Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under clause 37.5 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address, department and officer by that Lender for the purposes of clause 37.2 (*Addresses*) and clause 37.5 (*Electronic communication*) and the Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

32.15.3    Each Lender shall supply the Agent with any information that the Agent may reasonably specify as being necessary or desirable to enable the Agent or the Security Agent to perform its functions as Agent or Security Agent. Each Lender shall deal with the Security Agent exclusively through the Agent and shall not deal directly with the Security Agent.

**32.16    Credit appraisal by the Lenders**

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender confirms to each other Finance Party that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)    the financial condition, status and nature of each Obligor and other Group Member;

(b)  the legality, validity, effectiveness, adequacy or enforceability of any Finance Document , any Charter Document or any Building Contract Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document, any Charter Document or any Building Contract Document;

(c)  the application of any Basel II Regulation or Basel III Regulation to the transactions contemplated by the Finance Documents;

(d)  whether any Finance Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(e)  the adequacy, accuracy and/or completeness of any information provided by the Agent, any Party or by any other person under or in connection with any Finance Document, any Charter Document or any Building Contract Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document, any Charter Document or any Building Contract Document; and

(f)  the right of title of any person to, or the value or sufficiency of, any part of the Charged Property, the priority of the Security Documents or the existence of any Security Interest affecting the Charged Property.

**32.17    Reference Banks**

If a Reference Bank (or, if a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Agent shall (in consultation with the Borrowers) appoint another Lender or an Affiliate of a Lender to replace that Reference Bank.

**32.18    Agent's management time and additional remuneration**

Any amount payable to the Agent under clause 14.3 (*Indemnity to the Agent and the Security Agent*), clause 16 (*Costs and expenses*) and clause 32.11 (*Lenders' indemnity to the Agent*) (and in the case of the Security Agent, as extended to it by virtue of clause 32.22 (*Application of certain clauses to Security Agent*)) shall include the cost of utilising the Agent's management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Agent may notify to the Borrowers and the Lenders, and is in addition to any fee paid or payable to the Agent under clause 11 (*Fees*).

**32.19    Deduction from amounts payable by the Agent**

If any Party owes an amount to the Agent under the Finance Documents the Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

**32.20    Common parties**

Although the Agent and the Security Agent may from time to time be the same entity, that entity will have entered into the Finance Documents (to which it is party) in its separate capacities as agent for the Finance Parties and (as appropriate) security agent and trustee for the Finance Parties. Where any Finance Document provides for the Agent or Security Agent to communicate with or provide instructions to the other, while they are the same entity, such communication or instructions will not be necessary.

**32.21    Security Agent**

32.21.1    Each other Finance Party appoints the Security Agent to act as its agent and (to the extent permitted under any applicable law) trustee under and in connection with the Security Documents and confirms that the Security Agent shall have a lien on the Security Documents and the proceeds of the enforcement of those Security Documents for all monies payable to the beneficiaries of those Security Documents.

32.21.2    Each other Finance Party authorises the Security Agent:

(a)    to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions; and

(b)    to execute each of the Security Documents and all other documents that may be approved by the Agent and/or the Majority Lenders for execution by it.

32.21.3    The Security Agent accepts its appointment under clause 32.21 (*Security Agent*) as trustee of the Trust Property with effect from the date of this Agreement and declares that it holds the Trust Property on trust for itself and the other Finance Parties (for so long as they are Finance Parties) on and subject to the terms set out in clauses 32.21 (*Security Agent*) - 32.28 (*Indemnity from Trust Property*) (inclusive) and the Security Documents to which it is a party.

**32.22    Application of certain clauses to Security Agent**

32.22.1    Clauses 32.7 (*Rights and discretions of the Agent*), 32.8 (*Responsibility for documentation and other matters*), clause 32.9 (*No duty to monitor*), 32.10 (*Exclusion of liability*), 32.11 (*Lenders' indemnity to the Agent*), 32.12 (*Resignation of the Agent*), clause 32.13 (*Replacement of the Agent*) 32.14 (*Confidentiality*), 32.15 (*Relationship with the Lenders*), 32.16 (*Credit appraisal by the Lenders*), 32.18 (*Agent's management time and additional remuneration*) and 32.19 (*Deduction from amounts payable by the Agent*) shall each extend so as to apply to the Security Agent in its capacity as such and for that purpose each reference to the "Agent" in these clauses shall extend to include in addition a reference to the "Security Agent" in its capacity as such and, in clause 32.7 (*Rights and discretions of the Agent*), references to the Lenders and a group of Lenders shall refer to the Agent.

32.22.2    In addition, clause 32.12 (*Resignation of the Agent*) and clause 32.13 (*Replacement of Agent*) shall, for the purposes of their application to the Security Agent pursuant to clause 32.22.1, have the following additional sub-clause inserted after them:

At any time after the appointment of a successor, the retiring Security Agent shall do and execute all such acts, deeds and documents reasonably required by its successor to transfer to it (or its nominee, as it may direct) any property, assets and rights previously vested in the retiring Security Agent pursuant to the Security Documents and which shall not have vested in its successor by operation of law. All such acts, deeds and documents shall be done or, as the case may be, executed at the cost of the retiring Security Agent (except where the Security Agent is retiring under clause 32.12.5 as extended to it by clause 32.22.1, in which case such costs shall be borne by the Lenders (in proportion (if no part of the Loan is then outstanding) to their shares of the Total Commitments or (at any other time) to their participation in the Loan).

32.22.3    Clause 32.7 (*Rights and discretions of the Agent*) shall, for the purposes of its application to the Security Agent pursuant to clause 32.22.1, read as follows:

"The Security Agent may, at the cost of the Borrowers, rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Party), whether or not liability thereunder is limited by reference to monetary cap or otherwise, and shall not be liable for any damages,

costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.".

32.22.4    Clause 32.10 (*Exclusion of liability*) shall, for the purposes of its application to the Security Agent pursuant to clause 32.22.1, include the following after sub clause 32.10.1(b):

"(c)   any shortfall which arises on the enforcement or realisation of the Security Interests created by the Finance Documents.".

32.22.5    Clause 32.14 (*Confidentiality*) shall, for the purposes of its application to the Security Agent pursuant to clause 32.22.1, be read and construed as to refer to "its agency and trust department" instead of "its department, division or team directly responsible for the management of the Finance Documents".

32.22.6    Without prejudice to the generality of any other provision of this Agreement or any other Security Document, the entry into possession of the Charged Property shall not render the Security Agent or any Receiver liable to account as mortgagee in possession thereunder (or its equivalent in any other applicable jurisdiction) or take any action which would expose it to any liability in respect of Environmental Claims in respect of which it has not been indemnified and/or secured and/or pre-funded to its satisfaction or to be liable for any loss on realisation or for any default or omission on realisation or for any default or omission for which a mortgagee in possession might be liable unless such loss, default or omission is caused by its own gross negligence or wilful default.

32.22.7    The Security Agent shall not be bound to take any steps to ascertain whether any event, condition or act, the happening of which would cause a right or remedy to become exercisable by the Security Agent or any agent under this Agreement or the other Security Documents has happened or to monitor or supervise the observance and performance by the Borrowers, any agent or any of the other parties thereto of their respective obligations thereunder and, until it shall have actual knowledge or express notice to the contrary, the Security Agent shall be entitled to assume that no such event, condition or act has happened and that the Borrowers, the agents and the other parties thereto are observing and performing all their respective obligations thereunder.

## 32.23    Instructions to Security Agent

32.23.1    The Security Agent shall:

(a)   unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by the Agent; and

(b)   not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (a) above even though it may subsequently be found that there was a defect on the giving of such instruction.

32.23.2    The Security Agent shall be entitled to (but not obliged to) request instructions, or clarification of any instruction, from the Agent as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Security Agent may refrain from acting unless and until it receives those instructions or that clarification.

32.23.3    Unless a contrary indication appears in a Finance Document, any instructions given to the Security Agent by the Agent shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties.

32.23.4    The Security Agent may refrain from acting in accordance with any instructions of the Agent until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may

include payment in advance) for any cost, loss or liability (together with any associated VAT or other applicable tax) which it may incur in complying with those instructions.

32.23.5    For the avoidance of doubt, no provision of this Agreement shall require the Security Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity and/or security and/or prefunding against such risk or liability is not assured to it.

32.23.6    In the absence of instructions, the Security Agent may act (or refrain from acting) as it considers to be in the best interest of the Finance Parties.

32.23.7    The Security Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document. This clause 32.23.7 shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Security Documents or enforcement of the Security Documents.

32.23.8    The Security Agent shall have no responsibility whatsoever to the Obligors, the Agent, or any Finance Party as regards any deficiency which might arise because the Security Agent is subject to any Tax in respect of all or any of the Charged Property, the income therefrom or the proceeds thereof.

32.23.9    Until the delivery of an enforcement notice pursuant to clause 29.22 (*Acceleration*), the moneys standing to the credit of any accounts comprised in the Security Documents shall be dealt with in accordance with the provisions of this Agreement and the Security Documents and the Security Agent shall not be responsible in such circumstances or at any other time for any liabilities (howsoever described) suffered by any person, whether by reason of depreciation in value or by fluctuation in exchange rates or otherwise.

**32.24    Order of application**

32.24.1    The Security Agent agrees to apply the Trust Property and each other beneficiary of the Security Documents agrees to apply all moneys received by it in the exercise of its rights under the Security Documents in accordance with the following respective claims:

(a)    **first**, as to a sum equivalent to the amounts payable to the Security Agent under the Finance Documents (excluding any amounts received by the Security Agent pursuant to clause 32.11 (*Lenders' indemnity to the Agent*) as extended to the Security Agent pursuant to clause 32.22 (*Application of certain clauses to Security Agent*)), for the Security Agent absolutely;

(b)    **secondly**, as to a sum equivalent to the amounts payable to the Agent under the Finance Documents (excluding any amounts received by the Agent pursuant to clause 32.11 (*Lenders' indemnity to the Agent*)), for the Agent absolutely;

(c)    **thirdly**, as to a sum equivalent to the aggregate amount then due and owing to the other Finance Parties under the Finance Documents, for those Finance Parties absolutely for application between them in accordance with clause 35.5 *(Partial payments)*;

(d)    **fourthly**, until such time as the Security Agent is satisfied that all obligations owed to the Finance Parties have been irrevocably and unconditionally discharged in full, held by the Security Agent on a suspense account for payment of any further amounts owing to the Finance Parties under the Finance Documents and further application in accordance with this clause 32.24.1 as and when any such amounts later fall due;

(e)    **fifthly**, to such other persons (if any) as are legally entitled thereto in priority to the Obligors; and

(f) **sixthly**, as to the balance (if any), for the Obligors by or from whom or from whose assets the relevant amounts were paid, received or recovered or other person entitled to them.

32.24.2 The Security Agent and each other beneficiary of the Security Documents shall make each application as soon as is practicable after the relevant moneys are received by, or otherwise become available to, it save that (without prejudice to any other provision contained in any of the Security Documents) the Security Agent (acting on the instructions of the Agent), any other beneficiary of the Security Documents or any receiver or administrator may credit any moneys received by it to a suspense account for so long and in such manner as the Security Agent, such other beneficiary of the Security Documents or such receiver or administrator may from time to time determine with a view to preserving the rights of the Finance Parties or any of them to prove for the whole of their respective claims against the Borrowers or any other person liable.

32.24.3 The Security Agent and/or any other beneficiary of the Security Documents shall obtain a good discharge in respect of the amounts expressed to be due to the other Finance Parties as referred to in this clause 32.21 by paying such amounts to the Agent for distribution in accordance with clause 35 (*Payment mechanics*).

**32.25 Powers and duties of the Security Agent as trustee of the security**

In its capacity as trustee in relation to the Trust Property, the Security Agent:

(a) shall, without prejudice to any of the powers, discretions and immunities conferred upon trustees by law (and to the extent not inconsistent with the provisions of this Agreement or any of the Security Documents), have all the same powers and discretions as a natural person acting as the beneficial owner of such property and/or as are conferred upon the Security Agent by this Agreement and/or any Security Document but so that the Security Agent may only exercise such powers and discretions to the extent that it is authorised to do so by the provisions of this Agreement;

(b) shall (subject to clause 32.24 (*Order of application*)) be entitled (in its own name or in the names of nominees) to invest moneys from time to time forming part of the Trust Property or otherwise held by it as a consequence of any enforcement of the security constituted by any Finance Document which, in the reasonable opinion of the Security Agent, it would not be practicable to distribute immediately, by placing the same on deposit in the name or under the control of the Security Agent as the Security Agent may think fit without being under any duty to diversify the same and the Security Agent shall not be responsible for any loss due to interest rate or exchange rate fluctuations except for any loss arising from the Security Agent's gross negligence or wilful default and shall not be liable to account for an amount of interest greater than the standard amount that would be payable to an independent customer;

(c) may, in the conduct of its obligations under and in respect of the Security Documents instead of acting personally, employ and pay any agent (whether being a lawyer or any other person) to transact or concur in transacting any business and to do or concur in doing any acts required to be done by the Security Agent (including the receipt and payment of money) or may delegate to any person on any terms (including the power to sub-delegate) and on the basis that (i) any such agent or delegate engaged in any profession or business shall be entitled to be paid all usual professional and other charges for business transacted and acts done by him or any partner or employee of his or her in connection with such employment and (ii) the Security Agent shall not be bound to supervise, or be responsible for any loss incurred by reason of any act or omission of, any such agent or delegate if the Security Agent shall have exercised reasonable care in the selection of such agent; and

(d) may place all deeds and other documents relating to the Trust Property which are from time to time deposited with it pursuant to the Security Documents in any safe deposit, safe or receptacle selected by the Security Agent or with any firm of solicitors or

company whose business includes undertaking the safe custody of documents selected by the Security Agent and may make any such arrangements as it thinks fit for allowing Obligors access to, or its solicitors or auditors possession of, such documents when necessary or convenient and the Security Agent shall not be responsible for any loss incurred in connection with any such deposit, access or possession if it has exercised reasonable care in the selection of a safe deposit, safe, receptacle or firm of solicitors or company:

(i)      may, unless and to the extent the express provisions of any Security Document provide otherwise, do any act or thing in the exercise of any of its duties under the Finance Documents which in its absolute discretion (in the absence of any instructions of the Agent as to the doing of such act or thing) it deems advisable for the protection and benefit of all the Finance Parties;

(ii)     may, unless the express provisions of any such Security Document provide otherwise, if authorised by the Agent, amend or vary the terms of or waive breaches of or defaults under, or otherwise excuse performance of any provision of, or grant consents under any of the Security Documents to which it is a party, any such amendment, variation, waiver or consent so authorised to be binding on all the parties hereto and that Security Agent to be under no liability whatsoever in respect thereof;

(iii)    shall not be bound to disclose to any other person (including but not limited to any other Finance Party) (i) any confidential information or (ii) any other information, if disclosure would, or might in its reasonable opinion, constitute a breach of any law or be a breach of fiduciary duty;

(iv)     shall have no responsibility to make any payment, deduction or withholding of any Tax or governmental charge as a result of the Security Agent (i) holding the Security Interests created by the Finance Documents or (ii) enforcing such Security Interests created by the Finance Documents;

(v)      shall not have, or be deemed to have, any relationship of trust or agency with any Obligor; and

(vi)     shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied) and the role and functions of the Security Agent under this Agreement shall be purely mechanical and administrative in nature and, subject to the terms of this Agreement, acting on the instructions of the Agent.

32.25.2    The rights, powers and discretions conferred upon the Security Agent by this Agreement shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by general law or otherwise. Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement. Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent allowed by law, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

## 32.26    All enforcement action through the Security Agent

32.26.1    None of the other Finance Parties shall have any independent power to enforce any of those Security Documents which are executed in favour of the Security Agent only, or to exercise any rights, discretions or powers or to grant any consents or releases under or pursuant to such Security Documents or otherwise have direct recourse to the security and/or guarantees constituted by such Security Documents except through the Security Agent.

32.26.2    None of the other Finance Parties shall have any independent power to enforce any of those Security Documents which are executed in their favour or to exercise any rights, discretions or powers or to grant any consents or releases under or pursuant to such Security Documents or otherwise have direct recourse to the security and/or guarantees constituted by such Security Documents except with the prior written consent of the Agent (acting through the Security Agent and on the instructions of the Majority Lenders).  If any Finance Party (other than the Security Agent) is a party to any Security Document it shall promptly upon being requested by the Agent to do so grant a power of attorney or other sufficient authority to the Security Agent to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under such Security Document.

**32.27**    **Co-operation to achieve agreed priorities of application**

The other Finance Parties shall co-operate with each other and with the Security Agent and any receiver or administrator under the Security Documents in realising the property and assets subject to the Security Documents and in ensuring that the net proceeds realised under the Security Documents after deduction of the expenses of realisation are applied in accordance with clause 32.24 (*Order of application*).

**32.28**    **Indemnity from Trust Property**

32.28.1    In respect of all liabilities, costs or expenses for which the Obligors are liable under this Agreement, the Security Agent and each Affiliate of the Security Agent and each officer or employee of the Security Agent or its Affiliate (each a **Relevant Person**) shall be entitled to be indemnified out of the Trust Property in respect of all liabilities, damages, costs, claims, charges or expenses whatsoever properly incurred or suffered by such Relevant Person:

(a)    in the execution or exercise or bona fide purported execution or exercise of the trusts, rights, powers, authorities, discretions and duties created or conferred by or pursuant to the Finance Documents;

(b)    as a result of any breach by an Obligor of any of its obligations under any Finance Document;

(c)    in respect of any Environmental Claim made or asserted against a Relevant Person which would not have arisen if the Finance Documents had not been executed; and

(d)    in respect of any matter or thing done or omitted in any way in accordance with the terms of the Finance Documents relating to the Trust Property or the provisions of any of the Finance Documents.

32.28.2    The rights conferred by this clause 32.28 are without prejudice to any right to indemnity by law given to trustees generally and to any provision of the Finance Documents entitling the Security Agent or any other person to an indemnity in respect of, and/or reimbursement of, any liabilities, costs or expenses incurred or suffered by it in connection with any of the Finance Documents or the performance of any duties under any of the Finance Documents.  Nothing contained in this clause 32.28 shall entitle the Security Agent or any other person to be indemnified in respect of any liabilities, damages, costs, claims, charges or expenses to the extent that the same arise from such person's own gross negligence or wilful misconduct.

**32.29**    **Finance Parties to provide information**

The other Finance Parties shall provide the Security Agent with such written information as it may reasonably require for the purposes of carrying out its duties and obligations under the Security Documents and, in particular, with such necessary directions in writing so as to enable the Security Agent to make the calculations and applications contemplated by clause 32.24 (*Order of application*) above and to apply amounts received under, and the proceeds of realisation of, the Security Documents as contemplated by the Security Documents, clause 35.5 (*Partial payments*) and clause 32.24 (*Order of application*).

32.30    **No Reliance on Security Agent**

It is understood and agreed by each Finance Party (other than the Security Agent) that it has itself been, and will continue to be, solely responsible for making its own independent appraisal of and investigations into the financial condition, creditworthiness, condition, affairs, status and nature of each Obligor and, accordingly, each other Finance Party warrants to the Security Agent that it has not relied and will not hereafter rely on the Security Agent:

(a)    to check or enquire on its behalf into the adequacy, accuracy or completeness of any information provided to it by the Obligors or any other person in connection with any of the Finance Documents, the Charged Property or the transactions therein contemplated (whether or not such information has been or is hereafter circulated to such Finance Party by the Security Agent);

(b)    to check or enquire on its behalf into the adequacy, accuracy or completeness of any communication delivered to it under any of the Finance Documents, the Charged Property, any legal or other opinions, reports, valuations, certificates, appraisals or other documents delivered or made or required to be delivered or made at any time in connection with any of the Finance Documents, the Charged Property, any security to be constituted thereby or any other report or other document, statement or information circulated, delivered or made, whether orally or otherwise and whether before, on or after the date of this Agreement;

(c)    to check or enquire on its behalf into the due execution, delivery, validity, legality, adequacy, suitability, performance, enforceability or admissibility in evidence of any of the Finance Documents, the Charged Property or any other document referred to in paragraph (b) above or of any guarantee, indemnity or security given or created thereby or any obligations imposed thereby or assumed thereunder;

(d)    to check or enquire on its behalf into the ownership, value, existence or sufficiency of any Charged Property, the priority of any of the Security Interests, the right or title of any person in or to any property comprised therein or the existence of any encumbrance affecting the same; or

(e)    to assess or keep under review on its behalf the identity, financial condition, creditworthiness, condition, affairs, status or nature of any Obligor or other Group Member.

32.31    **Release to facilitate enforcement and realisation**

Each Finance Party acknowledges that pursuant to any enforcement action by the Security Agent (or a Receiver) carried out on the instructions of the Agent it may be desirable for the purpose of such enforcement and/or maximising the realisation of the Charged Property being enforced against, that any rights or claims of or by the Security Agent (for the benefit of the Finance Parties) and/or any Finance Parties against any Obligor and/or any Security Interest over any assets of any Obligor (in each case) as contained in or created by any Finance Document, other than such rights or claims or security being enforced, be released in order to facilitate such enforcement action and/or realisation and, notwithstanding any other provision of the Finance Documents, each Finance Party hereby irrevocably authorises the Security Agent (acting on the instructions of the Agent) to grant any such releases to the extent necessary to fully effect such enforcement action and realisation including, without limitation, to the extent necessary for such purposes to execute release documents in the name of and on behalf of the Finance Parties. Where the relevant enforcement is by way of disposal of shares in a Borrower, the requisite release shall include releases of all claims (including under guarantees) of the Finance Parties and/or the Security Agent against that Borrower and of all Security Interests over the assets of that Borrower.

**32.32** **Undertaking to pay**

Each Obligor which is a Party undertakes with the Security Agent on behalf of the Finance Parties that it will, on demand by the Security Agent, pay to the Security Agent all money from time to time owing, and discharge all other obligations from time to time incurred, by it under or in connection with the Finance Documents.

**32.33** **Additional trustees**

The Security Agent shall have power by notice in writing to the other Finance Parties and the Borrowers to appoint any person approved by the Borrowers (such approval not to be unreasonably withheld or delayed) either to act as separate trustee or as co-trustee jointly with the Security Agent:

(a) if the Security Agent reasonably considers such appointment to be in the best interests of the Finance Parties;

(b) for the purpose of conforming with any legal requirement, restriction or condition in any jurisdiction in which any particular act is to be performed; or

(c) for the purpose of obtaining a judgment in any jurisdiction or the enforcement in any jurisdiction against any person of a judgment already obtained,

and any person so appointed shall (subject to the provisions of this Agreement) have such rights (including as to reasonable remuneration), powers, duties and obligations as shall be conferred or imposed by the instrument of appointment. The Security Agent shall have power to remove any person so appointed. At the request of the Security Agent, the other parties to this Agreement shall forthwith execute all such documents and do all such things as may be required to perfect such appointment or removal and each such party irrevocably authorises the Security Agent in its name and on its behalf to do the same. Such a person shall accede to this Agreement as a Security Agent to the extent necessary to carry out their role on terms satisfactory to the Security Agent and (subject always to the provisions of this Agreement) have such trusts, powers, authorities, liabilities and discretions (not exceeding those conferred on the Security Agent by this Agreement and the other Finance Documents) and such duties and obligations as shall be conferred or imposed by the instrument of appointment (being no less onerous than would have applied to the Security Agent but for the appointment). The Security Agent shall not be bound to supervise, or be responsible for any loss incurred by reason of any act or omission of, any such person if the Security Agent shall have exercised reasonable care in the selection of such person.

**32.34** **Non-recognition of trust**

It is agreed by all the parties to this Agreement that:

(a) in relation to any jurisdiction the courts of which would not recognise or give effect to the trusts expressed to be constituted by this clause 32, the relationship of the Security Agent and the other Finance Parties shall be construed as one of principal and agent, but to the extent permissible under the laws of such jurisdiction, all the other provisions of this Agreement shall have full force and effect between the parties to this Agreement; and

(b) the provisions of this clause 32 insofar as they relate to the Security Agent in its capacity as trustee for the Finance Parties and the relationship between themselves and the Security Agent as their trustee may be amended by agreement between the other Finance Parties and the Security Agent. The Security Agent may amend all documents necessary to effect the alteration of the relationship between the Security Agent and the other Finance Parties and each such other party irrevocably authorises

the Security Agent in its name and on its behalf to execute all documents necessary to effect such amendments.

## 32.35    Security Agent's Ongoing Fees

32.35.1    The Borrowers shall pay to the Agent and the Security Agent certain fees in accordance with clause 11 (*Fees*).

32.35.2    If:

    (a)    a Default has occurred; or

    (b)    the Security Agent considers it expedient and/or necessary or is requested by the Borrowers or any Finance Party or group of Finance Parties to undertake duties which the Security Agent considers to be of an exceptional nature and/or outside the scope of the normal duties of the Security Agent under the Finance Documents (which for the avoidance of doubt shall include any amendments to the Finance Documents and the time incurred in relation thereto),

the Borrowers shall pay to the Security Agent any additional remuneration (together with any applicable taxes thereon) which shall be calculated by reference to its hourly rates in force from time to time.

## 32.36    Insurance by Security Agent

Where the Security Agent is named on any insurance policy (including the Insurances) as an insured party and/or loss payee, the Security Agent shall not be responsible for any loss which may be suffered by reason of, directly or indirectly, its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Agent shall have requested it to do so in writing and the Security Agent shall have failed to do so within 14 days after receipt of that request. The Security Agent shall have no obligation to, nor any liability for any failure to, insure any of the Charged Property.

## 32.37    Custodians and nominees

The Security Agent may (to the extent legally permitted) appoint and pay any person to act as a custodian or nominee on any terms in relation to any assets of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

## 32.38    Acceptance of title

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any of the Obligors have to any of the Charged Property and shall not be liable for or bound to require any Debtor to remedy any defect in its right or title.

## 32.39    Refrain from illegality

Notwithstanding anything to the contrary expressed or implied in the Finance Documents, the Security Agent may refrain from doing anything which in its opinion will or may be contrary to any relevant law, directive or regulation of any applicable jurisdiction and the Security Agent may do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

**32.40    Interest on Demand**

If the Borrowers fail to pay any amount payable by them to the Security Agent under this Agreement on its due date, interest shall accrue on the overdue amount (and be compounded with it) from the due date up to the date of actual payment (both before and after judgment and to the extent interest at a default rate is not otherwise being paid on such sum) at the rate which is two per cent. (2%) per annum over the rate at which the Security Agent was being offered, by prime banks in the London interbank market, deposits in an amount comparable to the unpaid amounts in the currencies of those amounts for such period(s) as the Security Agent may from time to time select.

**32.41    Release of Security**

If the Agent, with the approval of all the other Finance Parties, shall determine that all of the amounts owing under the Finance Documents and all other obligations the discharge of which is secured by any of the Security Documents have been fully and finally discharged and none of the Finance Parties is under any commitment, obligation or liability (whether actual or contingent) to make advances or provide other financial accommodation to the Borrowers under or pursuant to this Agreement or any other Finance Document, the trusts herein set out shall be wound up and the Security Agent shall, at the request and cost of the Borrowers and acting on the instructions of the Agent, release, without recourse or warranty, all of the security then held by it, whereupon the Security Agent, the Agent, the Lenders and the Obligors shall be released from their obligations hereunder (save for those which arose prior to such winding up).

## 33    Conduct of business by the Finance Parties

**33.1    Finance Parties tax affairs**

No provision of this Agreement will:

(a)  interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)  oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)  oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

**33.2    Finance Parties acting together**

Notwithstanding clause 2.2 (*Finance Parties' rights and obligations*), if the Agent makes a declaration under clause 29.22 (*Acceleration*) the Agent shall, in the names of all the Finance Parties, take such action on behalf of the Finance Parties and conduct such negotiations with the Borrowers and any Group Members and generally administer the Facilities in accordance with the wishes of the Majority Lenders.  All the Finance Parties shall be bound by the provisions of this clause and no Finance Party shall be entitled to take action independently against any Obligor or any of its assets without the prior consent of the Majority Lenders.

This clause shall not override clause 32 (*Roles of Agent, Security Agent and Arranger*) as it applies to the Security Agent.

**33.3    Majority Lenders**

33.3.1   Where any Finance Document provides for any matter to be determined by reference to the opinion of, or to be subject to the consent, approval or request of, the Majority Lenders or for any action to be taken on the instructions of the Majority Lenders (a **majority decision**), such majority decision shall (as between the Lenders) only be regarded as having been validly given or issued by the Majority Lenders if all the Lenders shall have received prior notice of the matter

on which such majority decision is required and the relevant majority of Lenders shall have given or issued such majority decision. However (as between any Obligor and the Finance Parties) the relevant Obligor shall be entitled (and bound) to assume that such notice shall have been duly received by each Lender and that the relevant majority shall have been obtained to constitute Majority Lenders when notified to this effect by the Agent whether or not this is the case.

33.3.2   If, within ten Business Days of the Agent despatching to each Lender a notice requesting instructions (or confirmation of instructions) from the Lenders or the agreement of the Lenders to any amendment, modification, waiver, variation or excuse of performance for the purposes of, or in relation to, any of the Finance Documents, the Agent has not received a reply specifically giving or confirming or refusing to give or confirm the relevant instructions or, as the case may be, approving or refusing to approve the proposed amendment, modification, waiver, variation or excuse of performance, then (irrespective of whether such Lender responds at a later date) the Agent shall treat any Lender which has not so responded as having indicated a desire to be bound by the wishes of 66 $^2/_3$ per cent. of those Lenders (measured in terms of the total Commitments of those Lenders) which have so responded.

33.3.3   For the purposes of clause 33.3.2, any Lender which notifies the Agent of a wish or intention to abstain on any particular issue shall be treated as if it had not responded.

33.3.4   Clauses 33.3.2 and 33.3.3 shall not apply in relation to those matters referred to in, or the subject of, clause 41.2 (*Exceptions*).

### 33.4   Conflicts

33.4.1   Each Borrower acknowledges that any Arranger and its parent undertaking, subsidiary undertakings and fellow subsidiary undertakings (together an **Arranger Group**) may be providing debt finance, equity capital or other services (including financial advisory services) to other persons with which the Borrowers may have conflicting interests in respect of the Facilities or otherwise.

33.4.2   No member of an Arranger Group shall use confidential information gained from any Obligor by virtue of the Facilities or its relationships with any Obligor in connection with their performance of services for other persons. This shall not, however, affect any obligations that any member of an Arranger Group has as Agent in respect of the Finance Documents. The Borrowers also acknowledge that no member of an Arranger Group has any obligation to use or furnish to any Obligor information obtained from other persons for their benefit.

33.4.3   The terms **parent undertaking**, **subsidiary undertaking** and **fellow subsidiary undertaking** when used in this clause have the meaning given to them in sections 1161 and 1162 of the Companies Act 2006.

## 34   Sharing among the Finance Parties

### 34.1   Payments to Finance Parties

If a Finance Party (a **Recovering Finance Party**) receives or recovers any amount from an Obligor other than in accordance with clause 35 (*Payment mechanics*) (a **Recovered Amount**) and applies that amount to a payment due under the Finance Documents then:

(a)   the Recovering Finance Party shall, within three Business Days, notify details of the receipt or recovery, to the Agent;

(b)   the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with clause 35 (*Payment mechanics*), without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(c) the Recovering Finance Party shall, within three Business Days of demand by the Agent, pay to the Agent an amount (the **Sharing Payment**) equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with clause 35.5 (*Partial payments*).

## 34.2   Redistribution of payments

The Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) (the **Sharing Finance Parties**) in accordance with clause 35.5 (*Partial payments*) towards the obligations of that Obligor to the Sharing Finance Parties.

## 34.3   Recovering Finance Party's rights

On a distribution by the Agent under clause 34.2 (*Redistribution of payments*) of a payment received by a Recovering Finance Party from an Obligor, as between the relevant Obligor and the Recovering Finance Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

## 34.4   Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a) each Sharing Finance Party shall, upon request of the Agent, pay to the Agent for the account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay) (the **Redistributed Amount**); and

(b) as between the relevant Obligor and each relevant Sharing Finance Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

## 34.5   Exceptions

34.5.1   This clause 34 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this clause, have a valid and enforceable claim against the relevant Obligor.

34.5.2   A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings in accordance with the terms of this Agreement, if:

(a) it notified that other Finance Party of the legal or arbitration proceedings; and

(b) the taking legal or arbitration proceedings was in accordance with the terms of this Agreement; and

that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

## SECTION 11 - ADMINISTRATION

### 35   Payment mechanics

#### 35.1   Payments to the Agent

35.1.1   On each date on which an Obligor or a Lender is required to make a payment under a Finance Document, that Obligor or Lender shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

35.1.2   Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in a Participating Member State or London as specified by the Agent) with such bank as the Agent, in each case specifies.

#### 35.2   Distributions by the Agent

Each payment received by the Agent under the Finance Documents for another Party shall, subject to clause 35.3 (*Distributions to an Obligor*) and clause 35.4 (*Clawback*) be made available by the Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Agent by not less than five Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London as specified by that Party).

#### 35.3   Distributions to an Obligor

The Agent may (with the consent of the Obligor or in accordance with clause 36 (*Set-off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

#### 35.4   Clawback

35.4.1   Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

35.4.2   If the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

#### 35.5   Partial payments

35.5.1   If the Agent receives a payment for application against amounts due under the Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Agent shall apply that payment towards the obligations of that Obligor under those Finance Documents in the following order:

(a)   **first**, in or towards payment pro rata of any unpaid fees, costs and expenses (ignoring any fees payable under clause 11 (*Fees*)) of the Agent, the Security Agent or the Arrangers under those Finance Documents;

(b) **secondly**, in or towards payment to the Lenders pro rata of any amount owing to the Lenders under clause 32.11 (*Lenders' indemnity to the Agent*) including any amount resulting from the indemnity to the Security Agent under clause 32.22.1 (*Application of certain clauses to Security Agent*);

(c) **thirdly**, in or towards payment to the Lenders pro rata of any accrued interest, fee or commission due but unpaid under those Finance Documents;

(d) **fourthly**, in or towards payment to the Lenders pro rata of any principal which is due but unpaid under those Finance Documents; and

(e) **fifthly**, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents.

35.5.2   The Agent shall, if so directed by all the Lenders, vary the order set out in paragraphs (b) to (d) of clause 35.5.1.

35.5.3   Clauses 35.5.1 and 35.5.2 above will override any appropriation made by an Obligor.

### 35.6   No set-off by Obligors

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

### 35.7   Business Days

35.7.1   Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

35.7.2   During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

### 35.8   Payments on demand

For the purposes of clause 29.1 (*Non-payment*) and subject to the Agent's right to demand interest under clause 8.3 (*Default interest*), payments on demand shall be treated as paid when due if paid within three Business Days of demand.

### 35.9   Currency of account

35.9.1   Subject to clauses 35.9.2 to 35.9.3, dollars is the currency of account and payment for any sum due from an Obligor under any Finance Document.

35.9.2   A repayment of all or part of the Loan or an Unpaid Sum and each payment of interest shall be made in dollars on its due date.

35.9.3   Each payment in respect of the amount of any costs, expenses or Taxes or other losses shall be made in dollars and, if they were incurred in a currency other than dollars, the amount payable under the Finance Documents shall be the equivalent in dollars of the relevant amount in such other currency on the date on which it was incurred.

35.9.4   All moneys received or held by the Security Agent or by a Receiver under a Security Document in a currency other than dollars may be sold for dollars and the Obligor which executed that Security Document shall indemnify the Security Agent against the full cost in relation to the sale. Neither the Security Agent nor such Receiver will have any liability to that Obligor in respect of any loss resulting from any fluctuation in exchange rates after the sale.

**35.10** **Change of currency**

35.10.1 Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(a) any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Borrowers); and

(b) any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

35.10.2 If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Borrowers) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the London interbank market and otherwise to reflect the change in currency.

**35.11** **Disruption to Payment Systems etc.**

If either the Agent determines (in its discretion) that a Payment Disruption Event has occurred or the Agent is notified by the Borrowers that a Payment Disruption Event has occurred:

(a) the Agent may, and shall if requested to do so by the Borrowers, consult with the Borrowers with a view to agreeing with the Borrowers such changes to the operation or administration of the Facilities as the Agent may deem necessary in the circumstances;

(b) the Agent shall not be obliged to consult with the Borrowers in relation to any changes mentioned in paragraph (a) above if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c) the Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) above but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d) any such changes agreed upon by the Agent and the Borrowers shall (whether or not it is finally determined that a Payment Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of clause 41 (*Amendments and grant of waivers*);

(e) the Agent shall not be liable for any damages, costs or losses to any person, or for any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this clause 35.11; and

(f) the Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

**35.12** **Impaired Agent**

35.12.1 If, at any time, the Agent becomes an Impaired Agent, an Obligor or a Lender which is required to make a payment under the Finance Documents to the Agent in accordance with clause 35.1 (*Payments to the Agent*) may instead either pay that amount direct to the intended recipient or pay that amount to an interest-bearing account held with an Acceptable Bank within the meaning of paragraph (a) of the definition of **Acceptable Bank** and in relation to which no Insolvency Event has occurred and is continuing, in the name of the Obligor or the Lender

making the payment and designated as a trust account for the benefit of the Party or Parties beneficially entitled to that payment under the Finance Documents. In each case such payments must be made on the due date for payment under the Finance Documents.

35.12.2    All interest accrued on the amount standing to the credit of the trust account shall be for the benefit of the beneficiaries of that trust account pro rata to their respective entitlements.

35.12.3    A Party which has made a payment in accordance with clause 35.1 (*Payments to the Agent*) shall be discharged of the relevant payment obligation under the Finance Documents and shall not take any credit risk with respect to the amounts standing to the credit of the trust account.

35.12.4    Promptly upon the appointment of a successor Agent in accordance with clause 32.13 (*Replacement of the Agent*), each Party which has made a payment to a trust account in accordance with clauses 35.1 (*Payments to the Agent*) shall give all requisite instructions to the bank with whom the trust account is held to transfer the amount (together with any accrued interest) to the successor Agent for distribution in accordance with clause 35.2 (*Distributions by the Agent*).

## 36    Set-off

A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off. For the purpose of this clause the term "Finance Party" includes each of the relevant Finance Party's holding companies and subsidiaries and each subsidiary of the relevant Finance Party's holding companies (as defined in the Companies Act 2006).

## 37    Notices

### 37.1    Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter or other means of telecommunication in permanent written form.

### 37.2    Addresses

The address, and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Obligor or Finance Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)    in the case of any Obligor which is a Party, that identified with its name in Schedule 1 (*The original parties*);

(b)    in the case of any Obligor which is not a Party, that identified in any Finance Document to which it is a party;

(c)    in the case of the Security Agent, the Agent and any other original Finance Party that identified with its name in Schedule 1 (*The original parties*); and

(d)    in the case of each Lender or other Finance Party, that notified in writing to the Agent on or prior to the date on which it becomes a Party in the relevant capacity,

or, in each case, any substitute address, fax number, or department or officer as an Obligor or Finance Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five Business Days' notice.

**37.3    Delivery**

37.3.1    Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(a)    if by way of fax or other means of telecommunication in permanent written form, when received in legible form; or

(b)    if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under clause 37.2 (*Addresses*), if addressed to that department or officer.

37.3.2    Any communication or document to be made or delivered to the Agent or the Security Agent will be effective only when actually received by the Agent or the Security Agent and then only if it is expressly marked for the attention of the department or officer identified in Schedule 1 (*The original parties*) (or any substitute department or officer as the Agent or the Security Agent shall specify for this purpose).

37.3.3    All notices from or to an Obligor shall be sent through the Agent.

37.3.4    Any communication or document made or delivered to the Borrowers in accordance with this clause will be deemed to have been made or delivered to each of the Obligors.

37.3.5    Any communication or document which becomes effective, in accordance with clauses 37.3.1 to 37.3.4 above, after 5:00 pm in the place of receipt shall be deemed only to become effective on the following day.

**37.4    Notification of address and fax number**

Promptly upon receipt of notification of an address and fax number or change of address or fax number pursuant to clause 37.2 (*Addresses*) or changing its own address or fax number, the Agent shall notify the other Parties.

**37.5    Electronic communication**

37.5.1    Any communication to be made between the Agent and a Lender or the Security Agent under or in connection with the Finance Documents may be made by electronic mail or other electronic means, if the Agent and the relevant Lender or the Security Agent:

(a)    agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

(b)    notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(c)    notify each other of any change to their address or any other such information supplied by them.

37.5.2    Any electronic communication made between the Agent and a Lender or the Security Agent will be effective only when actually received in readable form and in the case of any electronic communication made by a Lender or the Security Agent to the Agent only if it is addressed in such a manner as the Agent shall specify for this purpose.

37.5.3    Any electronic communication which becomes effective, in accordance with clause 37.5.2 above, after 5:00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

37.5.4    In particular, the Obligors are aware and acknowledge that:

(a) the unencrypted information is transported over an open, publicly accessible network and can, in principle, be viewed by others, thereby allowing conclusions to be drawn about a banking relationship;

(b) the information can be changed and manipulated by a third party;

(c) the sender's identity (sender of the electronic communication) can be assumed or otherwise manipulated;

(d) the exchange of information can be delayed or disrupted due to transmission errors, technical faults, disruptions, malfunctions, illegal interventions, network overload, the malicious blocking of electronic access by third parties, or other shortcomings on the part of the network provider. In certain situations, time-critical orders and instructions might not be processed on time; and

(e) the Finance Parties assume no liability for any loss incurred as a result of manipulation of the electronic address or content nor is it liable for any loss incurred by the Borrowers or any other Obligor due to interruptions and delays in transmission caused by technical problems.

37.5.5    The Finance Parties are entitled to assume that all the orders and instructions, and communications in general, received from the Borrowers or any other Obligor or a third party are from an authorized individual, irrespective of the existing signatory rights in accordance with the commercial register (or any other applicable equivalent document) or the specimen signature provided to any Finance Party. The Obligors shall further procure that all third parties referred to herein agree with the use of electronic communication and are aware of the above terms and conditions related to the use of electronic communication.

### 37.6    English language

37.6.1    Any notice given under or in connection with any Finance Document shall be in English.

37.6.2    All other documents provided under or in connection with any Finance Document shall be:

(a) in English; or

(b) if not in English, and if so required by the Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

### 37.7    Communication when Agent is Impaired Agent

If the Agent is an Impaired Agent the Parties may, instead of communicating with each other through the Agent, communicate with each other directly and (while the Agent is an Impaired Agent) all the provisions of the Finance Documents which require communications to be made or notices to be given to or by the Agent shall be varied so that communications may be made and notices given to or by the relevant Parties directly. This provision shall not operate after a replacement Agent has been appointed.

## 38    Calculations and certificates

### 38.1    Accounts

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

**38.2     Certificates and determinations**

Any certification or determination by the Agent of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**38.3     Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Interbank Market differs, in accordance with that market practice.

# 39     Partial invalidity

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

# 40     Remedies and waivers

No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.   The rights and remedies provided in the Finance Documents are cumulative and not exclusive of any rights or remedies provided by law.

# 41     Amendments and grant of waivers

**41.1     Required consents**

41.1.1     Subject to clause 41.2 (*Exceptions*), any term of the Finance Documents may be amended or waived with the consent of the Agent (acting on the instructions of the Majority Lenders and, if it affects the rights and obligations of the Security Agent or the Agent, the consent of the Agent or the Security Agent) and any such amendment or waiver agreed or given by the Agent will be binding on the other Finance Parties.

41.1.2     The Agent may (or, in the case of the Security Documents, instruct the Security Agent to) effect, on behalf of any Finance Party, any amendment or waiver permitted by this clause.

**41.2     Exceptions**

41.2.1     No amendment or waiver may be made before the date falling ten (10) Business Days after the terms of that amendment or waiver have been notified by the Agent to the Lenders, unless each Lender is a FATCA Protected Lender. The Agent shall notify the Lenders reasonably promptly of any amendments or waivers proposed by the Borrowers.

41.2.2     Without prejudice to the generality of sub- clauses 32.7.3, 32.7.4 and 32.7.5 of clause 32.7 *(Rights and discretions of Agent)*, the Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

41.2.3     Each Obligor agrees to any such amendment or waiver permitted by this clause 41 which is agreed to by the Borrowers. This includes any amendment or waiver which would, but for this clause 41.2.3, require the consent of the Guarantor.

**41.3    All Lenders matters**

41.3.1    An amendment, waiver or discharge or release or a consent of, or in relation to, the terms of any Finance Document that has the effect of changing or which relates to:

    (a)    the definition of "Change of Control" in clause 1.1 (*Definitions*);

    (b)    the definition of "IPO Change of Control" in clause 1.1 (*Definitions*);

    (c)    the definition of "Majority Lenders" in clause 1.1 (*Definitions*);

    (d)    the definition of "Last Availability Date" in clause 1.1 (*Definitions*);

    (e)    an extension to the date of payment of any amount under the Finance Documents;

    (f)    a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable or the rate at which they are calculated;

    (g)    an increase in, or an extension of, any Commitment or any requirement that a cancellation of Commitments reduces the Commitments of the Lenders pro rata under the relevant Facility;

    (h)    a change to the Borrowers or any other Obligor;

    (i)    any provision which expressly requires the consent or approval of all the Lenders;

    (j)    clause 2.2 (*Finance Parties' rights and obligations*), clause 7.2 (*Change of control*), clause 21.12 (*Sanctions*), clause 30 (*Changes to the Lenders*), clause 34.1 (*Payments to Finance Parties*), this clause 41, clause 44 (*Governing Law*) or clause 45 (*Enforcement*);

    (k)    the order of distribution under clause 35.5 (*Partial payments*);

    (l)    the order of distribution under clause 32.24 (*Order of application*);

    (m)    the currency in which any amount is payable under any Finance Document;

    (n)    the nature or scope of the Charged Property or the manner in which the proceeds of enforcement of the Security Documents are distributed;

    (o)    the nature or scope of the guarantee and indemnity granted under clause 17 (*Guarantee and Indemnity*); or

    (p)    the circumstances in which the security constituted by the Security Documents are permitted or required to be released under any of the Finance Documents,

shall not be made without the prior consent of all the Lenders.

41.3.2    If the Agent or a Lender reasonably believes that an amendment or waiver to any term of this Agreement, may constitute a "material modification" for the purposes of FATCA that may result (directly or indirectly) in a Party being required to make a FATCA Deduction and the Agent or that Lender (as the case may be) notifies the Borrowers and the Agent accordingly, that amendment or waiver may, subject to paragraph (ii) below, not be effected without the consent of the Agent or that Lender (as the case may be). The consent of a Lender shall not be required pursuant to this clause if that Lender is a FATCA Protected Lender.

41.3.3    An amendment or waiver which relates to the rights or obligations of the Agent, the Security Agent or the Arrangers in their respective capacities as such (and not just as a Lender) may not be effected without the consent of the Agent, Security Agent or the Arrangers (as the case may be).

41.3.4   Notwithstanding clauses 41.1 (*Required consents*) and 41.3.1 to 41.3.3 (inclusive), the Agent may make technical amendments to the Finance Documents arising out of manifest errors on the face of the Finance Documents, where such amendments would not prejudice or otherwise be adverse to the interests of any Finance Party without any reference or consent of the Finance Parties.

## 41.4   Disenfranchisement of Defaulting Lenders

41.4.1   For so long as a Defaulting Lender has any Commitment, in ascertaining the Majority Lenders or whether any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitment has been obtained to approve any request for a consent, waiver, amendment or other vote under the Finance Documents, that Defaulting Lender's Commitment will be reduced by the amount of its Commitment.

41.4.2   For the purposes of this clause 41.4, the Agent may assume that the following Lenders are Defaulting Lenders:

(a)   any Lender which has notified the Agent that it has become a Defaulting Lender; and

(b)   any Lender in relation to which it is aware that any of the events or circumstances referred to in paragraphs (a), (b) or (c) of the definition of **Defaulting Lender** has occurred, unless it has received notice to the contrary from the Lender concerned (together with any supporting evidence reasonably requested by the Agent) or the Agent is otherwise aware that the Lender has ceased to be a Defaulting Lender.

## 41.5   Replacement of a Defaulting Lender

41.5.1   The Borrowers may, at any time a Lender has become and continues to be a Defaulting Lender, by giving 10 Business Days' prior written notice to the Agent and such Lender replace such Lender by requiring such Lender to (and, to the extent permitted by law such Lender shall) transfer pursuant to clause 30 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to a Lender or other bank, financial institution, trust, fund or other entity (a **Replacement Lender**) selected by the Borrowers, and which (unless the Lender is an Impaired Agent) is acceptable to the Agent (acting reasonably) and which confirms its willingness to assume and does assume all the obligations or all the relevant obligations of the transferring Lender (including the assumption of the transferring Lender's participations or unfunded participations (as the case may be) on the same basis as the transferring Lender) for a purchase price in cash payable at the time of transfer equal to the outstanding principal amount of such Lender's participation in the outstanding Utilisations and all accrued interest, Break Costs and other amounts payable in relation thereto under the Finance Documents (or at any other purchase price approved by all of the other Lenders who are not Defaulting Lenders at the time).

41.5.2   Any transfer of rights and obligations of a Defaulting Lender pursuant to this clause shall be subject to the following conditions:

(a)   the Borrowers shall have no right to replace the Agent or Security Agent;

(b)   neither the Agent nor the Defaulting Lender shall have any obligation to the Borrowers to find a Replacement Lender;

(c)   the transfer must take place no later than 14 days after the notice referred to in clause 41.5.1 above; and

(d)   in no event shall the Defaulting Lender be required to pay or surrender to the Replacement Lender any of the fees received by the Defaulting Lender pursuant to the Finance Documents.

**41.6    Releases**

Except with the approval of all the Lenders or as is expressly permitted or required by the Finance Documents, the Agent shall not have authority to authorise the Security Agent to release:

(a)   any Charged Property from the security constituted by any Security Document; or

(b)   any Obligor from any of its guarantee or other obligations under any Finance Document.

## 42    Counterparts

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## 43    Confidentiality

**43.1    Confidential Information**

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by clause 43.2 (*Disclosure of Confidential Information*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

**43.2    Disclosure of Confidential Information**

Any Finance Party may disclose (without the consent of the Obligors) to any of its Affiliates, employees (including service and settlement employees) or any of its employees, officers, directors, representatives or advisers, and to any other person:

(a)   in the case of a Lender, to (or through) whom that Lender assigns (or may potentially assign) all or any of its rights and obligations under the Finance Documents;

(b)   in the case of a Lender, to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to clause 30.7 (*Security over Lenders' rights*);

(c)   in the case of a Lender, with (or through) whom that Lender enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made by reference to, the Finance Documents or any Obligor;

(d)   to whom, and to the extent that, information is required to be disclosed by any applicable law or regulation;

(e)   in order to preserve or enforce any rights any Finance Party may have under the Security Documents;

(f)    which is a rating agency (including its professional advisers) or such Finance Party's professional advisers (including auditors, lawyers, accountants, surveyors, valuers, insurers, insurance advisors and brokers); or

(g)   in the case of the Security Agent, in the course of the performance of its functions under the Finance Documents,

any information about any Obligor, the Group and the Finance Documents as that Finance Party shall consider appropriate; and any Finance Party may disclose (with the consent of the Borrowers) to any other person not included in paragraphs (a) - (f) above, any information about any Obligor, the Group and the Finance Documents as that Finance Party shall consider appropriate.

**43.3     Disclosure to numbering service providers**

43.3.1    Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facilities and/or one or more Obligors the following information:

(a)   names of Obligors;

(b)   country of domicile of Obligors;

(c)   place of incorporation of Obligors;

(d)   date of this Agreement;

(e)   clause 44 *(Governing law)*;

(f)   the names of the Agent and the Arrangers;

(g)   date of each amendment and restatement of this Agreement;

(h)   amount of Total Commitments;

(i)   currency of the Facilities;

(j)   type of the Facilities;

(k)   ranking of the Facilities;

(l)   the term of the Facilities;

(m)   changes to any of the information previously supplied pursuant to paragraphs (a) to (l) above; and

(n)   such other information agreed between such Finance Party and the Borrowers,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

43.3.2    The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facilities and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

43.3.3    The Borrowers represent that none of the information set out in clauses 43.3.1(a) to (m) above is, nor will at any time be, unpublished price-sensitive information.

43.3.4    The Agent shall notify the Borrowers and the other Finance Parties of:

(a)   the name of any numbering service provider appointed by the Agent in respect of this Agreement, the Facilities and/or one or more Obligors; and

(b)   the number or, as the case may be, numbers assigned to this Agreement, the Facilities and/or one or more Obligors by such numbering service provider.

**43.4     Entire agreement**

This clause 43 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential

Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

**43.5    Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**43.6    Continuing obligations**

The obligations in this clause 43 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of twelve months from the earlier of:

(a)    the date on which all amounts payable by the Obligors under or in connection with this Agreement have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

## SECTION 12 - GOVERNING LAW AND ENFORCEMENT

**44      Governing law**

This Agreement and any non-contractual obligations connected with it are governed by English law.

**45      Enforcement**

**45.1    Jurisdiction of English courts**

45.1.1   The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement or any non-contractual obligations connected with it (including a dispute regarding the existence, validity or termination of this Agreement) (a **Dispute**).

45.1.2   The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

45.1.3   This clause 45.1 is for the benefit of the Finance Parties only.  As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

**45.2    Service of process**

Without prejudice to any other mode of service allowed under any relevant law, each Obligor which is a Party:

(a)   irrevocably appoints the person named in Schedule 1 (*The original parties*) as that Obligor's English process agent as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document;

(b)   agrees that failure by a process agent to notify the relevant Obligor of the process will not invalidate the proceedings concerned; and

(c)   if any person appointed as process agent for an Obligor is unable for any reason to act as agent for service of process, that Obligor must immediately (and in any event within ten days of such event taking place) appoint another agent on terms acceptable to the Agent.  Failing this, the Agent may appoint another agent for this purpose.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

**Schedule 1**

**The original parties**

**Borrowers**

| Name: | Astipalea II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116591 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Kithnos II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116594 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Dilos II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116595 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Paros II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116593 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Othoni II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116589 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Samothraki II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-117112 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Shinoussa II Shipping Corporation |
|---|---|
| Jurisdiction of incorporation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-117113 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

**Guarantor**

| | |
|---|---|
| Name: | Eletson Gas LLC |
| Jurisdiction of incorporation | Republic of the Marshall Islands |
| Registration number (or equivalent, if any) | 962359 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London EC4A 2EJ |
| Registered office | Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

## The Original Lenders

| Name | Skandinaviska Enskilda Banken AB (publ) |
|---|---|
| Pre-Delivery Commitment $ | 10,298,647 |
| Post-Delivery Commitment $ | 50,000,000 |
| Aggregate Commitments | 60,298,647 |
| Name | Citibank N.A., London Branch |
| Pre-Delivery Commitment $ | 10,298,647 |
| Post-Delivery Commitment $ | 50,000,000 |
| Aggregate Commitments | 60,298,647 |
| Name | UniCredit Bank AG |
| Pre-Delivery Commitment $ | - |
| Post-Delivery Commitment $ | 41,667,000 |
| Aggregate Commitments | 41,667,000 |
| Name | BNP Paribas |
| Pre-Delivery Commitment $ | 8,582,206 |
| Post-Delivery Commitment $ | 41,666,500 |
| Aggregate Commitments | 50,248,706 |
| Name | NIBC Bank N.V. |
| Pre-Delivery Commitment $ | - |
| Post-Delivery Commitment $ | 41,666,500 |
| Aggregate Commitments | 41,666,500 |
| TOTAL | 254,179,500 |

## The Agent

| Name | Skandinaviska Enskilda Banken AB (publ) |
|---|---|
| Facility Office, address, fax number and attention details for notices and account details for payments | Name: SEB Loan Agency, Structured Finance<br>Address: Scandinavian House, 2 Cannon Street,<br>London EC4M 6XX, United Kingdom<br>Telephone: +44 20 7246 4699<br>Telefax: +44 20 7329 2304<br>E-mail: agency@seb.co.uk<br><br>With a copy to:<br><br>Name: SEB Structured Operations<br>Address: Rissneleden 110, 106 40 Stockholm, Sweden<br>Telephone: +46 8763 8593<br>Telefax: +44 8611 0384<br>E-mail: sco@seb.se |

**The Security Agent**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|---|---|
| **Facility Office, address, fax number and attention details for notices and account details for payments** | Name:      SEB Loan Agency, Structured Finance<br>Address:   Scandinavian House, 2 Cannon Street,<br>              London EC4M 6XX, United Kingdom<br>Telephone:  +44 20 7246 4699<br>Telefax:     +44 20 7329 2304<br>E-mail:      agency@seb.co.uk |

**The Arrangers**

| Name | Citibank N.A., London Branch |
|---|---|
| Name | Skandinaviska Enskilda Banken AB (publ) |

**Schedule 2**

**Ship information**

**Hull No. 8163**

| | |
|---|---|
| **Owner:** | **Othoni II Shipping Corporation** |
| **Builder:** | Hyundai Mipo Dockyard Co., Ltd. |
| **Builder's registered office:** | 100 Bangeojinsunhwan-Doro, Dong-Gu, Ulsan 682-712, Korea |
| **Hull Number:** | 8163 |
| **Scheduled Delivery Date:** | 25 June 2015 |
| **Date and description of Building Contract:** | Shipbuilding contract dated 13 September 2013 |
| **Building Contract Price:** | $36,580,000 |
| **Date and number of Refund Guarantee(s)** | 16 September 2013, 0117GAD130908163 |
| **Name of Refund Guarantor** | Korea Exchange Bank |
| **Ship Pre-Delivery Commitment** | $3,840,900 |
| **Ship Delivery Commitment:** | $29,616,769 |
| **Flag State:** | Hellenic Republic |
| **Classification:** | +100A1, Liquefied gas carrier, Ship Type 2G, Ethene (Ethylene), Ethane, Propene (Propylene), Propane, Commercial Propane, Propane / Butane, Anhydrous Ammonia, Vinyl Chloride Monomer (VCM), Butadiene, n-Butane, i-Butane, Commercial Butane, Butene (Butylene), Isoprene Monomer, Pentane, Pentene, Methyl Chloride, Acetaldehyde, Dimethylamine, Ethyl chloride, Diethyl Ether, Ethylene Oxide/Propylene Oxide (max. 30 wt%E.O.), Propene (Propylene) Oxide, Isopropylamine, Monoethylamine and Vinylethylether in Independent Tanks Type C, Max. specific gravity 0.97, Max. vapour pressure 5.0 bar g, Min. cargo temperature -104 °C, ShipRight(ACS(B), SDA, FDA, CM), +LMC, UMS, +Lloyd's RMC(LG), LI, *IWS, NAVI, IGS, ECO(BWT, IHM, EEDI, P).<br><br>Descriptive note: ShipRight (BWMP(T,S), SERS, SCM). |
| **Classification Society:** | Lloyd's Register |
| **Major Casualty Amount:** | $2,000,000 |

**Hull No. 8164**

| | |
|---|---|
| **Owner:** | Astipalea II Shipping Corporation |
| **Builder:** | Hyundai Mipo Dockyard Co., Ltd. |
| **Builder's registered office:** | 100 Bangeojinsunhwan-Doro, Dong-Gu, Ulsan 682-712, Korea |
| **Hull No.:** | 8164 |
| **Scheduled Delivery Date:** | 13 August 2015 |
| **Date and description of Building Contract:** | Shipbuilding contract dated 13 September 2013 |
| **Building Contract Price:** | $36,580,000 |
| **Date and number of Refund Guarantee(s)** | 16 September 2013, 0117GAD130908164 |
| **Name of Refund Guarantor** | Korea Exchange Bank |
| **Ship Pre-Delivery Commitment** | $3,840,900 |
| **Ship Delivery Commitment:** | $29,616,769 |
| **Flag State:** | Hellenic Republic |
| **Classification:** | +100A1, Liquefied gas carrier, Ship Type 2G, Ethene (Ethylene), Ethane, Propene (Propylene), Propane, Commercial Propane, Propane / Butane, Anhydrous Ammonia, Vinyl Chloride Monomer (VCM), Butadiene, n-Butane, i-Butane, Commercial Butane, Butene (Butylene), Isoprene Monomer, Pentane, Pentene, Methyl Chloride, Acetaldehyde, Dimethylamine, Ethyl chloride, Diethyl Ether, Ethylene Oxide/Propylene Oxide (max. 30 wt%E.O.), Propene (Propylene) Oxide, Isopropylamine, Monoethylamine and Vinylethylether in Independent Tanks Type C, Max. specific gravity 0.97, Max. vapour pressure 5.0 bar g, Min. cargo temperature -104$^0$C, ShipRight(ACS(B), SDA, FDA, CM), +LMC, UMS, +Lloyd's RMC(LG), LI, *1WS, NAVI, IGS, ECO(BWT, IHM, EEDI, P).<br><br>Descriptive note: ShipRight (BWMP(T,S), SERS, SCM). |
| **Classification Society:** | Lloyd's Register |
| **Major Casualty Amount:** | $2,000,000 |

**Hull No. 8165**

| Owner: | Paros II Shipping Corporation |
|---|---|
| Builder: | Hyundai Mipo Dockyard Co., Ltd. |
| Builder's registered office: | 100 Bangeojinsunhwan-Doro, Dong-Gu, Ulsan 682-712, Korea |
| Hull No.: | 8165 |
| Scheduled Delivery Date: | 2 October 2015 |
| Date and description of Building Contract: | Shipbuilding contract dated 13 September 2013 |
| Building Contract Price: | $36,580,000 |
| Date and number of Refund Guarantee(s) | 16 September 2013, 0117GAD130908165 |
| Name of Refund Guarantor | Korea Exchange Bank |
| Ship Pre-Delivery Commitment | $3,840,900 |
| Ship Delivery Commitment: | $29,616,769 |
| Flag State: | Hellenic Republic |
| Classification: | +100A1, Liquefied gas carrier, Ship Type 2G, Ethene (Ethylene), Ethane, Propene (Propylene), Propane, Commercial Propane, Propane / Butane, Anhydrous Ammonia, Vinyl Chloride Monomer (VCM), Butadiene, n-Butane, i-Butane, Commercial Butane, I Butene (Butylene), Isoprene Monomer, Pentane, Pentene, Methyl Chloride, Acetaldehyde, Dimethylamine, Ethyl chloride, Diethyl Ether, Ethylene Oxide/Propylene Oxide (max. 30 wt%E.O.), Propene (Propylene) Oxide, Isopropylamine, Monoethylamine and Vinylethylether in Independent Tanks Type C, Max. specific gravity 0.97, Max. vapour pressure 5.0 bar g, Min. cargo temperature -104°C, ShipRight(ACS(B), SDA, FDA, CM) +LMC, UMS, +Lloyd's RMC(LG), LI, *IWS, NAVI, IGS, ECO(BWT, IHM, EEDI, P).<br><br>Descriptive note: ShipRight (BWMP(T,S), SERS, SCM). |
| Classification Society: | Lloyd's Register |
| Major Casualty Amount: | $2,000,000 |

**Hull No. 8166**

| | |
|---|---|
| **Owner:** | Kithnos II Shipping Corporation |
| **Builder:** | Hyundai Mipo Dockyard Co., Ltd. |
| **Builder's registered office:** | 100 Bangeojinsunhwan-Doro, Dong-Gu, Ulsan 682-712, Korea |
| **Hull No.:** | 8166 |
| **Scheduled Delivery Date:** | 25 November 2015 |
| **Date and description of Building Contract:** | Shipbuilding contract dated 13 September 2013 |
| **Building Contract Price:** | $36,580,000 |
| **Date and number of Refund Guarantee(s)** | 16 September 2013, 0117GAD130908166 |
| **Name of Refund Guarantor** | Korea Exchange Bank |
| **Ship Pre-Delivery Commitment** | $3,840,900 |
| **Ship Delivery Commitment:** | $29,616,769 |
| **Flag State:** | Hellenic Republic |
| **Classification:** | +100A1, Liquefied gas carrier, Ship Type 2G, Ethene (Ethylene), Ethane, Propene (Propylene), Propane, Commercial Propane, Propane / Butane, Anhydrous Ammonia, Vinyl Chloride Monomer (VCM), Butadiene, n-Butane, i-Butane, Commercial Butane, Butene (Butylene), Isoprene Monomer, Pentane, Pentene, Methyl Chloride, Acetaldehyde, Dimethylamine, Ethyl chloride, Diethyl Ether, Ethylene Oxide/Propylene Oxide (max. 30 wt%E.0.), Propene (Propylene) Oxide, Isopropylamine, Monoethylamine and Vinylethylether in Independent Tanks Type C, Max. specific gravity 0.97, Max. vapour pressure 5.0 bar g, Min. cargo temperature -104°C, ShipRight(ACS(B), SDA, FDA, CM), +LMC, UMS, +Lloyd's RMC(LG), LI, *IWS, NAVI, IGS, ECO(BWT, IHM, EEDI, P). <br><br>Descriptive note: ShipRight (BWMP(T,S), SERS, SCM). |
| **Classification Society:** | Lloyd's Register |
| **Major Casualty Amount:** | $2,000,000 |

**Hull No. 8167**

| | |
|---|---|
| **Owner:** | Dilos II Shipping Corporation |
| **Builder:** | Hyundai Mipo Dockyard Co., Ltd. |
| **Builder's registered office:** | 100 Bangeojinsunhwan-Doro, Dong-Gu, Ulsan 682-712, Korea |
| **Hull No.:** | 8167 |
| **Scheduled Delivery Date:** | 21 January 2016 |
| **Date and description of Building Contract:** | Shipbuilding contract dated 13 September 2013 |
| **Building Contract Price:** | $36,580,000 |
| **Date and number of Refund Guarantee(s)** | 16 September 2013, 0117GAD130908167 |
| **Name of Refund Guarantor** | Korea Exchange Bank |
| **Ship Pre-Delivery Commitment** | $3,840,900 |
| **Ship Delivery Commitment:** | $29,616,768 |
| **Flag State:** | Hellenic Republic |
| **Classification:** | +  100A1, Liquefied gas carrier, Ship Type 2G, Ethene (Ethylene), Ethane, Propene (Propylene), Propane, Commercial Propane, Propane / Butane, Anhydrous Ammonia, Vinyl Chloride Monomer (VCM), Butadiene, n-Butane, i-Butane, Commercial Butane, Butene (Butylene), Isoprene Monomer, Pentane, Pentene, Methyl Chloride, Acetaldehyde, Dimethylamine, Ethyl chloride. Diethyl Ether, Ethylene Oxide/Propylene Oxide (max. 30 wt%E.O.), Propene (Propylene) Oxide, Isopropylamine, Monoethylamine and Vinylethylether in Independent Tanks Type C, Max. specific gravity 0.97, Max. vapour pressure 5.0 bar g, Min. cargo temperature -104°C, ShipRight(ACS(B), SDA, FDA, CM), +LMC, UMS, +Lloyd's RMC(LG), LI, *IWS, NAVI, IGS, ECO(BWT, IHM, EEDI, P).<br><br>Descriptive note: ShipRight (BWMP(T,S), SERS, SCM). |
| **Classification Society:** | Lloyd's Register |
| **Major Casualty Amount:** | $2,000,000 |

**Hull No. S1024**

| | |
|---|---|
| **Owner:** | Samothraki II Shipping Corporation |
| **Builder:** | Nantong Sinopacific Offshore & Engineering Co., Ltd. |
| **Builder's registered office:** | Yufeng Village, Hehe Town, Qidong City, 226251, Jiangsu Province, People's Republic of China |
| **Hull No.:** | S1024 |
| **Scheduled Delivery Date:** | 23 November 2016 |
| **Date and description of Building Contract:** | Shipbuilding contract dated 9 April 2014 |
| **Building Contract Price:** | $47,500,000 |
| **Date and number of Refund Guarantee(s)** | 30 May 2014, NJB2014LG00047 |
| **Name of Refund Guarantor** | Export – Import Bank of China |
| **Ship Pre-Delivery Commitment** | $4,987,500 |
| **Ship Delivery Commitment:** | $38,458,078 |
| **Flag State:** | Hellenic Republic |
| **Classification:** | LR ☐☐100A1, Liquefied Gas Carrier, Ship type 2G, Butane, Propane, Butane-Propane Mixtures, Ethylene, etc* * in Independent Tanks Type C, Max. Specific Gravity 0.970, Max. Vapour Pressure 5.0 bar g, Min. Cargo Temperature -104 deg. C, ShipRight(ACS(B), SDA, FDA, CM), LI, *IWS, ECO (BWT, IHM, EEDI-1 or 2 or 3, P) ☐☐LMC, IGS, UMS, NAV1 ☐☐Lloyd's RMC (LG) With descriptive notes "ShipRight (BWPM(S+F), SCM, SERS), ETA" |
| **Classification Society:** | Lloyd's Register |
| **Major Casualty Amount:** | $2,000,000 |

**Hull No. S1025**

| | |
|---|---|
| **Owner:** | Shinoussa II Shipping Corporation |
| **Builder:** | Nantong Sinopacific Offshore & Engineering Co., Ltd. |
| **Builder's registered office:** | Yufeng Village, Hehe Town, Qidong City, 226251, Jiangsu Province, People's Republic of China |
| **Hull No.:** | S1025 |
| **Scheduled Delivery Date:** | 23 February 2017 |
| **Date and description of Building Contract:** | Shipbuilding contract dated 9 April 2014 |
| **Building Contract Price:** | $47,500,000 |
| **Date and number of Refund Guarantee(s)** | - |
| **Name of Refund Guarantor** | Export – Import Bank of China |
| **Ship Pre-Delivery Commitment** | $4,987,500 |
| **Ship Delivery Commitment:** | $38,458,078 |
| **Flag State:** | Hellenic Republic |
| **Classification:** | LR ⊡⊡100A1, Liquefied Gas Carrier, Ship type 2G, Butane, Propane, Butane-Propane Mixtures, Ethylene, etc.* * in Independent Tanks Type C, Max. Specific Gravity 0.970, Max. Vapour Pressure 5.0 bar g, Min. Cargo Temperature -104 deg. C, ShipRight(ACS(B), SDA, FDA, CM), LI, * IWS, ECO (BWT, IHM, EEDI-1 or 2 or 3, P) ⊡⊡LMC, IGS, UMS, NAV1 ⊡⊡Lloyd's RMC (LG) With descriptive notes "ShipRight (BWPM(S+F), SCM, SERS), ETA" |
| **Classification Society:** | Lloyd's Register |
| **Major Casualty Amount:** | $2,000,000 |

... 

## Schedule 3
## Conditions precedent

### Part 1

#### Conditions precedent to any Utilisation

**1    Original Obligors' corporate documents**

(a)    A copy of the Constitutional Documents of each Original Obligor.

(b)    A copy of a resolution of the board of directors of each Original Obligor (or any committee of such board empowered to approve and authorise the following matters):

    (i)    approving the terms of, and the transactions contemplated by, the Finance Documents, any Building Contract Document or any Charter (**Relevant Documents**) to which it is a party and resolving that it execute the Relevant Documents;

    (ii)    authorising a specified person or persons to execute the Relevant Documents on its behalf; and

    (iii)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Relevant Documents to which it is a party.

(c)    If applicable, a copy of a resolution of the board of directors of the relevant company, establishing any committee referred to in paragraph (b) above and conferring authority on that committee.

(d)    A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(e)    A copy of a resolution signed by all the holders of the issued shares in each Original Obligor, approving the terms of, and the transactions contemplated by, the Relevant Documents to which such Obligor is a party.

(f)    A certificate of the Guarantor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on any Original Obligor to be exceeded.

(g)    A copy of any power of attorney under which any person is to execute any of the Relevant Documents on behalf of any Original Obligor.

(h)    A certificate of an authorised signatory of the relevant Original Obligor certifying that each copy document relating to it specified in this Part of this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement and that any such resolutions or power of attorney have not been revoked.

**2    Legal opinions**

(a)    A legal opinion of Norton Rose Fulbright Greece, addressed to the Arrangers, the Security Agent and the Agent on matters of English law, substantially in the form approved by the Agent.

153

(b)   A legal opinion of the legal advisers to the Arrangers, the Security Agent and the Agent in each jurisdiction in which an Obligor is incorporated substantially in the form approved by the Agent.

## 3   Other documents and evidence

(a)   Evidence that any process agent referred to in clause 45.2 (*Service of process*) or any equivalent provision of any other Finance Document entered into on or before the first Utilisation Date, if not an Original Obligor, has accepted its appointment.

(b)   A copy of any other authorisation or other document, opinion or assurance which the Agent (acting on the instructions of the Majority Lenders) considers to be necessary or desirable (if it has notified the Borrowers accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(c)   The Original Financial Statements.

(d)   Any Fee Letters duly executed and evidence that the fees, commissions, costs and expenses then due from the Borrowers pursuant to clause 11 (*Fees*) and clause 16 (*Costs and expenses*) have been paid or will be paid by the first Utilisation Date.

(e)   Evidence that the total issued membership interests in the Guarantor are directly and legally and beneficially owned by the Initial Shareholders.

## 4   Bank Accounts

Evidence that any Account required to be established under clause 27 (*Bank accounts*) has been opened and established, that any Account Security in respect of each such Account has been executed and delivered by the relevant Account Holder(s) in favour of the Security Agent and/or any of the other Finance Parties and that any notice required to be given to an Account Bank under that Account Security has been given to it and acknowledged by it in the manner required by that Account Security and that an amount has been credited to it.

## 5   Construction matters

(a)   A copy, certified by an approved person to be a true and complete copy, of the Building Contract for each Ship and any Refund Guarantees for each Ship which have been issued.

(b)   A Pre-Delivery Security Assignment in relation to each Ship duly executed by the relevant Owner.

(c)   Duly executed notices of assignment and acknowledgement of those notices as required by the Pre-Delivery Security Assignment for each Ship.

(d)   A legal opinion of legal advisers to the Arrangers, the Security Agent and the Agent in South Korea and the People's Republic of China substantially in the form approved by the Agent.

## 6   "Know your customer" information

Such documentation and information as any Finance Party may reasonably request through the Agent or as the Security Agent may reasonably require (including specimen signatures) to comply with "know your customer" or similar identification procedures under all laws and regulations applicable to that Finance Party.

**7    Share Security**

The Share Security in respect of each Borrower duly executed by the Guarantor together with all letters, transfers, certificates and other documents required to be delivered under each such Share Security.

## Part 2

### Conditions precedent before Delivery

In relation to each Advance under the Ship Pre-Delivery Commitment in respect of a Ship (the **Relevant Advance**):

## 1 Confirmation

A written confirmation from the Guarantor that:

(a) neither the relevant Builder nor any other party who may have a claim pursuant to the Building Contract Documents relating to the Relevant Advance has any claims against the relevant Ship or the relevant Owner and that there have been no breaches of the terms of such Building Contract Documents or any default thereunder; and

(b) there have been no amendments or variations agreed to the Building Contract Documents relating to the Relevant Advance (except as may have already been advised by the Borrowers to the Agent in writing and approved by the Majority Lenders in accordance with the provisions of the Finance Documents) and that no action has been taken by the relevant Builder or the relevant Refund Guarantor which might in any way render any of the relevant Building Contract Documents inoperative or unenforceable, in whole or in part.

## 2 Construction matters

(a) An invoice or notification from the relevant Builder demanding the payment of the Pre-Delivery Instalment which is to be financed by the Relevant Advance or, in the event that the relevant Owner has already paid such Pre-Delivery Instalment, evidence from the relevant Builder in form and substance satisfactory to the Agent of such payment.

(b) In the event that under the terms of the relevant Building Contract such Pre-Delivery Instalment is payable upon completion of a stage of construction of the Ship relating to the Relevant Advance, such evidence that such stage of construction has been completed as is required of the relevant Builder under the relevant Building Contract (including, if required thereunder, stage certificate from the relevant classification society).

(c) Evidence from the relevant Builder in form and substance satisfactory to the Agent that any Pre-Delivery Instalments in relation to the same Ship which had been due and payable prior to the Pre-Delivery Instalment which is to be financed by the Relevant Advance, have been paid in full.

(d) Evidence that any part of such Pre-Delivery Instalment which is not to be financed by the Relevant Advance has been paid or will be paid simultaneously with the Relevant Advance, to the relevant Builder.

(e) A copy, certified by an approved person to be a true and complete copy, of the Refund Guarantee covering such Pre-Delivery Instalment, as is financed by the Relevant Advance duly issued and, in the event of a Refund Guarantee issued in respect of Hull No. S1024 or No. S1025, evidence that it is also duly registered with SAFE.

(f) The notice of assignment and acknowledgement required by the relevant Pre-Delivery Security Assignment in respect of such Refund Guarantee, duly executed by the relevant Owner and Refund Guarantor.

(g) A legal opinion of legal advisers to the Arrangers, the Security Agent and the Agent in South Korea or (as the case may be) The People's Republic of China substantially in the form approved by the Agent.

## Part 3

### Conditions precedent on Delivery

**1**    **Corporate documents**

    (a)    A certificate of an authorised signatory of the relevant Owner certifying that each copy document relating to it specified in Part 1 of this Schedule remains correct, complete and in full force and effect as at a date no earlier than a date approved for this purpose and that any resolutions or power of attorney referred to in Part 1 of this Schedule in relation to it have not been revoked or amended.

    (b)    A certificate of an authorised signatory of each other Obligor which is party to any of the Original Security Documents required to be executed at or before Delivery of the Ship certifying that each copy document relating to it specified in Part 1 of this Schedule remains correct, complete and in full force and effect as at a date no earlier than a date approved for this purpose and that any resolutions or power of attorney referred to in Part 1 of this Schedule in relation to it have not been revoked or amended.

**2**    **Security**

    (a)    The Mortgage and Deed of Covenant or General Assignment in respect of the relevant Ship.

    (b)    If the relevant Ship is subject to a Charter on the Utilisation Date, a Charter Assignment in respect of that Charter.

    (c)    Any Manager's Undertaking required at Delivery pursuant to the Finance Documents duly executed by each Manager of the relevant Ship.

    (d)    Duly executed notices of assignment and acknowledgements of those notices as required by any of the above Security Documents or this Agreement.

**3**    **Delivery and registration of Ship**

Evidence that the relevant Ship:

    (d)    is legally and beneficially owned by the relevant Owner and registered in the name of the relevant Owner free from any Security Interests (other than Security Interests created under the Finance Documents) through the relevant Registry as a ship under the laws and flag of the relevant Flag State;

    (e)    is classed with the relevant Classification free of all requirements and recommendations of the relevant Classification Society;

    (f)    is insured in the manner required by the Finance Documents; and

    (g)    is free of any other charter commitment which would require approval under the Finance Documents.

**4**    **Mortgage registration**

Evidence that the Mortgage in respect of the relevant Ship has been registered against the relevant Ship through the relevant Registry under the laws and flag of the relevant Flag State.

## 5 Insurance

In relation to the relevant Ship's Insurances:

(a) an opinion from insurance consultants appointed by the Agent on such Insurances;

(b) evidence that such Insurances have been placed in accordance with clause 24 (Insurance); and

(c) evidence that approved brokers, insurers and/or associations have issued or will issue letters of undertaking in favour of the Security Agent in an approved form in relation to the Insurances.

## 6 ISM and ISPS Code

Copies of:

(a) the document of compliance issued in accordance with the ISM Code to the person who is the operator of the relevant Ship for the purposes of that code;

(b) the safety management certificate in respect of the relevant Ship issued in accordance with the ISM Code (or evidence that such certificate is to be issued shortly after Delivery of the relevant Ship);

(c) the international ship security certificate in respect of the relevant Ship issued under the ISPS Code (or evidence that such certificate is to be issued shortly after Delivery of the relevant Ship); and

(d) if so requested by the Agent, any other certificates issued under any applicable code required to be observed by the relevant Ship or in relation to its operation under any applicable law.

## 7 Value of security

Valuations (dated not more than 4 weeks before the relevant Utilisation Date) of the relevant Ship obtained in accordance with clause 25 (Minimum security value).

## 8 Fees and expenses

Evidence that the fees, commissions, costs and expenses that are due from the Borrowers pursuant to clause 11 (Fees) and clause 16 (Costs and expenses) have been paid or will be paid by the relevant Utilisation Date.

## 9 Environmental matters

Copies of the relevant Ship's certificate of financial responsibility and vessel response plan required under United States law and evidence of their approval by the appropriate United States government entity and (if requested by the Agent) an environmental report in respect of the relevant Ship from an approved person.

## 10 Management Agreement

Where a manager has been approved in accordance with clause 22.3 (Manager), a copy, certified by an approved person to be a true and complete copy, of the agreement between the relevant Owner and each Manager relating to the appointment of that Manager in respect of the relevant Ship.

**11 Construction matters**

(a) Evidence that any authorisations required from any government entity for the export of the relevant Ship by the relevant Builder have been obtained or that no such authorisations are required.

(b) Evidence that the full Building Contract Price of the relevant Ship (as adjusted in accordance with its Building Contract) will have been paid upon the relevant Utilisation being made and that the relevant Builder will not have any lien or other right to detain the ship on its Delivery.

**12 Delivery**

Evidence that the relevant Ship has been delivered to, and accepted by, the relevant Owner under the Building Contract, that the relevant Building Contract Price has been paid in full (or will be paid forthwith upon release of the proceeds of the relevant Utilisation), and that the builder's certificate, the bill of sale, the protocol of delivery and acceptance and any other documents to be delivered and exchanged between the parties under the Building Contract of the relevant Ship upon its Delivery, have been duly executed and delivered and exchanged between them in form and substance satisfactory the Agent.

**13 Refinancing of Pre-Delivery Advances**

Evidence that the Pre-Delivery Advances in respect of the relevant Ship have been repaid in full, or will be repaid in full forthwith upon the relevant Utilisation with the proceeds of the relevant Utilisation.

**14 Legal Opinions**

A legal opinion of the legal advisers to the Arrangers, the Security Agent and the Agent in England and also in each jurisdiction in which an Obligor is incorporated and/or which is or is to be the Flag State of the relevant Ship, substantially in the form approved by the Agent.

## Schedule 4
## Utilisation Request

From:   Astipalea II Shipping Corporation
        Kithnos II Shipping Corporation
        Dilos II Shipping Corporation
        Paros II Shipping Corporation
        Othoni II Shipping Corporation
        Samothraki II Shipping Corporation
        Shinoussa II Shipping Corporation

To:     **Skandinaviska Enskilda Banken AB (publ)**
        as Agent

Dated:  [●]

Dear Sirs

### $254,179,500
### Facilities Agreement dated [●] June 2014 (the "Agreement")

1   We refer to the Agreement. This is a Utilisation Request. Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2   We wish to borrow an Advance on the following terms:

    Proposed Utilisation Date:   [●] (or, if that is not a Business Day, the next Business Day)

    Amount:   $ [●]

3   We confirm that each condition specified in clause 4.5 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request.

4   This Advance is [part of the Ship Pre-Delivery Commitment] [the Delivery Advance] for Hull No. [●] and the purpose of this Advance is [**specify purpose complying with clause 3 of the Agreement**] and its proceeds should be credited to [●] [**specify account**].

5   We confirm that we will use the proceeds of this Advance for our benefit and under our full responsibility and exclusively for the purposes specified in the Agreement.

6   We request that the first Interest Period for the said Advance be [●] months.

7   This Utilisation Request is irrevocable.

Yours faithfully

......................................
authorised signatory for
**Astipalea II Shipping Corporation**
**Kithnos II Shipping Corporation**
**Dilos II Shipping Corporation**
**Paros II Shipping Corporation**
**Othoni II Shipping Corporation**
**Samothraki II Shipping Corporation**
**Shinoussa II Shipping Corporation**

## Schedule 5
## Selection Notice

From:   Astipalea II Shipping Corporation
        Kithnos II Shipping Corporation
        Dilos II Shipping Corporation
        Paros II Shipping Corporation
        Othoni II Shipping Corporation
        Samothraki II Shipping Corporation
        Shinoussa II Shipping Corporation

To:     **Skandinaviska Enskilda Banken AB (publ)**
        as Agent

Dated:  [•]

Dear Sirs

**$254,179,500**

**Facilities Agreement dated [•] June 2014 (the "Agreement")**

1   We refer to the Agreement. This is a Selection Notice. Terms defined in the Agreement have the same meaning in this Selection Notice unless given a different meaning in this Selection Notice.

2   We request that the next Interest Period for the [Pre-Delivery Advances] [Delivery Advance] in relation to Hull No. [•]] [be [•] months] [end on [●]].

3   This Selection Notice is irrevocable.

Yours faithfully

....................................
authorised signatory for
**Astipalea II Shipping Corporation**
**Kithnos II Shipping Corporation**
**Dilos II Shipping Corporation**
**Paros II Shipping Corporation**
**Othoni II Shipping Corporation**
**Samothraki II Shipping Corporation**
**Shinoussa II Shipping Corporation**

## Schedule 6
## Form of Transfer Certificate

To: **Skandinaviska Enskilda Banken AB (publ)** as Agent

From: [**The Existing Lender**] (the **Existing Lender**) and [**The New Lender**] (the **New Lender**)

Dated:

**$254,179,500 Facilities Agreement dated [•] 2014 as amended, supplemented and restated to date (the "Agreement")**

1   We refer to the Agreement. This is a Transfer Certificate. Terms defined in the Agreement have the same meaning in this Transfer Certificate unless given a different meaning in this Transfer Certificate.

2   We refer to clause 30.5 (*Procedure for transfer*):

   (a)   The Existing Lender and the New Lender agree to the Existing Lender assigning to the New Lender all or part of the Existing Lender's Commitment rights and assuming the Existing Lender's obligations referred to in the Schedule in accordance with clause 30.5 (*Procedure for transfer*) and the Existing Lender assigns and agrees to assign such rights to the New Lender with effect from the Transfer Date]

   (b)   The proposed Transfer Date is [•].

   (c)   The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of clause 37.2 (*Addresses*) are set out in the Schedule.

3   The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in clause 30.4.3.

4   The New Lender confirms that it is [not] a Guarantor Affiliate.

5   This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Transfer Certificate.

6   [*Consider including reference to accession to an intercreditor agreement, mortgage or other Finance Documents to which Lenders may need to be party and checklist of steps necessary for the New Lender to obtain the benefit of the Security Documents.*]

7   This Transfer Certificate and any non-contractual obligations connected with it are governed by English law.

8   This Transfer Certificate has been entered into on the date stated at the beginning of this Transfer Certificate.

**Note: The execution of this Transfer Certificate alone may not assign a proportionate share of the Existing Lender's interest in the Security Interests constituted by the Security Documents in all jurisdictions. It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect an assignment of such a share in the Existing Lender's interest in the Security Interests constituted by the Security Documents in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**The Schedule**

Commitment/rights to be assigned and obligations to be assumed

[*insert relevant details*]

**Facility Office address, fax number**

**and attention details for notices and account details for payments**

[*insert relevant details*]

[*Existing Lender*]        [*New Lender*]

By:                By:

This Transfer Certificate is accepted by the Agent and the Transfer Date is confirmed to be as stated above.

[*Agent*]

By:

## Schedule 7
## Form of Compliance Certificate

To:     **Skandinaviska Enskilda Banken AB (publ)** as Agent

From:   **Eletson Gas LLC**

Dated: [•]

Dear Sirs

**$254,179,500 Facilities Agreement dated [•] June 2014 as amended, supplemented and restated to date (the "Agreement")**

1       We refer to the Agreement. This is a Compliance Certificate. Terms defined in clause 20.1 (*Financial definitions*) of the Agreement and otherwise in the Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2       I/We confirm that, as at the end of the Measurement Period ended on [•]:

        *[To include also a calculation of six-month Debt Service.]*

        (a)     **Interest cover ratio:** the ratio of (i) EBITDA to (ii) Interest Expense, was [•]:1, calculated as shown in Appendix A and compared against a minimum required ratio of 3.0:1.0.

        (b)     **Debt Service cover ratio:** the ratio of (i) EBITDA to (ii) Total Debt Service was [•]:1, calculated as shown in Appendix B and compared against a minimum required ratio of 1.0:1.0.

        (c)     **Consolidated leverage ratio:** the ratio of Consolidated Debt to Total Assets was [•]:1, calculated as shown in Appendix C and compared against a maximum required ratio of 0.75:1.00.

        (d)     **Minimum liquidity:** the Cash and Cash Equivalents are $[•] calculated as [shown in Appendix D] versus the minimum required amount of $[•].

3       We confirm that the Security Value is $[•] calculated as shown in Appendix E, compared against a Minimum Value of $[•], calculated pursuant to valuations attached in Appendix F.

4       [We confirm that there is no breach of clause 22.7 (*Chartering*) of the Agreement and that no other Default is continuing and that.] **[If this statement cannot be made, the certificate should identify any relevant breach or other Default that is continuing and the steps, if any, being taken to remedy it.]**

Signed by:

........................................................
**Chief Financial Officer**
**ELETSON GAS LLC**

........................................................
for and on behalf of
**ELETSON GAS LLC**

## Schedule 8
## Forms of Notifiable Debt Purchase Transaction Notice

### Part 1

**Form of Notice on Entering into Notifiable Debt Purchase Transaction**

To:      **Skandinaviska Enskilda Banken AB (publ)** as Agent

From:   [The Lender]

Dated:

**$254,179,500 Facilities Agreement dated [•] June 2014 as amended, supplemented and restated to date (the "Facilities Agreement")**

1     We refer to clause 31.2.3 (*Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates*) of the Facilities Agreement. Terms defined in the Facilities Agreement have the same meaning in this notice unless given a different meaning in this notice.

2     We have entered into a Notifiable Debt Purchase Transaction.

3     The Notifiable Debt Purchase Transaction referred to in paragraph 2 above relates to the amount of our Commitment(s) as set out below.

| Commitment | Amount of our Commitment to which Notifiable Debt Purchase Transaction relates |
|---|---|
| [•] | *[insert amount (of Commitment) to which the relevant Debt Purchase Transaction applies]* |

[Lender]

**By:**

**Part 2**

**Form of Notice on Termination of Notifiable Debt Purchase Transaction / Notifiable Debt Purchase Transaction ceasing to be with Guarantor Affiliate**

To:        **Skandinaviska Enskilda Banken AB (publ)** as Agent

From:      [The Lender]

Dated:

**$254,179,500 Facilities Agreement dated [•] June 2014 as amended, supplemented and restated to date (the "Facilities Agreement")**

4    We refer to clause 31.2.4 (*Disenfranchisement on Debt Purchase Transactions entered into by Guarantor Affiliates*) of the Facilities Agreement. Terms defined in the Facilities Agreement have the same meaning in this notice unless given a different meaning in this notice.

5    A Notifiable Debt Purchase Transaction which we entered into and which we notified you of in a notice dated [ ] has [terminated]/[ceased to be with a Guarantor Affiliate].

6    The Notifiable Debt Purchase Transaction referred to in paragraph 2 above relates to the amount of our Commitment(s) as set out below.

| **Commitment** | **Amount of our Commitment to which Notifiable Debt Purchase Transaction relates (Base Currency)** |
|---|---|
| [•] | *[insert amount (of Commitment) to which the relevant Debt Purchase Transaction applies]* |

[Lender]

By

**SIGNATURES**

**THE BORROWERS**

**ASTIPALEA II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**KITHNOS II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**DILOS II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**PAROS II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**OTHONI II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**SAMOTHRAKI II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**SHINOUSSA II SHIPPING CORPORATION**
By:
Laskarina I. Karastamati
Secretary and Director

**THE GUARANTOR**

**ELETSON GAS LLC**
**EXECUTED as a DEED**
By:

Witnessed by:    ELENA VANDOROU
Name:            ATTORNEY - AT - LAW
Address:         118, KOLOKOTRONI STR.
                 PIRAEUS - GREECE
                 TEL. 30210-4598323. FAX: 30210-4598250

Laskarina I. Karastamati
Vice President, Secretary
and Director

**THE ARRANGERS**

**CITIBANK N.A., LONDON BRANCH**
By:

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
By:
Niki Alexandrou
Norton Rose Fulbright Greece
Solicitor

**THE AGENT**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**                    )
By:                                                           ) ................................

**THE SECURITY AGENT**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**                    )
By:                                                           ) ................................

**THE LENDERS**

**CITIBANK N.A., LONDON BRANCH**                               )
By:                                                           ) ................................

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**                    )
By:                    Alexandrou                             )
                Norton Rose Fulbright Greece
**UNICREDIT BANK AG** Solicitor                                )
By: PERICLES LYKOUDIS
   ANASTASIA KERPINICTI

**BNP PARIBAS** Niki Alexandrou                                )
By:        Norton Rose Fulbright Greece                       )
                   Solicitor

**NIBC BANK N.V.**                                             )
By:                                                           )
         Niki Alexandrou
       Norton Rose Fulbright Greece
                Solicitor

**SIGNATURES**

**THE BORROWERS**

| | |
|---|---|
| **ASTIPALEA II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |
| **KITHNOS II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |
| **DILOS II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |
| **PAROS II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |
| **OTHONI II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |
| **SAMOTHRAKI II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |
| **SHINOUSSA II SHIPPING CORPORATION**<br>By: | )<br>) ................................ |

**THE GUARANTOR**

| | |
|---|---|
| **ELETSON GAS LLC**<br>**EXECUTED as a DEED**<br>By: | )<br>)<br>) ................................ |

Witnessed by:
Name:
Address:

**THE ARRANGERS**

| | |
|---|---|
| **CITIBANK N.A., LONDON BRANCH**<br>By: | )<br>) ................................ |
| **SKANDINAVISKA ENSKILDA BANKEN AB (publ)**<br>By: | )<br>) ................................ |

**THE AGENT**

SKANDINAVISKA ENSKILDA BANKEN AB (publ)
By:

)
) .................................

---

**THE SECURITY AGENT**

SKANDINAVISKA ENSKILDA BANKEN AB (publ)
By:

)
) .................................

**THE LENDERS**

CITIBANK N.A., LONDON BRANCH
By:

)
) .................................

SKANDINAVISKA ENSKILDA BANKEN AB (publ)
By:

)
) .................................

UNICREDIT BANK AG
By:

)
) .................................

BNP PARIBAS
By:

)
) .................................

NIBC BANK N.V.
By:

)
) .................................

**THE AGENT**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
By:

)
⋯MICHAEL I. DICKS⋯

DUNCAN NASH

**THE SECURITY AGENT**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
By:

)
⋯ MICHAEL I. DICKS.

DUNCAN NASH

**THE LENDERS**

**CITIBANK N.A., LONDON BRANCH**
By:

)
) ⋯⋯⋯⋯⋯⋯⋯⋯⋯

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
By:

)
) ⋯⋯⋯⋯⋯⋯⋯⋯⋯

**UNICREDIT BANK AG**
By:

)
) ⋯⋯⋯⋯⋯⋯⋯⋯⋯

**BNP PARIBAS**
By:

)
) ⋯⋯⋯⋯⋯⋯⋯⋯⋯

**NIBC BANK N.V.**
By:

)
) ⋯⋯⋯⋯⋯⋯⋯⋯⋯



To:     Astipalea II Shipping Corporation
        Kithnos II Shipping Corporation
        Dilos II Shipping Corporation
        Paros II Shipping Corporation
        Othoni II Shipping Corporation
        Samothraki II Shipping Corporation
        Shinoussa II Shipping Corporation
        and
        Eletson Gas LLC

c/o:    Eletson Corporation
        118 Kolokotroni Street
        GR 185-35 Piraeus
        Greece

3 November 2014

Dear Sirs

**Loan Facility of €254,179,500 dated 24 June 2014**

1       We refer to a facility agreement dated 24 June 2014 (the **Facility Agreement**) made between
        inter alios (i) Astipalea II Shipping Corporation, Kithnos II Shipping Corporation, Dilos II
        Shipping Corporation, Paros II Shipping Corporation, Othoni II Shipping Corporation,
        Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers (the
        **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinaviska Enskilda
        Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial
        institutions referred to in schedule 1 thereto as original lenders (together the **Lenders**) in
        relation to a €254,179,500 term loan facility.

2       Words and expressions defined in the Facility Agreement shall have the same meaning where
        used in this Letter.

3       Following your request and due to a manifest clerical error, the Agent, for and on behalf of the
        other Finance Parties hereby agrees that the Facility Agreement shall be (and it is hereby)
        amended (and the Facility Agreement (as so amended), will continue to be binding upon the
        Finance Parties and the Obligors upon such terms as so amended) by deleting the words "(a)
        such lender's undrawn Pre-Delivery Commitment (if any) in respect of that Ship and (b)" in
        clause 11 1.4 of the Facility Agreement.

4       The agreement of the Agent in paragraph 3 above shall not take effect unless and until the
        Borrowers and the Guarantor have executed this Letter, and have returned it to the Agent as so
        executed

5       Save as amended by this Letter, the provisions of the Facility Agreement shall continue in full
        force and effect and the Facility Agreement and this Letter shall be read and construed as one
        instrument

6       This Letter and any non-contractual obligations connected with this Letter are governed by, and
        shall be interpreted in accordance with, English law.

7       This Letter may be executed in any number of counterparts and by the different parties on
        separate counterparts, each of which when so executed and delivered shall be an original but
        all counterparts shall together constitute one and the same instrument.
ATH-#4345037-v1

Signed by **David Sonnek**                Magnus Rundgren
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter

| | |
|---|---|
| EXECUTED as a DEED | ) |
| by | ) |
| for and on behalf of | ) |
| **ASTIPALEA II SHIPPING CORPORATION** | ) |
| **KITHNOS II SHIPPING CORPORATION** | ) |
| **DILOS II SHIPPING CORPORATION** | ) |
| **PAROS II SHIPPING CORPORATION** | ) |
| **OTHONI II SHIPPING CORPORATION** | ) |
| **SAMOTHRAKI II SHIPPING CORPORATION** | ) |
| **SHINOUSSA II SHIPPING CORPORATION** | ) |
| | ) Director / Attorney-in-fact |
| In the presence of | ) |

Witness
Name:
Address:
Occupation

Dated:                    2014

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement, including the guarantee given by us under clause 7 of the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.

Signed by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter

EXECUTED as a DEED )
by )
for and on behalf of )
**ASTIPALEA II SHIPPING CORPORATION** )
**KITHNOS II SHIPPING CORPORATION** )
**DILOS II SHIPPING CORPORATION** )
**PAROS II SHIPPING CORPORATION** )
**OTHONI II SHIPPING CORPORATION** )
**SAMOTHRAKI II SHIPPING CORPORATION** )
**SHINOUSSA II SHIPPING CORPORATION** )
)

Director / Attorney-in-fact

In the presence of: )

P.G. KANELOS

Witness
Name
Address:
Occupation

**ELENA VANDOROU**
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX 30210-4598250

Dated 3 November 2014

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement, including the guarantee given by us under clause 7 of the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter

**EXECUTED** as a DEED
by
for and on behalf of
**ELETSON GAS LLC**
In the presence of

)
)
)
)
)

Director / Attorney-in-fact

L.J. KARASTAMATI

Witness
Name
Address:
Occupation

ELENA VANDOROU
ATTORNEY · AT · LAW
118, KOLOKOTRONI STR.
PIRAEUS · GREECE
TEL. 30210-4588323, FAX: 302 10-4588250

Dated 3 November 2014

ATH-#4345037-v1

3



To:     Astipalea II Shipping Corporation
        Kithnos II Shipping Corporation
        Dilos II Shipping Corporation
        Paros II Shipping Corporation
        Othoni II Shipping Corporation
        Samothraki II Shipping Corporation
        Shinoussa II Shipping Corporation
        and
        Eletson Gas LLC

c/o:    Eletson Corporation
        118 Kolokotroni Street
        GR 185-35 Piraeus
        Greece

12 November 2014

Dear Sirs

### Loan Facility of €254,179,500 dated 24 June 2014

1   We refer to a facility agreement dated 24 June 2014 (the **Facility Agreement**) made between inter alios (i) Astipalea II Shipping Corporation, Kithnos II Shipping Corporation, Dilos II Shipping Corporation, Paros II Shipping Corporation, Othoni II Shipping Corporation, Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers (the **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinaviska Enskilda Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial institutions referred to in schedule 1 thereto as original lenders (together the **Lenders**) in relation to a €254,179,500 term loan facility, as amended by a first amendment letter dated 3 November 2014 and a second amendment letter dated 12 November 2014.

2   Words and expressions defined in the Facility Agreement shall have the same meaning where used in this Letter.

3   The Borrowers have requested the Lenders' consent to the entry by Shinoussa II Shipping Corporation into addendum No. 1 and amendment No. 1 both to the Building Contract in respect of Hull No. S1025 with the Builder and Sumec Marine Co., Ltd. and the entry by Samothraki II Shipping Corporation into amendment No. 1 to the Building Contract in respect of Hull No. S1024 with the Builder in the form previously sent to us.

4   Following your request, the Agent, for and on behalf of the other Finance Parties hereby consents to the addenda referred to above and agrees that the Facility Agreement shall be (and it is hereby) amended (and the Facility Agreement (as so amended), will continue to be binding upon the Finance Parties and the Obligors upon such terms as so amended) by inserting the words "Builder's Agent: Sumec Marine Co., Ltd." after the words "Builder: Nantong Sinopacific Offshore & Engineering Co., Ltd." in the ship information table in relation to Hull No. S1025 in Schedule 2 (*Ship information*) of the Facility Agreement.

5   The consent and agreement of the Agent in paragraph 4 above:

    (a)   is given on condition that:

**SEB Merchant Banking**

MAILING ADDRESS                      TELEPHONE                  FAX
2 Cannon Street, London EC4M 6XX     +44(0)20 7246 4000         +44 (0)20 7588 0929

HEAD OFFICE ADDRESS
Kungsträdgårdsgatan 8, Stockholm

Regulated by the Swedish Financial Supervisory Authority and authorised and subject to limited regulation by the Financial Services Authority.
Registered in England and Wales number BR000978.
Skandinaviska Enskilda Banken AB –A Public Company (publ) – is incorporated in Stockholm Sweden with Limited Liability.



(i)     Shinoussa II Shipping Corporation and the Security Agent enter into a new Pre-Delivery Security Assignment in relation to Hull no. S1025 in the agreed form; and

(ii)    the Agent, or its duly authorised representative, shall have received such documents and evidence as it may require in relation to the amendment and additional security including documents and evidence of the type referred to in Schedule 3 (*Conditions precedent*) in relation to that amendment and additional security and its execution and (if applicable) registration; and

(b)     shall not take effect unless and until the Borrowers and the Guarantor have executed this Letter, and have returned it to the Agent as so executed, and the Borrowers have satisfied the conditions referred to in paragraphs 5(a)(i) and (ii) above.

6     Save as amended by this Letter, the provisions of the Facility Agreement shall continue in full force and effect and the Facility Agreement and this Letter shall be read and construed as one instrument.

7     This Letter and any non-contractual obligations connected with this Letter are governed by, and shall be interpreted in accordance with, English law.

8     This Letter may be executed in any number of counterparts and by the different parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

ᴘᴇɴᴄᴇʟʟ —

**PENNY NEVILLE-PARK**
...........................................
Signed by:                              **DUNCAN NASH**
for and on behalf of
**SKANDINAVINSKA ENSKILDA BANKEN AB (publ)**
as Agent


We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.


| | |
|---|---|
| **EXECUTED as a DEED** | ) |
| by | ) |
| for and on behalf of | ) |
| **ASTIPALEA II SHIPPING CORPORATION** | ) |
| **KITHNOS II SHIPPING CORPORATION** | ) |
| **DILOS II SHIPPING CORPORATION** | ) |
| **PAROS II SHIPPING CORPORATION** | ) |
| **OTHONI II SHIPPING CORPORATION** | ) |
| **SAMOTHRAKI II SHIPPING CORPORATION** | ) |
| **SHINOUSSA II SHIPPING CORPORATION** | ) ............................... |
| | ) Director / Attorney-in-fact |
| In the presence of: | ) |

**SEB Merchant Banking**

| MAILING ADDRESS | TELEPHONE | FAX |
|---|---|---|
| 2 Cannon Street, London EC4M 6XX | +44(0)20 7246 4000 | +44 (0)20 7588 0929 |

HEAD OFFICE ADDRESS
Kungsträdgårdsgatan 8, Stockholm

Regulated by the Swedish Financial Supervisory Authority and authorised and subject to limited regulation by the Financial Services Authority.
Registered in England and Wales number BR000979.
Skandinaviska Enskilda Banken AB –A Public Company (publ) – is incorporated in Stockholm Sweden with Limited Liability.



............................................
Witness
Name:
Address:
Occupation

Dated:                2014

SEB Merchant Banking
MAILING ADDRESS                    TELEPHONE            FAX
2 Cannon Street, London EC4M 6XX   +44(0)20 7246 4000   +44 (0)20 7588 0929

HEAD OFFICE ADDRESS
Kungsträdgårdsgatan 8, Stockholm

Regulated by the Swedish Financial Supervisory Authority and authorised and subject to limited regulation by the Financial Services Authority.
Registered in England and Wales number BR000979.
Skandinaviska Enskilda Banken AB –A Public Company (publ) – is incorporated in Stockholm Sweden with Limited Liability.



We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement, including the guarantee given by us under clause 7 of the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.

**EXECUTED as a DEED**
by                                                    )
for and on behalf of                                 )          ...........................
**ELETSON GAS LLC**               )          Director / Attorney-in-fact
In the presence of                                  )

...........................................
Witness
Name:
Address:
Occupation

Dated:                                2014

SEB Merchant Banking
MAILING ADDRESS                    TELEPHONE              FAX
2 Cannon Street, London EC4M 6XX   +44(0)20 7246 4000    +44 (0)20 7588 0929

HEAD OFFICE ADDRESS
Kungsträdgårdsgatan 8, Stockholm

Regulated by the Swedish Financial Supervisory Authority and authorised and subject to limited regulation by the Financial Services Authority.
Registered in England and Wales number BR000879.
Skandinaviska Enskilda Banken AB –A Public Company (publ) – is incorporated in Stockholm Sweden with Limited Liability.

**[Letterhead of SKANDINAVINSKA ENSKILDA BANKEN AB (publ)]**

To: Astipalea II Shipping Corporation
Kithnos II Shipping Corporation
Dilos II Shipping Corporation
Paros II Shipping Corporation
Othoni II Shipping Corporation
Samothraki II Shipping Corporation
Shinoussa II Shipping Corporation
and
Eletson Gas LLC

c/o: Eletson Corporation
118 Kolokotroni Street
GR 185-35 Piraeus
Greece

12 November 2014

Dear Sirs

**Loan Facility of €254,179,500 dated 24 June 2014**

1   We refer to a facility agreement dated 24 June 2014 (the **Facility Agreement**) made between inter alios (i) Astipalea II Shipping Corporation, Kithnos II Shipping Corporation, Dilos II Shipping Corporation, Paros II Shipping Corporation, Othoni II Shipping Corporation, Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers (the **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinavinska Enskilda Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial institutions referred to in schedule 1 thereto as original lenders (together the **Lenders**) in relation to a €254,179,500 term loan facility, as amended by a first amendment letter dated 3 November 2014 and a second amendment letter dated 12 November 2014.

2   Words and expressions defined in the Facility Agreement shall have the same meaning where used in this Letter.

3   The Borrowers have requested the Lenders' consent to the entry by Shinoussa II Shipping Corporation into addendum No. 1 and amendment No. 1 both to the Building Contract in respect of Hull No. S1025 with the Builder and Sumec Marine Co., Ltd. and the entry by Samothraki II Shipping Corporation into amendment No. 1 to the Building Contract in respect of Hull No. S1024 with the Builder in the form previously sent to us.

4   Following your request, the Agent, for and on behalf of the other Finance Parties hereby consents to the addenda referred to above and agrees that the Facility Agreement shall be (and it is hereby) amended (and the Facility Agreement (as so amended), will continue to be binding upon the Finance Parties and the Obligors upon such terms as so amended) by inserting the words "Builder's Agent: Sumec Marine Co., Ltd." after the words "Builder: Nantong Sinopacific Offshore & Engineering Co., Ltd." in the ship information table in relation to Hull No. S1025 in Schedule 2 (*Ship information*) of the Facility Agreement.

5   The consent and agreement of the Agent in paragraph 4 above:

(a)   is given on condition that:

(i)   Shinoussa II Shipping Corporation and the Security Agent enter into a new Pre-Delivery Security Assignment in relation to Hull no. S1025 in the agreed form; and

ATH-#4363633-v4

(ii) the Agent, or its duly authorised representative, shall have received such documents and evidence as it may require in relation to the amendment and additional security including documents and evidence of the type referred to in Schedule 3 (*Conditions precedent*) in relation to that amendment and additional security and its execution and (if applicable) registration; and

(b) shall not take effect unless and until the Borrowers and the Guarantor have executed this Letter, and have returned it to the Agent as so executed, and the Borrowers have satisfied the conditions referred to in paragraphs 5(a)(i) and (ii) above.

6    Save as amended by this Letter, the provisions of the Facility Agreement shall continue in full force and effect and the Facility Agreement and this Letter shall be read and construed as one instrument.

7    This Letter and any non-contractual obligations connected with this Letter are governed by, and shall be interpreted in accordance with, English law.

8    This Letter may be executed in any number of counterparts and by the different parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

..........................................
Signed by:
for and on behalf of
**SKANDINAVINSKA ENSKILDA BANKEN AB (publ)**
as Agent

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.

**EXECUTED as a DEED**                                                    )
by                                                                                      )
for and on behalf of                                                          )
**ASTIPALEA II SHIPPING CORPORATION**                      )
**KITHNOS II SHIPPING CORPORATION**                         )
**DILOS II SHIPPING CORPORATION**                              )
**PAROS II SHIPPING CORPORATION**                            )
**OTHONI II SHIPPING CORPORATION**                          )
**SAMOTHRAKI II SHIPPING CORPORATION**               )
**SHINOUSSA II SHIPPING CORPORATION**                  )
                                                                                          )
In the presence of: .                                                       )

..............................
Director / Attorney-in-fact
Peter  Kanelos

..................................
Witness        **ELENA VANDOROU**
Name:              **ATTORNEY - AT - LAW**
Address:         **118, KOLOKOTRONI STR.**
                        **PIRAEUS - GREECE**
Occupation    **TEL. 30210-4598323, FAX: 30210-4598250**

Dated: **12 November** 2014

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement, including the guarantee given by us under clause 7 of the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.

**EXECUTED as a DEED**
by
for and on behalf of
**ELETSON GAS LLC**
In the presence of

)
)
)
)
)

.......................................
Director / Attorney-in-fact
Petec Kanelos

Witness
Name:            **ELENA VANDOROU**
Address:         ATTORNEY - AT - LAW
                 118, KOLOKOTRONI STR.
Occupation       PIRAEUS - GREECE
                 TEL. 30210-4598323; FAX: 30210-4598250

Dated: 12 November 2014

To:   Astipalea II Shipping Corporation
       Kithnos II Shipping Corporation
       Dilos II Shipping Corporation
       Paros II Shipping Corporation
       Othoni II Shipping Corporation
       Samothraki II Shipping Corporation
       Shinoussa II Shipping Corporation
       and
       Eletson Gas LLC

c/o:   Eletson Corporation
       118 Kolokotroni Street
       GR 185-35 Piraeus
       Greece

19 June 2015

Dear Sirs

**Loan Facility of $254,179,500 dated 24 June 2014**

1     We refer to a facility agreement dated 24 June 2014 (the **Facility Agreement**) made between inter alios (i) Astipalea II Shipping Corporation, Kithnos II Shipping Corporation, Dilos II Shipping Corporation, Paros II Shipping Corporation, Othoni II Shipping Corporation, Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers (the **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinaviska Enskilda Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial institutions referred to in schedule 1 thereto as original lenders (together the **Lenders**), in relation to a $254,179,500 term loan facility, as amended by a first amendment letter dated 3 November 2014 and a second amendment letter dated 12 November 2014.

2     Words and expressions defined in the Facility Agreement shall have the same meaning where used in this Letter.

3     The Borrowers have requested the Lenders' consent to the entry by Shinoussa II Shipping Corporation into amendment No. 2 to the Building Contract in respect of Hull No. S1025 with the Builder and Sumec Marine Co., Ltd. and the entry by Samothraki II Shipping Corporation into amendment No. 2 to the Building Contract in respect of Hull No. S1024 with the Builder, each in the form sent to us on [18] May 2015.

4     Following your request, the Agent, for and on behalf of the other Finance Parties hereby consents to the addenda referred to above and agrees that the Facility Agreement shall be (and it is hereby) amended (and the Facility Agreement (as so amended), will continue to be binding upon the Finance Parties and the Obligors upon such terms as so amended) by interpreting the Building Contracts for each of Hull No. S1024 and Hull No. S1025 to include the amendments thereto referred to in paragraph 3 above.

5     The consent and agreement of the Agent in paragraph 4 above:

       (a)    is given on condition that the Agent, or its duly authorised representative, shall have received an amendment to each Refund Guarantee in respect of each of Hull No. S1025 and Hull No. S1024 in approved form, and such other documents and evidence as it may require in relation to the amendment and additional security including documents and evidence of the type referred to in Schedule 3 (*Conditions precedent*) in relation to that amendment and additional security and its execution and (if applicable) registration; and

       (b)    shall not take effect unless and until the Borrowers and the Guarantor have executed this Letter, and have returned it to the Agent as so executed, and the Borrowers have satisfied the conditions referred to in paragraph 5(a) above.

6      Save as amended by this Letter, the provisions of the Facility Agreement shall continue in full
       force and effect and the Facility Agreement and this Letter shall be read and construed as one
       instrument.

7      This Letter and any non-contractual obligations connected with this Letter are governed by, and
       shall be interpreted in accordance with, English law.

8      This Letter may be executed in any number of counterparts and by the different parties on
       separate counterparts, each of which when so executed and delivered shall be an original but
       all counterparts shall together constitute one and the same instrument.

.......... **PENNY NEVILLE-PARK**                        **Duncan Nash**
Signed by:
for and on behalf of
**SKANDINAVINSKA ENSKILDA BANKEN AB (publ)**
as Agent


We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such
term is defined in the Facility Agreement) executed by us will remain valid and effective
notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.


**EXECUTED as a DEED**                               )
by                                                   )
for and on behalf of                                )
**ASTIPALEA II SHIPPING CORPORATION**               )
**KITHNOS II SHIPPING CORPORATION**                 )
**DILOS II SHIPPING CORPORATION**                   )
**PAROS II SHIPPING CORPORATION**                   )
**OTHONI II SHIPPING CORPORATION**                  )
**SAMOTHRAKI II SHIPPING CORPORATION**              )
**SHINOUSSA II SHIPPING CORPORATION**               )
                                                    )    ELENI P. VANDOROU
                                                    )    Attorney-in-fact
In the presence of:

Witness
Name:        EMMANOUIL S. ANDREOULAKIS
Address:     118, KOLOKOTRONI STREET
             GR 185 35 PIRAEUS, GREECE
Occupation: Lawyer

Dated:  19 June 2015

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facility Agreement, including the guarantee given by us under clause 7 of the Facility Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facility Agreement by the terms of this Letter.

**EXECUTED** as a **DEED**
by
for and on behalf of
**ELETSON GAS LLC**

In the presence of:

)
)
)
)
)

..............................
ELENI P. VANDOROU
Attorney-in-fact

**Witness**
Name:       EMMANOUIL S. ANDREOULAKIS
Address:    118, KOLOKOTRONI STREET
            GR 185 35 PIRAEUS, GREECE
Occupation: Lawyer

Dated:  19 June 2015

|Private & Confidential

**Dated 17 July 2015**

**THE ENTITIES LISTED IN SCHEDULE 1**
**as Borrowers**

**CITIBANK, N.A., LONDON BRANCH**
**and**
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Arrangers**

**with**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Agent**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Security Agent**

**guaranteed by**
**ELETSON GAS LLC**

---

**SUPPLEMENTAL AGREEMENT**

**relating to a Facilities Agreement**

**dated 24 June 2014**

---

NORTON ROSE FULBRIGHT

# Contents

| Clause | | Page |
|---|---|---|
| 1 | Definitions ................................................................................................................... | 1 |
| 2 | Consent of the Finance Parties .................................................................................. | 2 |
| 3 | Assumption of liability and obligations...................................................................... | 2 |
| 4 | Amendments to the Facilities Agreement.................................................................. | 3 |
| 5 | Representations and warranties ................................................................................. | 5 |
| 6 | Expenses ..................................................................................................................... | 5 |
| 7 | Miscellaneous and notices ......................................................................................... | 5 |
| 8 | Governing Law ............................................................................................................ | 7 |
| 9 | Enforcement ................................................................................................................ | 7 |
| Schedule 1 The Parties ..................................................................................................... | | 8 |
| Schedule 2 Documents and evidence required as conditions precedent ........................... | | 13 |

**THIS AGREEMENT** is dated 17 July 2015 and made **BETWEEN**:

(1)   **THE ENTITIES** listed in Part A of Schedule 1 (*The Parties*) as original borrowers (the **Original Borrowers**);

(2)   **THE ENTITIES** listed in Part B of Schedule 1 (*The Parties*) as new borrowers (the **New Borrowers** and together with the Original Borrowers, the **Borrowers**);

(3)   **ELETSON GAS LLC** of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (the **Guarantor**);

(4)   **CITIBANK, N.A., LONDON BRANCH** and **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as mandated lead arrangers and bookrunners (whether acting individually or together the **Arrangers**);

(5)   **THE FINANCIAL INSTITUTIONS** listed in Part C of Schedule 1 (*The Parties*) as lenders (the **Lenders**);

(6)   **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as agent of the other Finance Parties (the **Agent**); and

(7)   **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as security agent of the Finance Parties (the **Security Agent**).

**WHEREAS**:

(A)   this Agreement is supplemental to a facilities agreement dated 24 June 2014, made between (1) the Borrowers, (2) the Guarantor, (3) the Arrangers, (4) the Lenders, (5) the Agent and (6) the Security Agent, as amended and supplemented by a side letter dated 12 November 2014, a side letter dated 26 June 2014 and a side letter dated 19 June 2015 (together the **Original Facilities Agreement**), relating to loan facilities of up to $254,179,500;

(B)   the Finance Parties have agreed at the request of the Original Borrowers:

(a)   to the adhesion of the New Borrowers as joint and several borrowers under the Original Facilities Agreement; and

(b)   to certain amendments to the Original Facilities Agreement contained in clause 4 (*Amendments to the Facilities Agreement*); and

(C)   this Agreement sets out the terms and conditions upon which the Finance Parties agree to the amendments and changes referred to in paragraph (B) above.

**NOW IT IS HEREBY AGREED** as follows:

**1      Definitions**

**1.1      Defined expressions**

Words and expressions defined in the Original Facilities Agreement shall, unless the context otherwise requires or unless otherwise defined herein, have the same meanings when used in this Agreement.

**1.2      Definitions**

In this Agreement, unless the context otherwise requires:

**Effective Date** means the date, no later than 15 August 2015, on which the Agent has notified the Borrowers that it has received the documents and evidence specified in Schedule 2 (*Documents and evidence required as conditions precedent*) in a form and substance

satisfactory to it (and/or that their receipt has been waived by the Lenders, whether temporarily or permanent).

**Facilities Agreement** means the Original Facilities Agreement, as amended and supplemented by this Agreement.

**New Share Security** means, in relation to each New Borrower, the document constituting a first Security Interest in respect of all the shares of such New Borrower executed by the Guarantor in favour of certain of the Finance Parties in the agreed form.

**Party** means a party to this Agreement.

**Relevant Documents** means this Agreement and the New Share Security.

**Relevant Party** means each of the Borrowers, the Guarantor or any other person who may at any time be a party to any of the Relevant Documents (other than the Finance Parties) and **Relevant Parties** means any or all of them.

**1.3    Interpretation of the Facilities Agreement**

References in the Original Facilities Agreement to **this Agreement**, shall, with effect from the Effective Date and unless the context otherwise requires, be references to the Facilities Agreement, and words such as **herein**, **hereof**, **hereunder**, **hereafter**, **hereby** and **hereto**, where they appear in the Facilities Agreement, shall be construed accordingly.

**1.4    Headings**

Clause headings and the table of contents are inserted for convenience of reference only and shall be ignored in the interpretation of this Agreement.

**1.5    Incorporation of certain references**

Clauses 1.2 (*Construction*) and 1.3 (*Third party rights*) of the Original Facilities Agreement shall be deemed to be incorporated into this Agreement in full, *mutatis mutandis*.

**1.6    Designation as Finance Document**

The Parties agree that this Agreement is and shall be designated a Finance Document.

**2    Consent of the Finance Parties**

The Finance Parties, relying upon the representations, warranties and undertakings on the part of the Relevant Parties contained in clause 5 (*Representations and warranties*), agree with the Relevant Parties that, subject to the terms and conditions of this Agreement and in particular, but without prejudice to the generality of the foregoing, fulfilment on or before 15 August 2015 of the conditions contained in Schedule 2 (*Documents and evidence required as conditions precedent*), the Finance Parties agree, with effect on and from the Effective Date, to the amendment of the Original Facilities Agreement on the terms set out in clause 4 (*Amendments to the Facilities Agreement*).

**3    Assumption of liability and obligations**

**3.1    Additional parties**

It is hereby agreed that, on and with effect from the Effective Date, the New Borrowers shall be, and are hereby made, additional parties to the Original Facilities Agreement, as joint and several borrowers with the Original Borrowers, and the Original Facilities Agreement shall henceforth be construed and treated in all respects as if references therein to "Borrowers" included references to the New Borrowers in addition to the Original Borrowers.

**3.2**     **Assumption of Liability**

The New Borrowers hereby agree with the Finance Parties and the Original Borrowers that, as and with effect from the Effective date, they shall, jointly and severally with the Original Borrowers:

3.2.1     be bound by the terms of the Original Facilities Agreement as if the New Borrowers had all times been named therein as Borrowers;

3.2.2     duly and punctually perform all the liabilities and obligations whatsoever from time to time to be performed or discharged by the Original Borrowers under the Original Facilities Agreement (and for which the Borrowers hereby agree to be jointly and severally liable); and

3.2.3     without prejudice to the generality of clauses 3.2.1 and 3.2.2, be indebted for the full amount of the Loan, interest therein and all other sums which may be or become due to the Finance Parties or any of them pursuant to the Original Facilities Agreement.

**4**     **Amendments to the Facilities Agreement**

With effect on and from the Effective Date, the Original Facilities Agreement shall be, and it is hereby, amended as follows:

4.1     by replacing the definition of "**Approved Brokers**" with the following new definition of "**Approved Brokers**":

"**Approved Brokers** means each of H. Clarkson and Company Ltd (London), E.A., Gibson Shipbrokers Limited (London), Fearnleys AS (Oslo), Braemar Seascope Limited (London), Joachim Grieg & Co. (Oslo) and Inge Steensland S.A. (Oslo) or any other independent firm of shipbrokers agreed in writing from time to time between the Borrowers and the Agent (acting on the instructions of the Majority Lenders).";

4.2     by adding the following new definition of "**Supplemental Agreement**" in clause 1.1 (*Definitions*) of the Facilities Agreement:

"**Supplemental Agreement** means the agreement dated 17 July 2015 supplemental to this Agreement made between (among others) the Obligors and the Finance Parties.";

4.3     by adding the words "the Supplemental Agreement," after the words "this Agreement," in the definition of "**Finance Documents**" in clause 1.1 (*Definitions*) of the Original Facility Agreement;

4.4     by adding the words "and, as to any surplus, to finance any other part of such Building Contract Price already paid by the relevant Owner by paying the same to such Owner" after the words "to the relevant Builder" in paragraph (b) of clause 3.3 (*Use on Delivery*) of the Original Facility Agreement;

4.5     by deleting clause 27.1 (*Earnings Account*) of the Original Facilities Agreement and by inserting in its place the following new clause 27.1 (*Earnings Account*):

"**27.1**     **Earnings Account**

27.1.1     Each Owner shall be the holder of one or more Accounts with an Account Bank, designated as an "**Earnings Account**" for the purposes of the Finance Documents.

27.1.2     The Earnings of the Mortgaged Ships and all moneys payable to each Owner under each Ship's Insurances shall be paid by the persons from whom they are due to an Earnings Account unless required to be paid to the Security Agent or any other Finance Parties under the relevant Finance Documents.

27.1.3     The Obligors shall procure that no Owner shall withdraw amounts standing to the credit of an Earnings Account except as permitted by clause 27.1.4.

27.1.4   The Obligors undertake to procure that if there is no Default which is continuing, amounts standing to the credit of the Earnings Accounts shall be at the free disposal of the relevant Owner and each Owner may withdraw moneys from an Earnings Account for any purpose whatsoever which is permitted (or not prohibited) by the terms of this Agreement and the Finance Documents, including (without limitation) for:

(a)   payments then due to Finance Parties under the Finance Documents;

(b)   payments to another Earnings Account;

(c)   payments of the proper costs and expenses of insuring, repairing, operating and maintaining any Mortgaged Ship; and

(d)   payments to purchase other currencies in amounts and at times required to make payments referred to above in the currency in which they are due.";

4.6   by deleting the words "Othoni II Shipping Corporation" in the first row of the first table of Schedule 2 (*Ship information*) and by replacing them with the words "at all times prior to delivery under the relevant Building Contract, Othoni II Shipping Corporation, and upon delivery and at all times thereafter, Othoni Special Maritime Enterprise";

4.7   by deleting the words "Astipalea II Shipping Corporation" in the first row of the second table of Schedule 2 (*Ship information*) and by replacing them with the words "at all times prior to delivery under the relevant Building Contract, Astipalea II Shipping Corporation, and upon delivery and at all times thereafter, Astipalea Special Maritime Enterprise";

4.8   by deleting the words "Paros II Shipping Corporation" in the first row of the third table of Schedule 2 (*Ship information*) and by replacing them with the words "at all times prior to delivery under the relevant Building Contract, Paros II Shipping Corporation, and upon delivery and at all times thereafter, Paros Special Maritime Enterprise";

4.9   by deleting paragraph 17 (*Delivery*) of Part 3 (*Conditions precedent on Delivery*) of Schedule 3 (*Conditions precedent*) in its entirety and by replacing it with the following new paragraph 17 (*Delivery*):

"**17   Delivery**

Evidence that the relevant Ship has been delivered to, and accepted by, the relevant Owner (being, in the case of each of Hull No. 8163, Hull No. 8164 and Hull No. 8165 (an ENE Ship) the relevant Owner referred to in Schedule 1 (The parties) that became an additional Borrower under the Supplemental Agreement) under the Building Contract, that the relevant Building Contract Price has been paid in full (or will be paid forthwith upon release of the proceeds of the relevant Utilisation), and that the builder's certificate, the bill of sale, the protocol of delivery and acceptance and any other documents to be delivered and exchanged between the parties under the Building Contract of the relevant Ship upon its Delivery (including any novation agreement in respect of an ENE Ship), have been duly executed and delivered and exchanged between them in form and substance satisfactory the Agent.";

4.10   by deleting paragraph 4 (*Bank Accounts*) of Part 1 (*Conditions precedent to any Utilisation*) of Schedule 3 (*Conditions precedent*) in its entirety and by renumbering the remaining paragraphs of such part 1 accordingly; and

4.11   by inserting the following new paragraphs 15 (*Bank Accounts*) and 16 (*Process Agent*) in Part 3 (*Conditions precedent on Delivery*) of Schedule 3 (*Conditions precedent*):

"**15   Bank Accounts**

Evidence that the Earnings Account of the relevant Owner required to be established under clause 27 (*Bank accounts*) has been opened and established, that any Account Security in respect of each such Account has been executed and delivered by the

relevant Owner in favour of the Security Agent and/or any of the other Finance Parties and that any notice required to be given to an Account Bank under that Account Security has been given to it and acknowledged by it in the manner required by that Account Security and that an amount has been credited to it.

"16    **Process Agent**

Evidence that as process agent referred to in any of the Finance Documents referred to in this Part 3, if not an Original Obligor, has accepted if appointment.".

## 5    Representations and warranties

### 5.1    Representations and warranties under the Facilities Agreement

The Relevant Parties make the representations and warranties set out in clause 18 (*Representations*) of the Facilities Agreement to the Original Lenders on the date of this Agreement and on the Effective Date as if made on such date with reference to the facts and circumstances existing at each such date.

## 6    Expenses

### 6.1    Expenses

The Borrowers agree to pay to the Agent on a full indemnity basis on demand all expenses (including legal and out-of-pocket expenses) incurred by any Finance Party:

6.1.1    in connection with the negotiation, preparation, execution and, where relevant, registration of this Agreement and the other Relevant Documents (including any Transfer Certificate or other transfer agreement executed between the Lenders and any other banks who will become a Lender in the context of the syndication of the Facility) and of any amendment or extension of or the granting of any waiver or consent under this Agreement or the other Relevant Documents; and

6.1.2    in contemplation of, or otherwise in connection with, the enforcement of, or preservation of any rights under this Agreement or the other Relevant Documents or otherwise in respect of the monies owing and obligations incurred under this Agreement and the other Relevant Documents, together with interest at the rate and in the manner referred to in clause 8.3 of the Original Facilities Agreement from the date on which such expenses were incurred, to the date of payment (after, as well as before judgment).

### 6.2    Value Added Tax

All fees and expenses payable pursuant to this clause 6 shall be paid together with value added tax or any similar tax (if any) properly chargeable thereon. Any value added tax chargeable in respect of any services supplied by any of the Finance Parties under this Agreement shall, on delivery of the value added tax invoice, be paid in addition to any sum agreed to be paid hereunder.

### 6.3    Stamp and other duties

The Borrowers shall pay and, within three (3) Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of this Agreement and any other Relevant Documents.

## 7    Miscellaneous and notices

**7.1**   **Continuation of Facilities Agreement**

7.1.1   Save as amended by this Agreement, the provisions of the Original Facilities Agreement shall continue in full force and effect and the Original Facilities Agreement and this Agreement shall be read and construed as one instrument.

7.1.2   With effect as of the Effective Date, references in the Finance Documents to the "Facilities Agreement" or the "Loan Agreement" or the "Agreement" (or such other equivalent or similar references) shall henceforth be references to the Original Facilities Agreement as amended and supplemented by this Agreement and as from time to time hereafter amended, and shall also be deemed to include this Agreement and the obligations of the Borrowers hereunder.

**7.2**   **Continuing security – Relevant Parties**

Each of the Relevant Parties hereby confirms for the benefit of the Finance Parties that:

7.2.1   each Finance Document to which it is a party extends, in accordance with its terms, to the obligations of the Borrowers arising under the Original Facilities Agreement as amended by this Agreement; and

7.2.2   the obligations of the Relevant Parties under each such Finance Document and any Security Interests contained therein are not otherwise affected by this Agreement, or any other Relevant Documents or anything contained in them or in this Agreement and shall, in accordance with its terms, remain in full force and effect,

provided that, without prejudice to the foregoing, the Relevant Parties shall do all such acts and things as the Security Agent reasonably requires for the purposes of ensuring that all obligations and Security Interests purported to be created under the Finance Documents are and shall remain in full force and effect and fully perfected in favour of the Security Agent.

**7.3**   **Counterparts**

This Agreement may be executed in any number of counterparts and by the different Parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

**7.4**   **Partial invalidity**

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision in any other respect or under the law of any other jurisdiction will be affected or impaired in any way.

**7.5**   **Notices**

The provisions of clause 37 (*Notices*) of the Original Facilities Agreement shall extend and apply to the giving or making of notices or demands hereunder as if the same were expressly stated herein.

**7.6 Borrowers' obligations**

Notwithstanding anything to the contrary contained in this Agreement, the agreements, obligations and liabilities of the Borrowers herein contained are joint and several and shall be construed accordingly. Each of the Borrowers agrees and consents to be bound by this Agreement notwithstanding that the other Borrowers which were intended to sign or be bound may not do so or be effectually bound and notwithstanding that this Agreement may be invalid or unenforceable against the other Borrowers whether or not the deficiency is known to the Agent. The Agent shall be at liberty to release any of the Borrowers from this Agreement and to compound with or otherwise vary the liability or to grant time and indulgence to make other arrangements with any of the Borrowers without prejudicing or affecting the rights and remedies of the Agent against the other Borrowers.

## 8 Governing Law

This Agreement and any non-contractual obligations connected with it shall be governed by English law.

## 9 Enforcement

### 9.1 Jurisdiction

9.1.1 The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) or any non-contractual obligations connected with this Agreement (a **Dispute**).

9.1.2 The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

9.1.3 This clause 9.1 is for the benefit of the Finance Parties only. As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

9.1.4 Without prejudice to any other mode of service allowed under any relevant law, each of the Relevant Parties:

(a) irrevocably appoints Eletson Maritime Limited at present of 3 Crane Court, Fleet Street, London, EC4A 2EJ, England, as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement (including any non-contractual obligations in connection with it); and

(b) agrees that failure by a process agent to notify any Relevant Party of the process will not invalidate the proceedings concerned.

**IN WITNESS** whereof the parties to this Agreement have caused this Agreement to be duly executed as a deed on the date first above written.

**Schedule 1**
**The Parties**

**Part A**
**The Original Borrowers**

| Name: | Astipalea II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116591 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Kithnos II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116594 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Dilos II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116595 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Paros II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116593 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Othoni II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116589 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Samothraki II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-117112 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Shinoussa II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-117113 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

**Guarantor**

| Name: | Eletson Gas LLC |
|---|---|
| Original Jurisdiction of formation | Republic of Marshall Islands |
| Registration number (or equivalent, if any) | 962359 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

**Part B**
**The New Borrowers**

| Name: | Astipalea Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4837 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Othoni Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4834 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Paros Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4838 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

**Part C**

**The Lenders**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|
| Name | Citibank N.A., London Branch |
| Name | UniCredit Bank AG |
| Name | BNP Paribas |
| Name | NIBC Bank N.V. |

**The Agent**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|

**The Security Agent**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|

**The Arrangers**

| Name | Citibank N.A., London Branch |
|------|------------------------------|
| Name | Skandinaviska Enskilda Banken AB (publ) |

## Schedule 2
## Documents and evidence required as conditions precedent

1    **Corporate documents**

(a)    A copy of the constitutional documents of each Relevant Party or a written statement by legal advisers to the Original Borrowers that the same remain unchanged from those delivered to the Agent at the time of signing of the Original Facilities Agreement.

(b)    A copy of a resolution of the board of directors of each Relevant Party (or any committee of such board empowered to approve and authorise the following matters):

(i)    approving the terms of, and the transactions contemplated by, the Relevant Documents to which it is a party and resolving that it execute the Relevant Documents;

(ii)    authorising a specified person or persons to execute the Relevant Documents on its behalf; and

(iii)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Relevant Documents to which it is a party.

(c)    If applicable, a copy of a resolution of the board of directors of the relevant company, establishing any committee referred to in paragraph (b) above and conferring authority on that committee.

(d)    A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(e)    A copy of a resolution signed by all the holders of the issued shares in each Relevant Party, approving the terms of, and the transactions contemplated by, the Relevant Documents to which such Relevant Party is a party.

(f)    A certificate of the Guarantor signed by a director or confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on any Relevant Party to be exceeded.

(g)    A copy of any power of attorney under which any person is to execute any of the Relevant Documents on behalf of any Relevant Party.

(h)    A certificate of an authorised signatory of the relevant Relevant Party certifying that each copy document relating to it specified in this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement and that any such resolutions or power of attorney have not been revoked.

2    **New Share Security**

The New Share Security in respect of each New Borrower duly executed by the Guarantor together with all letters, transfers, certificates and other documents required to be delivered under each such New Share Security.

3    **Legal opinions**

Such legal opinions as the Agent may require.

**4**    **Other documents and evidence**

A letter from each of the Relevant Parties' agent for receipt of service of proceedings accepting its appointment under this Agreement and/or the other Relevant Documents in which it is or is to be appointed as such Relevant Party's process agent.

**SIGNATURES**

**THE BORROWERS**

EXECUTED as a DEED
by
for and on behalf of
**ASTIPALEA II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

..........................
Witness
Name:               Evangelia Platsidaki
Address:         Norton Rose Fulbright Greece
Occupation:            Solicitor


EXECUTED as a DEED
by
for and on behalf of
**KITHNOS II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)

Attorney-in-fact

..........................
Witness
Name:               Evangelia Platsidaki
Address:         Norton Rose Fulbright Greece
Occupation:            Solicitor


EXECUTED as a DEED
by
for and on behalf of
**DILOS II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)

Attorney-in-fact

..........................
Witness
Name:               Evangelia Platsidaki
Address:         Norton Rose Fulbright Greece
Occupation:            Solicitor


EXECUTED as a DEED
by
for and on behalf of
**PAROS II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)

Attorney-in-fact

..........................
Witness
Name:
Address:           Evangelia Platsidaki
Occupation:      Norton Rose Fulbright Greece
                         Solicitor

ATH-#4581725-v7                                          15

**EXECUTED** as a **DEED**
by
for and on behalf of
**OTHONI II SHIPPING CORPORATION**
as Borrower
in the presence of:

..............................

Witness
Name:
Address:                Evangelia Platsidaki
Occupation:        Norton Rose Fulbright Greece
                                    Solicitor

)
)
)
)
)
)

..............................
Attorney-in-fact


**EXECUTED** as a **DEED**
by
for and on behalf of
**SAMOTHRAKI II SHIPPING CORPORATION**
as Borrower
in the presence of:

..............................

Witness
Name:
Address:                Evangelia Platsidaki
Occupation:        Norton Rose Fulbright Greece
                                    Solicitor

)
)
)
)
)
)

..............................
Attorney-in-fact


**EXECUTED** as a **DEED**
by
for and on behalf of
**SHINOUSSA II SHIPPING CORPORATION**
as Borrower
in the presence of:

..............................

Witness
Name:
Address:                Evangelia Platsidak.
Occupation:        Norton Rose Fulbright Greece
                                    Solicitor

)
)
)
)
)
)

..............................
Attorney-in-fact


**EXECUTED** as a **DEED**
by
for and on behalf of
**ASTIPALEA SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

..............................

Witness
Name:
Address:                Evangelia Platsida
Occupation:        Norton Rose Fulbright Gree
                                    Solicitor

)
)
)
)
)
)

..............................
Attorney-in-fact

**EXECUTED** as a **DEED**
by
for and on behalf of
**OTHONI SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
)

....................
Attorney-in-fact

....................
Witness
Name:
Address:         Evangelia Platsidaki
Occupation:      Norton Rose Fulbright Greece
                     Solicitor

**EXECUTED** as a **DEED**
by
for and on behalf of
**PAROS SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
)

....................
Attorney-in-fact

....................
Witness
Name:
Address:         Evangelia Platsidaki
Occupation:      Norton Rose Fulbright Greece
                     Solicitor

**THE GUARANTOR**

**EXECUTED** as a **DEED**
by
for and on behalf of
**ELETSON GAS LLC**
as Guarantor
in the presence of:

)
)
)
)
)

....................
Attorney-in-fact

....................
Witness
Name:
Address:         Evangelia Platsidaki
Occupation:      Norton Rose Fulbright Greece
                     Solicitor

**THE ARRANGERS**

EXECUTED as a DEED *Evangelia Platsidaki*
by
for and on behalf of
**CITIBANK N.A., LONDON BRANCH**
as Arranger
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT. GREECE
Occupation: TRAINEE SOLICITOR

EXECUTED as a DEED *Platsidaki*
by *Evangelia*
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN ab (publ)**
as Arranger
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GREECE
Occupation: TRAINEE SOLICITOR

**THE AGENT**

EXECUTED as a DEED *Platsidaki*
by *Evangelia*
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN ab (publ)**
as Agent
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GREECE
Occupation: TRAINEE SOLICITOR

**THE SECURITY AGENT**

**EXECUTED as a DEED**
by *Evangelia Platsidaki*
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN ab (publ)**
as Security Agent
in the presence of:

)
)
)
)
)
)

...............................
Attorney-in-fact

...............................
Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GRECE
Occupation: TRAINEE SOLICITOR

**THE ORIGINAL LENDERS**

**EXECUTED as a DEED**
by *Evangelia Platsidaki*
for and on behalf of
**CITIBANK N.A., LONDON BRANCH**
as Lender
in the presence of:

)
)
)
)
)

...............................
Attorney-in-fact

...............................
Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GRECE
Occupation: TRAINEE SOLICITOR

**EXECUTED as a DEED**
by *Evangelia Platsidaki*
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Lender
in the presence of:

)
)
)
)
)

...............................
Attorney-in-fact

...............................
Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GRECE
Occupation: TRAINEE SOLICITOR

**EXECUTED as a DEED**
by *Evangelia Platsidaki*
for and on behalf of
**UNICREDIT BANK AG**
as Lender
in the presence of:

)
)
)
)
)

...............................
Attorney-in-fact

...............................
Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GRECE
Occupation: TRAINEE SOLICITOR

ATH-#4581725-v7

19

**EXECUTED as a DEED**
by *Evangelia Platsidaki*
for and on behalf of
**BNP PARIBAS**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GREECE
Occupation: TRAINEE SOLICITOR

**EXECUTED as a DEED**
by *Evangelia Platsidaki*
for and on behalf of
**NIBC BANK N.V.**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name: ALEXANDRA MIKELIS
Address: NORTON ROSE FULBRIGHT GREECE
Occupation: TRAINEE SOLICITOR

Private & Confidential

**Dated 14 January 2016**

**THE ENTITIES LISTED IN SCHEDULE 1**
**as Borrowers**

**CITIBANK, N.A., LONDON BRANCH**
**and**
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Arrangers**

**with**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Agent**

**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**as Security Agent**

**guaranteed by**
**ELETSON GAS LLC**

---

**SECOND SUPPLEMENTAL AGREEMENT**

**relating to a Facilities Agreement**

**dated 24 June 2014**

---

NORTON ROSE FULBRIGHT

# Contents

**Clause**                                                                                    **Page**

1       Definitions ................................................................................................................... 1

2       Consent of the Finance Parties ................................................................................... 2

3       Assumption of liability and obligations ........................................................................ 3

4       Amendments to the Facilities Agreement .................................................................... 3

5       Representations and warranties ................................................................................... 4

6       Expenses ...................................................................................................................... 5

7       Miscellaneous and notices........................................................................................... 5

8       Governing Law.............................................................................................................. 6

9       Enforcement ................................................................................................................. 6

Schedule 1 The Parties........................................................................................................... 8

Schedule 2 Documents and evidence required as conditions precedent................................. 14

Schedule 3 Form of Deed of Release...................................................................................... 16

**THIS AGREEMENT** is dated 14 January 2016 and made **BETWEEN**:

(1)  **THE ENTITIES** listed in Part A of Schedule 1 (*The Parties*) as original borrowers (the **Original Borrowers**);

(2)  **THE ENTITIES** listed in Part B of Schedule 1 (*The Parties*) as new borrowers (the **New Borrowers** and together with the Original Borrowers, the **Borrowers**);

(3)  **ELETSON GAS LLC** of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (the **Guarantor**);

(4)  **EMC GAS CORPORATION** of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (the **Commercial Manager**);

(5)  **ELETSON CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Technical Manager** and, together with the Commercial Manager, the **Managers**);

(6)  **CITIBANK, N.A., LONDON BRANCH** and **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as mandated lead arrangers and bookrunners (whether acting individually or together the **Arrangers**);

(7)  **THE FINANCIAL INSTITUTIONS** listed in Part C of Schedule 1 (*The Parties*) as lenders (the **Lenders**);

(8)  **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as agent of the other Finance Parties (the **Agent**); and

(9)  **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as security agent of the Finance Parties (the **Security Agent**).

**WHEREAS:**

(A)  this Agreement is supplemental to a facilities agreement dated 24 June 2014, made between (1) the Borrowers, (2) the Guarantor, (3) the Arrangers, (4) the Lenders, (5) the Agent and (6) the Security Agent, as amended and supplemented by a side letter dated 3 November 2014, a side letter dated 12 November 2014 and a side letter dated 19 June 2015 and as further amended and supplemented by a supplemental agreement dated 17 July 2015 (together the **Original Facilities Agreement**), relating to loan facilities of up to $254,179,500;

(B)  the Finance Parties have agreed at the request of the Original Borrowers:

(a)  to the adhesion of the New Borrowers as joint and several borrowers under the Original Facilities Agreement; and

(b)  to certain amendments to the Original Facilities Agreement contained in clause 4 (*Amendments to the Facilities Agreement*); and

(C)  this Agreement sets out the terms and conditions upon which the Finance Parties agree to the amendments and changes referred to in paragraph (B) above.

**NOW IT IS HEREBY AGREED** as follows:

# 1   Definitions

## 1.1   Defined expressions

Words and expressions defined in the Original Facilities Agreement shall, unless the context otherwise requires or unless otherwise defined herein, have the same meanings when used in this Agreement.

**1.2      Definitions**

In this Agreement, unless the context otherwise requires:

**Deed of Release** means a deed of release in the form set out in Schedule 3.

**Effective Date** means the date, no later than 18 January 2016, on which the Agent has notified the Borrowers that it has received the documents and evidence specified in Schedule 2 (*Documents and evidence required as conditions precedent*) in a form and substance satisfactory to it (and/or that their receipt has been waived by the Lenders, whether temporarily or permanent).

**Facilities Agreement** means the Original Facilities Agreement, as amended and supplemented by this Agreement.

**New Share Security** means, in relation to each New Borrower, the document constituting a first Security Interest in respect of all the shares of such New Borrower executed by the Guarantor in favour of certain of the Finance Parties in the agreed form.

**Party** means a party to this Agreement.

**Relevant Documents** means this Agreement and the New Share Security.

**Relevant Party** means each of the Borrowers, the Guarantor, the Managers or any other person who may at any time be a party to any of the Relevant Documents (other than the Finance Parties) and **Relevant Parties** means any or all of them.

**1.3      Interpretation of the Facilities Agreement**

References in the Original Facilities Agreement to **this Agreement**, shall, with effect from the Effective Date and unless the context otherwise requires, be references to the Facilities Agreement, and words such as **herein**, **hereof**, **hereunder**, **hereafter**, **hereby** and **hereto**, where they appear in the **Facilities Agreement**, shall be construed accordingly.

**1.4      Headings**

Clause headings and the table of contents are inserted for convenience of reference only and shall be ignored in the interpretation of this Agreement.

**1.5      Incorporation of certain references**

Clauses 1.2 (*Construction*) and 1.3 (*Third party rights*) of the Original Facilities Agreement shall be deemed to be incorporated into this Agreement in full, *mutatis mutandis*.

**1.6      Designation as Finance Document**

The Parties agree that this Agreement is and shall be designated a Finance Document.

**2      Consent of the Finance Parties**

2.1      The Finance Parties, relying upon the representations, warranties and undertakings on the part of the Relevant Parties contained in clause 5 (*Representations and warranties*), agree with the Relevant Parties that, subject to the terms and conditions of this Agreement and in particular, but without prejudice to the generality of the foregoing, fulfilment on or before 18 January 2016 of the conditions contained in Schedule 2 (*Documents and evidence required as conditions precedent*), the Finance Parties agree, with effect on and from the Effective Date, to the amendment of the Original Facilities Agreement on the terms set out in clause 4 (*Amendments to the Facilities Agreement*).

2.2     At any time following a request in writing to that effect by the Obligors to the Agent, the Finance Parties hereby further agree that following Delivery of Hull No.8166 and Hull No.8167 and satisfaction of all conditions precedent under the Facilities Agreement in respect of the Delivery Advances for such Ships, the Finance Parties will procure that a Deed of Release is executed and delivered to the Obligors for the purpose of releasing Othoni II Shipping Corporation, Astipalea II Shipping Corporation, Paros II Shipping Corporation, Kithnos II Shipping Corporation and Dilos II Shipping Corporation from their obligations under the Original Facilities Agreement.

2.3     Each of the other parties to this Agreement further agrees and consents to continue to be bound by the Original Facilities Agreement and any other Finance Documents to which it is a party notwithstanding that the aforementioned entities may be so released under the Deed of Release.

## 3      Assumption of liability and obligations

### 3.1     Additional parties

It is hereby agreed that, on and with effect from the Effective Date, the New Borrowers shall be, and are hereby made, additional parties to the Original Facilities Agreement, as joint and several borrowers with the Original Borrowers, and the Original Facilities Agreement shall henceforth be construed and treated in all respects as if references therein to "Borrowers" included references to the New Borrowers in addition to the Original Borrowers.

### 3.2     Assumption of Liability

The New Borrowers hereby agree with the Finance Parties and the Original Borrowers that, as and with effect from the Effective Date, they shall, jointly and severally with the Original Borrowers:

3.2.1    be bound by the terms of the Original Facilities Agreement as if the New Borrowers had all times been named therein as Borrowers;

3.2.2    duly and punctually perform all the liabilities and obligations whatsoever from time to time to be performed or discharged by the Original Borrowers under the Original Facilities Agreement (and for which the Borrowers hereby agree to be jointly and severally liable); and

3.2.3    without prejudice to the generality of clauses 3.2.1 and 3.2.2, be indebted for the full amount of the Loan, interest therein and all other sums which may be or become due to the Finance Parties or any of them pursuant to the Original Facilities Agreement.

## 4      Amendments to the Facilities Agreement

With effect on and from the Effective Date, the Original Facilities Agreement shall be, and it is hereby, amended as follows:

4.1     by adding the following new definitions of "**Second Supplemental Agreement**" in clause 1.1 (*Definitions*) of the Facilities Agreement:

"**Second Supplemental Agreement** means the agreement dated 14 January 2016 supplemental to this Agreement made between (among others) the Obligors and the Finance Parties.";

4.2     by adding the words "the Second Supplemental Agreement," after the words "this Agreement, the Supplemental Agreement" in the definition of "**Finance Documents**" in clause 1.1 (*Definitions*) of the Original Facility Agreement;

4.3　　by deleting clause 20.2(d) (*Financial condition*) of the Original Facilities Agreement and by inserting in its place the following new clause 20.2(d) (*Financial condition*):

"(d)　**Minimum liquidity:** on each day during and in respect of each Measurement Period:

(i)　from the date of this Agreement until the later of (1) 1 January 2017, (2) the date when all Ships are delivered to the Borrowers under the relevant Building Contracts and (3) the latest Last Availability Date (the **Start Date**), the Cash and Cash Equivalents shall not be less than the aggregate of $1,000,000 per Fleet Vessel (including each Mortgaged Ship); and

(ii)　from the day following the Start Date and at all times thereafter, the Cash and Cash Equivalents shall not be less than the higher of:

(A)　$1,000,000 per Fleet Vessel (including each Mortgaged Ship); and

(B)　the Six-Month Debt Service for the Test Period commencing on such day.";

4.4　　by deleting the words "Kithnos II Shipping Corporation" in the first row of the fourth table of Schedule 2 (*Ship information*) and by replacing them with the words "at all times prior to delivery under the relevant Building Contract, Kithnos II Shipping Corporation, and upon delivery at all times thereafter, Kithnos Special Maritime Enterprise";

4.5　　by deleting the words "Dilos II Shipping Corporation" in the first row of the fifth table of Schedule 2 (*Ship information*) and by replacing them with the words "at all times prior to delivery under the relevant Building Contract, Dilos II Shipping Corporation, and upon delivery at all times thereafter, Dilos II Special Maritime Enterprise"; and

4.6　　by deleting paragraph 12 (*Delivery*) of Part 3 (*Conditions precedent on Delivery*) of Schedule 3 (*Conditions precedent*) in its entirety and by replacing it with the following new paragraph 12 (*Delivery*):

"**12　　Delivery**

Evidence that the relevant Ship has been delivered to, and accepted by, the relevant Owner (being, in the case of each of Hull No. 8163, Hull No. 8164, Hull No. 8165, Hull No.8166 and Hull No.8167 (an **ENE Ship**) the relevant Owner referred to in Schedule 1 (The parties) that became an additional Borrower under the Supplemental Agreement or the Second Supplemental Agreement) under the Building Contract, that the relevant Building Contract Price has been paid in full (or will be paid forthwith upon release of the proceeds of the relevant Utilisation), and that the builder's certificate, the bill of sale, the protocol of delivery and acceptance and any other documents to be delivered and exchanged between the parties under the Building Contract of the relevant Ship upon its Delivery (including any novation agreement in respect of an ENE Ship), have been duly executed and delivered and exchanged between them in form and substance satisfactory the Agent.".

## 5　　Representations and warranties

### 5.1　　Representations and warranties under the Facilities Agreement

The Relevant Parties make the representations and warranties set out in clause 18 (*Representations*) of the Facilities Agreement to the Original Lenders on the date of this Agreement and on the Effective Date as if made on such date with reference to the facts and circumstances existing at each such date.

## 6 Expenses

### 6.1 Expenses

The Borrowers agree to pay to the Agent on a full indemnity basis on demand all expenses (including legal and out-of-pocket expenses) incurred by any Finance Party:

6.1.1 in connection with the negotiation, preparation, execution and, where relevant, registration of this Agreement and the other Relevant Documents (including any Transfer Certificate or other transfer agreement executed between the Lenders and any other banks who will become a Lender in the context of the syndication of the Facility) and of any amendment or extension of or the granting of any waiver or consent under this Agreement or the other Relevant Documents; and

6.1.2 in contemplation of, or otherwise in connection with, the enforcement of, or preservation of any rights under this Agreement or the other Relevant Documents or otherwise in respect of the monies owing and obligations incurred under this Agreement and the other Relevant Documents, together with interest at the rate and in the manner referred to in clause 8.3 of the Original Facilities Agreement from the date on which such expenses were incurred, to the date of payment (after, as well as before judgment).

### 6.2 Value Added Tax

All fees and expenses payable pursuant to this clause 6 shall be paid together with value added tax or any similar tax (if any) properly chargeable thereon. Any value added tax chargeable in respect of any services supplied by any of the Finance Parties under this Agreement shall, on delivery of the value added tax invoice, be paid in addition to any sum agreed to be paid hereunder.

### 6.3 Stamp and other duties

The Borrowers shall pay and, within three (3) Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of this Agreement and any other Relevant Documents.

## 7 Miscellaneous and notices

### 7.1 Continuation of Facilities Agreement

7.1.1 Save as amended by this Agreement, the provisions of the Original Facilities Agreement shall continue in full force and effect and the Original Facilities Agreement and this Agreement shall be read and construed as one instrument.

7.1.2 With effect as of the Effective Date, references in the Finance Documents to the "Facilities Agreement" or the "Loan Agreement" or the "Agreement" (or such other equivalent or similar references) shall henceforth be references to the Original Facilities Agreement as amended and supplemented by this Agreement and as from time to time hereafter amended, and shall also be deemed to include this Agreement and the obligations of the Borrowers hereunder.

### 7.2 Continuing security – Relevant Parties

Each of the Relevant Parties hereby confirms for the benefit of the Finance Parties that:

7.2.1 each Finance Document to which it is a party extends, in accordance with its terms, to the obligations of the Borrowers arising under the Original Facilities Agreement as amended by this Agreement; and

7.2.2   the obligations of the Relevant Parties under each such Finance Document and any Security Interests contained therein are not otherwise affected by this Agreement, any other Relevant Documents, the Deed of Release or anything contained in them or in this Agreement and shall, in accordance with its terms, remain in full force and effect,

provided that, without prejudice to the foregoing, the Relevant Parties shall do all such acts and things as the Security Agent reasonably requires for the purposes of ensuring that all obligations and Security Interests purported to be created under the Finance Documents are and shall remain in full force and effect and fully perfected in favour of the Security Agent.

### 7.3   Counterparts

This Agreement may be executed in any number of counterparts and by the different Parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

### 7.4   Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision in any other respect or under the law of any other jurisdiction will be affected or impaired in any way.

### 7.5   Notices

The provisions of clause 37 (*Notices*) of the Original Facilities Agreement shall extend and apply to the giving or making of notices or demands hereunder as if the same were expressly stated herein.

### 7.6   Borrowers' obligations

Notwithstanding anything to the contrary contained in this Agreement, the agreements, obligations and liabilities of the Borrowers herein contained are joint and several and shall be construed accordingly. Each of the Borrowers agrees and consents to be bound by this Agreement notwithstanding that the other Borrowers which were intended to sign or be bound may not do so or be effectually bound and notwithstanding that this Agreement may be invalid or unenforceable against the other Borrowers whether or not the deficiency is known to the Agent. The Agent shall be at liberty to release any of the Borrowers from this Agreement and to compound with or otherwise vary the liability or to grant time and indulgence to make other arrangements with any of the Borrowers without prejudicing or affecting the rights and remedies of the Agent against the other Borrowers.

## 8   Governing Law

This Agreement and any non-contractual obligations connected with it shall be governed by English law.

## 9   Enforcement

### 9.1   Jurisdiction

9.1.1   The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) or any non-contractual obligations connected with this Agreement (a **Dispute**).

9.1.2   The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

9.1.3     This clause 9.1 is for the benefit of the Finance Parties only. As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

9.1.4     Without prejudice to any other mode of service allowed under any relevant law, each of the Relevant Parties:

(a)     irrevocably appoints Eletson Maritime Limited at present of 3 Crane Court, Fleet Street, London, EC4A 2EJ, England, as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement (including any non-contractual obligations in connection with it); and

(b)     agrees that failure by a process agent to notify any Relevant Party of the process will not invalidate the proceedings concerned.

**IN WITNESS** whereof the parties to this Agreement have caused this Agreement to be duly executed as a deed on the date first above written.

**Schedule 1**
**The Parties**

**Part A**
**The Original Borrowers**

| Name: | Astipalea II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116591 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Kithnos II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116594 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Dilos II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116595 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Paros II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116593 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Othoni II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-116589 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Samothraki II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-117112 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Shinoussa II Shipping Corporation |
|---|---|
| Original Jurisdiction of formation | Republic of Liberia |
| Registration number (or equivalent, if any) | C-117113 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 80 Broad Street, Monrovia, Liberia |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Astipalea Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4837 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Othoni Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4834 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Paros Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4838 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

**Guarantor**

| Name: | Eletson Gas LLC |
|---|---|
| Original Jurisdiction of formation | Republic of Marshall Islands |
| Registration number (or equivalent, if any) | 962359 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

**Part B**
**The New Borrowers**

| | |
|---|---|
| **Name:** | Kithnos Special Maritime Enterprise |
| **Original Jurisdiction of formation** | Greece |
| **Registration number (or equivalent, if any)** | 4867 |
| **English process agent (if not incorporated in England)** | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| **Registered office** | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| **Address for service of notices** | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| | |
|---|---|
| **Name:** | Dilos II Special Maritime Enterprise |
| **Original Jurisdiction of formation** | Greece |
| **Registration number (or equivalent, if any)** | 4868 |
| **English process agent (if not incorporated in England)** | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| **Registered office** | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| **Address for service of notices** | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

Part C

**The Lenders**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|
| Name | Citibank N.A., London Branch |
| Name | UniCredit Bank AG |
| Name | BNP Paribas |
| Name | NIBC Bank N.V. |

**The Agent**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|

**The Security Agent**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|

**The Arrangers**

| Name | Citibank N.A., London Branch |
|------|------------------------------|
| Name | Skandinaviska Enskilda Banken AB (publ) |

## Schedule 2
## Documents and evidence required as conditions precedent

1    **Corporate documents**

   (a)    A copy of the constitutional documents of each Relevant Party or a written statement by legal advisers to the Original Borrowers that the same remain unchanged from those delivered to the Agent at the time of signing of the Original Facilities Agreement.

   (b)    A copy of a resolution of the board of directors of each Relevant Party (or any committee of such board empowered to approve and authorise the following matters):

      (i)    approving the terms of, and the transactions contemplated by, the Relevant Documents to which it is a party and resolving that it execute the Relevant Documents;

      (ii)    authorising a specified person or persons to execute the Relevant Documents on its behalf; and

      (iii)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Relevant Documents to which it is a party.

   (c)    If applicable, a copy of a resolution of the board of directors of the relevant company, establishing any committee referred to in paragraph (b) above and conferring authority on that committee.

   (d)    A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

   (e)    A copy of a resolution signed by all the holders of the issued shares or membership interests in each Relevant Party, approving the terms of, and the transactions contemplated by, the Relevant Documents to which such Relevant Party is a party.

   (f)    A certificate of the Guarantor signed by a director confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on any Relevant Party to be exceeded.

   (g)    A copy of any power of attorney under which any person is to execute any of the Relevant Documents on behalf of any Relevant Party.

   (h)    A certificate of an authorised signatory of the relevant Relevant Party certifying that each copy document relating to it specified in this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement and that any such resolutions or power of attorney have not been revoked.

2    **New Share Security**

   The New Share Security in respect of each New Borrower duly executed by the Guarantor together with all letters, transfers, certificates and other documents required to be delivered under each such New Share Security.

3    **Legal opinions**

   Such legal opinions as the Agent may require in agreed form.

**4**   **Other documents and evidence**

A letter from each of the Relevant Parties' agent for receipt of service of proceedings accepting its appointment under this Agreement and/or the other Relevant Documents in which it is or is to be appointed as such Relevant Party's process agent.

**Schedule 3**
**Form of Deed of Release**

Private & Confidential

**Dated [●] 2016**

**CITIBANK, N.A., LONDON BRANCH**
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
**UNICREDIT BANK AG**
**BNP PARIBAS**
**and**
**NIBC BANK N.V.**
**in favour of**
**ASTIPALEA II SHIPPING CORPORATION**
**KITHNOS II SHIPPING CORPORATION**
**DILOS II SHIPPING CORPORATION**
**PAROS II SHIPPING CORPORATION**
**and**
**OTHONI II SHIPPING CORPORATION**

---

**DEED OF RELEASE AND REASSIGNMENT**

---

NORTON ROSE FULBRIGHT

**THIS DEED** is dated [●] 2016 and made by:

(1)   **CITIBANK, N.A., LONDON BRANCH** and **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as mandated lead arrangers and bookrunners (whether acting individually or together, the **Arrangers**);

(2)   **THE BANKS AND FINANCIAL INSTITUTIONS** whose names are listed in Schedule 1 as lenders (the **Lenders**);

(3)   **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as agent of the other Finance Parties (the **Agent**); and

(4)   **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as security agent of the Finance Parties (the **Security Agent** and, together with the Arrangers, the Lenders and the Agent, the **Chargees**);

in favour of:

(5)   **ASTIPALEA II SHIPPING CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Astipalea Borrower**);

(6)   **KITHNOS II SHIPPING CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Kithnos Borrower**);

(7)   **DILOS II SHIPPING CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Dilos Borrower**);

(8)   **PAROS II SHIPPING CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Paros Borrower**); and

(9)   **OTHONI II SHIPPING CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Othoni Borrower** and, together with the Astipalea Borrower, the Kithnos Borrower, the Dilos Borrower and the Paros Borrower, the **Chargors**);

1      The Chargees hereby release and discharge the Chargors from all liabilities, obligations, claims and demands whatsoever under the loan agreement dated 24 June 2014 made between (1) the Chargors, Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers, (2) Eletson Gas LLC as guarantor, (3) the Arrangers, (4) the Lenders, (5) the Agent and (6) the Security Agent, as amended and supplemented by a side letter dated 3 November 2014, a side letter dated 12 November 2014, a side letter dated 1 June 2015, a supplemental agreement dated 17 July 2015 and a second supplemental agreement dated [●] 2016 (together, the "**Loan Agreement**") and in respect of anything done or omitted to be done under or in connection therewith.

2      Words and expressions defined in the Loan Agreement shall, unless otherwise specified herein, have the same meanings when used herein.

3      No term of this Deed is enforceable under the Contracts (Rights of Third Parties) Act 1999 by anyone other than a party to this Deed or to whom this Deed is made in favour of.

4      This Deed and any non-contractual obligations connected with it are governed by English law

**This Deed has been executed as a deed, and it has been delivered on the date stated at the beginning of this Deed.**

ATH-#4738372-v1

**Schedule 1**
**The Lenders**

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|
| Name | Citibank N.A., London Branch |
| Name | UniCredit Bank AG |
| Name | BNP Paribas |
| Name | NIBC Bank N.V. |

**SIGNATURES**

**THE BORROWERS**

**EXECUTED as a DEED**
by
for and on behalf of
**ASTIPALEA II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

P.G. KANELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED as a DEED**
by
for and on behalf of
**KITHNOS II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

P.G. KANELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED as a DEED**
by
for and on behalf of
**DILOS II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

P.G. KANELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED** as a **DEED**
by
for and on behalf of
**PAROS II SHIPPING CORPORATION**
as Borrower
in the presence of:

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY · AT · LAW
118, KOLOKOTRONI STR.
PIRAEUS · GREECE
TEL. 30210-4598323. FAX: 30210-4598250

)
)
)
)
)
)
Attorney-in-fact

P.C. KANELOS


**EXECUTED** as a **DEED**
by
for and on behalf of
**OTHONI II SHIPPING CORPORATION**
as Borrower
in the presence of:

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY · AT · LAW
118, KOLOKOTRONI STR.
PIRAEUS · GREECE
TEL. 30210-4598323. FAX: 30210-4598250

)
)
)
)
)
)
Attorney-in-fact

P.C. KANELOS


**EXECUTED** as a **DEED**
by
for and on behalf of
**SAMOTHRAKI II SHIPPING CORPORATION**
as Borrower
in the presence of:

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY · AT · LAW
118, KOLOKOTRONI STR.
PIRAEUS · GREECE
TEL. 30210-4598323. FAX: 30210-4598250

)
)
)
)
)
Attorney-in-fact

P.C. KANELOS


**EXECUTED** as a **DEED**
by
for and on behalf of
**SHINOUSSA II SHIPPING CORPORATION**
as Borrower
in the presence of:

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY · AT · LAW
118, KOLOKOTRONI STR.
PIRAEUS · GREECE
TEL. 30210-4598323. FAX: 30210-4598250

)
)
)
)
)
Attorney-in-fact

P.C. KANELOS


ATH-#4732154-v3                                              18

**EXECUTED** as a **DEED**
by
for and on behalf of
**ASTIPALEA SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED** as a **DEED**
by
for and on behalf of
**OTHONI SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED** as a **DEED**
by
for and on behalf of
**PAROS SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED** as a **DEED**
by
for and on behalf of
**KITHNOS SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**EXECUTED as a DEED**
by
for and on behalf of
**DILOS II SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)
)
......................................
Attorney-in-fact
)
)

P.G. KAMELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598250

**THE GUARANTOR**

**EXECUTED as a DEED**
by
for and on behalf of
**ELETSON GAS LLC**
as Guarantor
in the presence of:

)
)
)
)
......................................
Attorney-in-fact
)

P.G. KAMELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL 30210-4598323, FAX 30210-4598250

**THE COMMERCIAL MANAGER**

**EXECUTED as a DEED**
by
for and on behalf of
**EMC GAS CORPORATION**
as Guarantor
in the presence of:

)
)
)
)
......................................
Attorney-in-fact
)

P.G. KAMELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY - AT - LAW
118, KOLOKOTRONI STR.
PIRAEUS - GREECE
TEL 30210-4598323, FAX: 30210-4598250

**THE TECHNICAL MANAGER**

**EXECUTED** as a **DEED**
by
for and on behalf of
**ELETSON CORPORATION**
as Guarantor
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

K.C. KANELOS

Witness
Name:
Address:
Occupation:

ELENA VANDOROU
ATTORNEY · AT · LAW
118, KOLOKOTRONI STR.
PIRAEUS · GREECE
TEL. 30210-4598323, FAX: 30210-4598250


**THE ARRANGERS**

**EXECUTED** as a **DEED**
by
for and on behalf of
**CITIBANK N.A., LONDON BRANCH**
as Arranger
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

**Niki Alexandrou**
Norton Rose Fulbright Greece
Solicitor

Witness
Name:
Address:
Occupation:

Ariana Georgellis
Associate


**EXECUTED** as a **DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN ab (publ)**
as Arranger
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

**Niki Alexandrou**
Norton Rose Fulbright Greece
Solicitor

Witness
Name:
Address:
Occupation:

Ariana Georgellis

**THE AGENT**

**EXECUTED as a DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN ab (publ)**
as Agent
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

Niki Alexandrou
Norton Rose Fulbright Greece
Solicitor

..............................
Witness
Name:
Address:
Occupation:


**THE SECURITY AGENT**

**EXECUTED as a DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN ab (publ)**
as Security Agent
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

Niki Alexandrou
Norton Rose Fulbright Greece
Solicitor

..............................
Witness
Name:
Address:
Occupation:


**THE ORIGINAL LENDERS**

**EXECUTED as a DEED**
by
for and on behalf of
**CITIBANK N.A., LONDON BRANCH**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Niki Alexandrou
Norton Rose Fulbright Greece
Solicitor

..............................
Witness
Name:
Address:
Occupation:

**EXECUTED** as a **DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Lender
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

**Niki Alexandrou**
Norton Rose Fulbright Greece
Solicitor

Witness
Name:
Address:
Occupation:

**EXECUTED** as a **DEED**
by
for and on behalf of
**UNICREDIT BANK AG**
as Lender
in the presence of:

)
)
)
)
)
)

Nikolaos Tzoumakas

Attorney-in-fact  Anastasia Kerpinioti
Authorised representatives

Witness
Name:
Address:
Occupation:

Niki Alexandrou
Norton Rose Fulbright Greece
Solicitor

**EXECUTED** as a **DEED**
by
for and on behalf of
**BNP PARIBAS**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

**Niki Alexandrou**
Norton Rose Fulbright Greece
Solicitor

Witness
Name:
Address:
Occupation:

**EXECUTED** as a **DEED**
by
for and on behalf of
**NIBC BANK N.V.**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

**Niki Alexandrou**
Norton Rose Fulbright Greece
Solicitor

Witness
Name:
Address:
Occupation:

To:   Astipalea Special Maritime Enterprise
      Kithnos Special Maritime Enterprise
      Dilos II Special Maritime Enterprise
      Paros Special Maritime Enterprise
      Othoni Special Maritime Enterprise
      Samothraki II Shipping Corporation
      Shinoussa II Shipping Corporation
      and
      Eletson Gas LLC

c/o:  Eletson Corporation
      118 Kolokotroni Street
      GR 185-35 Piraeus
      Greece

29 September 2016

Dear Sirs

**Loan Facilities of $254,179,500 dated 24 June 2014**

1     We refer to a facilities agreement dated 24 June 2014 (the **Facilities Agreement**) made
      between inter alios (i) Astipalea II Shipping Corporation, Kithnos II Shipping Corporation, Dilos II
      Shipping Corporation, Paros II Shipping Corporation, Othoni II Shipping Corporation,
      Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers (the
      **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinaviska Enskilda
      Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial
      institutions referred to in schedule 1 thereto as original lenders (together the **Lenders**) in
      relation to $254,179,500 term loan facilities, as amended by a supplemental letter dated 3
      November 2014, a supplemental letter dated 12 November 2014 and a supplemental letter
      dated 19 June 2015 and as further amended and supplemented by a supplemental agreement
      dated 17 July 2015 and a second supplemental agreement dated 14 January 2016 (the
      **Facilities Agreement**).

2     Words and expressions defined in the Facilities Agreement shall have the same meaning where
      used in this Letter.

3     The Obligors have communicated to the Lenders that by a letter dated 16 August 2016
      Samothraki II Shipping Corporation gave notice to Nantong Sinopacific Offshore & Engineering
      Co., Ltd (the **Chinese Builder**) cancelling the Building Contract in respect of Hull No. S1024
      and by a letter of the same date Shinoussa II Shipping Corporation gave notice to the Chinese
      Builder and Sumec Marine Co. Ltd as builder's agent cancelling the Building Contract in respect
      of Hull No. S1025.

4     Such cancellations of the said Building Contracts constitute cancellation and prepayment events
      in relation to the Pre-Delivery Commitments, the Delivery Commitments and the Pre-Delivery
      Advances for the Chinese Ships, in each case under clause 7.7(a) of the Facilities Agreement.
      Following such communication and the request of the Obligors, the Agent, for and on behalf of
      all Finance Parties, and the Obligors, hereby agree that, notwithstanding the provisions of such
      clause 7.7(a) of the Facilities Agreement:

      (a)   with effect on 30 June 2016 the Pre-delivery Commitment and the Delivery Commitment
            in respect of each Chinese Ship is hereby cancelled and no further amounts shall be
            available for Utilisation thereunder; and

      (b)   the Borrowers shall prepay in full the outstanding amounts of each of the Pre-Delivery
            Advances for each Chinese Ship on the earlier of:

ATH #4912036-v5

       (i)     30 September 2017 in the case of Hull No. S1024 or 31 December 2017 in the case of Hull No. S1025; and

       (ii)    the date when the relevant Owner (or the Security Agent as its assignee) in respect of the relevant Chinese Ship receives from the relevant Builder or the relevant Refund Guarantor any refund of its payment of the Building Contract Price in respect for that Chinese Ship.

5      The Agent (for and on behalf of all Finance Parties), and the Obligors further agree that, with effect on the date of this Letter and while the amounts of each of the Pre-Delivery Advances for each Chinese Ship referred to in paragraph 4(b) above remain outstanding (being $4,987,500 on the date of this Letter), the definition of "Minimum Value" in clause 1.1 of the Facilities Agreement shall be read so as to include in the Loan as referred to therein, the amounts of each of the outstanding Pre-Delivery Advances for each Chinese Ship (notwithstanding that the said definition expressly excludes the same).

6      For the avoidance of doubt, with effect on 30 June 2016, no commitment commission under clause 11.1 of the Facilities Agreement shall accrue on the cancelled amount of each Lender's Delivery Commitment in respect of each Chinese Ship.

7      The consent of the Agent in paragraphs 4 and 5 above shall not take effect unless and until the Borrowers and the Guarantor have executed this Letter, and have returned it to the Agent as so executed.

8      Failure by the Borrowers to make the prepayments required under this Letter and to comply with any of their other obligations under this Letter at the times and in the manner referred to in this Letter shall constitute an Event of Default.

9      Save as amended by this Letter, the provisions of the Facilities Agreement shall continue in full force and effect and the Facilities Agreement and this Letter shall be read and construed as one instrument.

10    This Letter is a Finance Document.

11    This Letter may be executed in any number of counterparts and by the different parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

12    This Letter and any non-contractual obligations connected with this Letter are governed by, and shall be interpreted in accordance with, English law.

Yours sincerely

.........**Penny Neville-Park**..........................

Signed by:              **Duncan Nash**
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facilities Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facilities Agreement or any other arrangements contained in this Letter.

EXECUTED as a DEED            )
by                                 )
for and on behalf of           )
**ASTIPALEA SPECIAL MARITIME ENTERPRISE** )
**KITHNOS SPECIAL MARITIME ENTERPRISE** )
**DILOS II SPECIAL MARITIME ENTERPRISE** )
**PAROS SPECIAL MARITIME ENTERPRISE** )
**OTHONI SPECIAL MARITIME ENTERPRISE** )
**SAMOTHRAKI II SHIPPING CORPORATION** )
**SHINOUSSA II SHIPPING CORPORATION** )
In the presence of: )

........................................
Director / Attorney-in-fact

*Peter. G. Kanelos*

........................................
Witness
Name: *Elena P. Vandorou*
Address: *118, Kolokotroni str. Piraeus Greece*
Occupation *Attorney-at-law*

Dated: 27 September 2016

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facilities Agreement, including the guarantee given by us under clause 7 of the Facilities Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facilities Agreement any other arrangements contained in this Letter.

EXECUTED as a DEED            )
by                                 )
for and on behalf of           )
**ELETSON GAS LLC** )
In the presence of: )

........................................
Director / Attorney-in-fact

*Peter G Kanelos*

........................................
Witness
Name: *Elena P. Vandorou*
Address: *118 Kolokotroni str. Piraeus, Greece*
Occupation *Attorney-at-law*

Dated: 27 September 2016

Private & Confidential

Dated 31 July 2018

THE ENTITIES LISTED IN SCHEDULE 1
as Borrowers

CITIBANK, N.A., LONDON BRANCH
and
SKANDINAVISKA ENSKILDA BANKEN AB (publ)
as Arrangers

with

SKANDINAVISKA ENSKILDA BANKEN AB (publ)
as Agent

SKANDINAVISKA ENSKILDA BANKEN AB (publ)
as Security Agent

guaranteed by
ELETSON GAS LLC

---

THIRD SUPPLEMENTAL AGREEMENT

relating to a Facilities Agreement

dated 24 June 2014

---

NORTON ROSE FULBRIGHT

# Contents

| Clause | | Page |
|---|---|---|
| 1 | Definitions | 2 |
| 2 | Consent of the Finance Parties | 3 |
| 3 | Amendments to the Facilities Agreement | 3 |
| 4 | Representations and warranties | 11 |
| 5 | Conditions | 12 |
| 6 | Relevant Parties' confirmations | 12 |
| 7 | Expenses | 13 |
| 8 | Miscellaneous | 14 |
| 9 | Governing Law | 14 |
| 10 | Enforcement | 14 |
| Schedule 1 The Parties | | 16 |
| Schedule 2 Documents and evidence required as conditions precedent | | 20 |

**THIS AGREEMENT** is dated 31 July 2018 and made **BETWEEN**:

(1) **THE ENTITIES** listed in Part A of Schedule 1 (*The Parties*) as borrowers (**the Borrowers**);

(2) **ELETSON GAS LLC** of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (the **Guarantor**);

(3) **EMC GAS CORPORATION** of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960 (the **Commercial Manager**);

(4) **ELETSON CORPORATION** of 80 Broad Street, Monrovia, Liberia (the **Technical Manager** and, together with the Commercial Manager, the **Managers**);

(5) **CITIBANK, N.A., LONDON BRANCH** and **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as mandated lead arrangers and bookrunners (whether acting individually or together the **Arrangers**);

(6) **THE FINANCIAL INSTITUTIONS** listed in Part C of Schedule 1 (*The Parties*) as lenders (the **Lenders**);

(7) **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as agent of the other Finance Parties (the **Agent**); and

(8) **SKANDINAVISKA ENSKILDA BANKEN AB (publ)** as security agent of the Finance Parties (the **Security Agent**).

**WHEREAS:**

(A) this Agreement is supplemental to a facilities agreement dated 24 June 2014, made between (1) the Borrowers, (2) the Guarantor, (3) the Arrangers, (4) the Lenders, (5) the Agent and (6) the Security Agent, as amended and supplemented by a side letter dated 26 June 2014, a side letter dated 3 November 2014, a side letter dated 12 November 2014, a side letter dated 19 June 2015, a supplemental agreement dated 17 July 2015 and as further amended and supplemented by a second supplemental agreement dated 14 January 2016, a letter dated 29 September 2016, a deed of release and reassignment dated 13 November 2017 and a standstill agreement dated 18 July 2018 (together the **Original Facilities Agreement**), relating to loan facilities of up to $254,179,500;

(B) the Finance Parties have agreed at the request of the Borrowers:

(a) to certain changes to the repayment terms of the Loan;

(b) to waive (i) any breach of clauses 20.2(a) and 20.2(b) of the Original Facilities Agreement which may have occurred in respect of any Measurement Period ended between 1 January 2017 and 31 December 2017 (both inclusive), (ii) any breach of clause 20.2(d) of the Original Facilities Agreement which may have occurred in respect of any Measurement Period ended between 31 December 2017 and 30 June 2018 (both inclusive) and (iii) the other Relevant Events of Default (as defined below) existing on the date of this Agreement; and

(c) to certain other amendments to the Original Facilities Agreement contained in clause 3 (*Amendments to the Facilities Agreement*); and

(C) this Agreement sets out the terms and conditions upon which the Finance Parties agree to the amendments and changes referred to in paragraph (B) above.

**NOW IT IS HEREBY AGREED** as follows:

## 1    Definitions

### 1.1    Defined expressions

Words and expressions defined in the Original Facilities Agreement shall, unless the context otherwise requires or unless otherwise defined herein, have the same meanings when used in this Agreement.

### 1.2    Definitions

In this Agreement, unless the context otherwise requires:

**Effective Date** means the date, no later than 3 August 2018, on which the Agent has notified the Borrowers that it has received the documents and evidence specified clause 5 (*Conditions*) and in Schedule 2 (*Documents and evidence required as conditions precedent*) in a form and substance satisfactory to it.

**Facilities Agreement** means the Original Facilities Agreement, as amended and supplemented by this Agreement.

**Libera Agreement** means the master agreement in relation to a certain sale and purchase and bareboat project dated 14 May 2018 and executed between Libera Corporation and the Guarantor in respect of m.v.s *Kalolimnos, Ithaki, Antikithira* and *Kithira*.

**Mortgage Addendum** means, in relation to each Mortgage over a Ship, the mortgage addendum supplemental to such Mortgage executed or (as the context may require) to be executed by the relevant Owner in favour of the Lenders and/or the other Finance Parties in the agreed form and "**Mortgage Addenda**" means all of them.

**Party** means a party to this Agreement.

**Relevant Documents** means this Agreement and the Mortgage Addenda.

**Relevant Events of Default** has the meaning given to it in the Standstill Agreement.

**Relevant Party** means each of the Borrowers, the Guarantor, the Managers or any other person who may at any time be a party to any of the Relevant Documents (other than the Finance Parties) and **Relevant Parties** means any or all of them.

**Restructuring** means the restructuring of the Facilities agreed pursuant to this Agreement.

**Standstill Agreement** means the agreement dated 18 July 2018 made between (among others) the Borrowers, the Guarantor and the Finance Parties.

**Tufton Agreement** means, together, (i) the "Barecon 2001" bareboat charterparty dated 24 May 2018 and executed between BSL MGC Limited as owner and the Guarantor as bareboat charterer in respect of m.v. *Anafi*, (ii) the "Barecon 2001" bareboat charterparty dated 24 May 2018 and executed between BSL MGC Limited as owner and the Guarantor as bareboat charterer in respect of m.v. *Tilos* and (ii) the "Barecon 2001" bareboat charterparty dated 13 July 2018 and made between Neon Limited as owner and the Guarantor as bareboat charterer in respect of m.v. *Nisyros*.

### 1.3    Interpretation of the Facilities Agreement

References in the Original Facilities Agreement to this Agreement, shall, with effect from the Effective Date and unless the context otherwise requires, be references to the Facilities

Agreement, and words such as **herein**, **hereof**, **hereunder**, **hereafter**, **hereby** and **hereto**, where they appear in the Facilities Agreement, shall be construed accordingly.

**1.4     Headings**

Clause headings and the table of contents are inserted for convenience of reference only and shall be ignored in the interpretation of this Agreement.

**1.5     Incorporation of certain references**

Clauses 1.2 (*Construction*) and 1.3 (*Third party rights*) of the Original Facilities Agreement shall be deemed to be incorporated into this Agreement in full, *mutatis mutandis*.

**1.6     Designation as Finance Document**

The Parties agree that this Agreement is and shall be designated a Finance Document.

**2     Consent of the Finance Parties**

**2.1**     The Finance Parties, relying upon the representations, warranties and undertakings on the part of the Relevant Parties contained in clause 4 (*Representations and warranties*), agree with the Relevant Parties that, subject to the terms and conditions of this Agreement and in particular, but without prejudice to the generality of the foregoing, fulfilment on or before 3 August 2018 of the conditions contained in clause 5 (*Conditions*) and in Schedule 2 (*Documents and evidence required as conditions precedent*), the Finance Parties agree, with effect on and from the Effective Date, to:

(a)     certain changes to the repayment terms of the Loan on the terms set out in clause 3;

(b)     waive (i) the application of clauses 20.2(a) and 20.2(b) of the Original Facilities Agreement, each in respect of any Measurement Period ending between 1 January 2017 and 31 December 2018 (both inclusive) and any breaches of such clauses which may have occurred in respect of any Measurement Period ended between 1 January 2017 and 31 December 2017, (ii) the application of clause 20.2(d) of the Original Facilities Agreement in respect of any Measurement Period ending between 31 December 2017 and 30 September 2018 (both inclusive) and any breaches of such clause which may have occurred in respect of any Measurement Period ended between 31 December 2017 and 30 June 2018 and (iii) the other Relevant Events of Default existing as at the date of this Agreement; and

(c)     certain other amendments to the Original Facilities Agreement on the terms set out in clause 3 (*Amendments to the Facilities Agreement*).

**3     Amendments to the Facilities Agreement**

**3.1**     With effect on and from the Effective Date, the Original Facilities Agreement shall be, and it is hereby, amended as follows:

(a)     by adding the following new definitions of "**Calculation Period**", "**Cash and Cash Equivalents**", "**Debt Service Reserve Account**", "**Deferral Period**", "**Deferred Amounts**", "**Excess Cash**", "**Excess Cash Certificate**", "**Libera Agreement**", "**Third Supplemental Agreement**" and "**Tufton Agreement**" in clause 1.1 (*Definitions*) of the Original Facilities Agreement in the correct alphabetical order:

"**Calculation Period** means each of the financial quarters of the Borrowers ending on 30 September 2018, 31 December 2018, 31 March 2019 and 30 June 2019.";

"**Cash and Cash Equivalents** has the meaning given to it in clause 20.1 (*Financial definitions*).";

"**Debt Service Reserve Account** means any account designated as a **Debt Service Reserve Account** under clause 27 (*Bank accounts*).";

"**Deferral Period** means the period commencing on 1 May 2018 and ending on 30 April 2019.";

"**Deferred Amounts** shall have the meaning given to it in clause 7.11 (*Deferral Option*).";

"**Excess Cash** means, in relation to each Calculation Period, the amount in Dollars (initially calculated by the Borrowers and re-calculated and determined by the Agent (acting on the instructions of the Majority Lenders)) pursuant to clause 7.12 (*Excess Cash recapture*)) which is equal to:

(a)   the Earnings of all Mortgaged Ships paid to all the Borrowers during that Calculation Period;

less

(b)   the total voyage and operating expenses and costs (including, without limitation, maintenance cost, crew wages, insurance costs, management fees, dry-docking cost, improvement costs and overhead expenses) actually paid in relation to the Mortgaged Ships and the total cost of any intermediate or special survey actually paid for the Mortgaged Ships, in each case during such Excess Cash Calculation Period,

less

(c)   the amount of all scheduled repayments of principal, interest and other financing costs paid to the Finance Parties under the Finance Documents during such Calculation Period.";

"**Excess Cash Certificate** shall have the meaning given to it in clause 19.2.1(c).";

"**Libera Agreement** means the master agreement in relation to a certain sale and purchase and bareboat project dated 14 May 2018 and executed between Libera Corporation and the Guarantor in respect of m.v.s *Kalolimnos*, *Ithaki*, *Antikithira* and *Kithira*.";

"**Third Supplemental Agreement** means the agreement dated 31 July 2018 supplemental to this Agreement made between (among others) the Obligors and the Finance Parties.";

"**Tufton Agreement** means, together, (i) the "Barecon 2001" bareboat charterparty dated 24 May 2018 and executed between BSL MGC Limited as owner and the Guarantor as bareboat charterer in respect of m.v. *Anafi*, (ii) the "Barecon 2001" bareboat charterparty dated 24 May 2018 and executed between BSL MGC Limited as owner and the Guarantor as bareboat charterer in respect of m.v. *Tilos* and (ii) the "Barecon 2001" bareboat charterparty dated 13 July 2018 and made between Neon Limited as owner and the Guarantor as bareboat charterer in respect of m.v. *Nisyros*.";

(b)   by adding the words "the Third Supplemental Agreement," after the words "this Agreement, the Supplemental Agreement, the Second Supplemental Agreement" in the definition of "Finance Documents" in clause 1.1 (*Definitions*) of the Original Facilities Agreement;

(c)   by inserting the following new clauses 7.11 (*Deferral Option*) and 7.12 (*Excess Cash recapture*) after clause 7.10 (*Mandatory repayment and cancellation of FATCA Protected Lenders*) of the Original Facilities Agreement:

'7.11   **Deferral Option**

(a)   Subject to the other provisions of this clause 7.11, the Borrowers may elect to defer payment of up to 90% of the amount of the four (4) instalments in respect of each Delivery Advance falling due for payment under clause 6.2 (*Scheduled repayment of Delivery Facility*) during the Deferral Period (namely, 90% of a total of 20 repayment instalments under all five (5) Delivery Advances).

(b)   Any part of the instalments in respect of each Delivery Advance which has been deferred pursuant to this clause (the **Deferred Amounts**), shall be repaid together with the Balloon Instalment for that Delivery Advance.

(c)   The deferral option under this clause 7.11 for each instalment in respect of each Delivery Advance shall be exercisable by the Borrowers by a written irrevocable notice from the Borrowers to the Agent (a **Deferral Notice**), specifying the relevant instalment (and its relevant Delivery Advance) and the relevant amount which is to be deferred, and the Borrowers shall send such Deferral Notice to the Agent not later than ten (10) days prior to the Repayment Date for such Delivery Advance on which the relevant part of the instalment for such Delivery Advance to be deferred would, but for such proposed deferral, have been due.

(d)   The deferral option for each instalment in respect of each Delivery Advance shall only be exercisable and the instalment referred to in a Deferral Notice shall only be deferred pursuant to this clause 7.11, if all of the following conditions have been satisfied in form and substance satisfactory to the Agent (acting on the instructions of all the Lenders) in all respects:

(i)   the Deferral Notice is received by the Agent no later than the relevant date specified in paragraph (c) above (except if accepted by the Finance Parties at any other time pursuant to clause 3.2 of the Third Supplemental Agreement); and

(ii)   no Event of Default shall have occurred and be continuing.

7.12   **Excess Cash recapture**

(a)   Following an initial calculation of the same made by the Borrowers as set out in the Excess Cash Certificate delivered to the Agent under clause 19.2.1(c) together with the unaudited financial statements of the Borrowers provided to the Agent under clause 19.1.1(d) in respect of each Calculation Period, the Agent (acting on the instructions of the Majority Lenders) shall be entitled to re-calculate and determine the amount of the Excess Cash for each Calculation Period and the amount of Cash and Cash Equivalents as at the last day of the relevant Calculation Period, in each case by reference to such unaudited financial statements of the Borrowers and the relevant Excess Cash Certificate.

(b)   Following each such determination by the Agent (acting on the instructions of the Majority Lenders) of the amount of Excess Cash for the relevant Calculation Period, the Agent shall notify the Borrowers and the Lenders of the amount of such Excess Cash for that Calculation Period.

(c)     If the amount of Excess Cash in respect of a Calculation Period notified by the Agent to the Borrowers is a positive figure, the Borrowers shall prepay to the Agent (for the account of the Lenders) a part of the Delivery Advances equal to such notified amount of Excess Cash.

(d)     Following an initial calculation of the same made by the Borrowers as set out in the Excess Cash Certificate delivered to the Agent under clause 19.1.1(c) together with the audited annual financial statements of the Borrowers provided to the Agent under clause 19.1.1(e) in respect of each annual Calculation Period, the Agent (acting on the instructions of the Majority Lenders) shall be entitled to re-calculate and determine the amount of the Excess Cash for each Calculation Period and the amount of Cash and Cash Equivalents as at the last day of such Calculation Period, in each case by reference to such audited annual financial statements of the Borrowers and the relevant Excess Cash Certificate.

(e)     Following such determination by the Agent (acting on the instructions of the Majority Lenders), the Agent (acting on the instructions of the Majority Lenders) shall also determine the amount of Excess Cash for the relevant annual Calculation Period minus any amount of Excess Cash previously paid by the Borrowers under this clause 7.12 for quarterly Calculation Periods which were part of such annual Calculation Period, and it shall notify the Borrowers and the Lenders of such amount (**Residual Amount**). If the Residual Amount in respect of an annual Calculation Period notified by the Agent to the Borrowers is a positive figure, it shall be treated as Excess Cash for the purposes of this Agreement and the Borrowers shall prepay to the Agent (for the account of the Lenders) a part of the Delivery Advances equal to such notified sum of Residual Amount.

(f)     Each prepayment under this clause 7.12 shall be applied by the Agent pro rata as between the Delivery Advances and as regards each Delivery Advance, first, in reduction of the Deferred Amounts of such Delivery Advance, until they have been reduced to zero and, secondly, in reduction of the remaining instalments (including its Balloon Instalment) of such Delivery Advance under clause 6.2 (*Scheduled repayment of Delivery Facility*) pro rata.

(g)     Any prepayment under this clause 7.12 shall be due and payable on the later of (a) 5 days after the relevant notification of Excess Cash (including Residual Amount, where applicable) was made by the Agent to the Borrowers and (b) the next Repayment Date for any Delivery Advance.

(h)     Any calculation, re-calculation or determination made by the Agent (acting on the instructions of the Majority Lenders) pursuant to this clause 7.12 shall be conclusive and binding on the Borrowers.

(i)     For the avoidance of doubt, the Agent (acting on the instructions of the Majority Lenders) shall be entitled to make a calculation, re-calculation or determination of Excess Cash (or, Residual Amount, where applicable) and, where applicable, require a prepayment under this clause 7.12 every time it receives financial statements of the Borrowers in respect of one or more Calculation Periods.

(j)     The Borrowers' obligation to make any pre-payments on account of Excess Cash (or, Residual Amount, where applicable) under this clause 7.12 shall apply only if the Cash and Cash Equivalents as at the last day of the relevant Calculation Period is higher than $40,000,000.";

(d)     by adding the following clause 18.19.3 after clause 18.19.2 of the Original Facilities Agreement:

"18.19.3    No Obligor has granted in favour of any lender or creditor of any Financial Indebtedness of any Group Member as at the Effective Date (as defined in the Third Supplemental Agreement) any excess cash recapture provisions more favourable than those granted to the Finance Parties or any of them under this Agreement.";

(e)     by adding the following new paragraphs (d)" and "(e)" after paragraph (c) of clause 19.1.1 of the Original Facilities Agreement, by deleting the word "and" from the end of paragraph (b) of the said clause and by also replacing the symbol "." at the end of paragraph (c) of the said clause with the symbol ";":

"(d)    the unaudited financial statements of the Borrowers for each financial quarter (each being a Calculation Period) of the Borrowers as soon as the same become available, but in any event within 60 days after the end of each such financial quarter; and

(e)     the audited financial statements of the Borrowers for each of its financial year as soon as the same become available, but in any event within 120 days after the end of each of its financial year.";

(f)     by adding the following new sub-paragraph "(c)" after paragraph (b) in clause 19.2.1 of the Original Facilities Agreement, by deleting the word "and" at the end of paragraph (a) of the said clause and by replacing the symbol "." at the end of paragraph (b) of the said clause with the symbol and word "; and":

"(c)    with each set of unaudited or audited financial statements of the Borrowers delivered to the Agent under clause 19.1 (*Financial statements*), a certificate (an **Excess Cash Certificate**) in form and substance satisfactory to the Majority Lenders, setting out a detailed calculation, analysis and break-down by the Borrowers of the Excess Cash in respect of the relevant Calculation Period and the amount of Cash and Cash Equivalents as at the last day of that Calculation Period. Each Excess Cash Certificate shall be signed by an authorised signatory or the Borrowers and certified as to its correctness by the Chief Financial Officer of the Guarantor.";

(g)     by adding the words "and audited financial statements of the Borrowers delivered pursuant to paragraph (e) of clause 19.1.1" before the words "shall be audited by the Auditors" in clause 19.3.1 of the Original Facilities Agreement;

(h)     by adding the words "and audited financial statements of the Borrowers delivered pursuant to paragraph (e) of clause 19.1.1" after the words "(in the case of Annual Financial Statements" in paragraph (b) of clause 19.3.2 of the Original Facilities Agreement;

(i)     by adding the following new clauses 21.17 (*Debt Service Reserve Account*), 21.18 (*Borrowers' minimum liquidity*) and 21.19 (*Refinancing matters and other conditions subsequent*) after clause 21.16 (*Bribery and corruption*) of the Original Facilities Agreement:

"21.17    **Debt Service Reserve Account**

The Obligors undertake that by 30 September 2018, the Guarantor shall:

(a)     open in its name the Debt Service Reserve Account;

(b)     execute Account Security in respect of the Debt Service Reserve Account and any notice required to be given to an Account Bank thereunder and promptly procure the service of any such notice on

the Account Bank and procure the acknowledgement of such notice by the Account Bank in the manner required by the relevant Account Security; and

(c)    deliver to the Agent such documents and evidence of the type referred to in Part 1 of Schedule 3 (*Conditions precedent to any Utilisation*) in relation to the relevant Account Security, the relevant notice and its acknowledgment (including, but without limitation, legal opinions regarding the valid execution and binding effect thereof) as the Agent (acting on the instructions of all the Lenders) may require,

in each case at the cost and expense of the Guarantor.

21.18    **Guarantor's minimum liquidity**

21.18.1    Subject to clause 21.18.2, the Guarantor undertakes that it will maintain in the Debt Service Reserve Account credit balances of no less than:

(a)    at all times during the Deferral Period, $3,973,488.63; and

(b)    at all times thereafter but only for as long as Deferred Amounts in respect of any Delivery Advances remain outstanding, $8,415,888.63.

21.18.2    Notwithstanding clause 21.18.1, until the date when the Guarantor has complied with the undertakings of clause 21.17 (*Debt Service Reserve Account*) to the satisfaction of the Lenders, the credit balances set out n clause 21.18.1 above shall be maintained in the Earnings Account of Othoni Special Maritime Enterprise in accordance with clause 27.1.5.

21.19    **Refinancing matters and other conditions subsequent**

The Obligors shall provide, to the satisfaction of the Majority Lenders by no later than 10 August 2018 evidence in form and substance satisfactory to the Majority Lenders that:

(a)    a certain facility agreement dated 22 April 2016 (as amended or supplemented from time to time) to which Citibank, N.A., BNP Paribas and Skandinaviska Enskilda Banken AB (publ) are lenders and the Guarantor is guarantor (the **BNPP Facility**), has been irrevocably cancelled and all outstanding amounts of principal, interest and other Financial Indebtedness of the Group thereunder has been prepaid in full;

(b)    Hull No 8209 has been sold and all the Financial Indebtedness under the BNPP Facility has been fully refinanced under the Libera Agreement; and

(c)    the mv *Nisyros*, previously financed under a certain facility agreement dated 30 December 2009 (as amended or supplemented from time to time) to which UniCredit Bank AG, Credit Suisse and Deutsche Bank AG are lenders and the Guarantor is guarantor, has been sold and all outstanding amounts of principal, interest and other Financial Indebtedness of the Group thereunder has been fully refinanced under the arrangements of Tufton Agreement.";

(j)    by adding the words "(but not before the Borrowers have made the relevant prepayment to the Lenders required under clause 7.12 (*Excess Cash recapture*) on account of Excess Cash for a Calculation Period)" after the words "and the Finance Documents" in the fourth line of clause 27.1.4 of the Original Facilities Agreement;

(k)    by adding the words "(but subject to such withdrawal not resulting in a breach of clause 21.18.2)" after the words "and each Owner may withdraw moneys from an Earnings Account" in clause 27.1.4 of the Original Facilities Agreement;

(l)    by inserting the following new clause 27.2 (*Debt Service Reserve Account*) after the existing clause 27.1 (*Earnings Account*) of the Original Facilities Agreement and by re-numbering the existing clause 27.2 (*Other provisions*) of the Original Facilities Agreement as clause 27.3 (*Other provisions*):

    "27.2    **Debt Service Reserve Account**

        (a)    The Guarantor shall be the holder of an Account with Citibank, N.A., London Branch as Account Bank which is designated as a "**Debt Service Reserve Account**" for the purposes of the Finance Documents.

        (b)    Except with prior approval by the Majority Lenders, the Guarantor shall not withdraw amounts standing to the credit of the Debt Service Reserve Account.";

(m)    by deleting clause 28.7 (*Contracts and arrangements with Affiliates*) of the Original Facilities Agreement and by replacing it with the following new clause 28.7 (*Contracts and arrangements with Affiliates*):

    "28.7    **Contracts and arrangements with Affiliates**

        No Borrower (and the Obligors shall procure that no other Group Member) shall be a party to any arrangement or contract with any of its Affiliates unless and only when the Deferred Amounts in respect of all Delivery Advances have been reduced to zero and such arrangement or contract is on arm's length basis.";

(n)    by adding the following new paragraph "28.9.2" after the end of the existing paragraph in clause 28.9 (*Acquisitions and investments*) of the Original Facilities Agreement and by also numbering the said existing paragraph as "28.9.1:

    "28.9.2    The Guarantor shall procure that no other Group Member (other than the Borrowers) shall acquire any person, business, assets or liabilities or make any investment in any person or business or enter into any joint-venture arrangement except when the Deferred Amounts in respect of all Delivery Advances have been reduced to zero.";

(o)    by deleting clause 28.12 (*Distributions and other payments*) of the Original Facilities Agreement and by replacing it with the following new clause 28.12 (*Distributions and other payments*):

    "28.12    **Distributions and other payments**

        None of the Obligors who are Parties shall:

        (a)    declare or pay (including by way of set-off, combination of accounts or otherwise) any dividend or redeem or make any other distribution or payment (whether in cash or in specie), including any interest and/or unpaid dividends, in respect of its equity, membership interests or any other share capital or any warrants for the time being in issue; or

        (b)    make any payment (including by way of set-off, combination of accounts or otherwise) by way of interest, or repayment, redemption,

purchase or other payment, in respect of any shareholder loan, loan stock or similar instrument,

except if the Deferred Amounts in respect of all Delivery Advances have been reduced to zero and no Default is continuing at the time of the declaration or payment of any such dividend, distribution or other payment, nor would result from the declaration or payment of the same and the Obligors would be in compliance with their obligations under clause 20 (*Financial covenants*) immediately after declaration and payment of the same if the financial covenants were tested then.";

(p)   by inserting the following new clause 28.13 (*No charter-in*) after the existing clause 28.12 (*Distributions and other payments*) of the Original Facilities Agreement:

"**28.13      No charter-in**

Except with approval by all the Lenders, the Obligors shall not, and they shall procure that no Group Member will, charter-in any vessel;"; and

(q)   by adding the following new clause 35.13 (*Contractual recognition of bail-in*) after clause 35.12 (*Impaired Agent*) of the Original Facilities Agreement:

"**35.13      Contractual recognition of bail-in**

35.13.1   Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(a)   any Bail-In Action in relation to any such liability, including (without limitation):

(i)   a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(ii)   a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

(iii)   a cancellation of any such liability; and

(b)   a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

35.13.2   In this Agreement and (unless otherwise defined in the relevant Finance Document) the other Finance Documents:

**Bail-In Action** means the exercise of any Write-down and Conversion Powers.

**Bail-In Legislation** means:

(a)   in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or

regulation as described in the EU Bail-In Legislation Schedule from time to time; and

(b) in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

**EEA Member Country** means any member state of the European Union, Iceland, Liechtenstein and Norway.

**EU Bail-In Legislation Schedule** means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

**Resolution Authority** means any body which has authority to exercise any Write-down and Conversion Powers.

**Write-down and Conversion Powers** means:

(a) in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and

(b) in relation to any other applicable Bail-In Legislation:

(i) any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(ii) any similar or analogous powers under that Bail-In Legislation.".

**3.2   Deferral Notices**

With effect on and from the Effective Date, the Borrowers hereby give the Agent notice under clause 7.11 (*Deferral Option*) of the Facilities Agreement that they wish to defer 90% of the instalments of each Delivery Advance falling during the Deferral Period, and the Agent and each Finance Party hereby accept such notice. This notice shall constitute a Deferral Notice under and for the purposes of clause 7.11 (*Deferral Option*) of the Facilities Agreement in respect of all such repayment instalments of each such Delivery Advance referred to in clause 7.11(a) of the Facilities Agreement.

**4   Representations and warranties**

**4.1   Representations and warranties under the Facilities Agreement**

The Relevant Parties make the representations and warranties set out in clause 18 (*Representations*) of the Facilities Agreement to the Original Lenders on the date of this Agreement and on the Effective Date as if made on such date with reference to the facts and circumstances existing at each such date.

## 5    Conditions

### 5.1    Documents and evidence

The consent and waivers of the Finance Parties referred to in clause 2 (*Consent of the Finance Parties*) shall be subject to the receipt by the Agent or its duly authorised representative, on or before 3 August 2018, of the documents and evidence specified in Schedule 2 (*Documents and evidence required as conditions precedent*) in form and substance satisfactory to the Agent (acting on the instructions of the Majority Lenders). The Agent shall notify the Borrowers promptly upon being so satisfied.

### 5.2    General conditions precedent

The consent and waivers of the Finance Parties referred to in clause 2 (*Consent of the Finance Parties*) shall be further subject to:

5.2.1    the representations and warranties in clause 4 (*Representations and warranties*) being true and correct on the Effective Date as if each was made with respect to the facts and circumstances existing at such time; and

5.2.2    no Event of Default (other than the Relevant Events of Default) having occurred at the time of the Effective Date.

### 5.3    Waiver of conditions precedent

The conditions specified in this clause 5 are inserted solely for the benefit of the Finance Parties and may be waived on their behalf in whole or in part with or without conditions by the Agent (acting on the instructions of all the Lenders).

## 6    Relevant Parties' confirmations

### 6.1    Finance Documents

Each of the Relevant Parties hereby confirms its consent to the amendments to the Original Facilities Agreement and the waivers and other arrangements contained in this Agreement, and agrees and acknowledges that:

6.1.1    each Finance Document to which it is a party extends, in accordance with its terms, to the obligations of the Borrowers arising under the Original Facilities Agreement as amended by this Agreement;

6.1.2    the Finance Documents to which such Relevant Party is a party and the obligations of such Relevant Party thereunder (including the Guarantee) and any Security Interests contained therein, are not otherwise affected by this Agreement and the other Relevant Documents or anything contained in them or in this Agreement, and they shall remain and continue in full force and effect notwithstanding the amendments to, the Original Facilities Agreement and the waivers and other arrangements contained in this Agreement; and

6.1.3    with effect from the Effective Date references in the Finance Documents to which such Relevant Party is a party to "the Agreement" or "the Facility Agreement" or "the Facilities Agreement" or "the Loan Agreement" (or equivalent or similar references) shall henceforth be references to the Original Facilities Agreement as amended and supplemented by this Agreement and as from time to time hereafter amended and shall also be deemed to include this Agreement and the obligations of the Borrowers hereunder.

**6.2     Reservation**

Each of the Relevant Parties and the Finance Parties agree and acknowledge that:

(a)     neither this Agreement nor the other arrangements contained in this Agreement (including the Relevant Documents) nor any other act or omission by a Finance Party constitutes a waiver by a Finance Party of any rights or remedies available under any Finance Document, whether in relation to any Events of Default or otherwise (other than the waiver of the Relevant Events of Default contained herein); and

(b)     the rights of a Finance Party (including any rights to receive payment) to take any action at any time or pursue any remedy available to it, whether pursuant to applicable law or contract, at any time, are expressly reserved, whether in relation to any Event of Default (other than the Relevant Events of Default) or otherwise.

## 7     Expenses

**7.1     Fees**

The Borrowers agree with the Lenders that they shall pay to each Lender an amendment and restructuring fee of $50,000 on or before the date of this Agreement.

**7.2     Expenses**

The Borrowers agree to pay to the Finance Parties on a full indemnity basis on demand all expenses (including legal and out-of-pocket expenses) incurred by any of them:

7.2.1     in connection with the negotiation, preparation, execution and, where relevant, registration of this Agreement and the other Relevant Documents   and of any amendment or extension of or the granting of any waiver or consent under this Agreement or the other Relevant Documents; and

7.2.2     in contemplation of, or otherwise in connection with, the enforcement of, or preservation of any rights under this Agreement or the other Relevant Documents or otherwise in respect of the monies owing and obligations incurred under this Agreement and the other Relevant Documents, together with interest at the rate and in the manner referred to in clause 8.3 of the Original Facilities Agreement from the date on which such expenses were incurred, to the date of payment (after, as well as before judgment).

**7.3     Value Added Tax**

All fees and expenses payable pursuant to this clause 7 shall be paid together with value added tax or any similar tax (if any) properly chargeable thereon. Any value added tax chargeable in respect of any services supplied by any of the Finance Parties under this Agreement shall, on delivery of the value added tax invoice, be paid in addition to any sum agreed to be paid hereunder.

**7.4     Stamp and other duties**

The Borrowers shall pay and, within three (3) Business Days of demand, indemnify each Finance Party against any cost, loss or liability that Finance Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of this Agreement and any other Relevant Documents.

## 8    Miscellaneous

### 8.1    Counterparts

This Agreement may be executed in any number of counterparts and by the different Parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

### 8.2    Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision in any other respect or under the law of any other jurisdiction will be affected or impaired in any way.

### 8.3    Notices

The provisions of clause 37 (*Notices*) of the Original Facilities Agreement shall extend and apply to the giving or making of notices or demands hereunder as if the same were expressly stated herein and as if references therein to "Obligors" included all Relevant Parties.

### 8.4    Borrowers' obligations

Notwithstanding anything to the contrary contained in this Agreement, the agreements, obligations and liabilities of the Borrowers herein contained are joint and several and shall be construed accordingly. Each of the Borrowers agrees and consents to be bound by this Agreement notwithstanding that the other Borrowers which were intended to sign or be bound may not do so or be effectually bound and notwithstanding that this Agreement may be invalid or unenforceable against the other Borrowers whether or not the deficiency is known to the Agent. The Agent shall be at liberty to release any of the Borrowers from this Agreement and to compound with or otherwise vary the liability or to grant time and indulgence to make other arrangements with any of the Borrowers without prejudicing or affecting the rights and remedies of the Agent against the other Borrowers.

### 8.5    Contractual recognition of bail-in

Without prejudice to clause 1.2 (*Construction*), the provisions of clause 35.13 (*Contractual recognition of bail-in*) to the Facilities Agreement shall apply to:

(a)     each of the Finance Documents to which each of the Relevant Parties (other than the Borrowers and the Guarantors) is a party; and

(b)     any liability of any of the Finance Parties to such Relevant Parties under or in connection with such Finance Documents,

as if set out in such Finance Documents but with all necessary changes and as if references to Finance Documents referred to such Finance Documents.

## 9    Governing Law

This Agreement and any non-contractual obligations connected with it shall be governed by English law.

## 10    Enforcement

### 10.1    Jurisdiction

10.1.1     The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or

termination of this Agreement) or any non-contractual obligations connected with this Agreement (a **Dispute**).

10.1.2  The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

10.1.3  This clause 10.1 is for the benefit of the Finance Parties only. As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

**10.2    Service of process**

Without prejudice to any other mode of service allowed under any relevant law, each of the Relevant Parties:

(a)     irrevocably appoints Eletson Maritime Limited at present of 3 Crane Court, Fleet Street, London, EC4A 2EJ, England, as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement (including any non-contractual obligations in connection with it); and

(b)     agrees that failure by a process agent to notify any Relevant Party of the process will not invalidate the proceedings concerned.

**IN WITNESS** whereof the parties to this Agreement have caused this Agreement to be duly executed as a deed on the date first above written.

**Schedule 1**
**The Parties**

**Part A**
**The Borrowers**

| | |
|---|---|
| **Name:** | Samothraki II Shipping Corporation |
| **Original Jurisdiction of formation** | Republic of Liberia |
| **Registration number (or equivalent, if any)** | C-117112 |
| **English process agent (if not incorporated in England)** | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| **Registered office** | 80 Broad Street, Monrovia, Liberia |
| **Address for service of notices** | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| | |
|---|---|
| **Name:** | Shinoussa II Shipping Corporation |
| **Original Jurisdiction of formation** | Republic of Liberia |
| **Registration number (or equivalent, if any)** | C-117113 |
| **English process agent (if not incorporated in England)** | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| **Registered office** | 80 Broad Street, Monrovia, Liberia |
| **Address for service of notices** | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| | |
|---|---|
| **Name:** | Astipalea Special Maritime Enterprise |
| **Original Jurisdiction of formation** | Greece |
| **Registration number (or equivalent, if any)** | 4837 |
| **English process agent (if not incorporated in England)** | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| **Registered office** | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| **Address for service of notices** | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Othoni Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4834 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Paros Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4838 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Kithnos Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4867 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

| Name: | Dilos II Special Maritime Enterprise |
|---|---|
| Original Jurisdiction of formation | Greece |
| Registration number (or equivalent, if any) | 4868 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | 62 Iroon Polytechneiou Avenue, Piraeus 18535, Greece |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

Guarantor

| Name: | Eletson Gas LLC |
|---|---|
| Original Jurisdiction of formation | Republic of Marshall Islands |
| Registration number (or equivalent, if any) | 962359 |
| English process agent (if not incorporated in England) | Eletson Maritime Limited, 3 Crane Court, Fleet Street, London, EC4A 2EJ, England |
| Registered office | Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands |
| Address for service of notices | Eletson Corporation, 118 Kolokotroni Street, GR 185-35, Piraeus, Greece |

Part B

The Lenders

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|
| Name | Citibank, N.A., London Branch |
| Name | UniCredit Bank AG |
| Name | BNP Paribas |
| Name | NIBC Bank N.V. |

The Agent

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|

The Security Agent

| Name | Skandinaviska Enskilda Banken AB (publ) |
|------|------------------------------------------|

The Arrangers

| Name | Citibank, N.A., London Branch |
|------|--------------------------------|
| Name | Skandinaviska Enskilda Banken AB (publ) |

**Schedule 2**
**Documents and evidence required as conditions precedent**

1    **Corporate documents**

(a)    A copy of the constitutional documents of each Relevant Party or a written statement by legal advisers to the Original Borrowers that the same remain unchanged from those delivered to the Agent at the time of signing of the Original Facilities Agreement.

(b)    A copy of a resolution of the board of directors of each Relevant Party (or any committee of such board empowered to approve and authorise the following matters):

   (i)    approving the terms of, and the transactions contemplated by, the Relevant Documents to which it is a party and resolving that it execute the Relevant Documents;

   (ii)   authorising a specified person or persons to execute the Relevant Documents on its behalf; and

   (iii)  authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with the Relevant Documents to which it is a party.

(c)    If applicable, a copy of a resolution of the board of directors of the relevant company, establishing any committee referred to in paragraph (b) above and conferring authority on that committee.

(d)    A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(e)    A copy of a resolution signed by all the holders of the issued shares or membership interests in each Relevant Party, approving the terms of, and the transactions contemplated by, the Relevant Documents to which such Relevant Party is a party.

(f)    A certificate of the Guarantor signed by a director confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on any Relevant Party to be exceeded.

(g)    A copy of any power of attorney under which any person is to execute any of the Relevant Documents on behalf of any Relevant Party.

(h)    A certificate of an authorised signatory of the relevant Relevant Party certifying that each copy document relating to it specified in this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement and that any such resolutions or power of attorney have not been revoked.

2    **Mortgage addenda**

evidence that the Mortgage Addenda have been:

(a)    duly executed and delivered; and

(b)    registered against the relevant Ships through the relevant registry under the Greek flag.

3   **Legal opinions**

Such legal opinions as the Agent (acting on the instructions of all the Lenders) may require in agreed form.

4   **Agreements with other lenders**

Evidence in form and substance satisfactory in all respects to the Agent (acting on the instructions of all the Lenders) that:

(a)   at least 90% of the total amount in Dollars of any payments of principal (including balloon payments) owing, including but not limited to DVB Bank SE under certain facilities agreement, by any Group Member in respect of Financial Indebtedness of the Group (excluding leasing transactions) and falling due during the Deferral Period (as defined in the Facilities Agreement) has been approved to be deferred or otherwise rescheduled on terms similar or comparable to the terms agreed in this Agreement in respect of the Delivery Advances; and

(b)   waivers of financial covenants have been agreed by DVB Bank SE and the Guarantor and certain other Group Members under a certain facility agreement dated 17 October 2013 (as amended or supplemented from time to time) to which they are a party in respect of m.v.s *Telendos*, *Symi* and *Mathraki*, on terms similar or comparable to the terms agreed in this Agreement and maturity of the said facility has been extended to not earlier than 1 May 2019.

5   **Tufton Agreement and Libera Agreement**

Evidence in form and substance satisfactory in all respects to the Agent (acting on the instructions of the Majority Lenders) that:

(a)   the Libera Agreement is in full force and effect and the relevant sales and drawdowns thereunder have been effected in accordance with its terms;

(b)   Hull Nos 8210, 8213 and 8214 have been sold;

(c)   the Tufton Agreement is in full force and effect and the relevant sales and drawdowns thereunder have been effected in accordance with its terms (except in respect of m.v. *Nisyros*); and

(d)   each of the mvs *Tilos* and *Anafi*, previously financed under a certain facility agreement dated 30 December 2009 (as amended or supplemented from time to time) to which UniCredit Bank AG, Credit Suisse and Deutsche Bank AG are lenders and the Guarantor is guarantor, have been sold.

6   **Blackstone facility**

Evidence in form and substance satisfactory in all respects to the Agent (acting on the instructions of all the Lenders) that a facility agreement in respect of a loan of up to $15,000,000 between Blackstone Eletson Holdings L.P., Blackstone Family Tactical Opportunities Investment Partnership (Cayman) ESC L.P. and Blackstone Family Tactical Opportunities Investment Partnership (Cayman) SMD L.P. as lenders and the Guarantor as borrower is in full force and effect, in form and substance satisfactory to the Lenders.

7   **Restructuring**

Evidence in form and substance in all respects satisfactory to all the Lenders that the other creditors of any Group Member have agreed to the restructuring of all of their other Financial Indebtedness on terms that are similar to the Restructuring in respect of the Facilities and in a manner satisfactory to the Lenders in their absolute and unfettered discretion.

**8    Other documents and evidence**

A letter from each of the Relevant Parties' agent for receipt of service of proceedings accepting its appointment under this Agreement and/or the other Relevant Documents in which it is or is to be appointed as such Relevant Party's process agent.

**SIGNATURES**

**THE BORROWERS**

**EXECUTED as a DEED**
by *Eleni   P. Vandorou*
for and on behalf of
**SAMOTHRAKI II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)   ...................................
)   Attorney-in-fact
)
)

Witness
Name:                EMMANOUIL S. ANDREOULAKIS
Address:                      LAWYER
                       110, KOLOKOTRONI STREET
                        185 35 PIRAEUS - GREECE
Occupation:     TEL. 30210 4598325 · FAX: 30210 4599025.
                         V.A.T, No. 050892448

**EXECUTED as a DEED**
by *Eleni   P. Vandorou*
for and on behalf of
**SHINOUSSA II SHIPPING CORPORATION**
as Borrower
in the presence of:

)
)
)   ...................................
)   Attorney-in-fact
)
)

Witness
Name:                EMMANOUIL S. ANDREOULAKIS
Address:                      LAWYER
                       110, KOLOKOTRONI STREET
                        185 35 PIRAEUS - GREECE
Occupation:     TEL. 30210 4598325 · FAX: 30210 4599025
                         V.A.T, No. 050892448

**EXECUTED as a DEED**
by *Eleni   P. Vandorou*
for and on behalf of
**ASTIPALEA SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)   ...................................
)   Attorney-in-fact
)
)

Witness
Name:                EMMANOUIL S. ANDREOULAKIS
Address:                      LAWYER
                       110, KOLOKOTRONI STREET
                        185 35 PIRAEUS - GREECE
Occupation:     TEL. 30210 4598325 · FAX: 30210 4599025
                         V.A.T, No. 050892448

EXECUTED as a DEED
by *Eleni P. Vandorou*
for and on behalf of
**OTHONI SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)  ....................................
)  Attorney-in-fact
)
)

Witness
Name:
Address:           EMMANOUIL S. ANDREOULAKIS
Occupation:                    LAWYER
                        118, KOLOKOTRONI STREET
                        185 35 PIRAEUS · GREECE
                   TEL. 30210 4598125 · FAX. 30210 4598250
                          V.A.T. No. 058622449

EXECUTED as a DEED
by *Eleni P. Vandorou*
for and on behalf of
**PAROS SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)  ....................................
)  Attorney-in-fact
)
)

Witness
Name:
Address:           EMMANOUIL S. ANDREOULAKIS
Occupation:                    LAWYER
                        118, KOLOKOTRONI STREET
                        185 35 PIRAEUS · GREECE
                   TEL. 30210 4598125 · FAX. 30210 4598250
                          V.A.T. No. 058622449

EXECUTED as a DEED
by *Eleni P. Vandorou*
for and on behalf of
**KITHNOS SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)  ....................................
)  Attorney-in-fact
)
)

Witness
Name:
Address:           EMMANOUIL S. ANDREOULAKIS
Occupation:                    LAWYER
                        118, KOLOKOTRONI STREET
                        185 35 PIRAEUS · GREECE
                   TEL. 30210 4598125 · FAX. 30210 4598250
                          V.A.T. No. 058622449

EXECUTED as a DEED
by *Eleni P. Vandorou*
for and on behalf of
**DILOS II SPECIAL MARITIME ENTERPRISE**
as Borrower
in the presence of:

)
)
)  ....................................
)  Attorney-in-fact
)
)

Witness
Name:
Address:           EMMANOUIL S. ANDREOULAKIS
Occupation:                    LAWYER
                        118, KOLOKOTRONI STREET
                        185 35 PIRAEUS · GREECE
                   TEL. 30210 4598125 · FAX. 30210 4598250
                          V.A.T. No. 058622449

ATH-#5468516-v7

**THE GUARANTOR**

**EXECUTED as a DEED**
by   *Eleu.  P. Venditou*
for and on behalf of
**ELETSON GAS LLC**
as Guarantor
in the presence of:

)
)
)
)
)
)

.............................
Attorney-in-fact

Witness
Name:
Address:
Occupation:

EMMANOUIL S. ANDREOULAKIS
LAWYER
110, KOLOKOTRONI STREET
185 35 PIRAEUS · GREECE
TEL.30210 4550325 · FAX: 30210 455825
V.A.T. No. 050227499

**THE COMMERCIAL MANAGER**

**EXECUTED as a DEED**
by   *Eleu. P. Venditou*
for and on behalf of
**EMC GAS CORPORATION**
as Commercial Manager
in the presence of:

)
)
)
)

.............................
Attorney-in-fact

Witness
Name:
Address:
Occupation:

EMMANOUIL S. ANDREOULAKIS
LAWYER
110, KOLOKOTRONI STREET
185 35 PIRAEUS · GREECE
TEL.30210 4550325 · FAX: 30210 455825
V.A.T. No. 050227499

**THE TECHNICAL MANAGER**

**EXECUTED as a DEED**
by   *Eleu.  P. Venditou*
for and on behalf of
**ELETSON CORPORATION**
as Technical Manager
in the presence of:

)
)
)
)

.............................
Attorney-in-fact

Witness
Name:
Address:
Occupation:

EMMANOUIL S. ANDREOULAKIS
LAWYER
110, KOLOKOTRONI STREET
185 35 PIRAEUS · GREECE
TEL. 30210 4550325 · FAX: 30210 455825
V.A.T. No. 050227499

**THE ARRANGERS**

**EXECUTED as a DEED**
by *Vassilis Marolis*
for and on behalf of
**CITIBANK, N.A., LONDON BRANCH**
as Arranger
in the presence of:

)
)
)
)
)
)

Attorney-in-fact   *Authorised Signatory*

Witness:
Name: BRIAN LAMBE
Address: CITIGROUP CENTRE, LONDON E14 5LB
Occupation: BANKER

**EXECUTED as a DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Arranger
in the presence of:

)
)
)
)
)
)

.............................
**Attorney-in-fact**

.............................
Witness
Name:
Address:
Occupation:

**THE AGENT**

**EXECUTED as a DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent
in the presence of:

)
)
)
)
)
)

.............................
**Attorney-in-fact**

.............................
Witness
Name:
Address:
Occupation:

ATH-#5468516-v7                                26

**THE ARRANGERS**

EXECUTED as a DEED  )
by  )
for and on behalf of  )
**CITIBANK, N.A., LONDON BRANCH**  )    ………………………..
as Arranger  )    Attorney-in-fact
in the presence of:  )

…………………………
Witness
Name:
Address:
Occupation:

EXECUTED as a DEED  )
by  *Angeliki Steudilias*  )
for and on behalf of  )
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**  )
as Arranger  )    Attorney-in-fact
in the presence of:  )

…………………………
Witness
Name:    **Christos Magklaras**
Address:    Norton Rose Fulbright Greece
Occupation:    Solicitor

**THE AGENT**

EXECUTED as a DEED  )
by  *Angeliki Steudilias*  )
for and on behalf of  )
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**  )
as Agent  )    Attorney-in-fact
in the presence of:  )

…………………………
Witness
Name:    **Christos Magklaras**
Address:    Norton Rose Fulbright Greece
Occupation:    Solicitor

**THE SECURITY AGENT**

**EXECUTED** as a **DEED**
by *Angeliki Skiandilias*
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Security Agent
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:      Christos Magklaras
Address:   Norton Rose Fulbright Greece
Occupation:      Solicitor

**THE ORIGINAL LENDERS**

**EXECUTED** as a **DEED**
by
for and on behalf of
**CITIBANK, N.A., LONDON BRANCH**
as Lender
in the presence of:

)
)
)
)
)
)

Attorney-in-fact

Witness
Name:
Address:
Occupation:

**EXECUTED** as a **DEED**
by *Angeliki Skiandilias*
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:      Christos Magklaras
Address:   Norton Rose Fulbright Greece
Occupation:      Solicitor

**THE SECURITY AGENT**

**EXECUTED as a DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Security Agent
in the presence of:

)
)
)
)
)
)

...........................
Attorney-in-fact

...........................
Witness
Name:
Address:
Occupation:

**THE ORIGINAL LENDERS**

**EXECUTED as a DEED**
by *Vassilis Maratlis*
for and on behalf of
**CITIBANK, N.A., LONDON BRANCH**
as Lender
in the presence of:

)
)
)
)
)

~~Attorney-in-fact~~ *Authorised Signatory*

*Brian Lambe*

Witness
Name: BRIAN LAMBE
Address: CITIGROUP CENTRE, LONDON  E14 5LB
Occupation: BANKER

**EXECUTED as a DEED**
by
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Lender
in the presence of:

)
)
)
)
)

...........................
Attorney-in-fact

...........................
Witness
Name:
Address:
Occupation:

**EXECUTED as a DEED**
by *Angeliki Skindilias*
for and on behalf of
**UNICREDIT BANK AG**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:     Christos Magklaras
Address:  Norton Rose Fulbright Greece
Occupation:     Solicitor

**EXECUTED as a DEED**
by *Angeliki Skindilias*
for and on behalf of
**BNP PARIBAS**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:     Christos Magklaras
Address:  Norton Rose Fulbright Greece
Occupation:     Solicitor

**EXECUTED as a DEED**
by *Angeliki Skindilias*
for and on behalf of
**NIBC BANK N.V.**
as Lender
in the presence of:

)
)
)
)
)

Attorney-in-fact

Witness
Name:     Christos Magklaras
Address:  Norton Rose Fulbright Greece
Occupation:     Solicitor

To:   Astipalea Special Maritime Enterprise
Kithnos Special Maritime Enterprise
Dilos II Special Maritime Enterprise
Paros Special Maritime Enterprise
Othoni Special Maritime Enterprise
Samothraki II Shipping Corporation
Shinoussa II Shipping Corporation
and
Eletson Gas LLC

c/o:   Eletson Corporation
118 Kolokotroni Street
GR 185-35 Piraeus
Greece

5 January 2017

Dear Sirs

**Loan Facilities of $254,179,500 dated 24 June 2014**

1     We refer to a facilities agreement dated 24 June 2014 (the **Facilities Agreement**) made between inter alios (i) Astipalea II Shipping Corporation, Kithnos II Shipping Corporation, Dilos II Shipping Corporation, Paros II Shipping Corporation, Othoni II Shipping Corporation, Samothraki II Shipping Corporation and Shinoussa II Shipping Corporation as borrowers (the **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinaviska Enskilda Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial institutions referred to in schedule 1 thereto as original lenders (together the **Lenders**) in relation to $254,179,500 term loan facilities, as amended by a supplemental letter dated 3 November 2014, a supplemental letter dated 12 November 2014 and a supplemental letter dated 19 June 2015 and as further amended and supplemented by a supplemental agreement dated 17 July 2015, a second supplemental agreement dated 14 January 2016 and a supplemental letter (the **Deferral Letter**) dated 29 September 2016 (together, the **Facilities Agreement**).

2     Words and expressions defined in the Facilities Agreement shall have the same meaning where used in this Letter.

3     The Obligors have communicated to the Lenders that Nantong Sinopacific Offshore & Engineering Co., Ltd (the **Chinese Builder**) is currently subject to insolvency proceedings in China (the **Insolvency Proceedings**). The Obligors have further communicated to the Lenders their intention not to file a claim against the Chinese Builder in the Insolvency Proceedings in relation to any claims any of them have against the Chinese Builder in connection with the Building Contract for Hull S1025.

4     Further, the Obligors have communicated to the Lenders that arbitration proceedings have commenced in London (together with any reference or appeal therefrom to a court, the **Arbitration Proceedings**) between the Chinese Builder and Sumec Marine Co. Ltd (jointly and severally the **Claimants**) and Shinoussa II Shipping Corporation (**Shinoussa**), as respondents, in connection with the termination of the Building Contract for Hull S1025 by Shinoussa.

5     The Obligors have requested that, pending and without prejudice to the Borrowers' prepayment obligations in connection with such Building Contract and the relevant Advances under the Deferral Letter, the Finance Parties consent to the proposed course of action of the Obligors in connection with the Insolvency Proceedings and the Arbitration Proceedings, namely that:

     (a)    the Obligors and the Finance Parties refrain from making any filings in the Insolvency Proceedings in relation to any claims that the Obligors and/or the Security Agent (for and

on behalf of the Finance Parties) as assignee of the Building Contract for Hull S1025 under the relevant Pre-Delivery Security Assignment, may have in relation to or as against the Chinese Builder; and

(b) the Obligors shall pursue the Arbitration Proceedings, and the Security Agent (for and on behalf of the Finance Parties) as assignee of the Building Contract for Hull S1025 (and any relevant Refund Guarantees) under the relevant Pre-Delivery Security Assignment, shall allow the Arbitration Proceedings to continue, in the manner recommended by Counsel, Mr Neil Hart, in his written advice dated 30 November 2016.

6    Following such communication and the request of the Obligors, the Agent (for and on behalf of the Finance Parties and having obtained the prior written consent of the Majority Lenders to this effect) hereby agrees that:

(a) for the time being and until further notice from the Agent (acting on the instructions of the Majority Lenders) to the contrary, the Obligors and the Finance Parties refrain from filing in the Insolvency Proceedings; and

(b) for the time being and until further notice from the Agent (acting on the instructions of the Majority Lenders) to the contrary, the Security Agent shall allow the Arbitration Proceedings to continue, in the manner recommended by Counsel, Mr Neil Hart, in his written advice dated 30 November 2016.

7    In consideration of the matters referred to in paragraph 6 (above), the Obligors jointly and severally undertake:

(a) to indemnify the Security Agent and the other Finance Parties against any and all costs and expenses (including legal costs and expenses incurred by the other Finance Parties, including reasonable fees and expenses of Norton Rose Fulbright and A M Ocean and other legal advisers of the other Finance Parties) and any and all other Losses joint or several that may be incurred by or asserted or awarded against any of them arising out of or in connection with the Arbitration Proceedings and/or the Insolvency Proceedings or otherwise the matters referred to or contemplated in this Letter;

(b) to keep the Agent fully and promptly informed, by the provision of documents and otherwise, of all material developments occurring in connection with the Insolvency Proceedings and the Arbitration Proceedings; and

(c) to take all necessary and reasonable steps to ensure that any payment from the Claimants pursuant to any award or determination or settlement of the Arbitration Proceedings and/or from any relevant Refund Guarantees is made directly to the Agent in discharge of the prepayment obligation set out in the Deferral Letter and otherwise for application in accordance with the provisions of clause 32.24 of the Facility Agreement.

8    Each of the Obligors hereby confirms for the benefit of the Finance Parties that its obligations under each Finance Document and any Security Interests contained therein are not affected by this Letter, or any other relevant documents or anything contained in them or in this Letter and shall, in accordance with its terms, remain in full force and effect.

9    The consent of the Agent and the other Finance Parties contained in this Letter shall not take effect unless and until the Borrowers and the Guarantor have executed this Letter, and have returned it to the Agent as so executed.

10   Failure by the Borrowers to comply with any of their other obligations under this Letter at the times and in the manner referred to in this Letter shall constitute an Event of Default.

11   We reserve any and all rights and remedies which we may have now or subsequently under or in relation to the Facilities Agreement, the Pre-Delivery Security Assignment in respect of Hull S1025 or the other Finance Documents, or at law and neither this letter nor anything else should be construed as a waiver of any such rights and remedies.

12      We take this opportunity to remind you of clause 40 (*Remedies and Waivers*) of the Facilities Agreement which provides that no failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any, other right or remedy. The rights and remedies provided in the Finance Documents are cumulative and not exclusive of any rights or remedies provided by law.

13      The rights reserved by us under this Letter are cumulative and not exclusive of any rights we may have under general law and may be waived only in writing and may be exercised as often as necessary.

14      Save as amended by this Letter, the provisions of the Facilities Agreement shall continue in full force and effect and the Facilities Agreement and this Letter shall be read and construed as one instrument.

15      This Letter is a Finance Document.

16      This Letter may be executed in any number of counterparts and by the different parties on separate counterparts, each of which when so executed and delivered shall be an original but all counterparts shall together constitute one and the same instrument.

17      This Letter and any non-contractual obligations connected with this Letter are governed by, and shall be interpreted in accordance with, English law.

Yours sincerely

**Penny Neville-Park**

Signed by:                                              Duncan Nash
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent and Security Agent
(for and on behalf of the other Finance Parties)

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facilities Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facilities Agreement or any other arrangements contained in this Letter.

**EXECUTED as a DEED**     )
by            )
for and on behalf of      )
**ASTIPALEA SPECIAL MARITIME ENTERPRISE** )
**KITHNOS SPECIAL MARITIME ENTERPRISE** )
**DILOS II SPECIAL MARITIME ENTERPRISE** )  Director / <u>Attorney-in-fact</u>
**PAROS SPECIAL MARITIME ENTERPRISE**  )
**OTHONI SPECIAL MARITIME ENTERPRISE** )  **E. S.Andreoulakis**
**SAMOTHRAKI II SHIPPING CORPORATION** )
**SHINOUSSA II SHIPPING CORPORATION** )
In the presence of:       )

EMMANOUIL S. ANDREOULAKIS
LAWYER
118, KOLOKOTRONI STREET
185 35 PIRAEUS - GREECE
TEL. 30210 4598325 - FAX: 30210 4598250
V.A.T. No. 050222446

Witness  **Thekla S. Matthew**
Name:
Address: 118, Kolokotroni Street, Piraeus, Greece
Occupation Legal Secretary

Dated: 5 January 2017

We, hereby acknowledge and agree to the above and confirm that the Finance Documents (as such term is defined in the Facilities Agreement, including the guarantee given by us under clause 7 of the Facilities Agreement) executed by us will remain valid and effective notwithstanding any amendments made to the Facilities Agreement any other arrangements contained in this Letter.

**EXECUTED as a DEED**    )
by          )
for and on behalf of    )
**ELETSON GAS LLC**     )
In the presence of:     )  Director / <u>Attorney-in-fact</u>

            **E. S.Andreoulakis**

EMMANOUIL S. ANDREOULAKIS
LAWYER
118, KOLOKOTRONI STREET
185 35 PIRAEUS - GREECE
TEL. 30210 4598325 - FAX: 30210 4598250
V.A.T. No. 050222446

Witness  **Thekla S. Matthew**
Name:
Address: 118, Kolokotroni Street, Piraeus, Greece
Occupation Legal Secretary

Dated: 5 January 2017

To:   Samothraki II Shipping Corporation
       Shinoussa II Shipping Corporation
       Astipalea Special Maritime Enterprise
       Othoni Special Maritime Enterprise
       Paros Special Maritime Enterprise
       Kithnos Special Maritime Enterprise
       and
       Dilos II Special Maritime Enterprise
       (as Borrowers)

       and

       Eletson Gas LLC
       (as Guarantor)

Dated: 20 September 2018

Dear Sirs,

**Facilities Agreement dated 24 June 2014 (as amended)**

1      Reference is made to the facilities agreement dated 24 June 2014, made between (1) Samothraki II Shipping Corporation, Shinoussa II Shipping Corporation, Astipalea Special Maritime Enterprise, Othoni Special Maritime Enterprise, Paros Special Maritime Enterprise, Kithnos Special Maritime Enterprise and Dilos II Special Maritime Enterprise as joint and several borrowers (together, the **Borrowers**), (2) Eletson Gas LLC as guarantor (the **Guarantor**), (3) Citibank, N.A., London Brach and Skandinaviska Enskilda Banken AB (publ) as arrangers, (4) Skandinaviska Enskilda Banken AB (publ) as agent (in such capacity, the **Agent**) and security agent (in such capacity, the **Security Agent**) and (5) the banks and financial institutions referred to therein as lenders (the **Lenders**), as amended and supplemented by a side letter dated 26 June 2014, a side letter dated 3 November 2014, a side letter dated 12 November 2014, a side letter dated 19 June 2015, a supplemental agreement dated 17 July 2015 and as further amended and supplemented by a second supplemental agreement dated 14 January 2016, a letter dated 29 September 2016, a deed of release and reassignment dated 13 November 2017, a standstill agreement dated 18 July 2018 and a third supplemental agreement (the **Third Supplemental Agreement**) dated 31 July 2018 (together, the **Facilities Agreement**), in relation to loan facilities of up to $254,179,500.

2      Words and expressions defined in the Facilities Agreement shall, unless the context otherwise requires or unless otherwise defined herein, have the same meanings when used in this Letter.

3      We advise you that the evidence referred to in paragraph 4 of Schedule 2 (*Documents and evidence required as conditions precedent*) to the Third Supplemental Agreement has not been provided by the Borrowers to the Agent. Therefore, this condition precedent remains outstanding. Nevertheless, the Agent (acting on the instructions of all the Lenders) agrees and notifies you that the Effective Date is 20 September 2018.

4      In consideration of the Lenders' agreement in paragraph 3 above, you hereby undertake that if certain facility agreement dated 17 October 2013 entered into between any Group Members and DVB Bank SE referred to in such paragraph 4 of Schedule 2 (*Documents and evidence required as conditions precedent*) of the Third Supplemental Agreement (the **DVB Facility Agreement**) is refinanced by DVB Bank SE or any other banks and/or financial institutions or is otherwise prepaid in full or in part, then the Borrowers shall immediately prepay to the Agent (for the account of the Lenders) an amount which is the higher of (a) the amount equal to the Deferred Amounts that remain outstanding at that time and (b) the amount by which the Financial Indebtedness of the Group has been actually reduced as a result of the said

refinancing or prepayment of the DVB Facility Agreement (and taking into account any moneys advanced as a result of any such refinancing).

5      If you fail to comply with the conditions set out in paragraph 4 above, any such failure shall be an Event of Default.

6      This Letter is supplemental to the Facilities Agreement.

7      This Letter constitutes a Finance Document.

8      Save as agreed in this Letter, the provisions of the Facilities Agreement shall continue in full force and effect and the Facilities Agreement and this Letter shall be read and construed as one instrument.

9      This Letter may be signed in a number of counterparts all of which taken together shall constitute one and the same Letter.

10     The provisions of clauses 37 (*Notices*) and 45 (*Enforcement*) of the Facilities Agreement shall be incorporated into this Letter as if set out in full herein and as if references to "this Agreement" were references to this Letter.

11     This Letter and any non-contractual obligations in connection with this Letter are governed by, and shall be construed in accordance with English law.

Yours faithfully,


…………………………………
Authorised Signatory
for and on behalf of
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent
(for and on behalf of the Lenders)

Date: 20 September 2018

We hereby acknowledge and agree to the foregoing and confirm and agree that our obligations under the Finance Documents (as such term is defined in the Facilities Agreement) to which we are a party remain valid and effective notwithstanding the arrangements contained above.


…………………………………
Attorney-in-fact
**EXECUTED** as a **DEED**
for and on behalf of
**SAMOTHRAKI II SHIPPING CORPORATION**
**SHINOUSSA II SHIPPING CORPORATION**
**ASTIPALEA SPECIAL MARITIME ENTERPRISE**
**OTHONI SPECIAL MARITIME ENTERPRISE**
**PAROS SPECIAL MARITIME ENTERPRISE**
**KITHNOS SPECIAL MARITIME ENTERPRISE**
**DILOS II SPECIAL MARITIME ENTERPRISE**
as Borrowers

Date: 20 September 2018

Witness
Name:
Address:
Occupation:




…………………………………
Attorney-in-fact
**EXECUTED** as a **DEED**
for and on behalf of
**ELETSON GAS LLC**
as Guarantor

Date: 20 September 2018

Witness
Name:
Address:
Occupation:




…………………………………
Attorney-in-fact
**EXECUTED** as a **DEED**
for and on behalf of
**EMC GAS CORPORATION**
as Commercial Manager

Date: 20 September 2018

Witness
Name:
Address:
Occupation:

……………………………………

Attorney-in-fact
**EXECUTED** as a **DEED**
for and on behalf of
**ELETSON CORPORATION**
as Technical Manager

Date: 20 September 2018

Witness
Name:
Address:
Occupation:

To:   Samothraki II Shipping Corporation
      Shinoussa II Shipping Corporation
      Astipalea Special Maritime Enterprise
      Othoni Special Maritime Enterprise
      Paros Special Maritime Enterprise
      Kithnos Special Maritime Enterprise
      and
      Dilos II Special Maritime Enterprise
      (as Borrowers)

      and

      Eletson Gas LLC
      (as Guarantor)

Dated: 5 October 2018

Dear Sirs,

**Facilities Agreement dated 24 June 2014 (as amended)**

1   Reference is made to the facilities agreement dated 24 June 2014, made between (1) Samothraki II Shipping Corporation, Shinoussa II Shipping Corporation, Astipalea Special Maritime Enterprise, Othoni Special Maritime Enterprise, Paros Special Maritime Enterprise, Kithnos Special Maritime Enterprise and Dilos II Special Maritime Enterprise as joint and several borrowers (together, the **Borrowers**), (2) Eletson Gas LLC as guarantor (the **Guarantor**), (3) Citibank, N.A., London Brach and Skandinaviska Enskilda Banken AB (publ) as arrangers, (4) Skandinaviska Enskilda Banken AB (publ) as agent (in such capacity, the **Agent**) and security agent (in such capacity, the **Security Agent**) and (5) the banks and financial institutions referred to therein as lenders (the **Lenders**), as amended and supplemented by a side letter dated 26 June 2014, a side letter dated 3 November 2014, a side letter dated 12 November 2014, a side letter dated 19 June 2015, a supplemental agreement dated 17 July 2015 and as further amended and supplemented by a second supplemental agreement dated 14 January 2016, a letter dated 29 September 2016, a deed of release and reassignment dated 13 November 2017, a standstill agreement dated 18 July 2018 and a third supplemental agreement (the **Third Supplemental Agreement**) dated 31 July 2018 (together, the **Facilities Agreement**), in relation to loan facilities of up to $254,179,500.

2   Words and expressions defined in the Facilities Agreement shall, unless the context otherwise requires or unless otherwise defined herein, have the same meanings when used in this Letter.

3   We advise you that the evidence referred to in paragraph 4 of Schedule 2 (*Documents and evidence required as conditions precedent*) to the Third Supplemental Agreement has not been provided by the Borrowers to the Agent. Therefore, this condition precedent remains outstanding. Nevertheless, the Agent (acting on the instructions of all the Lenders) agrees and notifies you that the Effective Date is 5 October 2018.

4   In consideration of the Lenders' agreement in paragraph 3 above, you hereby undertake that if a certain facility agreement dated 17 October 2013 entered into between any Group Members and DVB Bank SE referred to in such paragraph 4 of Schedule 2 (*Documents and evidence required as conditions precedent*) of the Third Supplemental Agreement (the **DVB Facility Agreement**) is refinanced by DVB Bank SE or any other banks and/or financial institutions or is otherwise prepaid in full or in part (other than as a result of a sale or a leaseback transaction in respect of a Ship), then the Borrowers shall immediately prepay to the Agent (for the account of the Lenders) an amount which is the higher of (a) the amount equal to the Deferred Amounts that remain outstanding at that time and (b) the amount contributed by Group Members to such

reduction of the Financial Indebtedness of the Group from their own liquidity (i.e. excluding any refinancing debt).

5    If you fail to comply with the conditions set out in paragraph 4 above, any such failure shall be an Event of Default.

6    This Letter is supplemental to the Facilities Agreement.

7    This Letter constitutes a Finance Document.

8    Save as agreed in this Letter, the provisions of the Facilities Agreement shall continue in full force and effect and the Facilities Agreement and this Letter shall be read and construed as one instrument.

9    This Letter may be signed in a number of counterparts all of which taken together shall constitute one and the same Letter.

10   The provisions of clauses 37 (*Notices*) and 45 (*Enforcement*) of the Facilities Agreement shall be incorporated into this Letter as if set out in full herein and as if references to "this Agreement" were references to this Letter.

11   This Letter and any non-contractual obligations in connection with this Letter are governed by, and shall be construed in accordance with English law.

Yours faithfully,

Authorised Signatory   attorney-in-fact
for and on behalf of   Angeliki Suindilias
**SKANDINAVISKA ENSKILDA BANKEN AB (publ)**
as Agent
(for and on behalf of the Lenders)

Date: 5 October 2018

We hereby acknowledge and agree to the foregoing and confirm and agree that our obligations under the Finance Documents (as such term is defined in the Facilities Agreement) to which we are a party remain valid and effective notwithstanding the arrangements contained above.

Laskarina I. Karastamati

Attorney-in-fact
**EXECUTED as a DEED**
for and on behalf of
**SAMOTHRAKI II SHIPPING CORPORATION**
**SHINOUSSA II SHIPPING CORPORATION**
**ASTIPALEA SPECIAL MARITIME ENTERPRISE**
**OTHONI SPECIAL MARITIME ENTERPRISE**
**PAROS SPECIAL MARITIME ENTERPRISE**
**KITHNOS SPECIAL MARITIME ENTERPRISE**
**DILOS II SPECIAL MARITIME ENTERPRISE**
as Borrowers

Date: 5 October 2018

Witness
Name:
Address:
Occupation:

VALENTINI TOPOUZELI
ATTORNEY - AT - LAW
118, KOLOKOTRONI STREET
PIRAEUS - GREECE
TEL. 30210 4598321 · FAX: 30210 4598250

Laskarina I. Karastamati

Attorney-in-fact
**EXECUTED as a DEED**
for and on behalf of
**ELETSON GAS LLC**
as Guarantor

Date: 5 October 2018

Witness
Name:
Address:
Occupation:

VALENTINI TOPOUZELI
ATTORNEY - AT - LAW
118, KOLOKOTRONI STREET
PIRAEUS - GREECE
TEL. 30210 4598321 · FAX: 30210 4598250

Laskarina I. Karastamati

Attorney-in-fact
**EXECUTED as a DEED**
for and on behalf of
**EMC GAS CORPORATION**
as Commercial Manager

Date: 5 October 2018

Witness
Name:
Address:
Occupation:

VALENTINI TOPOUZELI
ATTORNEY - AT - LAW
118, KOLOKOTRONI STREET
PIRAEUS - GREECE
TEL. 30210 4598321 · FAX: 30210 4598250

ATH-#5505770-v6                                3

Attorney-in-fact          Lastavina I. karavstawati
**EXECUTED as a DEED**
for and on behalf of
**ELETSON CORPORATION**
as Technical Manager

Date: 5 October 2018

Witness
Name:
Address:
Occupation:

VALENTINI TOPOUZELI
ATTORNEY - AT - LAW
11B, KOLOKOTRONI STREET
PIRAEUS - GREECE
TEL. 30210 4598321 · FAX: 30210 4590250



To:    Samothraki II Shipping Corporation
        Shinoussa II Shipping Corporation
        Astipalea Special Maritime Enterprise
        Othoni Special Maritime Enterprise
        Paros Special Maritime Enterprise
        Kithnos Special Maritime Enterprise
        Dilos II Special Maritime Enterprise
        (as joint and several Borrowers)

Cc:    Eletson Gas LLC
        (as Guarantor)

Cc:    Eletson Corporation
        and
        EMC Eletson Gas Corporation
        (as Managers)

Attention:  Mr. Vassilis E. Kertsikoff (CEO) and Mr. Peter Kanelos (CFO), Eletson Gas LLC

**WITHOUT PREJUDICE**

13 June 2019

Dear Sirs,

**US$254,179,500 Facilities Agreement dated 24 June 2014 as amended, supplemented and/or restated from time to time**

We refer to a facilities agreement dated 24 June 2014, made between (inter alios) (i) Samothraki II Shipping Corporation, Shinoussa II Shipping Corporation, Astipalea Special Maritime Enterprise, Othoni Special Maritime Enterprise, Paros Special Maritime Enterprise, Kithnos Special Maritime Enterprise and  Dilos II Special Maritime Enterprise as joint and several borrowers (together the **Borrowers**), (ii) Eletson Gas LLC as Guarantor (the **Guarantor**), (iii) Skandinavinska Enskilda Banken AB (publ) as agent (the **Agent**) and security agent and (iv) the banks and financial institutions referred to therein as lenders (together the **Lenders**) as amended and supplemented by a letter dated 26 June 2014, a letter dated 3 November 2014, a letter dated 12 November 2014, a letter dated 19 June 2015, a supplemental agreement dated 17 July 2015, a second supplemental agreement dated 14 January 2016, a letter dated 29 September 2016, a deed of release and reassignment dated 13 November 2017, a standstill agreement dated 18 July 2018 and a third supplemental agreement dated 31 July 2018 (together the **Facilities Agreement**), in relation to US$254,179,500 term loan facilities.

We write to you in our capacity as Agent, for and on behalf of the Lenders, ourselves and the other Finance Parties.

Terms defined in the Facilities Agreement shall have the same meaning in this letter unless the context otherwise requires. References in this letter to any clause are references to clauses in the Facilities Agreement, unless stated otherwise.

We refer to our letter to you dated 28 May 2019 (the **Syndicate Letter**) and your subsequent response sent by email dated  5 June 2019 (the **Company Response**).

In the Syndicate Letter the Lenders made clear that a number of urgent actions and measures were required to be taken by the Guarantor and its shareholders prior to any further discussion regarding the terms for which any potential concessions from the Lenders might be considered. The Lenders set

ATH-#5720824-v1                   1

out a number of such actions and measures in the Syndicate Letter  which, for ease of reference, are set out again in this letter. Namely, they include:

- given the dire cash position of the group, immediate and full drawdown by the Guarantor of the committed US$15,000,000 Blackstone backstop liquidity facility (the **BX Facility**). Once drawn, the BX Facility cannot be repaid prior to the Facility having been repaid in full;

- the release in full to the Guarantor by Tufton Oceanic of US$4,300,500 retained cash proceeds (the **Tufton Funds**) from the executed sale-lease-back transactions for vessels m.v. Anafi, m.v. Nisyros and m.v. Tilos;

- refinancing (or extension) by the Guarantor of the DVB Facility given its maturity (at terms acceptable to the Lenders);

- sale by the Guarantor of vessel m.v. Mathraki (the sale proceeds to be used for purposes acceptable to the Lenders); and

- provision by the Guarantor to the Lenders of reasonable cash flow forecasts proving and quantifying the necessity for further liquidity injections (after taking into account proceeds from the BX Facility, the release of the Tufton Funds and the sale of m.v. Mathraki); and

- the Guarantor continuing to service in full its scheduled debt service under the Facility in accordance with the Facilities Agreement.


Whilst the Lenders note the $3,000,000 cash infusion by Blackstone, they also note that in the Company Response the Guarantor and the Borrowers do not, at this point in time, satisfy a number of the above urgent measures and actions.

Namely, the BX Facility is not fully drawn, the Tufton Funds remain unavailable, the DVB Facility is not refinanced, the sale of m.v. Mathraki is not completed and, crucially, application of sale proceeds is not discussed at all.

Therefore, as already communicated in the Syndicate Letter,  the Lenders are unable to consider any of the requested concessions in the Company Response.

Further, the Lenders also wish to urgently understand the proposed manner of the $3,000,000 cash infusion by Blackstone (described in the Company Response as new "equity") and its consequences on the membership interests/shareholding arrangements and governance and control of the Guarantor.  Was this cash injection not part of the utilisation of the BX Facility?  In explaining the new arrangements, please do provide us urgently with copies of the applicable documentation for such equity, together with a copy of the BX Facility documentation which the Lenders have not received despite prior requests.

Also, despite prior requests, the Guarantor has not provided the Lenders with copies of all updates or addenda to the LLC agreement of the Guarantor (or a copy of the relevant contribution agreement), whilst it is understood from discussions with the Guarantor  that such updates/addenda have been entered into between the Initial Shareholders.  The Guarantor is requested to advise of any such updates  or addenda.  The Lenders continue to only have a copy of the restated LLC agreement dated 17 October 2013 and request again that such copies are delivered to them in line with the Facilities Agreement.

On behalf of the Lenders and pursuant to the provisions of the Facilities Agreement,  we hereby ask that you provide us immediately with a written report of the current employment arrangement of each of the Ships, including the charterer or other counterparty of the Owners (including their contact details) under such arrangement, charter rates and duration of such employment, and a copy of any charter commitment or other employment contract regarding each Ship (including without limitation any time, voyage or period charters).

The Lenders expect the terms of their Facilities Agreement to be complied with at all times. Therefore, any payment or other default under the Facility in the period during which the abovementioned measures and actions are to be implemented and/or during discussions with the Lenders, would certainly cause further escalation of matters and leave the Lenders with no choice but to consider all available remedies.  In that regard the Lenders remind you of the Events of Default previously notified to you and also of the current breach by the Guarantor of clause 21.18 of the Facilities Agreement. Contrary to such clause, the Guarantor does not maintain $8,415,888.63  in the Debt Service Reserve Account and the Lenders expect that this breach is remedied immediately.

We also take this opportunity of reminding you of the provisions of clause 40 (*Remedies and waivers*) of the Facilities Agreement.  These are to the effect that no failure or delay on behalf of any Finance Party to exercise any rights or remedies provided in clause 29.22 (*Acceleration*) or in any other provisions of the Facilities Agreement and the other Finance Documents shall operate as a waiver thereof nor shall any single or partial exercise of any such rights or remedies by the Finance Parties preclude any other or further exercise thereof or the exercise of any other right or remedy whatsoever.

The contents of this message are without prejudice to the contents of any reservation of rights letter previously sent by us to you, or to any of the rights of the Lenders under the Facilities Agreement, the Finance Documents, in law or otherwise, all of which such rights are fully reserved at all times.

Yours sincerely,

Duncan Nash

.......Penny Neville-Park
For and on behalf of
**SKANDINAVINSKA ENSKILDA BANKEN AB (publ)**
as Agent for and on behalf of the Finance Parties